# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| **M.G.U.** | **E.F.** | **A.P.F.** | § |
| 300 El Rancho Way | 8915 Montana Ave. | 27991 Buena Vista Blvd. | § |
| Dilley, TX 78017 | El Paso, TX 79925 | Los Fresnos, TX 78566 | § |
| | | | § |
| | | | § |
| *Plaintiffs*, | | | § |
| | | | § Civil Action No. |
| v. | | | § |
| | | | § 18-cv- _____ |
| | | | § |
| **Kirstjen Nielsen** | **Thomas Homan** | **Daniel A. Bible** | § |
| 245 Murray Ln. S.W. | 500 12th St. S.W. | 1777 N.E. Loop 410 Fl. 15 | § |
| Washington, D.C. 20528 | Washington, D.C. 20536 | San Antonio, TX 78217 | § |
| **Rodney S. Scott** | **Kevin K. McAleenan** | **Manuel Padilla, Jr.** | § |
| 2411 Boswell Rd. | 1300 Pennsylvania Ave. N.W. | 4400 S. Expy. 281 | § |
| Chula Vista, CA 91914 | Washington, D.C. 20229 | Edinburg, TX 78542 | § |
| **Scott Lloyd** | **Alex Azar** | **Robert L. Boatright** | § |
| 330 C St. S.W. | 200 Independence Ave. S.W. | 300 E. Madrid St. | § |
| Washington, D.C. 20201 | Washington, D.C. 20201 | Marfa, TX 79843 | § |
| **William Joyce** | | | § |
| 11541 Montana Ave. Ste E | | | § |
| El Paso, TX 79936 | | | § |
| | | | § |
| **U.S. Department of Homeland Security** | | | § |
| 245 Murray Ln. S.W. | | | § |
| Washington, D.C.  20528 | | | § |
| | | | § |
| **U.S Immigration and Customs Enforcement** | | | § |
| 500 12th St. S.W. | | | § |
| Washington, D.C. 20536 | | | § |
| | | | § |
| **U.S Customs and Border Protection** | | | § |
| 1300 Pennsylvania Ave. N.W. | | | § |
| Washington, D.C. 20229 | | | § |
| | | | § |
| **U.S. Department of Health & Human Services** | | | § |
| 200 Independence Ave. S.W. | | | § |
| Washington, D.C. 20201 | | | § |
| | | | § |
| **U.S. Office of Refugee Resettlement** | | | § |
| 330 C St. S.W. | | | § |
| Washington, D.C. 20201 | | | § |
| | | | § |
| *Defendants*. | | | § |

# COMPLAINT SEEKING PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

## INTRODUCTION

1.      This lawsuit challenges the federal government's recent decision to indefinitely separate immigrant parents from their young children.  The government's separation policy is designed, intended, and administered as a means of deterring all immigration, even legal immigration by those with a right to seek asylum.  This is punishment, it interferes with family integrity, and it interferes with access to courts, all of which our Constitution's Fifth Amendment does not allow. Families naturally experience forced separation as torture and they urge this Court to stop it.

## PARTIES

2.      Plaintiff M.G.U. is an individual who is a citizen of Guatemala and is presently detained by Defendants near Pearsall, Texas after Defendants forcibly separated her from her three biological children whose ages are 2, 6, and 13.

3.      Plaintiff E.F. is an individual who is a citizen of Guatemala and is presently detained by Defendants near El Paso, Texas after Defendants forcibly separated her from her 9-year-old biological son.

4.      Plaintiff A.P.F. is an individual who is a citizen of Honduras and is presently detained by Defendants near Los Fresnos, Texas after Defendants forcibly separated him from his 12-year-old biological daughter.

5.      Defendant U.S. Department of Homeland Security ("DHS") is a department of the executive branch of the U.S. government that is responsible for enforcing federal immigration laws, overseeing lawful immigration to the United States, and screening of asylum applicants.

