# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

M.G.U., *et al.*,                          §
                                           §
          Plaintiffs,                      §
                                           §          No. 18-cv-1458
v.                                         §
                                           §          Civil Action
Kirstjen Nielsen, *et al.*,                §
                                           §
          Defendants.                      §

## APPLICATION FOR A TEMPORARY RESTRAINING ORDER

Plaintiffs are M.G.U., E.F., and A.P.F., three parents who entered the United States with their children aged 2, 6, 9, 12, and 13.

Defendants are the federal agencies and officials who forcibly separated Plaintiffs from their children, are maintaining this separation indefinitely, and are maintaining separation almost incommunicado.  Defendants include the following agencies and their responsible officials: U.S. Department of Homeland Security (DHS); U.S. Immigration and Customs Enforcement (ICE); U.S. Customs and Border Protection (CBP); U.S. Department of Health and Human Services (HHS); and U.S. Office of Refugee Resettlement (ORR).

By this Rule 65(b) application for temporary restraining order, Plaintiffs seek immediate access to basic information about their children's whereabouts and well-being, and frequent, meaningful opportunity to see and hear their children.  By application for preliminary injunction to be filed separately in this cause, Plaintiffs will seek prompt reunification with their children.

In compliance with Rule 65(b) and Local Civil Rule 65.1(a), undersigned counsel notified defense counsel of this application and furnished to defense counsel all documents filed in this cause, as described on the last page of this document.

**RELIEF REQUESTED**

Plaintiffs seek a temporary restraining order requiring Defendants to immediately provide reliable, daily information to each Plaintiff concerning the well-being of each of Plaintiff's children, either orally or in writing with reasonable specificity, as follows:

    a.  the complete address where each child is currently located;

    b.  the government's most accurate estimate of the date that it anticipates reuniting each parent with each child;

    c.  a description of the setting where each child resides, whether home or institutional;

    d.  the name, age, and gender of each person primarily responsible for each child's care;

    e.  whether the child has suffered any accident or illness;

    f.  a description of each child's activities during that day; and

Plaintiffs also seek frequent and meaningful access to or communication with each child via telephone or video link.  Plaintiffs have attached a proposed order that conforms to Rule 65(b).

**FACTS**

As shown by his succinct handwritten declaration, Plaintiff A.P.F. last saw his 12-year-old daughter on June 5, 2018 and he knows almost nothing about what has happened to her.  He describes his indefinite and essentially incommunicado separation from her as "torture." Declaration of A.P.F. at 1, attached.

As shown by her attached declaration, Plaintiff E.F. entered the United States near Presidio, Texas on May 14, 2018 together with her 9-year-old son B.Y.A.F.  Declaration of E.F. at 1-5 (May 21, 2018), attached.  Defendants arrested E.F. and forcibly separated her son from her the next day.  She has not seen him since.  She does not know where he is, except she believes that he is in New York while she is detained in El Paso, Texas.  She does not know

when or how she will ever be able to see him again.  Since the separation, Defendants have allowed E.F. to speak with her son but three times for approximately five minutes each time.  *Id.* ¶ 9 ("He only asks when we will see each other again and begs to be with me.  He is scared and lonely and desperate to be with me.  I try to tell him everything will be ok and that I'll see him soon but, the truth is, I don't know what will happen with us.").   E.F. endures constant anguish for lack of information about her son's well-being.  *Id.* at ¶ 18 ("I wake up from my sleep crying because I remember that he was taken from me.  I feel so upset and sad when I remember how he was taken from me.  I don't understand how someone could take their child away from their mother.  I think, 'Don't they have children too?  Don't they know the pain I'm feeling?'  Then I say to myself that God has a plan but I still don't understand why my son was taken.").

As shown by her handwritten declaration, Plaintiff M.G.U. has only been able to speak with her three children for 10 minutes two times each week.  These communications are costly and unreliable.  Of course her two-year-old is unable to provide reliable information about his circumstances, and staff provide only general information to M.G.U., nothing specific about her children's well-being, which causes her anguish.

The attached declarations of medical professionals confirm what is apparent from Plaintiffs' common experience: forced separation traumatizes parents and children, and this trauma is compounded when parents and children are denied basic information about each other's well being and reunification prospects.  *See* Declaration of Dr. Aurelie Athan at ¶¶ 5-6 ("When reunification is ambiguous, learned helplessness and hopelessness set in which are precursors to depression along with the already often established anxiety and social distrust . . . . The above separation reactions, both short and long-term, are especially exacerbated when there is a) uncertainty as to when and if reunification is possible, b) access to and communication with

the child is not possible, [and] c) objects belonging to the child have been removed and taken away."); Declaration of Dr. Lisa Fortuna at ¶ 12 ("If individual families are detained separately, a lack of information regarding each other's well-being or status has a negative effect on both children and parents.  In addition to the trauma of separation, being detained without information can induce profound hopelessness, despair, depression and even suicidal urges….").

Defendants recognize their responsibility to facilitate communication between separated parents and their children, albeit in vague terms.  *See* ECF No. 1-4 ("HHS and DHS work to facilitate communication between detained parents and their children in HHS care.").  Defendants' efforts to do so are incomplete, for they do not commit to informing parents of the current location of each child, or the date of anticipated reunification. *See* ECF No. 1-4 at 3 ("HHS and ICE can take steps to facilitate family reunification . . . . "); *id.* at 5 ("Where are children going?  Alien children who are separated from their parents or legal guardians will be transferred to ... ORR.").  Defendants' efforts have also proved ineffective to supply basic information to Plaintiffs, as described in Plaintiffs' attached declarations.

## JURISDICTION

The Court has jurisdiction to enjoin unconstitutional action by the Defendant federal agencies.  *Trudeau v. Fed. Trade Commn.*, 456 F.3d 178, 190 (D.C. Cir. 2006).  The government has waived sovereign immunity from suits directly under the Constitution that seek equitable relief.  *Id.* at 186 (citing 5 U.S.C. § 702).  Plaintiffs invoke this jurisdiction to redress Defendants' Fifth Amendment violations.  ECF No. 1 at ¶¶ 95-104.

## STANDARD OF REVIEW

 "The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for preliminary injunction."  *Baker DC v. Nat'l Labor Relations Bd.*, 102 F.

Supp. 3d 194, 198 (D.D.C. 2015).   Courts "consider four factors when deciding whether to grant a preliminary injunction: whether the plaintiff will be irreparably harmed if the injunction does not issue; whether the defendant will be harmed if the injunction does issue; whether the public interest will be served by the injunction; and whether the plaintiff is likely to prevail on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 392 (1981).   These factors "interrelate on a sliding scale and must be balanced against each other." *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999).   "A district court must balance the strengths of the requesting party's arguments in each of the four required areas." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

The court may include mandatory relief regarding immigration detention in a temporary restraining order.   *See, e.g., Mahmood v. Nielsen*, 17-cv-8233, 2018 WL 2148439 at *2 (S.D.N.Y. May 9, 2018).

