## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| M.G.U., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | No. 1:18-cv-1458-PLF |
| v. | § | |
| | § | Civil Action |
| KIRSTJEN NIELSEN, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## APPLICATION FOR A PRELIMINARY INJUNCTION

Plaintiffs are M.G.U., E.F., and A.P.F., three immigrant parents (the "Parents") who entered the United States with their children. The Parents bring this application against the defendant federal agencies and officials (the "Government")[1] because the Government continues to subject the Parents and their children to indefinite family separation for the express purpose of inducing their suffering as a means of deterring immigration. This policy is cruel. It punishes the Parents and interferes with their right to family integrity, both of which violate the Fifth Amendment. The Parents seek a preliminary injunction directing the Government to immediately reunite them with their children.

## STATEMENT OF FACTS

### A.    The Government Separated the Parents from their Children

On May 4, 2018, Plaintiff M.G.U. entered the United States at the San Ysidro, California port of entry and lawfully sought asylum. M.G.U. entered the United States together with her

---

[1] Defendants include the U.S. Department of Homeland Security ("DHS") and its sub-agencies Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP"), who are responsible for arresting and detaining families to enforce immigration law, and the U.S. Department of Health and Human Services ("HHS") and its sub-agency Office of Refugee Resettlement ("ORR"), who are responsible for detaining "unaccompanied" minors awaiting immigration proceedings.

three minor biological children, G.V.G, her 2-year-old son, J.V.G., her 6-year-old son, and W.M.G., her 13-year-old son.  The Government transported M.G.U. and her sons to Texas and detained them together until about May 18, 2018, when the Government forcibly separated them after M.G.U. passed her credible fear interview.  When the Government escorted M.G.U.'s children away, weeping and gnashing of teeth ensued, with the 13-year-old holding the 2-year-old in one arm and the hand of the 6-year-old in the other.  The Government transported M.G.U.'s sons to New York while M.G.U. has remained in the Government's custody in Texas.  M.G.U. has not seen her sons since.  She has little information about their well-being.  M.G.U. knows nothing about when she will see her children again, and she suffers because of this.  Declaration of M.G.U. at 1-2 (June 22, 2018), ECF No. 12-2; Declaration of M.G.U. (June 13, 2018) at 1-3, ECF No. 13-4.

On May 14, 2018, Plaintiff E.F. entered the United States near Presidio, Texas with her biological and only son, 9-year-old B.Y.A.F.  The Government arrested them together and forcibly separated E.F. from her son the next day.  E.F. has not seen him since.  She believes that he is in the state of New York but she is not sure.  She has little information about her son's well-being.  E.F. knows noting about when she will see her son again.  Since the separation, E.F. has spoken with her son but three times for approximately five minutes each time.  Her son is afraid and desperate to be with her, which causes her anguish.    Declaration of E.F. at 1-5 (June 22, 2018), ECF No. 8-2; Declaration of E.F. (June 15, 2018), ECF No. 13-5.

On June 4, 2018, Plaintiff A.P.F. entered the United States in Cameron County, Texas, and did so together with his 12-year-old biological daughter, C.P.R.  Upon entering, they immediately sought assistance from immigration officers, who arrested them.  The Government separated A.P.F. from C.P.R. shortly after their arrest, and A.P.F has not seen or spoken to his

daughter since.  A.P.F. has no information about where his daughter is.  The only information provided to A.P.F. to date is that he and his daughter will be separated indefinitely.  He knows nothing about when he will see his daughter again, and he describes his feelings about the separation experience as "torture."  Declaration of A.P.F. (June 22, 2018) at 1, ECF No. 12-1; Declaration of A.P.F. (June 12, 2018), ECF No. 13-6.

The Government has contacted undersigned counsel regarding the Parents' access to additional information regarding their children, but the Government has not proposed any terms for reunification.

**B.      The Government Implemented a Policy of Family Separation in Late 2017[2]**

Every year between 2012 and 2017, the Government has annually apprehended between 11,116 and 77,674 noncitizen parents who entered the United States accompanied by their noncitizen children.  Government's Memorandum in *Flores v. Sessions* at 8-9 (June 21, 2018), ECF No. 13-3; *see also Veg-Mix, Inc. v. USDA*, 832 F.2d 601, 607 (D.C. Cir. 1987) ("Courts may take judicial notice of official court records . . . .").

Prior to 2017, the Government's policies sought to keep immigrant families intact and did not separate parents from their children except in limited, specified circumstances, "generally only if the familial relationship cannot be confirmed, [DHS] believe[s] the adult is a threat to the safety of the child, or the adult is a criminal alien."  DHS Retraction Policy at 1 (June 23, 2018), ECF No. 13-2; Declaration of Agent Ortiz at ¶ 3 (March 15, 2018), ECF No. 8.  Otherwise, the Government's policy was to "maintain a comprehensive process for identifying, placing,

---

[2] The material facts concerning the Government's implementation of its family separation policy should ultimately be undisputed, for the facts are readily available from the Government's own recent records and public statements.  The Parents' motion for limited, expedited discovery, which will be filed near the time of this Application, only seeks to efficiently place in evidence the Government's public actions and avoid the need for testimony at preliminary injunction hearing, in accord with Local Civil Rule 65.1(d).

monitoring, accommodating, and removing alien parents or legal guardians of minor children while safeguarding their parental rights." ICE defined "parental rights" to mean "[t]he fundamental rights of parents to make decisions concerning the care, custody, and control of their minor children without regard to the child's citizenship, as provided for and limited by applicable law." ECF No. 1-1 at 1-2.