6.      Defendant U.S. Immigration and Customs Enforcement ("ICE") is a component of DHS. ICE is the principal investigative arm of DHS and is charged with criminal and civil enforcement of federal immigration laws.  ICE's primary duties include the investigation of persons suspected

to have violated the immigration laws and the apprehension, detention, and removal of people who are not lawfully present in the United States.

7.      Defendant U.S. Customs and Border Protection ("CBP") is a component of DHS.  CBP is responsible for the initial processing and detention of people without lawful immigration status who CBP apprehends near the U.S. border.

8.      Defendant U.S. Department of Health and Human Services ("HHS") is a department of the executive branch of the U.S. government that is responsible for administering a broad range of programs addressing social needs, including care for all persons who meet the definition of "unaccompanied alien child" stated in 6 U.S.C. § 279(g)(2).

9.      Defendant Office of Refugee Resettlement (ORR) is a component of HHS.  ORR is responsible for care and placement of "unaccompanied" children under § 279(g)(2).

10.      Defendant Kirstjen Nielsen is sued in her official capacity as the Secretary of DHS.  In this capacity, she is charged with enforcing and administering the immigration laws, and directing all HHS component agencies, including DHS, ICE, and CBP.  She has ultimate authority over all policies, procedures, and practices relating to immigrant detention conducted by CBP and ICE.  She is responsible for ensuring that all detained individuals held in CBP and ICE custody are detained in accord with law.

11.      Defendant Thomas D. Homan is sued in his official capacity as the Acting Director of ICE.  In that capacity, he has authority over all ICE policies, procedures, and practices relating to ICE enforcement operations and detention facilities.  He is responsible for ensuring that all people held in ICE custody are detained in accord with law.

12.      Defendant Daniel A. Bible is sued in his official capacity as the Field Office Director of ICE, San Antonio, Texas.  In that capacity, he has direct responsibility for policies, procedures,

and practices relating to ICE enforcement operations and detention facilities in the Central South

Texas Area of Responsibility.  He is responsible for ensuring that all individuals held in ICE

custody in the Central South Texas Area of Responsibility are detained in accord with law.

13.     Defendant William Joyce is sued in his official capacity as the Acting Field Office

Director of ICE, El Paso, Texas.  In that capacity, he has direct responsibility for policies,

procedures, and practices relating to ICE enforcement operations and detention facilities in the

West Texas and New Mexico Areas of Responsibility.  He is responsible for ensuring that all

individuals held in ICE custody in the West Texas and New Mexico Areas of Responsibility are

detained in accord with law.

14.     Defendant Kevin K. McAleenan is sued in his official capacity as the Acting

Commissioner of CBP.  In that capacity, he has direct authority over all CBP policies,

procedures, and practices relating to CBP immigration enforcement operations and facilities.  He

is responsible for ensuring that the arrest and detention of all individuals by CBP is in accord

with law.

15.     Defendant Rodney S. Scott is sued in his official capacity as the Chief Patrol Agent for

the San Diego Sector of CBP.   In that capacity, he has direct responsibility for policies,

procedures, and practices relating to CBP enforcement operations and detention in the San

Diego, California Sector.

16.     Defendant Robert L. Boatright is sued in his official capacity as the Chief Patrol Agent

for the Big Bend Sector of CBP.  In that capacity, he has direct responsibility for policies,

procedures, and practices relating to CBP enforcement operations and detention in the Big Bend

Sector of Texas.

17.     Defendant Manuel Padilla, Jr. is sued in his official capacity as the Chief Patrol Agent for the Rio Grande Valley Sector of CBP.  In that capacity, he has direct responsibility for policies, procedures, and practices relating to CBP enforcement operations and detention in the Rio Grande Valley of Texas Sector.

18.     Defendant Alex Azar is sued in his official capacity as the Secretary of HHS.  In that capacity, he is charged with the care and custody of "unaccompanied" children, including their reunification with parents.  He has ultimate authority over all policies, procedures, and practices relating to the care and custody of "unaccompanied" children.  He is responsible for ensuring that the care and custody of all "unaccompanied" children in HHS custody is in accord with law.