## ARGUMENT

Plaintiffs seek immediate access to the basic information that any separated parent would be desperate to learn about his or her children.   Defendants can state no legitimate reason for withholding this information.   All four factors strongly favor granting immediate relief.

## I.   Lack of Basic Information about Children Causes Plaintiffs Immediate, Ongoing, Irreparable Harm

Defendants have not only forcibly separated Plaintiffs from their minor children, Defendants separated Plaintiffs from their children:

(a)  indefinitely;

(b)  without any statement of what events will produce reunification;

(c)  without informing parents exactly where their children are and who is caring for them;

(d) without information about each other's well-being; and

(e) without reliable and sufficient means of communicating with one another by video or telephone.

*See* Attached Declarations of Plaintiffs.  Plaintiffs naturally seek additional information about reunification and their children's -well being, whereabouts, and care.  They also seek frequent and meaningful communication to reduce the anguish that they endure every minute they remain separated from their children, and that they are sure their children are also experiencing.

Lack of information about family members itself causes trauma to children and parents alike, particularly when children and parents have been forcibly separated.  *See* Attached Declarations of Medical Professionals.  ICE so acknowledges when it states that "ICE is augmenting mental health care staffing, to include trained clinical staff, to provide mental health services to detained parents who have been separated from their children."  ECF No. 1-4 at 3.

Courts uniformly recognize that separation causes trauma, as does uncertainty about family members.  *See also Stanley v. Illinois*, 405 U.S. 645, 647 (1972) ("[P]etitioner suffers from the deprivation of h[er] child[], and the child[] suffer[s] from uncertainty and dislocation."); *J.B. v. Washington County*, 127 F.3d 919, 925 (10th Cir.1997) ("[F]orced separation of parent from child, even for a short time, represents a serious infringement upon both the parents' and child's rights."); *Nicolson v. Pappalardo*, 685 F. Supp. 2d 142, 145-46 (D. Me. 2010) ("[e]very additional day" of separation causes further harm).

"[L]oss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (citations omitted).  As a result, "[w]hen an alleged deprivation of a constitutional right is

involved, most courts hold that no further showing of irreparable injury is necessary." 11A
WRIGHT & MILLER, FED. PRAC. & PROC. § 2948.1 (2d ed. 2004).

## II.    Plaintiffs Are Likely to Succeed on the Merits of their Fifth Amendment Claims

The Fifth Amendment's Due Process guarantee protects noncitizens who are present on
U.S. soil. *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("there are literally millions of aliens within
the jurisdiction of the United States" and "the Fifth Amendment . . . protects every one of these
persons") (internal references omitted). Plaintiffs seek this Court's protection of two of their due
process rights: the right to family integrity and the right to be free of punishment.

### A.    Defendants' Withholding of Information from Parents is Not Narrowly
Tailored to Serve a Compelling Government Interest

The parent-child relationship is a "basic civil right[] of man" and "far more precious . . .
than property rights." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). "[T]he relationship between
parent and child is constitutionally protected" by the Fifth Amendment. *Quilloin v. Walcott*, 434
U.S. 246, 255 (1978). Indeed, "[t]he liberty interest at issue in this case—the interest of parents
in the care, custody, and control of their children— is perhaps the oldest of the fundamental
liberty interests recognized by" the Court. *Troxel v. Granville,* 530 U.S. 57, 65 (2000).

Government may only interfere with family integrity in ways that are narrowly tailored to
serve a compelling government interest. *Pittman v. Cuyahoga County Dept. of Children and
Fam. Services*, 640 F.3d 716, 728 & n.6 (6th Cir. 2011); *U.S. v. Breeden*, No. 16-cr-0008, 2016
WL 8943168 at *2 (D.D.C. June 3, 2016); *U.S. v. Godoy*, No. 10-cr-16, 2014 WL 12618708 at
*5 (D.D.C. June 13, 2014); *O'Donnell v. Brown*, 335 F. Supp. 2d 787, 821 & n.16 (W.D. Mich.
2004).

Two compelling state interests in interfering with family integrity are widely recognized:
the state's legitimate interest in protecting children from dangerous parents, and the state's

interest in administering criminal justice to parents.  Neither rationale explains Defendants'
continued interference with any Plaintiff's parental rights.

Defendants' own previous policy indicates that they have no compelling state interest in
withholding information about children from parents, and preventing them from readily
communicating with one another.  In 2013, Defendant ICE committed to "ensure that the
agency's immigration enforcement activities do not unnecessarily disrupt the parental right of
both alien parents or legal guardians of minor children."  ECF No. 1-1 at 1 ¶ 2.  ICE defined
"parental rights" as "[t]he fundamental rights of parents to make decisions concerning the care,
custody, and control of their minor children without regard to the child's citizenship, as provided
for and limited by applicable law."  *Id.* at 2 ¶ 3.3.  ICE policy was that "ICE will maintain a
comprehensive process for identifying, placing, monitoring, accommodating, and removing alien
parents . . . while safeguarding their parental rights."  *Id.* at 1 ¶ 2.  ICE operated under this policy
until 2017.  On August 29, 2017, ICE retracted all of the language quoted in the previous
paragraph without explanation.  ECF No. 1-2 at 1.  This suggests that ICE is no longer
committed to "ensure that the agency's immigration enforcement activities do not unnecessarily
disrupt" parental rights, and that it is no longer committed to maintaining "a comprehensive
process for identifying, placing, monitoring, accommodating, and removing alien parents . . .
while safeguarding their parental rights."

Nor is Defendants' failure to provide information to Plaintiffs about their children or
provide for frequent and meaningful communication narrowly tailored to serve any legitimate
interest, even if Defendants were able to articulate any conceivable legitimate interest in
maintaining indefinite separation of parents from their young children.

### B.   Defendants Punish Parents by Withholding Information About Their Children

Defendants are detaining Plaintiffs and their children civilly, not under any criminal process.  The Fifth Amendment prohibits the government from inflicting punishment on detainees who are not serving sentences for crime.  *Bell v. Wolfish*, 441 U.S 520, 536 (1979) (detention conditions cannot "amount to punishment").  Detention conditions amount to punishment if either: (1) the government expresses an intent to punish; or (2) the conditions are excessive in relation to a legitimate non-punitive purpose.  *Schall v. Martin*, 467 U.S. 253, 269 (1984); *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004).  Both tests show that the indefinite, virtually incommunicado, family separation that Defendants are inflicting on Plaintiffs amounts to unconstitutional punishment.