On August 23, 2017, Defendant ICE formally rescinded its commitment to maintain a comprehensive process for safeguarding the fundamental rights of parents. ECF No. 1-2 at 1. Then, in late 2017, Defendants made a policy choice to begin forcible separation of immigrant parents from their children without regard to parental fitness. *See* ECF No. 1-4 at 1; *U.S. v. Dominguez-Portillo*, No. EP-17-MJ-4409, 2018 WL 315759 at *1-8 (W.D. Tex. Jan. 5, 2018).

This policy change was not the result of any change in any statute or regulation. Rather, the policy change resulted from decisions made by the Government and announced, at least in part, by the Attorney General on April 6, 2018. On that day, the Attorney General announced a "zero tolerance" policy for violations of 8 U.S.C. § 1325(a), and directed the Department of Justice to accept for prosecution all referrals of § 1325(a) complaints from ICE and CBP. ECF No. 1-3.

Although entering the United States without inspection is a crime, 8 U.S.C. § 1325(a), it is "quite literally one of the least serious federal offenses." *Dominguez-Portillo*, 2018 WL 315759 at *8 & n.14. Congress defines a first violation of § 1325(a) as a "petty misdemeanor" punishable by up to six months' incarceration. 18 U.S.C. § 19.

When a defendant has no criminal or immigration history, most § 1325(a) prosecutions are resolved with a sentence of "time served," so that the arrest, charge, plea, and sentence are all completed within five or fewer days after arrest. Declaration of Chris Carlin at ¶¶ 3-4 (June 25,

2018), ECF No. 13-7; One Court's Daily Docket (June 12, 2018), ECF No. 1-6; DHS Retraction Policy at 1-2 (June 23, 2018), ECF No. 13-2.  Moreover, a violation of § 1325(a) does not prevent any person from exercising the right to seek asylum pursuant to 8 U.S.C. § 1158.  DHS Policy, ECF No. 1-4 at 2.

Under the "zero-tolerance" policy, the Government charged adults with violating § 1325(a), and placed the adults into custody as pre-trial detainees for a period of hours to a few days.  *See.* FED. R. CRIM. P. 5(a) ("without unnecessary delay"); *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 928 (2017) ("when an arrest is made without a warrant, the arrestee, generally within 48 hours, must be brought before a judicial officer").  The Government then used the fact of this form of pre-trial detention as a reason to separate the adults from their children indefinitely.

The Government's representatives have clearly stated the purpose of separation.  John Kelly is currently White House Chief of Staff.  He also served as immediate predecessor to Defendant Kirstjen Neilsen.  On May 11, 2018, Mr. Kelly stated that the Administration's objective for family separation is to deter families from coming to the United States:

> *Mr. Burnett:*  Are you in favor of this new move announced by the attorney general early this week that if you cross the border illegally even if you're a mother with your children [we're going] to arrest you?  We're going to prosecute you, we're going to send your kids to a juvenile shelter?
>
> *Mr. Kelly:*  The name of the game to a large degree . . . . a big name of the game is deterrence.
>
> *Mr. Burnett:*  Family separation stands as a pretty tough deterrent.
>
> *Mr. Kelly:*  It could be a tough deterrent — would be a tough deterrent.  A much faster turnaround on asylum seekers.
>
> *Mr. Burnett:* Even though people say that's cruel and heartless to take a mother away from her children?

> *Mr. Kelly:* I wouldn't put it quite that way. The children will be taken care of — put into foster care or whatever. But the big point is they elected to come illegally into the United States and this is a technique that no one hopes will be used extensively or for very long.

John Burnett, *Transcript: White House Chief of Staff John Kelly's Interview With NPR*, National

Public Radio (May 11, 2018), ECF No. 13-14,

https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-

interview-with-npr. A year earlier, as Secretary of DHS, Mr. Kelly told a television audience

that "in order to deter [immigration], I am considering [a family separation policy]." Daniella

Diaz, *Kelly: DHS Is Considering Separating Undocumented Children from Their Parents at the*

*Border*, CNN (Mar. 7, 2017), video clip at 00:55 to 01:05, ECF No. 13-16,

https://www.cnn.com/2017/03/06/politics/john-kelly-separating-children-from-parents-

immigration-border/index.html. HHS officials have also stated at press briefings that they

separate families as a way to deter future asylum seekers and other families from entering the

United States. See, e.g., Julia Preston, What you should know about Family Separations, THE

MARSHALL PROJECT (June 19, 2018), ECF No. 13-15 ("Steven Wagner, the Acting Assistant

Secretary in charge of children and families at the Department of Health and Human Services,

who oversees the shelter system [for minors], explained one goal in a telephonic media briefing

on Tuesday[, June 19]: 'We expect the new policy will result in a deterrence effect," Wagner

said. "We certainly hope that parents stop bringing kids on this dangerous journey and entering

the country illegally."), https://www.themarshallproject.org/2018/06/19/what-you-should-know-

about-family-separations.