19.     Defendant Scott Lloyd is sued in his official capacity as the Director of ORR.  In that capacity, he is charged with the care and custody of "unaccompanied" children, including their reunification with a legal parent or guardian.  He is responsible for ensuring that the care and custody of all "unaccompanied" children in ORR custody is in accord with law.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 (federal question) and 1346 (federal defendant).  This action arises under the U.S. Constitution.

21.     This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because the defendant federal agencies are headquartered in this District.

## INCORPORATED DOCUMENTS

23.     Attached to this Complaint are the following documents, which Plaintiffs incorporate pursuant to Rule 10(c):

    a.   DHS's 2013 policy on respecting parental rights is filed as ECF No. 1-1;

    b.   DHS's 2017 rescission of its policy respecting parental rights is filed as ECF No. 1-2;

    c.   The Attorney General's 2018 "Zero-Tolerance" directive is filed as ECF No. 1-3;

    d.   DHS's 2018 policy on separating children is filed as ECF No. 1-4;

    e.   DHS's 2018 notice to separated parents is filed as ECF No. 1-5;

    f.   The docket from one court for one day, showing standard brief sentences imposed, ending prosecutions within days after arrest, is filed as ECF No. 1-6; and

    g.   American Academy of Pediatrics Policy Statement on Detention of Immigrant Children is filed as ECF No. 1-7.

## STATEMENT OF FACTS

### A.    Forced Separation Harms Children and Parents

24.    Forced separation of parents from their children causes trauma to both.

25.    The trauma can be severe, and can endanger their physical and mental health.

26.    Each of these factors compounds the trauma of forced separation:

    a.   the duration of separation is indefinite, and unknown to parent or child;

    b.   the child is young;

    c.   parent and child are denied information about one another; and

    d.   parent or child have pre-existing trauma.

27.    The American Academy of Pediatrics (AAP) is an association of over 66,000 physicians who specialize in treating children and training others to do so.  AAP concludes that "Separation of a parent or primary caregiver from his or her children should never occur, unless there are

concerns for safety of the child at the hand of a parent."  American Academy of Pediatrics Policy

Statement, Detention of Immigrant Children at 7 (Mar. 13, 2017),

http://pediatrics.aappublications.org/content/139/5/e20170483 (visited June 18, 2018).

     **B.**     **Defendants Made a Policy Choice to Begin Separating Families in Late 2017**

28.     Defendants and their predecessor agencies have enforced immigration laws at U.S.

borders for almost a century.

29.     Defendants' history of immigration law enforcement has included periods when

Defendants apprehended large numbers of noncitizen parents who entered the United States

together with their minor noncitizen children.

30.     Until late 2017, Defendants' policy was to maintain immigrant families intact as they

enforced immigration laws.

31.     Until late 2017, Defendants committed that "ICE will maintain a comprehensive process

for identifying, placing, monitoring, accommodating, and removing alien parents or legal

guardians of minor children *while safeguarding their parental rights.*"  ICE defined "parental

rights" to mean "[t]he fundamental rights of parents to make decisions concerning the care,

custody, and control of their minor children without regard to the child's citizenship, as provided

for and limited by applicable law."

32.     On August 29, 2017, Defendants rescinded the language quoted in the previous

paragraph.

33.     Throughout 2017, Defendants' leaders and employees began publicly threatening to

begin a policy of separating immigrant families as a means of deterring immigration.  *See, e.g.*,

CNN Interview of DHS Secretary John Kelly at 00:55 to 01:05 (March 7, 2017),

https://www.cnn.com/2017/03/06/politics/john-kelly-separating-children-from-parents-immigration-border/index.html (visited June 18, 2018).

34.     Slowly in late 2017, and more rapidly as 2018 progressed, Defendants began to routinely separate immigrant parents from their children.  *See U.S. v. Dominguez-Portillo*, No. EP-17-MJ-4409, 2018 WL 315759 at \*1-8 (W.D. Tex. Jan. 5, 2018).