Defendants have repeatedly stated that they decided to inflict separation on families as a means of deterring immigration to the United States.  Transcript: White House Chief of Staff John Kelly's Interview with NPR, National Public Radio (May 11, 2018), https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr; *see also* Daniella Diaz, *Kelly: DHS Is Considering Separating Undocumented Children from Their Parents at the Border*, CNN (Mar. 7, 2017), video clip at 00:55 to 01:05, https://www.cnn.com/2017/03/06/politics/john-kelly-separating-children-from-parents-immigration-border/index.html.  Indeed, no other rationale can explain the costly and embarrassing spectacle that Defendants' separation policy has produced.  Harmful actions taken for purposes of deterrence are punishment that is proscribed by the Fifth Amendment.  *See Kansas v. Crane*, 534 U.S. 407, 412 (2002) (civil detention may not "become a 'mechanism for retribution or general deterrence'—functions properly those of criminal law, not civil commitment") (citations omitted); *Bell*, 441 U.S. at 570 & n.20 (deterrence is "not [a] legitimate

nonpunitive governmental objective"); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 188-89 (D.D.C.

2015) (The government "maintains that one particular individual may be civilly detained for the

sake of sending a message of deterrence to other Central American individuals who may be

considering immigration.  This appears out of line with analogous Supreme Court decisions.").

And independent of punitive intent, the extreme nature of Defendants' separation policy

on its face— which does not even permit parents to have reliable information about where their

children are or when they will ever see them again—is patently excessive in relation to any

conceivable legitimate objective.  *See, e.g., Valentine v. Englehardt*, 474 F. Supp. 294, 301-02

(D.N.J. 1979) ("The rule forbidding incarcerated parents from seeing their children is not only

arbitrary, it is an exaggerated response to a concern which does not properly rest with the jail

authorities.").  Plaintiffs naturally experience their indefinite, incommunicado separation from

their children as torture.

Defendants have deprived Plaintiffs of their right to family integrity as a means of

inflicting punishment on innocent children and their parents, simultaneously violating two

constitutional rights at once.

**III.    The Balance of Harms and Public Interest Favor Informing Parents of Basic
         Information About Their Children**

The government itself, of which Defendants are a part, has an important interest in

promoting family integrity:

> the state also shares the interest of the parent and child in their family's integrity, *see
> Santosky [v. Kramer*, 455 U.S. 745, 766-67 (1982)] ("the *parens patriae* interest favors
> preservation, not severance of natural familial bonds"), because the welfare of the state
> depends in large part on the strength of the family.

*Jordan by Jordan v. Jackson*, 15 F.3d 333, 346 (4th Cir. 1994); *see also id*. ("The forced

separation of parent from child, even for a short time, represents a serious impairment on

[parental] rights.").  This basic commitment to family values, enshrined in our Constitution, expresses the public interest in this case.  *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'") (citation omitted).

Defendants cannot name any harm that they could face by an injunction requiring them to provide parents with daily basic information about how and where, and how long, the government intends to detain their young children, nor can Defendants suffer any harm from allowing Plaintiffs reliable, consistent communication with their children.

### CONCLUSION

Plaintiffs urge the Court to enter immediate relief and permit them basic information about their children.

June 22, 2018

Respectfully submitted,
TEXAS RIOGRANDE LEGAL AID, INC.

Jerome Wesevich
   D.D.C. Attorney No. TX0125
Amanda Chisholm
   Texas Bar No. 24040684
Peter McGraw
   Texas Bar No. 24081036
1331 Texas Avenue
El Paso, Texas 79901
(915) 241-0534
jwesevich@trla.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| M.G.U., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | No. 18-cv-1458 |
| v. | § | |
| | § | Civil Action |
| U.S. DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**CERTIFICATE OF NOTICE TO DEFENDANTS**

I, Jerome Wesevich, counsel for Plaintiffs, certify that I took the following actions to furnish the information and documents to the adverse parties as required by Local Civil Rule 65.1(a):

On June 21, 2018 at 3:15 p.m. EST I made telephone contact with Sarah B. Fabian, Senior Litigation Counsel in the U.S. Department of Justice's Office of Immigration Litigation by dialing (202) 532-4824.  I informed Ms. Fabian that I represent M.G.U. in a case filed in the U.S. District Court and she stated that she is aware of the existence of this litigation.  I notified her that our clients intend to seek a temporary restraining order and offered to email her all filings to date, or to communicate this information to any other appropriate counsel at DOJ.  Ms. Fabien recommended that I contact Daniel van Horn at (202) 252-2506 and I immediately reached him using this number.  I provided the same information to Mr. van Horn that I provided to Ms. Fabian regarding Plaintiffs' anticipated application for a Temporary Restraining Order.  Mr. van Horn stated that his email address as daniel.vanhorn@usdoj.gov and warned me that emailing documents to him does not constitute service.

On June 22, 2018 at about noon EST, I emailed all documents that have been filed in this litigation to Ms. Fabian using sarah.b.fabian@usdoj.gov  and to Mr. van Horn using daniel.vanhorn@usdoj.gov.  If the Court sets this application for hearing, undersigned counsel will immediately notify Ms. Fabian and Mr. van Horn by telephone.

I also certify that I will serve Defendants with all documents as required by the Federal Rules of Civil Procedure.

/s/ Jerome Wesevich
Counsel for Plaintiffs

**DECLARATION OF A.P.F.**

I, A.P.F., make the following declaration based on my personal knowledge and declare under oath pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I am the father of C.P.R. My daughter is twelve (12) years old.

2. I was separated from my daughter very late on June 4th or in the early morning hours of June 5th.

3. First the officials told me that my daughter was going to place called Casa Hogar, but they did not tell me where Casa Hogar was located or how long she would be there.

4. I have asked other immigration officials where my daughter is, but none of them are able to tell me where she is.

5. I called Jose Angel Rodriguez, the grandfather of C.P.R., and he told me that C.P.R. has called him two (2) times. Jose Angel Rodriguez told me that C.P.R. was very worried and was desperate to be with me. C.P.R. does not know where she is.

6. I worry about my daughter constantly. I am not able to speak with her directly. I do not know if she is well cared for. I do not know if she has been sick. I do not know if she has been sleeping well or eating well. Not knowing anything about my daughter is torture. I am not able to sleep. I desperately want to be with her.

I, ___████████ █████████___, under pains and penalties of perjury state and declare that the foregoing is true and correct based on my personal knowledge. Executed in Port Isabel, Texas on June __21__, 2018.



A███ P██ F███████

## CERTIFICATE OF TRANSLATION

I, ___Jonecia Martinez___, certify that the above is an accurate translation of A███████ P███ - F███████'s declaration from Spanish to English and that I am competent in both Spanish and English to render such translation.