Since April 2018, the Attorney General's zero-tolerance policy has produced thousands

of additional § 1325(a) prosecutions, mass trials, and overburdened courts. *See*, *e.g.*, Lomi Kriel,

*New 'zero tolerance' policy overwhelms South Texas courts*, Houston Chronicle (June 9, 2018),

ECF No. 13-17, https://www.houstonchronicle.com/news/houston-texas/texas/article/New-zero-tolerance-policy-overwhelms-South-12981190.php.  And beginning slowly in late 2017 and progressing rapidly after April 2018, the Government has now forcibly separated over two thousand immigrant parents from their children without regard to parental fitness.  DHS Retraction Policy at 3 (June 23, 2018), ECF No. 13-2; Declaration of Chris Carlin at ¶ 5 (June 25, 2018), ECF No. 13-7; *Dominguez-Portillo*, 2018 WL 315759 at *8 & n.14.

On Wednesday, June 20, 2018, the President issued an Executive Order directing agencies to halt most new family separations.  Executive Order No. 13841, 83 FED. REG. 29435, 2018 WL 3093128 (June 20, 2018), ECF No. 13-1.

On Saturday June 23, 2018, the Government announced plans to reunite some separated families, but did so without: (a) making a binding commitment to reunite all families who the Government separated exclusively as a result of zero-tolerance and for no other reason; (b) stating when families would be reunited; or (c) stating the terms on which reunification would occur.  DHS Retraction Policy at 1-4 (June 23, 2018), ECF No. 2.

**C.     Forced Separation Harms Children and Parents**

Forced separation of parents from their children causes trauma to both, which can be severe, and which can endanger their physical and mental health.  Declaration of Dr. Griffin at ¶¶ 4-10 (June 15, 2018), ECF No. 13-10; Declaration of Dr. Linton at 2 (June 15, 2018), ECF No. 13-11; Declaration of Dr. Shapiro ¶ 16 (June 18, 2018), ECF No. 13-12 ("I can say confidently that separation can lead to further trauma of these children (and their parents) with possible irreparable damage."); *see also* Jeffrey C. Mays and Matt Stevens, *Honduran Man Kills Himself After Being Separated From Family at U.S. Border, Reports Say,* New York Times (June 10,

2018), ECF No. 13-18, https://www.nytimes.com/2018/06/10/us/border-patrol-texas-family-separated-suicide.html.

Each of these factors increase the trauma of forced separation: (a) the duration of separation is indefinite, and unknown to parent or child; (b) the child is young; (c) parent and child are denied information about one another during separation; and (d) parent or child have pre-existing trauma.  Declaration of Dr. Griffin at ¶¶ 9-12 (June 15, 2018), ECF No. 13-10; Declaration of Dr. Linton at ¶ 4 (June 15, 2018), ECF No. 13-11; Declaration of Dr. Shapiro at ¶ 16 (June 18, 2018), ECF No. 13-12; Declaration of Dr. Athan at ¶¶ 5-6 (June 21, 2018), ECF No. 8-4; Declaration of Dr. Fortuna at ¶ 12 (June 21, 2018), ECF No. 8-5.  Accordingly, the American Academy of Pediatrics concludes that "[s]eparation of a parent or primary caregiver from his or her children should never occur, unless there are concerns for safety of the child at the hand of a parent."  AAP POLICY STATEMENT: DETENTION OF IMMIGRANT CHILDREN at 7 (March 13, 2017), ECF No. 1-7.

After the Government implemented its family separation policy, major medical associations, including the American Medical Association, the National Academy of Sciences, the American College of Physicians, the American Psychological Association, the American Psychiatric Association, the American College of Emergency Physicians, and a group of over 5,000 medical professionals and experts, have voiced their strong opposition to family separation due to the trauma that separation inflicts upon parents and children.  Medical Association Letters (circa June 2018) at 9-57, ECF No. 13-13.  The Government has never suggested that a contrary medical opinion exists.

## ARGUMENT

Courts "consider four factors when deciding whether to grant a preliminary injunction: whether the plaintiff will be irreparably harmed if the injunction does not issue; whether the defendant will be harmed if the injunction does issue; whether the public interest will be served by the injunction; and whether the plaintiff is likely to prevail on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 392 (1981). These factors "interrelate on a sliding scale and must be balanced against each other." *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999). "A district court must balance the strengths of the requesting party's arguments in each of the four required areas." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "If the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak." *Id*. Even so, "[i]t is particularly important for the movant to demonstrate a likelihood of success on the merits." *Taseko Mines Ltd. v. Raging River Capital*, 185 F. Supp. 3d 87, 91 (D.D.C. 2016).