35.     On April 6, 2018, the U.S. Attorney General announced a "zero tolerance" policy for entering the United States in violation of 8 U.S.C. § 1325(a) and directed the U.S. Department of Justice to accept for prosecution all referrals of § 1325(a) complaints from ICE and CBP.

36.     Although entering the United States without inspection is a crime under 1325(a), courts describe it as "quite literally one of the least serious federal offenses."  *Dominguez-Portillo*, 2018 WL 315759 at \*8.  Congress defines a first violation of § 1325(a) as a "petty misdemeanor" punishable by up to six months' incarceration.  18 U.S.C. § 19.

37.     Judges almost never impose six months' incarceration for violation of § 1325(a).  Instead, in thousands of § 1325(a) prosecutions every year, the standard sentence for a person with no criminal or immigration history is "time served," meaning that the one-to-three days that a person awaits appearance in court after arrest is the only criminal sanction imposed.

38.     Judges alone decide § 1325(a) sentencing, not Defendants or the Attorney General.  18 U.S.C. § 3553(a)(1).  Judges consider need to care for children as part of sentencing.  *See U.S. v. King*, 201 F. Supp. 3d 167, 171 (D.D.C. 2016).

39.     Defendants and the Attorney General are well aware that almost all § 1325(a) prosecutions and sentencing will be concluded within days after arrest.

40.     Defendants cite the fact of a § 1325(a) prosecution as a pretext for separating parents from their children indefinitely.

41.     On June 15, 2018, Defendants published a policy stating:

     a.  all parents charged with violating § 1325(a) will be separated from their children at or near the time of arrest;

     b.  the separation will be indefinite;

     c.  the anguish that Defendants know that they cause by this separation will be addressed by providing mental health services to parents and children;

     d.  Defendants do not guarantee that parents will ever be reunited with their children;

     e.  if parents wish for further information about their children, they may call or email Defendants.

DHS Family Separation Policy (June 15, 2018), https://www.dhs.gov/news/2018/06/15/fact-sheet-zero-tolerance-immigration-prosecutions-families .

42.     Between November 2017 and June 2018, Defendants have separated roughly two thousand parents from their children without regard to parental fitness.

43.     Defendants' change in family separation practice has resulted from changed agency policy alone, and not from any change in any statute or codified regulation.

### C.     Defendants Forcibly Separated Plaintiffs From Their Children

44.     Defendants currently hold Plaintiffs and their children solely as civil immigration detainees, and not in association with any criminal charge or conviction.

### (i)     Plaintiff M.G.U.

45.     Defendants forcibly separated Plaintiff M.G.U. from G.V.G., her biological 2-year-old son, J.V.G., her biological 6-year-old son, and W.M.G., her biological 13-year-old son.

46.     M.G.U. does not currently have sufficient reliable information about where her sons are, how to contact them, or how they will be reunited.

47.     The separation and lack of information described in the preceding paragraphs cause M.G.U. and her sons continuous and severe emotional distress.

48.     M.G.U. and her sons are citizens of Guatemala.

49.     M.G.U. and her sons fled Guatemala after receiving threats of murder due to community organizing efforts undertaken by M.G.U.'s husband in Guatemala.

50.     In compliance with 8 U.S.C. § 1325, M.G.U., G.V.G., J.V.G., and W.M.G. crossed the U.S.-Mexico border together and presented themselves to Defendants' employees at the San Ysidro, California port of entry on May 4, 2018, and sought asylum under 8 U.S.C. § 1158 due to their fear of returning to Guatemala.

51.     Defendants' employees detained M.G.U., G.V.G., J.V.G., and W.M.G., and transferred them together from California to the South Texas Family Residential Center (STFRC) that Defendants operate near Dilley, Texas.

52.     On May 18, 2018, M.G.U., G.V.G., J.V.G., and W.M.G. were provided a "credible fear interview" at STFRC before an Asylum Officer as provided by 8 U.S.C. § 1158.

53.     Within two days after the credible fear interviews, M.G.U. was eating lunch at STFRC with her 2-year-old and her 6-year-old children.  Her 13-year-old ran into the lunchroom and exclaimed that officers had told him that the entire family was being released and needed to pack immediately.  After the family packed everything from their room at STFRC, they were escorted STFRC's intake area, where families are processed for release.