_____    ___6/21/2018___
                              Date

Declaración de A██████████
P█████ F██

Yo, A██████████ P████ F███,
hago la siguiente declaración basado en mi
conocimiento personal y declaro bajo penal
de perjurio bajo la ley 28 U.SC. §1746 que
lo siguiente es verdadero y correcto:

1. Yo soy el Padre de C████████ P███
R███████. Mi hija tiene doce (12)
años.

2. Yo fui separada de mi hija en la
noche muy tarde el 4 de Junio o en
la madrugada el 5 de Junio.

3. Primero los oficiales de inmigración me
dijieron que mi hija iba a un lugar
llamado "casa hogar", pero no me dijieron
en donde se localiza casa hogar y cuanto
tiempo ella estuviera ahi.

4. Le he preguntado a otros oficiales de
inmigracion en donde esta mi hija y ninguno
de ellos me ha podido decir en donde esta.

5. Yo llame a Jose Angel Rodriguez, el abuelo de C▮▮▮, y el me dijo que Cheyli lo llamo dos (2) veses a el. Jose Angel Rodriguez me dijo que C▮▮▮ se eschucha muy preocupada y estaba muy desesperada por quiere estar conmigo. C▮▮▮ no sabe en donde se encuentra.

6. Yo constantamente estoy preocupado por ella. Yo no he podido hablar con ella directamente. Yo no se si la estan cuidando bien. Yo no se si ella se ha enfermado. Yo no se si ella esta durmiendo bien o comiendo bien. No poder saber nada sobre mi hija es una tortura. ~~▮▮▮▮~~ Yo no puedo dormir. Yo desesperadamente quisiera estar junto a ella.

Yo, A▮▮▮ ▮▮▮ F▮▮, bajo penal de perjurio y declaro que esta declaración es verdadera y correcta basado en mi conocimiento personal. Firmado en Port Isabel, Texas el 21 de Junio, 2018.

Declaration of E.F.

I, E.F., make the following declaration based on my personal knowledge and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the mother of B.Y.A.F.

2. I entered the United States together with my child and was seperated from my child one day after I was arrested.

3. I am now held in immigration custody at 8915 Montana Ave, El Paso, TX 79925, without my child.

4. I do not believe that I am involved in any criminal process at the present time. I am only detained for immigration porposes.

5. I do not know when I will be able to see my child again.

6. I have been able to speak to my child only 3 times and only for approximately 5 minutes each time since we were separated.

7. My son isn't able to give me much information about his circumstances because he is too young and too upset to understand what is happening. Every time we talk he only wants to know when he will see me again so it's hard for him to focus on anything else.

8. Each time we have spoken he only cries. In the brief moments where he can speak he tells me he is ok and that he misses me very much.

9. My son used to be such a happy child who was always joking around with me. Now he just seems depressed- he doesn't joke with me he only asks when we will see each other again and begs to be with me. He is scared and lonely and desperate to be with me. I try to tell him everything will be OK and that I'll see him soon but, the truth is, I don't know what will happen with us.

10. There have been a few times, he's said that he has had a nosebleed. I told him to tell someone if he is feeling sick but he's too scared to tell anyone. He says that he's scared to report any type of mistreatment or health issue because the other children have told him that children who report things get sent to another place.

11. My son asks me where I am and I tell him I'm in a room somewhere but I don't tell him I'm detained because I don't want to worry him. I try to get him to focus on when he'll be released but I know he doesn't understand why we're separated and he just wants to be with me. I pray every day that he is released soon because I don't know what is happening with him even though he says he is ok.

2 of 5

12. I do not know where my child is located. I believe that he is in New York, but I do not have any other information, like the name of the facility or its location.

13. I don't know who is caring for him. I know he has a social worker but I don't know who cares for him regularly.

14. I've spoken with his social worker a few times. She is the one I call when I want to speak to him. Our conversations are brief and about who will care for my son, then she passes the phone to ~~him~~ him.

15. The information that I get on my son's well-being is from him. I try to ask if he is doing well and he says yes but that he misses me very much. Then he begins to cry.

16. Like I said before, I ask my son if he is healthy or if anyone has treated him badly but he says nothing is wrong. I don't know if I should believe him especially after he told me that he would be transferred elsewhere for reporting anything.

17. This whole situation has been horrible for me. I can't eat and I can't sleep because I am constantly reminded 3 of 5

when my son was taken from me. I have never been away from my son and I am just so sad I have to be without him. When I go to eat I'm reminded of when we used to eat together. When I try to sleep I remember how he always slept with me. It breaks my heart to not have him with me.

18. I am always thinking of my son. I wake up from my sleep crying because I remember that he was taken from me. I feel so upset and sad when I remember how he was taken from me. I don't understand how someone could take their child away from their mother. I think "Don't they have children too? Don't they know the pain I'm feeling?" then I say to myself that God has a plan but I still don't understand why my son was taken.

19. Every minute that I don't have information about my son is anguish.

20. Every minute that I am separated from my little boy causes me and him more pain and harm.

21. I brought my son from Guatemala to protect him. I didn't think that bringing him here would be so traumatic and awful for him. I thought I'd be able to 4 of 5

care for my son and keep him safe and now I can't even see him. I just want to be reunited with my son so he can live a safe and happy life and so I can work to send him to school and give him a good life.

_____X_____     ___6|21|18___
E. F.                            Date

I, Ashley N. Martinez, am fluent in both English and Spanish. I have read and translated the foregoing declaration to E.F. who has stated to me that she understood it and that it was true and correct.

June 21, 2018

_____
Ashley N. Martinez

5 of 5

## DECLARATION OF M.G.U.

I am the mother of W.M.G., J.V.G., and G.V.G.

We entered the United States together. They separated me and my children 14 days after the first day at the detention center in Dilley, TX.

Now, I am in a detention center in Pearsall, TX without my children.

I do not know when I will be able to see my children again.

I am able to speak with them two times each week for only 10 minutes each time, but sometimes I am not able to speak with them because there are problems with the telephone. Sometimes the telephone says, "your voice is not recognized" and I need to call again. Also sometimes the telephone says "your call is disconnected." The calls are very expensive so I am only able to call when I have money, but when I do not have money, I am not able to communicate with my children. In one month I only received one free call from the center. Also, sometimes my children do not answer.

When I am able to call, G.V.G. is not able to give me information about his circumstances because he is only two years old and too young to communicate how he is.

J.V.G. cannot communicate either by phone. He is a child that communicates with emotion and actions so it is difficult for him to communicate how he is.

W.M.G. is able to communicate a little, but he is not able to tell me how G.V.G. is because they are only together for one hour each day.

They feel more comfortable and confident to say more in person than over the telephone. They have never needed to do this before because we were always together, so this type of communication is uncomfortable.

I do not know the people who are caring for them so I worry every day.

I have never seen my children's room either, nor the school, the cafeteria, nothing. So I am not able to know if they are safe.