The Parents seek a preliminary injunction directing their immediate reunification with their children. All four factors strongly favor this relief.

## A.     The Parents Are Likely to Succeed on their Claims that Forcible Separation is an Impermissible Burden on Family Integrity and is also Punishment

The Parents claim that by maintaining indefinite separation, the Government is inflicting ongoing harm in violation of their Fifth Amendment Due Process rights to family integrity and to be free of punishment. ECF No. 1 ¶¶ 95-104. They are likely to succeed on both claims.

The Fifth Amendment mandates that no person shall "be deprived of life, liberty, or property, without due process. of law." U.S. CONST. amend V. Due Process protects noncitizens who are present on U.S. soil. *Plyler v. Doe*, 457 U.S. 202, 210 (1982); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976). The Due Process guarantee has both procedural and substantive

components.  Only the substantive component is at issue here.  Substantive Due Process bars

government interference with certain fundamental rights "regardless of the fairness of the

procedures used to implement them."  *Daniels v. Williams*, 474 U.S. 327, 331 (1986).

Two fundamental rights are at issue here: the right to family integrity and the right to be

free of punishment.  The Government's separation policy damages family integrity as a form of

punishment, thus managing to accomplish two constitutional violations with one policy.  The

Parents' likelihood of success in proving either violation would support the immediate

reunification they seek.

1.      **The Government's Separation Policy Impermissibly Interferes with Family Integrity**

Substantive Due Process includes the right to family integrity.  *Quilloin v. Walcott*, 434

U.S. 246, 255 (1978).  The parent-child relationship is a "basic civil right[] of man" and "far

more precious . . . than property rights."  *Stanley v. Illinois*, 405 U.S. 645, 651 (1972).  Indeed,

"the interest of parents in the care, custody, and control of their children— is perhaps the oldest

of the fundamental liberty interests recognized by" the Court.  *Troxel v. Granville,* 530 U.S. 57,

65 (2000).

Substantial Government burdens on family integrity are subject to strict scrutiny, and

only survive if the burden is narrowly tailored to serve a compelling state interest.  *Pittman v.

Cuyahoga County Dept. of Children and Fam. Services*, 640 F.3d 716, 728 & n.6 (6th Cir.

2011); *U.S. v. Breeden*, No. 16-cr-0008, 2016 WL 8943168 at *2 (D.D.C. June 3, 2016); *U.S. v.

Godoy*, No. 10-cr-16, 2014 WL 12618708 at *5 (D.D.C. June 13, 2014); *O'Donnell v. Brown*,

335 F. Supp. 2d 787, 821 & n.16 (W.D. Mich. 2004); *see also United States v. Wolf Child*, 699

F.3d 1082, 1092 (9th Cir. 2012) ("Interference with" the "fundamental right to familial

association" "requires 'a powerful countervailing interest.'") (*quoting Lassiter v. Dep't of Social*

*Servs.*, 452 U.S. 18, 27 (1981)).  To survive strict scrutiny, the Government must show that it

employed the least restrictive means of furthering its compelling interest.  *See Shelton v. Tucker*,

364 U.S. 479, 488 (1960) ("even though the governmental purpose be legitimate and substantial,

that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when

the end can be more narrowly achieved."); *Franz v. United States*, 707 F.2d 582, 602 (D.C. Cir.

1983) ("Severance of the relationship between a parent and his child will survive constitutional

scrutiny only if . . . it [is] impossible to achieve the goal in question through any means less

restrictive of the rights of parent and child").[3]

 Here, the Government's burden on the Parents' right to family integrity is substantial by

any measure.  The Government is imposing separation of indefinite duration.  *See Sosna v. Iowa*,

419 U.S. 393, 409-10 (1975) (duration of burden on family choices is constitutionally

dispositive); *Jordan by Jordan v. Jackson*, 15 F.3d 333, 344 (4th Cir. 1994) (emergency removal

statute is constitutional because it almost always produces judicial review or return of the child

in fewer than 96 hours).  The separation imposed by the Government is largely incommunicado,

potentially permanent, and absolutely precludes the Parents' involvement in any aspect of their

children's care, custody, and control, from religion to education.  And separation prevents the

Parents and children from expressing love for and comfort to one another, arguably any parent's

---

[3] The Government has previously argued that as a threshold matter, any burden on the right to
family integrity must "shock the conscience" to trigger constitutional scrutiny.  Many courts
reject this view.  *See, e.g., D.B. v. Cardall*, 826 F.3d 721, 740 (4th Cir. 2016); *Pittman*, 640 F.3d
at 728-29; *Seegmiller v. Laverkin City*, 528 F.3d 762, 767 (10th Cir. 2008).  The First Circuit has
accepted it.  *See Aguilar v. ICE*, 510 F.3d 1, 21 (1st Cir. 2007).  The Parents contend that the
Government's family separation policy indeed shocks the conscience, even though this showing
is not required to state a Due Process violation.  The Parents submit that the vast national outcry
that produced the Government's ongoing retraction of its family separation policy confirms that
the separation policy shocks the nation's conscience.  *Compare* ECF No. 1-4 (policy) to ECF No.
13-2 (retraction).

most important gifts to a child, gifts that only a parent can give, and gifts that children

desperately need as they endure the bewildering experience of incarceration.  *See Zablocki v.*

*Redhail*, 434 U.S. 374, 387 & n.12 (1978) ("The directness and substantiality of the interference"

with a fundamental right renders state limits unconstitutional as insufficiently tailored.); *see also*

ECF Nos. 8-4, 8-5, 13-10, 13-11, 13-12, 13-13 (describing medical harm of forced separation).