54.     An officer then informed M.G.U. that he had good news and bad news.  The good news: M.G.U. received a positive credible fear determination and her family would be released from STFRC.  The bad news: the family would not be leaving together, and instead were going to be separated.  The officer stated that Defendants intended to take the children and transport them to

New York while M.G.U. would be detained in Texas.  M.G.U., G.V.G., J.V.G., and W.M.G. all burst out in tears, with proverbial weeping and gnashing of teeth.

55.     M.G.U. eventually asked the officers how long the separation would last, and the officers responded that the separation would last at most a week.  The officers stated that a judge needed to talk to M.G.U.

56.     M.G.U.'s 13-year-old son held her 2-year-old in one arm and held the hand of her 6-year-old in the other as Defendants' employees and agents led them away from STFRC at about 2 p.m. on May 18, 2018.  This was the last time that MGU has seen any of her children.

57.     M.G.U.'s separation from her sons has already endured for almost a month, and M.G.U. has never been taken before any judge during this time.

58.     M.G.U. presently has no idea when or how she will be reunited with her children.

59.     Defendants have allowed M.G.U. to speak with her children by telephone once or twice per week.

60.     When M.G.U. speaks with her children, they express fear, distress, and no understanding of what the future holds.  M.G.U.'s 6-year-old is so overcome with grief that he can say little, and instead cries during his telephone calls with M.G.U.  M.G.U. has only heard the voice of her 2-year-old toddler once since being separated; she has only heard him cry.

61.     M.G.U. worries about her children constantly and is depressed due to her separation from them.

62.     M.G.U., G.V.G., J.V.G., and W.M.G. are all desperate to be reunited with one another.

        **(ii)     Plaintiff A.P.F.**

63.     Defendants forcibly separated Plaintiff A.P.F. from C.P.R., his 12-year-old biological daughter.

64.      A.P.F. does not currently have sufficient reliable information about where C.P.R. is, how to contact C.P.R., or how they will be reunited.

65.      The separation and lack of information described in the preceding paragraphs cause A.P.F. and C.P.R. continuous and severe emotional distress.

66.      A.P.F. and C.P.R. are citizens of Honduras.

67.      A.P.F. fled Honduras to the United States after A.P.F. was shot in the shoulder, producing scars that he still bears today.  After A.P.F. returned from the hospital to his home in Honduras, he received threats that he and his family would be killed.

68.      A.P.F. and C.P.R. crossed the U.S.-Mexico border together in Cameron County, Texas on June 4, 2018.  They were extremely tired and hungry from their journey.  They began walking alongside a road and soon encountered immigration officials.  A.P.F. approached the officials and asked for assistance for himself and his daughter in seeking asylum.

69.      Defendants' employees arrested A.P.F. and C.P.R. on the spot and drove them to a processing center in Brownsville, Texas.

70.      Within minutes after A.P.F. and C.P.R. entered the facility, Defendants' employees presented A.P.F. and C.P.R. with several documents and indicated on each document where they should sign, and both A.P.F. and C.P.R. signed the forms together.  At no time did anyone explain what the forms state.  A.P.F. still has no idea what the forms state.

71.      After A.P.F. and C.P.R. signed the forms, Defendants' employees physically separated A.P.F. from C.P.R. by leading C.P.R. out of the room where A.P.F. sat.  Defendants' employees did not explain what they were doing.  A.P.F. assumed that he would soon be reunited with C.P.R. and assumed that C.P.R. thought the same thing.

72.     Defendants' employees did not inform APF that he and his daughter would be indefinitely separated until A.P.F. was transferred to a different detention location near Brownsville, Texas later on the same day of arrest, June 4, 2018.  At that time, the only information provided to A.P.F. about C.P.R. was that they would be separated indefinitely.