The Director said that she knows that the news is saying lots of things but the children are fine there and that they are good kids. But she does not say any details. She did not tell me anything about how they are eating, or how they are sleeping, and nothing about the school. I know that they are not "fine" because they cry a lot, especially J.V.G. y G.V.G.. And W.M.G. is always asking "how is your case" because he wants to be together.

Like every parent, I want all the information about my children. I want a video of where they are living. I want to know the therapists, the teacher, and all of the people that have contact with my children. Also, I have concerns about the school and I want to know how school is going.

I am not able to get this information because of the problems with the telephone, it is too expensive, and if I just have 20 minutes each week to speak, I am going to talk to my children and they are not able to give me this information.

Each minute that I do not have this information is anguish.

Each minute that I am separated from my children is anguish.

I am never at ease without this information and without my children.

I, ███████████ under pains and penalties of perjury state and declare that the foregoing is true and correct based on my personal knowledge. Executed in

_Pearsall_, Texas on June _21_, 2018.

███████████

## CERTIFICATE OF TRANSLATION

I, _Laura Jones_, certify that the above is an accurate translation of ███████████'s declaration from Spanish to English and that I am competent in both Spanish and English to render such translation.

_[signature]_                                    _6/21/18_
                                                   Date

Yo soy la madre de u███ J██████ y 6█████

Entramos los Estados Unidos juntos. Los separaron de mi 14 días después del primer día en el centro de detención en Dilley, TX.

Ahora estoy en un centro de detención en Pearsall, TX sin mis hijos.

No sé cuando yo puedo ver mis hijos otra vez.

Puedo hablar con ellos 2 veces cada semana por solo 10 minutos cada vez, pero a veces no puedo hablar con ellos porque hay problemas con el teléfono. A veces el teléfono dice, "su voz no es reconicido" y necesito llamar otra vez. También a veces el teléfono dice "tu llamada es disconectada." Las llamadas son muy caras así solo cuando tengo dinero puedo llamar, pero cuando no tengo, no puedo tener comunicación con mis hijos. En un mes solo recibí una llamada gratis del centro.
También a veces ellos no contestan.

Cuando puedo hablar, 6█████ no puede darme información sobre las circunstancias de él porque él solo tiene 2 años y es demasiado

pequeño para comunicar como es.

J█████ tampoco no puede comunicar por teléfono. Él es un niño que comunica con emoción y acción así es demasiado difícil para él explicar como es.

W███ puede comunicar un poco, pero el no puede decirme como es G████ porque ellos solo están juntos por una hora cada día.

Ellos se sienten más comodo y confianza decir más en persona que por teléfono. Ellos nunca necesitaron hacer esto ántes porque siempre estamos juntos, asi este tipo de comunicacion es incómodo.

No conocé las personas que están cuidando ellos asi tengo muchas preocupaciones cada día.

Tampoco, nunca vr el cuarto de mis niños, ni la escuela, la cafetería, nada. Asi no puedo saber que ellos están seguros.

El director dijo que ella sabe que las noticias están diciendo muchas cosas pero los

3

niños están bienes allí y que ellos están buenos
niños. Pero ella no dijó ningún detalle. No dijó
nada sobre como ellos están comiendo, ni
durmiendo, hi nada sobre la escuela.
Yo sé que ellos no están "bienes" porque
ellos lloran muchos, especialmente Jeancarlos y
Gustavo. Y Wilson siempre está preguntando "Cómo
está su caso" porque el quiere ser juntos.

Como cada padre, yo quiero toda la información
sobre mis hijos. Quiero un video de las
habitaciones. Quiero conocer las terapistas, la
maestra, y todas las personas que tienen
contactos con mis hijos. También, tengo
preocupaciones sobre la escuela y quiero saber
como va la escuela.

No puedo obtener esta información porque
de las problemas del teléfono, es demasiado
caro, y si yo solo tengo 20 minutos cada
semana para hablar, me voy a hablar solo
con mis niños y ellos no pueden darme
esta información.

Cada minuto que no tengo esta información
sobre mis niños es angustia.

Cada minuto que estoy separada de mis niños
es angustia.

Nunca estoy tranquila sin esta información y
sin mis hijos.

6/21/18

## DECLARATION OF AURELIE M. ATHAN

I, Aurelie M. Athan, Ph.D., make the following declaration based on my personal knowledge and declare under the penalty of perjury as set forth in 28 U.S. Code § 1746 that the following is true and correct.

1. I am a New York State Licensed Clinical Psychologist through the New York State Education Department, Division of Professional Licensing Services. I am a Full-time Lecturer and Academic Director within the Department of Counseling & Clinical Psychology at Teachers College, Columbia University in New York City, NY. My clinical and academic work focuses on the transition to parenthood, maternal mental health, reproductive and perinatal psychology. I have spent the last decade building a rationale through my scholarship for the creation of a new field of Maternal and Reproductive Mental Health and Wellbeing along with formalized training programs for students and professionals in this sub-specialization. I designed the first national courses on Maternal Psychology: Clinical and Developmental Implications, Perinatal Mental Health: Clinical and Counseling Perspectives as well as the first national NY-State Certification in Sexuality, Women, & Gender in Psychology and Education with a track in Maternal and Reproductive Wellness. In my role I frequently interface with community organizations that disseminate treatment and education related to maternal health, from mental health clinics to maternal mortality non-profits. I referee editorial submissions to journals with publications focused on maternal psychological experience.

2. I completed my Ph.D. degree at Teachers College, Columbia University in 2011 inclusive of my internship training at a Elmhurst Hospital a public hospital in Elmhurst, Queens,

with New York City's Women's Forensic Unit for incarcerated women, some of whom were mothers. I established my research laboratory on Maternal Psychology in 2012.

3. I have not personally met with the mothers or their children in this lawsuit. I am addressing the psychological phenomena and mental health repercussions of taking of children from their parents for an indefinite period of time and without sufficient or frequent communication, access, or information as to their children's whereabouts and wellbeing.

4. The field of maternal-infant attachment has a century old history of theory, evidence, and research on the primacy of the attachment system to human development. Animal and human experiments of maternal deprivation and separation have more than sufficiently demonstrated its negative physiological and psychological reactions. Extreme and acute stress reactions are common in the early stages and often develop into long term pathological coping reactions, poor emotional regulation, cognitive and academic deficits, and disturbed interpersonal relationships. The cycle of a disrupted attachment system can have a devastating cascade in family systems for generations perpetuated through their intergenerational modeling and genetic transmission. This is especially true for individuals and families that because of other life circumstances are already psychological vulnerable due to exposure to other traumatic events. This confluence of adverse life experiences and separation from loved ones as sources of solace, comfort, and reassurance is a certain mixture for increasing risk for serious mental health outcomes.