The fact that the Government's family separation policy imposes a substantial burden on

the right to family integrity shifts the burden to the Government to prove that its policy is

narrowly tailored to serve a compelling state interest.  *See Cooper v. Harris*, 137 S. Ct. 1455,

1464 (2017); *Reno v. Flores*, 507 U.S. 292, 302 (1993); *see also Santosky v. Kramer*, 455 U.S.

745, 769 (1982) (Due Process requires state to prove need for termination of parental rights by

"clear and convincing evidence").  Here, the Government cannot prove that any compelling state

interest is at stake.  While the need to protect children from unfit parents is a well-recognized

compelling reason for burdening family integrity, the Government must make some showing of

parental unfitness in order to establish such a compelling state interest.  *See Quilloin*, 434 U.S. at

255 (1978) ("[T]he Due Process Clause would be offended if a State were to attempt to force the

breakup of a natural family . . . without some showing of unfitness and for the sole reason that to

do so was thought to be in the children's best interest."); *United States v. Loy*, 237 F.3d 251,

269-70 (3d Cir. 2001) ("[W]here there is insufficient evidence to support a finding that children

are potentially in danger from their parents, the state's interest cannot be said to be 'compelling,'

and thus interference in the family relationship is unconstitutional").

In this case, the Government admits that its family separation policy is not designed to

protect children.  Rather, it was the result of a decision to adopt a "zero tolerance" policy for

violations of 8 U.S.C. § 1325, causing separation regardless of parental fitness.  DHS Retraction

Policy at 1 (June 23, 2018), ECF No. 13-2 (only a "small number of children . . . were separated for reasons other than zero tolerance"); DHS Separation Policy at 1 (June 15, 2018), ECF No. 1-4 ("Children whose parents are referred for prosecution will be placed [in ORR custody]."). This proves that the policy serves no compelling state interest and is overbroad.

The fact that the policy is overbroad is further proved by the President's June 20, 2018 Executive Order, which directs the Government to maintain family integrity during § 1325 prosecutions.  Executive Order No. 13841, 83 FED. REG. 29435, 2018 WL 3093128 (June 20, 2018), ECF No. 13-1.  This Executive Order effectively concedes that the Government's "zero-tolerance" separation policy, ECF No. 1-4, which is still being applied to the Parents today, is not narrowly tailored to serve a compelling government interest.  To survive strict scrutiny, the Government would have to show that its policy of family separation was the least restrictive means for furthering its purported interest in protecting its laws and borders.  *See Franz,* 707 F.2d at 602.  The Government cannot meet its burden because the Executive Order itself names a less restrictive alternative: detaining parent with child.  Executive Order No. 13841 at § 3(a) (June 20, 2018), ECF No. 13-1 ("The Secretary of Homeland Security (Secretary), shall, to the extent permitted by law and subject to the availability of appropriations, maintain custody of alien families during the pendency of any criminal improper entry or immigration proceedings.").  The Government's pre-2017 experience in maintaining integrity for tens of thousands of noncitizen families only confirms that indefinite separation is not necessary to serve a compelling state interest.  *See* pages 3-5, *supra* (citing evidence of pre-2017 policy).

**2.      The Government's Separation Policy Punishes Civil Detainees**

As a matter of substantive Due Process, people who are not serving a sentence for crime cannot be subjected to conditions of confinement that "amount to punishment."  *Bell v. Wolfish,*

441 U.S 520, 536 (1979); *see also Edwards v. Johnson*, 209 F.3d 772, 778 (5th Cir. 2000) (same

for civil immigration detainees).  Detention conditions amount to punishment if either: (1) the

government expresses an intent to punish; or (2) the conditions are excessive in relation to a

legitimate non-punitive purpose.  *Schall v. Martin*, 467 U.S. 253, 269 (1984); *Jones v. Blanas*,

393 F.3d 918, 932 (9th Cir. 2004).  Both tests show that the family separation inflicted on the

Parents amounts to unconstitutional punishment.

### a.     The Government Intends to Punish Immigrant Families

Direct and circumstantial evidence proves the Government's intent to inflict punishment

on immigrant families, including the Parents.