73.     On June 5 or 6, 2018, A.P.F. pleaded guilty in federal court to violating 8 U.S.C. § 1325(a), and a judge sentenced A.P.F. to a term of detention equal to the time that A.P.F. had previously spent in federal custody known as "time served."

74.     A.P.F. is currently detained by Defendants' employees and agents near Los Fresnos, Texas.

75.     A.P.F. has expressed his fear of returning to Honduras to guards on several occasions and intends to pursue an application for asylum under 8 U.S.C. § 1158.

76.     A.P.F. has no information from Defendants or anyone else about C.P.R., her well-being, or her whereabouts.

77.     A.P.F. convulses and cries when he speaks of his daughter and the pain that they both endure from their separation.  He is unable to sleep for worry about his daughter.

                    **(iii)    Plaintiff E.F.**

78.     Defendants forcibly separated Plaintiff E.F. from B.Y.A.F., her 9-year-old biological son, and her only child.

79.     E.F. does not currently have sufficient reliable information about where B.Y.A.F. is, how to contact him, or how they will be reunited.

80.     The separation and lack of information described in the preceding paragraphs cause E.F. and B.Y.A.F.. continuous and severe emotional distress.

13

81.     E.F. and B.Y.A.F. are citizens of Guatemala.  They fled Guatemala after being threatened

with violence.  E.F. and B.Y.A.F. crossed the U.S.-Mexico border together near Presidio, Texas

on May 14, 2018.  The first and only action they took after crossing was to affirmatively search

for immigration officials at a nearby port of entry.  They found the officials quickly and asked

for protection.  The officials arrested and detained them together.

82.     On May 15, 2018, Defendants' employees forcibly separated E.F. from B.Y.A.F. amid

much crying and confusion and begging by E.F. and B.Y.A.F.

83.     After B.Y.A.F. was led away, Defendants provided E.F. no information about why they

were separated, how long it would last, how B.Y.A.F. would be cared for, or how they would be

reunited.

84.     On or about May 18, 2018, Defendants' employees transferred E.F. into the custody of

U.S. marshals at a federal courthouse where, minutes later, E.F. pleaded not guilty to violating §

1325(a) because she affirmatively sought inspection at the border and did not believe that she

evaded inspection.

85.     On June 6, 2018, a record trial was held where E.F. testified about her experience in

fleeing Guatemala and seeking protection in the United States, and in being forcibly separated

from her child.

86.     Upon hearing the evidence, the magistrate pronounced E.F. guilty of violating § 1325(a),

sentenced her to "time served," closed her criminal case, and returned her to Defendants'

custody.

87.     E.F. is presently held in immigration detention in Texas while she pursues her asylum

claim.

88.     Now, almost a month after criminal proceedings concluded against her, E.F. is still unsure where her son is, although she believes that he is in New York.  She has been allowed to speak with him one time since their forced separation.

89.     E.F. has trouble eating and sleeping, and she wakes up crying, for worry about her son.

### D.     Defendants Inflicted Separation as Punishment

90.     The following facts show that Defendants separated Plaintiffs from their children to punish Plaintiffs.

91.     Defendants had no legitimate reason for forcibly separating Plaintiffs from their children, for maintaining the separation indefinitely, or for maintaining the separation without providing sufficient information or contact.

92.     Defendants implemented a practice of not merely separating parents from their children, but doing so indefinitely and without providing information to family members about one another, to demonstrate to the world what agony parents should expect if they attempt to enter the United States with their children.

93.     Defendants expect reports of the agony endured by Plaintiffs and people like Plaintiffs to deter not only illegal immigration, but also legal immigration from people who have a right to seek asylum pursuant to 8 U.S.C. § 1158.

94.     The employees and agents who Defendants deploy to interact with parents and children in immigration detention facilities sadistically tease and taunt parents and children with the prospect of separation, and do so using words and tones indicating that Defendants' employees and agents enjoy the pain and suffering that the very idea of separation causes to parents and children.

## CAUSES OF ACTION:

95.     All of the foregoing allegations of fact are incorporated as if repeated to support each of the following two causes of action.