5.   Studies surrounding the parents' own stress reactions to separation from their children is less abundant but sufficient to provide a framework of reciprocal psychological damage. One of the most disturbing and painful conditions documented for mothers is separation from their children and it is indeed the other side of the same coin. Their psychological reactions are in parallel, beginning with the same phenomena of initial anguish, terror, panic and desperate attempts for reunification at all costs. When reunification is ambiguous, learned helplessness and hopelessness set in which are precursors to depression along with the already often established anxiety and social distrust. Mothers I have spoken with describe attempts to maintain a bond with their child irregardless, often doing so imaginatively by holding the belongings/photos of their child (if they are lucky to have them), or revisiting memories in their minds-- both strategies which can simultaneously relieve and revive the original trauma. Bargaining with powers or forces larger than the self are often initiated (as similar in the stages of death and dying), whether that is actual authorities or a personal God, to seek rescue. Social support when/if available is relied upon for temporary relief of intrapsychic pain and for external scaffolding to survive moment to moment and day to day. Distraction is preferred so as not to experience thoughts or feelings related to the child and behavioral impulsivity increases.  If all else fails, mothers often succumb to suicidal ideation and lose the will to live, just as children without mothers are at risk of failure to thrive. This may manifest as disruptions in vegetative rhythms such as eating and sleeping and extend to general poor self-care and finally escalating attempts to end their life.

6.  The above separation reactions, both short and long-term, are especially exacerbated when there is a) uncertainty as to when and if reunification is possible b) access to and communication with the child is not possible c) objects belonging to the child have been removed and taken away.

7.  The research to date on the effects of child separation on mothers is largely centered on studies of incarcerated mothers, custody removals in family court, or transnational family immigration in which children are left behind in the country of origin. In the cases where child separation is tied to imprisonment, studies have effectively demonstrated that visitation and access to their children is both a necessary and motivated force for wellbeing and rehabilitation. This has led to a series of reforms in how families and family bonds are maintained and supported. For example, it is now the case for many prisons to incorporate nurseries where the mother can have care for their infants while incarcerated.

8.  Based on my expertise as a clinical and reproductive psychologist, whose training it is to understand the acute and chronic mental health conditions that may manifest and be diagnosed in mothers, it is my recommendation that mothers do not undergo the stress of separation from their infants for the reasons stated above.

_____

Aurelie Athan, Ph.D.

## DECLARATION OF DR. LISA R. FORTUNA

I, Lisa R. Fortuna, MD, MPH, M.Div., make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I have not directly treated the children of the Plaintiffs but was asked to give this declaration based on my knowledge as a psychiatrist with over 20 years of experience working with vulnerable children and families, including immigrants and trauma survivors.

2. I am a graduate of Yale University (BA in Psychology 1991); I earned a Doctor of Medicine (MD) degree from New Jersey Medical School in 1996; a Masters of Public Health (MPH) from Hunter College School of Public Health, City University of New York in 2000, a Masters of Divinity in 2012 and I completed a Pediatric Health Services Research Fellowship at Harvard Medical School, Boston in 2003.

3. I am board certified in general psychiatry and child and adolescent psychiatry (Diplomat of the American Board of Psychiatry and Neurology), and addiction medicine. I am a health services researcher and have been an investigator on both national and international studies of immigrant and refugee mental health and the impact of trauma and post-traumatic stress in children. My work has contributed to the field's understanding of treatment needs and interventions for immigrant and refugee children and adults. My clinical training and experience in the practice of psychiatry and child and adolescent psychiatry offers me skills and specialization in the psychological and social development of individuals across the life span and the impact of biology, traumatic stress and environment on mental health.

4. I am the Director of the Section (Division) of Child and Adolescent Psychiatry for the Boston Medical Center (BMC), and Assistant Professor in the Department of Psychiatry at Boston University School of Medicine, where I conduct child behavioral health and disparities research and practice clinical psychiatry (treating children and youth ages 3 to 21). Our clinical division includes offering child-parent psychotherapy, a dyadic approach for young children (0-5 years of age) and parents who have both experienced trauma. In this latter context, I have developed clinical experience in working with young immigrant and refugee children who have experienced trauma, including witnessing violence and traumatic separations.

5. My clinical career has focused on treating a range of childhood psychiatric disorders and I have particular interest and expertise in Post-Traumatic Stress Disorder (PTSD), access to care, and quality of treatment for underserved and vulnerable populations including children, immigrant and refugee populations. I am a cofounder of the Refugee Immigrant Assistance Center Community Counseling (RIAC-CC), a mental health clinic in Boston. My clinical work at RIAC involves the mental health assessment and treatment of immigrant and refugee patients. I have served as a clinical investigator on several National Institutes of Health funded research projects with most of this work focused on immigrant mental health. I conduct collaborative research with colleagues both nationally and internationally, including most recently a clinical intervention research study of Latino immigrants in the United States and Spain.

6. I have published several articles and a book in the field of psychiatry, largely on issues related to immigrant (including unaccompanied minors) and minority mental health, PTSD and adolescent substance use disorders. I have included my curriculum vitae with

this declaration, attached hereto as Appendix 1. The following are select publications relevant to this declaration:

    a.  **Fortuna LR**, Porche MV, Alegria M. Political violence, psychosocial trauma, and the context of mental health services use among immigrant Latinos in the United States. *Ethnicity & Health* 2008 Nov;13(5):435-63. PMCID: PMC2771411.

    b.  Porche, MV, **Fortuna, LR**, Lin, J. & Alegria M. (2011) Childhood trauma events and psychiatric disorders as correlates of school dropout in a national sample of young adults, *Child Development. 82,* 982-998. PMCID: PMC3089672.

    c.  **Fortuna LR**, Alvarez K, Ramos Ortiz Z, Wang Y, Mozo Alegría X, Cook BL, Alegría M. Mental health, migration stressors and suicidal ideation among Latino immigrants in Spain and the United States. *European Psychiatry*. 2016 Aug; 36:15-22. PMID: 27311103.

    d.  Ramos Z, **Fortuna L.R**, Porche MV, Wang Y, Shrout PE, Loder S, McPeck S, Noyola N, Toro M, Carmona R, Alegría M. Posttraumatic Stress Symptoms and their Relationship to Drug and Alcohol use in an International Sample of Latino Immigrants. J *Immigrant and Minority Health*. 2016 May 5. PMID: 27150593.

7.  To prepare this declaration, I reviewed the scientific literature in addition to relying on the knowledge accumulated during my education, research and clinical experience described above.

8.  It is my opinion that immigrant and refugee young children who have faced

psychological trauma are at heightened risk of suffering from irreversible, psychological harm and especially if a child also experiences a traumatic separation from their parent. Based on my review of scientific and medical literature, as well as my practice in the field, my opinions are as follows.