First, the Government's highest officials have repeatedly stated that the purpose of their

family separation policy is to deter immigration.  *See* pages 5-6, *supra* (citing examples).  The

Government's repeated broadcast of its deterrence rationale, including reference to the suffering

caused by separation, is itself plainly designed to promote deterrence.  *Id.*  Settled law establishes

that actions taken to deter future undesirable conduct is punishment proscribed by the Fifth

Amendment.  *See Kansas v. Crane*, 534 U.S. 407, 412 (2002) (warning that civil detention may

not "become a 'mechanism for retribution or general deterrence'—functions properly those of

criminal law, not civil commitment") (citations omitted); *Bell*, 441 U.S. at 570 & n.20

(deterrence is "not [a] legitimate nonpunitive governmental objective"); *R.I.L-R v. Johnson*, 80

F. Supp. 3d 164, 188-89 (D.D.C. 2015) (The government "maintains that one particular

individual may be civilly detained for the sake of sending a message of deterrence to other

Central American individuals who may be considering immigration.  This appears out of line

with analogous Supreme Court decisions."); *see also Austin v. United States*, 509 U.S. 602, 621

(1993) ("[A] civil sanction that cannot fairly be said solely to serve a remedial purpose, but

rather can only be explained as also serving either retributive or deterrent purposes, is

punishment, as we have come to understand the term.").

      Second, before retracting the family separation policy, Government officials also

repeatedly stated that unspecified laws required indefinite separation of families whenever a

parent is charged with a petty misdemeanor offense under 8 U.S.C. § 1325.  DHS Separation

Policy at 1 (June 15, 2018), ECF No. 1-4, https://www.dhs.gov/news/2018/06/15/fact-sheet-zero-

tolerance-immigration-prosecutions-families.[4]  Congress has expressly disagreed:

> Children who are apprehended by DHS while in the company of their parents are not in
> fact 'unaccompanied' and if their welfare is not at issue, they should not be placed in
> ORR custody. The committee expects DHS to release families or use alternatives to
> detention such as the Intensive Supervised Appearance Program [(including ankle
> bracelets)] whenever possible. When detention of family units is necessary, the
> Committee directs DHS to use appropriate detention space to house them together.

House Committee on Appropriations, Department of Homeland Security Appropriations Bill,

2006: report together with additional views (to accompany H.R. 2360), 109th Cong., 1st Session,

2005, H. Rep. 109–79 (*quoted in Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-cv-164-SS,

2007 WL 1074070 at *2 (W.D. Tex. Apr. 9, 2007)).  The Government's claims as to what

unspecified "law" requires are undermined by the fact that even though the text of no statute or

regulation changed in any material respect since passage of H.R. 2360, the President simply

retracted the family separation policy by Executive Order issued June 20, 2018.  While the

Parents do not in this action claim that their § 1325(a) prosecutions themselves are pretextual or

improper, they do claim that the Government improperly used the prosecutions as a pretext for

---

[4] Of course, no prosecution rationale can justify the family separation inflicted on M.G.U., who
did not violate § 1325(a) when she entered the U.S. with her children.  The fact that Defendants
separated M.G.U. from her children in the absence of a concurrent § 1325(a) prosecution proves
that prosecution does not fully explain the Government's separation policy.

unconstitutionally punishing them by separating them from their children indefinitely.[5]  The fact

that the Government has stated a pretextual reason for maintaining indefinite separation of

families is circumstantial evidence of improper intent to punish.  *See Kansas v. Hendricks*, 521

U.S. 346, 371 (1997) (Kennedy, J., concurring) ("If the object or purpose of the Kansas law had

been to provide treatment but the treatment provisions were adopted as a sham or mere pretext,

there would have been an indication of the forbidden purpose to punish.").

Finally, the arbitrary administration of harmful detention conditions permits a court to

"infer that the purpose of the governmental action is punishment that may not constitutionally be

inflicted."  *Bell*, 441 U.S. at 520-21; *see also Allah v. Milling*, 876 F.3d 48, 58 (2d Cir. 2017)

(inferring punishment from arbitrary administration); *Stevenson v. Carroll*, 495 F.3d 62, 67-68

(3d Cir. 2007) (allegations of arbitrary treatment state a claim for unconstitutional punishment of

pretrial detainee); *O'Connor v. Huard*, 117 F3d 12, 16 (1st Cir. 1997) (jury was properly

instructed that if it found restrictions or conditions were arbitrary, it could infer that the purpose

was punishment, and therefore unconstitutional).  While the Government has plainly

implemented a separation policy, it has done so in a way that invites arbitrary administration.

The Government's policy explicitly refrains from making any commitment that parents will *ever*

be reunited with their children.  *See* DHS Family Separation Policy at 2, ECF No. 1-4 ("Alien

children may also present an individual claim for asylum and depending on the circumstances,

may undergo separate immigration proceedings."); *id.* at 3 ("HHS and ICE can take steps to

facilitate family reunification for purposes of removal, consistent with federal law where the

parent or legal guardian is capable of providing for the physical and mental well-being of the

---

[5] Moreover, § 1325 prosecutions and sentences are routinely completed within days after arrest
by sentences of "time served."  DHS Retraction Policy at 1-2 (June 23, 2018), ECF No. 13-2;
One Court's Daily Docket (June 12, 2018), ECF 1-6; Declaration of Chris Carlin at ¶¶ 3-4 (June
25, 2018), ECF No. 13-7.  Thus § 1325 proceedings cannot justify indefinite family separation.

child and comports with the wishes of the parent or legal guardian."); DHS Retraction Policy at 2

(June 23, 2018), ECF No. 13-2 ("A parent who is ordered removed from the U.S. may request

that his or her minor child accompany them.  It should be noted that in the past many parents

have elected to be removed without their children.").  Defendants specifically renounced any

intent to "safeguar[d] . . . parental rights."  *Compare* ICE 2013 Policy Statement at 1-2, ECF No.