96.     All persons on U.S. soil, including all Plaintiffs and their children, are protected by Due Process under the U.S. Constitution's Fifth Amendment.

### COUNT I: Punishment of Civil Detainees in Violation of Due Process

97.     The Constitution's Fifth Amendment prohibits punishment of immigrants held in civil detention. *Bell v. Wolfish*, 441 U.S. 520, 538-39 & n.20 (1979).

98.     At all times after Defendants arrested Plaintiffs and their children, Defendants and their agents and employees have continuously detained Plaintiffs and their children pursuant to civil immigration detention statutes or as persons charged with crime awaiting trial.  Defendants' have never detained Plaintiffs as convicted criminals.

99.     Defendants intend to punish Plaintiffs and their children by taking the following actions:

    a.   forcibly separating them;

    b.   maintaining separation indefinitely;

    c.   failing to provide meaningful information to parents or children about one another's whereabouts and well-being, and anticipated reunification; and

    d.   preventing them from reliable and ready access to means of communicating with one another.

100.    The following actions taken by Defendants punish Plaintiffs and their children regardless of any intent by any Defendant because they are patently excessive in relation to any legitimate objective:

    a.   forcibly separating Plaintiffs from their children;

    b.  maintaining separation indefinitely;

    c.  failing to provide meaningful information to parents or children about one

       another's whereabouts and well-being, and anticipated reunification; and

    d.  preventing them from reliable and ready access to means of communicating with

       one another.

### COUNT II: Family Separation in Violation of Due Process

101.    The Constitution's Fifth Amendment protects the relationship of parent and child.

*Quilloin v. Walcott*, 434 U.S. 246, 255 (1978).

102.    Plaintiffs and their children have a liberty interest in remaining together as a family,

which is protected by Due Process.

103.    Defendants' initial separation of Plaintiffs from their children violates substantive Due

Process because it furthers no legitimate purpose, and serves no compelling government interest.

104.    Defendants' continued separation of Plaintiffs from their children after conclusion of all

criminal proceedings violates substantive Due Process because it furthers no legitimate purpose,

and serves no compelling government interest.

### PRAYER

105.    WHEREFORE, Plaintiffs pray that the Court grant them the following relief:

    (a)  issue preliminary and permanent injunctions directing Defendants to immediately

       reunite Plaintiffs with their children, and to refrain from taking any action to separate

       them absent emergency or further order of this Court;

    (b)  order Defendants to produce the complete administrative record in the time specified

       by D.D.C. Loc. R. 7(n)(1);

    (c)  enter declaratory judgment that:

(1) Defendants' forced separation of immigrant detainees from their children is
punishment that is proscribed by the Fifth Amendment;

(2) Defendants' forced separation of immigrant detainees from their children
interferes with family integrity in violation of the Fifth Amendment;

(3) Defendants violated Plaintiffs' Fifth Amendment rights when they separated
them from their children; and

(4) Defendants violated Plaintiffs' Fifth Amendment rights when Defendants
maintained separation of Plaintiffs from their children after the conclusion of
criminal proceedings against them;

(d) order Defendants to pay Plaintiffs' litigation costs and reasonable attorney fees; and

(e) all other relief that the Court deems just and proper to ensure that Defendants act
according to law.

June 20, 2018

Respectfully submitted,
TEXAS RIOGRANDE LEGAL AID, INC.


Jerome Wesevich
    D.D.C. Attorney No. TX0125
Amanda Chisholm
    Texas Bar No. 24040684
Peter McGraw
    Texas Bar No. 24081036
1331 Texas Avenue
El Paso, Texas 79901
(915) 585-5120
jwesevich@trla.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF INDIGENT REPRESENTATION

In accord with D.D.C. Local Rule 83.2(g), all attorneys signing this pleading certify that they are members in good standing of the bar of the Texas Supreme Court, and that they are employed by Texas RioGrande Legal Aid, Inc. to represent indigent clients at no cost to the clients, including all Plaintiffs named in the above lawsuit.

/s/

_____

Jerome Wesevich
Amanda Chisholm
Peter McGraw