### Separation for a Primary Attachment Figure is Psychologically Hazardous for Young Immigrant and Refugee Children

9. Children who are detained are at risk of a variety of psychosocial and developmental problems linked to their detention experiences. A variety of factors contribute to the distress experienced by children who are held in detention, including previous trauma experienced in their home country or during migration, disruption of the family unit, separation from parents and poor and unsafe conditions of detention (Young & Gordon, 2016).[1]

10. The study of attachment has illuminated the critical role of early caregiving relationships in fostering healthy development and forming a basis for future relationships and mental health well-being (Ainsworth, Blehar, Waters, & Wall, 2015; Bowlby, 1988; Freud & Burlingham, 1943; Lyons-Ruth, 1996; Lyons-Ruth, Zoll, Connell, & Grunebaum, 1986). The loss of a parent is a severe hardship for any child; children who have suffered traumatic stress and other losses as many refugee/ asylum seeking children have, are particularly vulnerable to negative psychological consequences related to separation from parent.

11. Risk factors known to be especially hazardous for children include separations from their primary attachment figure and loss or disappearance of a parent, exposure to traumatic events such as abuse, and damaging social environments (Carlson, 2012).

---

[1] Complete citations for medical literature cited herein is referenced in Appendix 2.

12. The harm that develops during detention does not necessarily resolve once the detainee is freed, and indefinite, prolonged and/or undetermined length of detention makes detainees (both children and adult parents) vulnerable to physical, social, and emotional harms (Fujio, 2011). Studies of detained immigrants have found that negative physical and emotional symptoms induced under these circumstances do not always disappear at the time of release and children may experience developmental delay and poor psychological adjustment, potentially affecting functioning in school and socially (Linton et al., 2017; Lorek et al., 2009). If individual families are detained separately, a lack of information regarding each other's well-being or status has a negative effect on both children and parents. In addition to the trauma of separation, being detained without information can induce profound hopelessness, despair, depression and even suicidal urges (Procter et. al. 2018).

13. In my clinical practice, I have evaluated several children asylum seekers whose anxiety, depression and post-traumatic stress are worsened during periods of uncertainty, times of separation from primary caregiver and when he or she is unable to have the physical and emotional protection from his or her  parent.

**Children Who Have Experienced Traumatic Loss are at Risk of Suffering Irreparable Harm to Their Brain Development**

14. Severe stress such as traumatic separations in infancy and childhood may have serious, long-lasting effects on a child's brain development, affecting future manifestations of negative emotions, maladaptive behaviors, and conflictual attachments. As a result, children thus affected operate in a survival mode, rather than learning to flexibly adapt to environmental demands.

15. Factors such as the level of supervision, familial and social support make a difference in

the level of distress children experience. Hodes et al., (2008) discovered that PTSD and depressive disorders were significantly higher in children with low-support living arrangements as compared to those with good social supports and attachments.

16. In addition to the issue of support, a host of risks and influences create and exacerbate mental distress among children including if children have lost their home, belongings, family and friends (Carlson et al., 2012). Other influences on stress include language barriers, uncertainty about asylum status, fears of deportation, the process of immigration itself, and the lack of personal and structural support all contribute to the distress experienced by a child and the long-term risk to their cognitive and emotional development (Bronstein & Montgomery, 2011).

17. The mental health risks thus far described may surface or be aggravated when children are placed in confined, institutional settings and are also separated from family members (Lee, 2012). Social isolation and being deprived of one's caretakers are risk factors for poor psychological outcomes (Ehnthold & Yule, 2006; Ellis, et al., 2008; Grove & Zwi, 2006).

**Children Who Have Experienced Traumatic Loss Are at Risk of Suffering Irreparable Harm to their Mental Health**

18. Traumatic exposures, especially long term and recurrent, combined with the loss of attachment figures and social instability can impede personality and identity development and subsequently impair functioning (Howard et al, 2011; Smid et al., 2011).

19. Bronstein and Montgomery (2011) examined the developmental impact on refugee immigrant children highlighting the uncertainty that is created for these children due to separations from attachment figures and the challenges this presents to their learning,

functioning and well-being. Without parents, family and others who care about them to fill emotional needs, a child's adaptive processes are impaired by their uncertain future prospects (Chavez & Menjivar, 2010). In the long term, this can result in school failure, drop out, persistent poverty and hopelessness and even suicidality later in life (Fortuna et al., 2016; Porche et al., 2011).

20. Children of families seeking asylum have by definition experienced traumatic stress, often severe in nature. The more terror inducing the trauma is and the longer its duration is, particularly when combined with the absence of a parent, the more devastating its effects on children (Boothby, 1994). Trauma exposure in children and adolescents can impede personality development, causing disturbances in sense of self, impairment of basic trust, attachment disorders, and sharp deterioration in functioning (van der Kolk, 1996; Carlson, 2012). This adversely impacts interpersonal attachments and developments in the future (Moro, 2003).

21. It is my opinion that when refugee and immigrant children, especially young children are separated from their parent and primary attachment figure, they are placed at significant risk for irreparable harm in regards to brain development, psychological health and thus a trajectory of poor mental health, learning and development throughout their life. I treat children in my clinical practice who range the ages of 3 to 17 years old who are still recovering from past separations and traumatic losses. Children who are seeking asylum who are accompanied by their parents, should be maintained together with their parent/ primary attachment figure. Imposing a traumatic separation and then imposing uncertainty regarding release, safety and/or reunification upon a child and their parent further increases the risk that the child will develop long-term psychological

consequences and that the dyadic relationship, both parent and child will be harmed.

## Clinical Recommendation

22. Based on my clinical experience and the foregoing analysis, it is my opinion that separating children from their parents has a real and substantial risk of leading to long-term (and irreversible) physiological, developmental and psychological problems. If children and parents are detained it is absolutely necessary, that they are not separated from one another.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge. Executed in Boston, Massachusetts on June 21, 2018.


_____

Lisa R. Fortuna, MD, MPH, M.Div.

## Appendix 2

Ainsworth, M. D. S., Blehar, M. C., Waters, E., Wall, S. N. (2015). Patterns of attachment: A psychological study of the strange situation. New York: Psychology Press.

Boothby, N. (1994). Trauma and violence among refugee children. In A. J. Marsella, T. Bornmann, S. Ekblad,& J. Orley (Eds.), Amidst peril and pain: The mental health and well-being of the world's refugees (pp.239–259). Washington, DC: American Psychological Association.

Bowlby, J. (1988). A secure base. New York: Routledge.

Bronstein, I., & Montgomery, P. (2011). Psychological distress in refugee children: a systematic review. *Clin Child Fam Psychol Rev, 14*(1), 44-56. doi:10.1007/s10567-010-0081-0

Carlson, B. E., Cacciatore, J., & Klimek, B. (2012). A risk and resilience perspective on unaccompanied refugee minors. *Social Work, 57*(3), 259-269. doi:10.1093/sw/sws003

Chavez, L. and Menjívar, L. (2010). Children Without Borders: A Mapping of the Literature on Unaccompanied Migrant Children to the United States."*Migraciones Internacionales*, 5 (3): 71-111.