1-1 (commitment to safeguard) *with* ICE 2017 Policy Statement at 1, ECF No. 1-2 (retraction of

commitment).  Moreover, even while the Government implemented its forcible separation

policy, it arbitrarily selected which families would be separated and which would be released,

and it has never claimed that during any period of time, its "zero-tolerance" policy was ever

uniformly enforced.

> **b.     Indefinite Separation is Patently Excessive in Relation to any
>          Legitimate Non-Punitive Purpose**

The extreme nature of indefinite family separation alone indicates that the Government is

unconstitutionally punishing the Parents and their children.

Detention of people in immigration proceedings can serve a legitimate, non-punitive

purpose when the detention is necessary "on the basis of those aliens' risk of flight or danger to

the community."  *R.I.L-R*, 80 F. Supp. 3d at 188.  Here, the detention and the conditions of that

detention—separation of children—in no way serve a purpose of preventing flight or protecting

the community, but is instead a blanket policy applied regardless of danger or flight risk.

Three facts independently prove that the Government's policy is unconstitutionally

extreme.  First, medical consensus confirms what parents naturally know: indefinite forcible

separation of parents from their children, particularly the two-year-old separated in this case,

presents a high risk of severe and permanent trauma to innocent children.  ECF Nos. 13-10, 13-

11, 13-12, 13-13.  No authority suggests that the Government's deliberate infliction of possibly

permanent injury on innocent children can be tolerated under our Constitution for any reason whatsoever.

Second, the American public's denunciation of the Government's family separation policy been strong and sustained.  On June 22, 2018 the Office of the United Nations Human Rights Commissioner published a letter warning that that the policy "may amount to torture." *UN Experts to US: "Release migrant children from detention and stop using them to deter irregular migration,"* Office of the United Nations Human Rights Commissioner at 2 (June 22, 2018), ECF No. 13-9,

https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=23245&LangID=E ; *see also Ms. L. v. ICE*, 302 F. Supp. 3d 1149, 2018 WL 2725736 at ¶ 12 (S.D. Cal. June 6, 2018) (the Government's family separation policy as alleged is "brutal, offensive, and fails to comport with traditional notions of fair play and decency").  Globally, nationally, and viscerally, the public plainly senses the extreme nature of the Government's policy.

Third, civil immigration detainees, including all of the Parents here, "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S 307, 321-22 (1982); *see also Lynch v. Cannatella*, 810 F.2d 1363, 1373 (5th Cir. 1987) (the Constitution "does not limit the right of excludable aliens detained within United States territory to humane treatment").  Congress has recognized that "the removal of a child from the parents is a penalty as great [as], if not greater, than a criminal penalty . . . ."  *Santosky*, 455 U.S. at 769 (*quoting* H.R. REP. NO. 95-1386 at 22 (1978), *reprinted in*, 1978 U.S.C.C.A.N. 7530. 7545).  Moreover, the Eighth Amendment's cruel and unusual punishment standards serve as an absolute floor for the treatment of civil detainees.  *See Lock v. Jenkins*, 641 F.2d 488, 491-94 & n.6 (7th Cir. 1981)

("We have no hesitancy in concluding that confinement of these detainees in a prison maintained primarily for the purpose of punishment of convicted persons, under conditions more burdensome than those imposed on the general population of convicted felons, amounts to punishment under *Bell v. Wolfish*."); *see also* WILLIAM J. RICH, MODERN CONSTITUTIONAL LAW § 23:16 (3d ed. and Dec. 2017 Update) ("case law that establishes protection for prison inmates from cruel and unusual punishment may be seen as a floor; persons subject to involuntary commitment are entitled to more protection than the Eighth Amendment cases provide").  Ample Eighth Amendment authority establishes that prison administrators may not exhibit deliberate indifference to the serious medical needs of convicted inmates.  *See, e.g.*, *Shepherd v. Dall. Cty.*, 591 F.3d 445, 452-53 (5th Cir. 2009) (denying access to medication).  The families here are not convicted inmates, and they have a serious need to maintain family integrity, a need that is obvious to the Government.  To the extent that the Government deliberately interferes with this integrity, the Government inflicts serious harm on the Parents and their children.  The Government is no more allowed to do this than it is allowed to deliberately ignore the serous medical needs of convicted inmates.

## B.     Separation Irreparably Harms Plaintiffs Every Minute It Persists

"It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (internal citations omitted).  As a result, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." 11A WRIGHT & MILLER, FED. PRAC. & PROC. § 2948.1 (2d ed. 2004).