Ehntholt, K. A., & Yule, W. (2006). Practitioner review: assessment and treatment of refugee children and adolescents who have experienced war-related trauma. *J Child Psychol Psychiatry, 47*(12), 1197-1210. doi:10.1111/j.1469-7610.2006.01638.x

Fortuna, L. R., Alvarez, K., Ramos Ortiz, Z., Wang, Y., Mozo Alegria, X., Cook, B. L., & Alegria, M. (2016). Mental health, migration stressors and suicidal ideation among Latino immigrants in Spain and the United States. *Eur Psychiatry, 36*, 15-22. doi:10.1016/j.eurpsy.2016.03.001

Freud, A. & Burlingham, D. T. (1943). War and children. New York: Medical War Books.

Hodes, M. (2008). Psychopathology in refugee and asylum seeking children. In M. Rutter, D. Bishop, D. Pine, S. Scott, J. Stevenson, E. Taylor, A. Thapar, M. Rutter, D. Bishop, D. Pine, S. Scott, J. Stevenson, E. Taylor, & A. Thapar (Eds.), *Rutter's child and adolescent psychiatry.* (pp. 474-486): Wiley-Blackwell.

Howard, K., Martin, A., Berlin, L. J., & Brooks-Gunn, J. (2011). Early Mother-Child Separation, Parenting, and Child Well-Being in Early Head Start Families. *Attachment & Human Development, 13*(1), 5–26. http://doi.org/10.1080/14616734.2010.488119

Lyons-Ruth, K. (1996). Attachment relationships among children with aggressive behavior problems: the role of disorganized early attachment patterns. *J Consult Clin Psychol, 64*(1), 64-73.

Lyons-Ruth, K., Zoll, D., Connell, D., & Grunebaum, H. U. (1986). The depressed mother and

her one-year-old infant: environment, interaction, attachment, and infant development. *New Dir Child De v*(34), 61-82.

Porche, M. V., Fortuna, L. R., Lin, J., & Alegria, M. (2011). Childhood trauma and psychiatric disorders as correlates of school dropout in a national sample of young adults. *Child Dev, 82*(3) 982-998.doi:10.1111/j.1467-8624.2010.01534.x

Procter NG, Kenny MA, Eaton H, Grech C. Lethal hopelessness: Understanding and responding to asylum seeker distress and mental deterioration. Int J Ment Health Nurs. 2018 Feb;27(1):448-454. doi: 10.1111/inm.12325. Epub 2017 Mar 21.

Van der Kolk, B.A., Pelcovitz, D., Roth, S., Mandel, F., McFarlane, A., & Herman, J.L. (1996). Dissociation, somatization, and affect dysregulation: The complexity of adaptation to trauma. *American Journal of Psychiatry, 153*(7), 83–93.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

M.G.U., *et al.*,                              §
                                              §
      Plaintiffs,                     §
                                              §        No. _____
v.                                            §
                                              §        Civil Action
U.S. DEPARTMENT OF                            §
HOMELAND SECURITY, *et al.*,                  §
                                              §
      Defendants.                     §

**[PROPOSED] TEMPORARY RESTRAINING ORDER**

The Court has considered all authorities, evidence, and argument presented by all parties

concerning Plaintiffs' application for temporary restraining order, ECF No. ___.  Counsel for

Plaintiffs notified immigration litigation counsel at the U.S. Department of Justice of this

proceeding and they [appeared / did not appear] for Defendants.

The Court concludes that all four temporary injunction elements weigh in favor of

entering immediate relief for Plaintiffs as follows:

(1)  Plaintiffs M.G.U., E.F., and A.P.F. are likely to succeed on the merits of their claim

that Defendants indefinitely separated them from their children without ensuring that

they have basic information about their children's whereabouts, care, and well-being

violates Plaintiffs' Due Process rights to family integrity and to be free of

punishment.  Plaintiffs are civil detainees held by Defendants.  Defendants include

the U.S Department of Homeland Security (DHS) and its sub-agencies Immigration

and Customs Enforcement (ICE) and Customs and Border Protection (CBP), and the

U.S. Department of Health and Human Services (HHS) and its sub-agency Office of

Refugee Resettlement (ORR).  Defendants have not provided Plaintiffs sufficient, reliable information to reassure them about their children's whereabouts, care, and well-being.  Unconstitutional punishment is shown in this case by: (1) Defendants' statements lack of rationale for their actions other than that they intend separation to be harsh and therefore deter immigration to the United States; (2) the fact that the indefinite, and largely incommunicado separation that they are inflicting on Plaintiffs is not narrowly tailored to serve any compelling government interest; (3) the fact that Defendants have not published specific policies describing when and how they will provide contact between family members, provide information to parents about their children, and most importantly, when they anticipate reuniting each family; and (4) the suffering caused by forcible separation of parent from child is so extreme in relation to any legitimate purpose that the punitive nature of Defendants' actions is manifest to the Court.

(2) Plaintiffs suffer irreparable harm by the deprivation of their constitutional rights, and by enduring forcible separation without sufficient information regarding their children without justification.  The trauma caused by separation is exacerbated by the fact that Defendants have supplied insufficient information to Plaintiffs' about their children's whereabouts, care, and well-being..

(3) The balance of harms strongly favors Plaintiffs.

(4) The public interest weighs in favor of ensuring that parents have adequate information about their children, and basic human decency.

WHEREFORE, the Court hereby directs Defendants to provide the following information to each Plaintiff daily either orally or in writing in a language understood by each Plaintiff:

(a) the complete address where each child is currently located;

(b) Defendants' most accurate estimate of the date that it anticipates reuniting each parent with each child;

(c) a description of the setting where each child resides, whether home or institutional;

(d) the name, age, and gender of each person primarily responsible for each child's care;

(e) whether the child has suffered any accident or illness;

(f) a description of each child's activities during that day; and

(g) meaningful access to communication with each child via telephone or video link.

The Court further ORDERS that Defendants are forbidden to take any action to separate Plaintiffs from their children named above without further order of the Court.

The Court further ORDERS Defendants to immediately facilitate secure communication among Plaintiffs' counsel, Plaintiffs, and their children to enable them to discuss the content of this preliminary injunction.

Plaintiffs shall post a bond of $ _____ as security pursuant to Rule 65(c).

This ORDER expires exactly 14 days after entry unless extended.  Plaintiffs shall file any application for preliminary injunction by June 26, 2018.  Defendants shall respond within _____ days.  Hearing on any application is set for _____ o'clock on _____, 2018 at courtroom _____ .

SO ORDERED at ____ ___.m. Eastern Standard Time on this _____ day of June, 2018 at Washington, D.C.


_____
United States District Judge