The injury here is irreparable not merely legally, but in fact according to broad and deep consensus medical opinion.  Medical Association Letters (circa June 2018), ECF No. 13-13; Declarations, ECF Nos. 8-4, 8-5, 13-10, 13-11, 13-12; *see also Stanley v. Illinois*, 405 U.S. 645, 647 (1972) ("[P]etitioner suffers from the deprivation of h[er] child[], and the child[] suffer[s] from uncertainty and dislocation."); *J.B. v. Washington County*, 127 F.3d 919, 925 (10th Cir.1997) ("[F]orced separation of parent from child, even for a short time, represents a serious infringement upon both the parents' and child's rights."); *Nicolson v. Pappalardo*, 685 F. Supp. 2d 142, 145-46 (D. Me. 2010) ("[e]very additional day" of separation causes further harm). Indefinite separation is inflicted on children who are innocent of any wrongful conduct, and parents who are, at most, guilty of a petty misdemeanor.

Not only does forced family separation cause unthinkable emotional harm, but it also forces parents and children alike to make critical legal decisions in isolation from one another. Every minute of continued separation increases the risk that family members will have to make final and potentially incongruous decisions about their respective futures in immigration proceedings.  Family separation causes irreparable harm through present suffering and because it can cause long-term damage and truly permanent separation.  Declaration of Chris Carlin at ¶ 10 (June 25, 2018), ECF No. 13-7.

## C.    The Balance of Equities Strongly Favors Plaintiffs

In considering whether to grant a preliminary injunction, the Court should "balance the competing claims of injury and ... consider the effect on each party of the granting or withholding of the requested relief."  *Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014) (citations omitted).  Where an injunction "will not substantially injure other interested parties," the balance of equities tips in plaintiffs' favor.  *League of Women Voters of*

*U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks and citation omitted).
The defendants "cannot suffer harm from an injunction that merely ends an unlawful practice."
*Open Cmtys. All. v. Carson*, No. 17-cv-2192, 2017 WL 6558502 at *21 (internal quotation marks
and citation omitted); *accord, e.g., Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013).

The fact that immigration officials administered identical statutes and regulations through
2017 without inflicting forced separation of families proves that the balance of harms favors the
Parents, and the Government should be prevented from implementing their policy against the
Parents unless and until they are able to prevail in this litigation after final trial on the merits.

While the Government has an obvious legitimate interest in enforcing immigration laws,
nothing in federal law suggests that deterring immigration by separating families is a legitimate
government objective.  Even if deterrence were somehow a permissible rationale, the
Government's forced separation policy is overbroad because it equally deters both lawful and
unlawful conduct.  *See* 8 U.S.C. § 1158(a) (right to apply for asylum); *see also* 8 U.S.C. § 1231
note ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the
involuntary return of any person to a country in which there are substantial grounds for believing
the person would be in danger of being subjected to torture, regardless of whether the person is
physically present in the United States.").

Finally and critically, the government itself also has an important interest in maintaining
family integrity:

> the state also shares the interest of the parent and child in their family's integrity, *see*
> *Santosky* [*v. Kramer*, 455 U.S. 745, 766-67 (1982)] ("the *parens patriae* interest favors
> preservation, not severance of natural familial bonds"), because the welfare of the state
> depends in large part on the strength of the family.

*Jordan by Jordan v. Jackson*, 15 F.3d at 346; *see also id.* ("The forced separation of parent from child, even for a short time, represents a serious impairment on [parental] rights."). To be clear, some of the Government's own interests are served by the injunction sought by the Parents.

**D.      Preliminary Injunction Serves the Public Interest**

The Executive Branch's interests are not the same as the public interest. "[T]he public always has an interest in agency compliance with the law." *ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 29 (D.D.C. 2012); *see also Patriot, Inc. v. HUD*, 963 F. Supp. 1, 6 (D.D.C. 1997) ("[T]he public interest is best served by having federal agencies comply with the requirements of federal law.") (citation omitted); *League of Women Voters*, 838 F.3d at 12 ("[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'") (citation omitted)). Our Constitution indicates that the American people's values do not permit families to be gratuitously broken, and children to be harmed. The world is watching how the Government treats vulnerable immigrant children. The public interest here is in caution, and assurance that the Government's policies are implemented in compliance with the Constitution prior to any continued deployment.

## CONCLUSION

Because all relevant considerations weigh heavily in the Parents' favor, a preliminary injunction is warranted.  *See O'Donnell Constr. Co. v. District of Columbia*, 963 F. 2d 420, 429 (D.C. Cir. 1992).  Immigrant families need this Court's protection, and urgently so.  The Parents seek the most prompt possible hearing on this Application as provided in Local Civil Rule 65.1(d), and an order directing their immediate reunification with their children as stated in the attached Proposed Order.

June 26, 2018

Respectfully submitted,
TEXAS RIOGRANDE LEGAL AID, INC.

Jerome Wesevich
   D.D.C. Attorney No. TX0125
Amanda Chisholm
   Texas Bar No. 24040684
Peter McGraw
   Texas Bar No. 24081036
1331 Texas Avenue
El Paso, Texas 79901
(915) 241-0534
jwesevich@trla.org

*Attorneys for Plaintiffs*