**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| M.G.U, *et al.* | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:18-cv-01458 (PLF) |
| | ) | |
| v. | ) | |
| | ) | |
| Kirstjen Nielsen, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION**
**FOR PRELIMINARY INJUNCTION**

## I.   INTRODUCTION

This Court should decline to issue the preliminary injunction sought by the Plaintiffs in this case for a number of reasons. First, Plaintiffs are currently believed to be class members in *Ms. L., et al. v. ICE, et al.*, Case No. 18-cv-0428 (S.D. Cal.), and are beneficiaries of the preliminary injunction order in that case which requires the reunification of Plaintiffs and their children—along with all other separated families—subject to the timeline contained in that order. This Court should not allow Plaintiffs' individual claims for injunctive relief to go forward in light of the existing class action because doing so would interfere with the orderly administration of the pending class action. Second, this Court lacks jurisdiction over Plaintiffs claims, and over any request for the release of Plaintiffs or their children, none of whom are in custody within the jurisdiction of this Court. Third, even if this Court reaches Plaintiffs' constitutional claims, Plaintiffs are not likely to succeed on those claims. Finally, the balance of hardships in this case weighs in favor of the Government, and the public interest is not served by granting a preliminary injunction, because granting the relief sought by Plaintiffs could interfere with the

Government's ongoing efforts to timely comply with the preliminary injunction order in *Ms. L.*

Thus, for all of the above reasons this Court should decline to issue the preliminary injunctions

requested by Plaintiffs in this case.

## II.   LEGAL BACKGROUND

### A.   Expedited Removal, Credible Fear, and Mandatory Detention

Plaintiffs, as aliens who were seeking to enter the United States without any

documentation allowing for their admission, are subject to a process commonly referred to as

"expedited removal," which provides an accelerated removal process for certain aliens. *See* 8

U.S.C. § 1225(b); 69 Fed. Reg. 48,877 (Aug. 11, 2004). Congress has explicitly mandated the

detention of individuals who are in the expedited removal process and whose claim of credible

fear of persecution is still being considered, or who have been found not to have a credible fear

of persecution. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) ("Any alien subject to the procedures under

this clause shall be detained pending a final determination of credible fear of persecution and, if

found not to have such a fear, until removed.").

Individuals subject to such mandatory detention under expedited removal are eligible for

release from immigration detention only if they are granted parole under certain limited criteria.

*See* 8 C.F.R. §§ 235.3(b)(2)(iii); 235.3(b)(4)(ii) (parole of aliens subject to mandatory detention

who are awaiting a credible fear determination or who have not expressed a fear of return "may

be permitted only when the [Secretary of Homeland Security] determines, in the exercise of

discretion, that parole is required to meet a medical emergency or is necessary for a legitimate

law enforcement objective."); 8 U.S.C. § 1182(d)(5)(A) (DHS may, in its "discretion parole into

the United States temporarily under such conditions as [the Secretary] may prescribe only on a

case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States . . . .").

If a U.S. Citizenship and Immigration Services asylum officer interviews an individual in expedited removal proceedings and determines that he or she has a credible fear of persecution or torture, the individual will be placed in immigration proceedings before an immigration judge where he may seek asylum or other protection from removal before an immigration judge. *See* 8 U.S.C. § 1225(b)(1)(B); 8 C.F.R. §§ 208.30, 235.3(b)(4). If the asylum officer determines the individual does not have a credible fear of persecution or torture, the individual may request review of that determination by an immigration judge. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. § 208.30(g); 8 C.F.R. § 1003.42; 8 C.F.R. § 1208.30. If the immigration judge determines that the individual does not have a credible fear of persecution or torture, he will be removed from the United States. 8 U.S.C. § 1225(b)(1)(B)(iii); *see also* 8 U.S.C. §§ 1225(b)(1)(C), 1252(a)(2)(A)(iii); 8 C.F.R. § 1003.42(f) ("No appeal shall lie from a review of an adverse credible fear determination made by an immigration judge.").

B.     Statutes Governing the Custody of Unaccompanied Children.

i.     *The Homeland Security Act of 2002 ("HSA")*

In 2002, Congress enacted the HSA.  Pub. L. No. 107-296, 116 Stat. 2135. The HSA created the U.S. Department of Homeland Security ("DHS"), transferring most immigration functions formerly performed by INS to the newly-formed DHS and its components, including U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and ICE. *See also* Department of Homeland Security Reorganization Plan Modification of January 30, 2003, H.R. Doc. No. 108-32 (2003) (also set forth as a note to 6 U.S.C. § 542).

Congress transferred to the U.S. Department of Health and Human Services ("HHS"), the responsibility for the care of UACs "who are in Federal custody by reason of their immigration status." HSA § 462(a), (b)(1)(A); 6 U.S.C. § 279(a), (b)(1)(A). The HSA defines an "unaccompanied alien child" as:

> a child who-
>
> (A) has no lawful immigration status in the United States;
>
> (B) has not attained 18 years of age; and
>
> (C) with respect to whom-
>
>> (i) there is no parent or legal guardian in the United States; or
>>
>> (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

6 U.S.C. § 279(g)(2). The HSA also transferred to HHS the responsibility for making all placement decisions for UACs, and required HHS to coordinate these placement decisions with DHS. Finally, the HSA prohibited HHS from releasing UACs on their own recognizance. *See* 6 U.S.C. § 279(b)(l)(C), (D), (b)(2).

#### ii.   *Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA")*

The TVPRA was signed into law on December 23, 2008. The TVPRA codified protections related to the processing and detention of unaccompanied alien children ("UACs"). The TVPRA requires that "the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services." 8 U.S.C. § 1232(b)(1) (emphasis added).  It also requires that:

> Except in the case of exceptional circumstances, any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child.

8 U.S.C. § 1232(b)(3).

The TVPRA made clear that HHS, and not DHS or its components, is responsible for all placement decisions for UACs in its custody, and provides guidelines for the reunification of UACs by HHS, including dictating the requirements for HHS to evaluate the suitability of any placement. 8 U.S.C. § 1232(c)(3). The TVPRA does provide that a child may be placed with a proposed custodian, but the UAC may not be:

> placed with a person or entity unless [HHS] makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being.  Such determination shall, at a minimum, include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child.

8 U.S.C. § 1232(c)(3)(A).

## III.    FACTUAL BACKGROUND

Plaintiffs in this case are M.G.U., E.F., and A.P.F. Each of them is a parent who was separated from a child as a result of lawful immigration enforcement actions. They are all detained in ICE detention facilities in Texas. Complaint ¶¶ 2-4. All three are currently believed to be class members in the case of *Ms. L., et al. v. ICE, et al.*, Case No. 18-cv-0428 (S.D. Cal.), and are beneficiaries of the preliminary relief order in that case issued on June 26, 2018.

Plaintiff M.G.U. entered the United States at the San Ysidro Port of Entry. Complaint ¶ 50. She was subsequently detained as a family unit with her sons at the South Texas Family Residential Center. Complaint ¶ 51. However, based on a discovery by ICE that M.G.U. had previously been charged and convicted of false and misleading representations and sentenced to 75 days confinement, ICE determined that continued detention in an ICE family residential

center was not appropriate, and therefore M.G.U. was transferred into an ICE adult detention facility near Pearsall, TX. *See* Declaration of Gerardo Aguilar, attached. Because M.G.U. was placed into an ICE adult detention facility, her children had "no parent or legal guardian in the United States . . . available to provide care and physical custody." 6 U.S.C. § 279(g)(2). Thus, in accordance with the TVPRA, her children were transferred to the custody of ORR. 8 U.S.C. § 1232(b)(3). M.G.U. is in the process of being transferred to an ICE facility in New York for reunification with her children in accordance with the *Ms. L.* order. According to M.G.U.'s records, she was transferred out of the adult detention facility on the morning of July 5, 2018. *See* Declaration of Gerardo Aguilar, attached.

Plaintiff A.P.F. was apprehended in May 5, 2018with his daughter in the Rio Grande Valley Sector after illegally crossing the U.S. border. Complaint ¶ 68. A.P.F. and his daughter were separated because A.P.F. was prosecuted for illegal entry under 8 U.S.C. § 1325(a), and was placed into the custody of the U.S. Marshals Service. Complaint ¶¶ 73. Because A.P.F. was in the custody of the U.S. Marshals, his daughter had "no parent or legal guardian in the United States . . . available to provide care and physical custody." 6 U.S.C. § 279(g)(2). Thus, in accordance with the TVPRA, A.P.F.'s daughter was transferred to the custody of ORR. 8 U.S.C. § 1232(b)(3). Following his time in the custody of the U.S. Marshals Service, A.P.F. was released to ICE custody, Complaint ¶ 74, and remains in ICE custody in mandatory detention

Plaintiff E.F. was apprehended with her son in Texas after illegally crossing the U.S. border. Complaint ¶ 81. E.F. and her son were separated because E.F. was prosecuted for illegal entry under 8 U.S.C. § 1325(a), and was placed into the custody of the U.S. Marshals Service. Complaint ¶¶ 84-86. Because E.F. was in the custody of the U.S. Marshals, her son had "no parent or legal guardian in the United States . . . available to provide care and physical custody."

6 U.S.C. § 279(g)(2). Thus, in accordance with the TVPRA, E.F.'s son was transferred to the custody of ORR. 8 U.S.C. § 1232(b)(3). Following her time in the custody of the U.S. Marshals Service, E.F. was released to ICE custody, Complaint ¶ 87, and remains in ICE custody in mandatory detention.

## IV. ARGUMENT

A.   <u>Plaintiffs' Request For A Preliminary Injunction Should Be Subject To A Heightened Standard Because Plaintiffs Do Not Seek to Preserve the Status Quo.</u>

This court may issue a preliminary injunction only when the movant demonstrates that:

(1) there is a substantial likelihood plaintiff will succeed on the merits;
(2) plaintiff will be irreparably injured if an injunction is not granted;
(3) an injunction will not substantially injure the other party; and
(4) the public interest will be furthered by an injunction.

*Barton v. District of Colum.*, 131 F. Supp. 2d 236, 241 (D.D.C. 2001) (quoting *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998)); *see also Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011; *Banks v. Harrison*, 864 F. Supp. 2d 142, 145 (D.D.C. 2012).[1]  Moreover, it has been recognized that the standard for a preliminary injunction should be heightened when, as here, "a

---

[1] Traditionally, courts have analyzed those factors on a "sliding scale," balancing them against each other.  *Barton*, 131 F. Supp. 2d at 241 (citing *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)) (citations and quotation omitted).  Under that approach, the "four factors are not considered in isolation from one another, and no one factor is necessarily dispositive as to whether preliminary injunctive relief is warranted."  *Id.*  But, "[r]ecently, the continued validity of that approach has been called into some doubt, as the . . . [D.C.] Circuit has suggested, without holding, that a likelihood of success on the merits is an independent free-standing requirement for a preliminary injunction."  *TD Bank NA v. Pearl*, 891 F. Supp. 2d 103, 106 (D.D.C. 2012).  Judges in this Circuit have also suggested that "a party moving for a preliminary injunction must meet [all] four independent requirements."  *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J. & Henderson, J., concurring).  The Court need not resolve that open question here because Plaintiffs' claims do not satisfy either standard.

plaintiff seeks an injunction that would alter the status quo rather than merely preserve it (i.e., a mandatory injunction)." *English v. Trump*, 279 F. Supp. 3d 307, 316 (D.D.C. 2018) (citing *Elec. Privacy Info. Ctr. v. DOJ*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) (collecting cases)). Under that heightened standard, "the moving party must "clearly" show that "he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo–Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997), *aff'd*, 1998 U.S. App. LEXIS 7871, at *2 (D.C. Cir. 1998) ("we need not reach the question of whether the district court erred in holding that the standard applicable to a mandatory preliminary injunction is higher than that applicable to a prohibitory preliminary injunction because, as the district court also held, the appellants fail even under the lower standard that they advocate").

  B. <u>Plaintiffs' Individual Actions Should Not Be Permitted To Interfere With The Orderly Administration Of The Class Claims In *Ms. L., et al. v. ICE, et al.*, Case No. 18-cv-0428 (S.D. Cal.).</u>

On June 26, 2018, the District Court for the Southern District of California certified a class in *Ms. L., et al. v. ICE, et al.*, Case No. 18-cv-0428 (S.D. Cal.), of which Plaintiffs are class members. *Ms. L., et al. v. ICE, et al.*, Case No. 18-cv-0428, ECF No. 82 (S.D. Cal.). That Court also granted a preliminary injunction motion that was based on a claim that the Government's separation of children from their parents violated the Fifth Amendment. *Ms. L., et al. v. ICE, et al.*, Case No. 18-cv-0428, ECF No. 83 (S.D. Cal.). In granting class relief, and as relevant here, the Court's preliminary injunction order requires that class members be reunified with their children within 14 days of the Court's order for children under 5, and within 30 days of the Court's order for all other children. The Government is in the process of implementing the relief

required by the Court's order. *See Ms. L., et al. v. ICE, et al.*, Case No. 18-cv-0428, ECF Nos 86, 87 (S.D. Cal.), attached hereto.

This Court should not permit Plaintiffs' individual claims to go forward in this case where there is an ongoing class action that is based on the same constitutional claims relied on by Plaintiffs here, and in which Plaintiffs are currently believed to be class members. *See McNeil v. Guthrie*, 945 F.2d 1163, 1165-1166 (10th Cir. 1991) ("Individual suits for injunctive and equitable relief from alleged unconstitutional prison conditions cannot be brought where there is an existing class action. To permit them would allow interference with the ongoing class action.") (citing *Long v. Collins*, 917 F.2d 3, 4-5 (5th Cir. 1990); *Goff v. Menke*, 672 F.2d 702, 704 (8th Cir. 1982)); *see also Kidd v. Andrews*, 340 F. Supp. 2d 333, 335-337 (W.D.N.Y. 2004) ("As between federal district courts . . . the general principle is to avoid duplicative litigation.") (quoting *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817 (1976)). This is because allowing these individual claims would interfere with the administration of the *Ms. L.* class action by that district court, and would create the risk of conflicting orders on the same claims by the same plaintiffs. *See Gillespie v. Crawford*, 858 F.2d 1101, 1103 (5th Cir. 1988) (en banc) (concluding that to allow individual suits would interfere with the orderly administration of a pending class action and risk inconsistent adjudications). This is particularly true here, because the district court has ordered preliminary relief on behalf of the class, including Plaintiffs, and Defendants have already undertaken extensive efforts towards compliance with the preliminary injunction order. *See* attachment. An order from this Court issuing conflicting relief for Plaintiffs would interfere with the implementation of the relief already ordered by the *Ms. L.* court, which already provides Plaintiffs the relief they are seeking

from this Court. Accordingly, this Court should decline to order the relief sought by Plaintiffs in this case, and should require Plaintiffs to proceed as part of the class in the *Ms. L.* case.

      C.     <u>This Court Should Not Issue A Preliminary Injunction Because Plaintiffs Are Not Likely To Succeed On Their Claims.</u>

            i.     *<u>Plaintiffs Have Not Pled Any Waiver of Sovereign Immunity That Would Allow This Court To Take Jurisdiction Over Their Claims.</u>*

"Absent a waiver, sovereign immunity shields the Federal Government and its agents from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (citations omitted). "Sovereign immunity is jurisdictional in nature," so a claim barred by sovereign immunity should be dismissed for lack of subject matter jurisdiction. *Id.* (citations omitted). The "plaintiff bears the burden of establishing that sovereign immunity has been abrogated." *Stone v. Holder*, 859 F. Supp. 2d 48, 51 (D.D.C. 2012) (citing *Jackson v. Bush*, 448 F. Supp. 2d 198, 200 (D.D.C. 2006)). Plaintiffs allege jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1346, and further contend that the Court has authority to grant declaratory relief under 28 U.S.C. § 2201 and 28 U.S.C. § 2202. Thus, Plaintiffs have not pleaded any statute that provides a waiver of sovereign immunity for their claims which arise under the Due Process Clause of the U.S. Constitution. *See Stone v. Holder*, 859 F.Supp.2d 48, 52 (D.D.C. 2012) (noting that § 1331 and Declaratory Judgment Act do not waive sovereign immunity); *Himex Co. v. United States*, 17 F.Supp.3d 77, 80 (D.D.C. 2014) (noting that 28 U.S.C. § 1346 "creates a limited waiver to the government's sovereign immunity" for claims related to "injury or loss of property ... caused by the negligent of wrongful act or omission of any employee of the Government"). Accordingly Plaintiffs have not established that this Court has jurisdiction over their claims, and thus are not likely to succeed on those claims.

ii. *Neither Plaintiffs Nor Their Children Are In Custody Within The Jurisdiction Of This Court.*

Plaintiffs do not allege that they, or their children, are in custody within the jurisdiction of this Court. Accordingly, to the extent Plaintiffs were to ask this Court to release or transfer them or their children for the purpose of reunification through a writ of habeas corpus under 28 U.S.C. § 2241, this Court lacks jurisdiction over such claims because they must be directed at the person with custody and control over Plaintiffs or their children, and that person would be not be located in the District of Columbia. *See Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) (For "core" habeas challenges—defined as "challenges to present physical confinement"—brought under 28 U.S.C. § 2241, "the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official."); *see also* 28 U.S.C. § 2243 (providing that "[t]he writ, or order to show cause, shall be directed to the person having custody of the person detained."). Accordingly, this Court lacks jurisdiction to order the relief requested in Plaintiffs' motion to the extent it requires the court to order the release or transfer of Plaintiffs or their children through a writ of habeas corpus. *See Padilla*, 542 U.S. at 443 ("[F]or core habeas petitions challenging present physical confinement, jurisdiction lies in only one district: the district of confinement."); *see also id.* at 442-43 (citing *Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 495 (1973)) (stating that to have jurisdiction over a habeas action, a federal court must have jurisdiction over the properly named custodian).

Moreover, this Court also cannot order ICE to release Plaintiffs because such release is available only through parole, and the discretion to make decisions regarding parole has been specifically delegated to DHS by statute. *See* 8 U.S.C. § 1182(d)(5)(A) (DHS may, in its "discretion parole into the United States temporarily under such conditions as [the Secretary]

may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public

benefit any alien applying for admission to the United States . . . ."); 8 C.F.R. §§ 235.3(b)(2)(iii);

235.3(b)(4)(ii) (parole of aliens mandatory detention who are awaiting a credible fear

determination or who have not expressed a fear of return "may be permitted only when the

[Secretary of Homeland Security] determines, in the exercise of discretion, that parole is required

to meet a medical emergency or is necessary for a legitimate law enforcement objective."). The

Supreme Court has recognized that a decision unambiguously "specified by statute 'to be in the

discretion of the [Government]'"—as in 8 U.S.C. § 1182(d)(5)(A)—is "shielded from court

oversight by § 1252(a)(2)(B)(ii)." *Kucana v. Holder*, 558 U.S. 233, 248 (2010); 8 U.S.C. §

1252(a)(2)(B)(ii) ("no court shall have jurisdiction to review . . . any other decision or action of

the Attorney General or the Secretary of Homeland Security the authority for which is specified

under this subchapter to be in the discretion of the Attorney General or the Secretary of

Homeland Security . . . .").

     More recent cases have recognized the non-reviewability of parole determinations in light

of § 1252(a)(2)(B)(ii). *Milardo v. Kerilikowske*, No. 3:16-MC-99, 2016 WL 1305120, *6, 9 (D.

Conn. Apr. 1, 2016) (ICE's discretionary parole decisions are "generally not subject to judicial

review, and [are] never subject to judicial review by a district court"); *United States v. Bush*, No.

CR 12-92, 2015 WL 7444640, *1 (W.D. Pa. Nov. 23, 2015) (finding that section

1252(a)(2)(B)(ii) "explicitly denies courts the jurisdiction to review" parole decisions, "except

insofar as those claims raise constitutional issues, then only the appropriate court of appeals shall

hear the case"); *Naul v. Gonzales*, No. 05-4627, 2007 WL 1217987, *2-*3 (D.N.J. Apr. 23,

2007) (parole denial pursuant to § 1182(d)(5)(A) "is a discretionary decision outside this Court's

review"). Because ICE's decision whether to parole Plaintiffs fathers is clearly committed to its

discretion under the statute, that decision is not subject to review by this Court, and this Court correspondingly cannot grant Plaintiffs the relief they seek to the extent it would require the Court to order ICE to exercise its discretion to parole Plaintiffs.

### iii.   _Plaintiffs Are Not Likely to Succeed On Their Constitutional Claims._

In any event, Plaintiffs are not likely to succeed on their constitutional claims. In essence, Plaintiffs ask this Court to recognize a constitutional right not to be held in Government custody separately from their children, despite the fact that they are lawfully in immigration detention. However, the extent of any right that parents may have based in a relationship with their children (or vice versa) necessarily depends on the circumstances of a particular case. *See, e.g., Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (recognizing that rights of familial association apply differently when an individual is imprisoned). Moreover, the liberty interest at issue for Plaintiffs in this case is not absolute, and must be considered in light of the fact that Plaintiffs are lawfully in immigration custody, and that "'juveniles, unlike adults, are always in some form of custody,' . . . , and where the custody of the parent or legal guardian fails, the government may (indeed, we have said must) either exercise custody itself or appoint someone else to do so." *Flores v. Reno*, 507 U.S. 292, 302 (1993). Thus, where Plaintiffs are in lawful immigration custody, it also stands to reason that the custody of Plaintiffs' children by ORR, as required by the TVPRA when a parent is "unavailable to provide care and custody" to the child, does not violate the Constitution.

To establish a substantive due process violation, Plaintiffs must establish that the Government has engaged in conduct that is so outrageous that it shocks the conscience. *See Cty of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998) ("so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."); *see also Marsh v. Cty. of San Diego*, 680 F.3d 1148, 1154 (9th Cir. 2012) (to violate the "well-established substantive due process right to family

integrity," "the alleged conduct must 'shock[ ] the conscience' and 'offend the community's sense of fair play and decency.'"). The Supreme Court has warned against analyzing claimed substantive due process rights "at too general a level." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

As described above, the separation of Plaintiffs from their children occurred because Plaintiffs were subject to lawful prosecution under 8 U.S.C. § 1325(a), or in the case of M.G.U. because ICE determined that detention at an ICE family residential center was no longer appropriate in light of M.G.U.'s past criminal actions. Plaintiffs remain separated from their children because they are now in ICE custody and subject to mandatory detention. In light of this legal framework which governs the separation and custody of Plaintiffs, and which involves lawful criminal and immigration enforcement actions on the part of the Government, Plaintiffs are not likely to succeed on any substantive due process claim.

D.    The Balance Of Harms Tips In Favor Of The Government, And The Public Interest Would Not Be Served By Entry Of The Preliminary Injunction Sought By Plaintiffs.

The Court should further decline to grant Plaintiffs' requests for preliminary injunction in this case because affording the relief sought by Plaintiffs would impact the Government's ongoing efforts to timely comply with the preliminary injunction order in *Ms. L., et al. v. ICE, et al.*, Case No. 18-cv-0428 (S.D. Cal.). Under that order, the Government has thirty days to reunite all class members with their children—either by placing them together or by releasing them together. Implementation of the requirements of that order are underway, and the Government is devoting significant resources to facilitating compliance for all class members. *See Ms. L* Notice of Compliance, attached. The Government, and the public, have an interest allowing these efforts to move forward without the issuance of other orders from other district courts that may impact these compliance efforts. Accordingly, there is good reason for this Court to decline to grant

preliminary injunctions in these cases and to allow the Government to move forward as quickly as possible to comply with the relief already granted by the *Ms. L.* Court.

## V.      CONCLUSION

For the foregoing reasons, the Plaintiffs' motion for preliminary injunction should be denied.

DATE: July 6, 2018                    Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
WILLIAM C. PEACHEY
Director
WILLIAM C. SILVIS
Assistant Director

By:   Sarah B Fabian
SARAH B. FABIAN
Senior Litigation Counsel
U.S. Department of Justice
Office of Immigration Litigation
District Court Section
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962
E-mail: Sarah.B.Fabian@usdoj.gov

and

JESSIE K. LIU, D.C. Bar #472845
United States Attorney
DANIEL F. VAN HORN
D.C. BAR # 924092
Civil Chief

JEREMY S. SIMON, D.C. BAR #447956
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2528
Jeremy.simon@usdoj.gov

*Counsel for Respondents*

CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2018, I served the foregoing pleading on all counsel of

record by means of the District Clerk's CM/ECF electronic filing system.

/s/ Sarah B. Fabian
SARAH B. FABIAN
U.S. Department of Justice
District Court Section
Office of Immigration Litigation

*Attorney for Respondents*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| M.G.U, *et al.* | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:18-cv-01458 (PLF) |
| | ) | |
| v. | ) | |
| | ) | |
| Kirstjen Nielsen, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**DECLARATION OF SDDO GERARDO AGUILAR**

I, Supervisory Detention and Deportation Officer (SDDO) Gerardo Aguilar, hereby make the following declaration with respect to the above-captioned matter:

1. I am a Supervisory Detention and Deportation Officer at the South Texas Family Residential Center (STFRC) in Dilley, Texas.  I am employed by Enforcement and Removal Operations (ERO), U.S. Immigration and Customs Enforcement (ICE), U.S. Department of Homeland Security.  In this capacity, I am a sworn Federal law enforcement officer charged with supervisory oversight over immigration detention, case management, and removal operations at the STFRC, including detention of family units.  On May 17, 2018, I was assigned to be the Acting Assistant Field Office Director for ERO San Antonio's STFRC sub-office.

2. I am familiar with the immigration history of Plaintiff M.G.U.  She and three of her children entered the United States at the San Ysidro Port of Entry on or about May 4, 2018.  On May 8, 2018, they were received at the STFRC and initially detained as a family unit at the STFRC in Dilley, Texas.  However, after it was discovered that

1

M.G.U. had previously entered the United States under a different alien number, we found that M.G.U. had been convicted of making False and Misleading Representations and sentenced to 75 days confinement.  On May 17, 2018, with ERO field office management's concurrence, I determined that M.G.U.'s continued detention in an ICE family residential center was not appropriate in light of this prior conviction.  ICE places aliens into family detention if they have no criminal record or a minor criminal conviction.  I did not consider a conviction for False and Misleading Representation to be a minor criminal violation. This conviction constituted a more serious violation and I determined (with ERO field office management's concurrence) that detention in a more structured detention facility was appropriate.  Therefore, M.G.U. was transferred into an ICE adult detention facility near Pearsall, Texas.

3.  Because M.G.U. was placed into an ICE adult detention facility, her children had no parent or legal guardian in the United States to care for them.  Thus, in accordance with the Trafficking Victim Protection Reauthorization Act, her children were transferred to the custody of the U.S. Department of Health and Human Services, Office of Refugee Resettlement.

4.  On July 5, 2018, first thing in the morning, M.G.U. was transferred out of the adult detention facility and is in the process of being transferred to an ICE facility in New York for reunification with her children in accordance with a court order in *Ms. L. v. ICE*, No. 18-0428 (S.D. Cal.).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

2

Executed this 6th day of July, 2018, in Dilley, Texas.

_____

Gerardo Aguilar
Supervisory Detention and Deportation Officer (SDDO)

CHAD A. READLER
Acting Assistant Attorney General
SCOTT G. STEWART
Deputy Assistant Attorney General
WILLIAM C. PEACHEY
Director
Office of Immigration Litigation
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director
Office of Immigration Litigation
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation

U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

*Attorneys for Federal Respondents-Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L, et al., | Case No. 18cv428 DMS MDD |
| Petitioners-Plaintiffs, | |
| vs. | **RESPONDENTS' NOTICE REGARDING COMPLIANCE AND REQUEST FOR CLARIFICATION AND/OR RELIEF** |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Respondents-Defendants. | |

## I. NOTICE REGARDING COMPLIANCE

On June 26, 2018, this Court issued orders granting Plaintiffs' motion to certify a class, ECF No. 82, and ordering a preliminary injunction on behalf of that class, ECF No. 83. After receiving the Court's preliminary-injunction order, Defendants immediately acted to implement and comply with it. As a result of that prompt action, Defendants believe that they are in compliance with all aspects of the Court's injunctive order regarding the forward-looking policies on separation and communication. Defendants have been working diligently on complying with the Court's reunification directives. Defendants understand the urgent concerns underpinning the Court's order. Defendants have dedicated immense resources and effort to reunifying families, and personnel at the highest levels of the agencies have been involved in implementing the Court's directives. Defendants are submitting declarations to explain the extensive efforts of the U.S. Department of Health and Human Services ("HHS") (declaration attached hereto) and U.S. Immigration and Customs Enforcement ("ICE") (declaration to follow) to identify class members and their children and to reunify class members with their children.

In the preliminary-injunction order, the Court set a status conference for July 6. *Id.* Defendants have plans to comply with the injunction, and are prepared to discuss those plans at the conference. To fully implement these plans, however, Defendants may need clarification on or relief from certain parts of the order, so that Defendants can safely reunite families. Among other issues, Defendants need

1  this Court's guidance on issues that arise because of HHS's understanding of its

2  statutory obligations to ensure the safety of children before transferring them out of

3  HHS custody. The processes that HHS has developed in order to fulfill its statutory

4  obligations are critical to protecting children against the well-documented risk of

5  trafficking or abuse, but they also require HHS to follow procedures that are time-

6  consuming, even in this unique context. Defendants thus seek confirmation about

7  the Court's intent in its order as it relates to those procedures and, as appropriate,

8  relief from the Court's deadlines.[1] Defendants also seek clarification regarding the

9  definition of the class certified by this Court.

**II.    REQUEST FOR CLARIFICATION AND/OR RELIEF**

The Government respectfully requests the Court's prompt resolution of

several critical implementation issues, at or soon after the July 6 status conference.

The Government anticipates that additional clarification or relief may be requested

as its implementation of the Court's injunction proceeds. The Government will

bring any additional such requests to the Court's attention promptly.

---

[1] The Government also has advised the court in *Flores v. Sessions*, No. 85-4544
(C.D. Cal.), that the Flores Settlement Agreement permits the Government to use
ICE family residential centers to hold families together while in Government
custody. *See Flores*, ECF No. 447 (attached).

18cv428 DMS MDD

A. <u>Releasing Children From HHS Custody.</u>

As this Court is aware, the class definition includes "[a]ll adult parents who enter the United States," whether at or between ports of entry, "who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody." Class-Certification Order, ECF No. 82 at 17. The class excludes parents if there is "a determination that the parent is unfit or presents a danger to the child." *Id.* It also excludes parents "with criminal history that prevents them from being released into the community along with their child or housed together in a [family] detention center," parents "with some kind of communicable disease" raising safety concerns, or "parents who fall within the [Family Separation Executive Order]." *Id.* at 4 n.5, 10. The Court's preliminary injunction, in turn, directs Defendants to "reunify all Class members with their minor children" within 14 days for children under age 5 and within 30 days for minor children age 5 and over, "[u]nless there is a determination that the parent is unfit or presents a danger to the child, or the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child." Preliminary-Injunction Order, ECF No. 83 at 23 ¶ (3).

As explained in the attached declaration of Jonathan White, HHS understands the Court's order in light of its statutory mission, which requires HHS

to ensure child welfare and the safety of minors released from its custody. More specifically, considering the order in light of its statutory obligations relating to the release of unaccompanied alien children (UACs), *see* 6 U.S.C. § 279; 8 U.S.C. § 1232, HHS understands the order to require three distinct findings before a child can be released.

First, to confirm that an individual is, in fact, a class member as well as a "parent" within the meaning of 6 U.S.C. § 279(g)(2), HHS first must determine that the individual is the parent of the child with whom he or she seeks to be reunified. White Declaration ¶¶ 20-26. HHS believes that this requirement applies regardless of whether the parent is in federal custody or has been released into the interior. To determine parentage, HHS is using DNA swab testing because it is a reasonably prompt and efficient method for determining biological parentage in a significant number of cases. White Declaration ¶¶ 21, 25. HHS is working diligently to minimize the burdens of confirming parentage, and is expediting DNA verification. White Declaration ¶¶ 20-24. But given the possibility of false claims of parentage, confirming parentage is critical to ensure that children are returned to their parents, not to potential traffickers. White Declaration ¶ 25. Although HHS is moving expeditiously to undertake these DNA tests, that process takes meaningful time, even when it is expedited—as this Court has implicitly recognized. *See* Order on Motion to Dismiss 3-4, 8 (noting that on March 8, 2018,

the Court ordered that a DNA test for Ms. L. be completed by March 14—which the Court described as "order[ing] an expedited DNA test").

In many cases involving parents who are detained, this process will not interfere with the Government's ability to reunify families within the timelines provided by the Court. In some cases, however, this process may not be conclusive in establishing parentage, and further evaluation of available documentation may be required. White Declaration ¶¶ 20, 45. Confirming parentage for adults who have already been released may also take additional time, including for the parent to appear for DNA testing or other confirmation. In those cases, it may be harder to reunify some families within the Court's timeline.

Accordingly, the Government respectfully requests clarification from the Court as to whether the process for confirming parentage implemented by HHS is consistent with the Court's understanding of its mandate, and seeks clarification that in cases where parentage cannot be confirmed quickly, HHS will not be in violation of the Court's order if reunification occurs outside of the timelines provided by the Court. The Government can for the Court's consideration prepare a proposal for an alternative timeline.

Second, to confirm that an individual is neither "unfit [n]or presents a danger to the child," that the parent is "available to provide care and physical custody," 6 U.S.C. § 279(g)(2), and that the parent "has not engaged in any activity that would

indicate a potential risk to the child," 8 U.S.C. §1232(c)(3)(A), ICE and HHS must confirm whether an individual has any criminal history, including a history indicative of abuse. White Declaration ¶¶ 27, 29. To expedite those determinations in the unusual context of reunification following government separation, the agencies are relying on summaries of criminal background checks run by ICE, which are in turn shared with HHS. White Declaration ¶ 29. That process is not currently anticipated to delay reunification.

Third, before releasing any child to a class member who is not in government custody, HHS understands that the determination that a parent is not "unfit or presents a danger to the child," Preliminary-Injunction Order at 23 ¶ 2, must be read in conjunction with the TVPRA, 8 U.S.C. § 1232, which imposes additional safety requirements before "plac[ing]" a child with someone outside federal custody. Specifically, a UAC "may not be placed with a person or entity unless [HHS] makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being," which must include "an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." 8 U.S.C. § 1232(c)(3)(A). HHS believes that, in the context of reunifying a parent with a child following government separation, when the parent has since been released into the interior and the child remains in HHS custody, HHS remains obligated to apply existing HHS procedures under the

18cv428 DMS MDD

TVPRA. *See* White Declaration ¶¶ 33-44 for an explanation of such procedures. The processes involved in applying these provisions have developed to ensure that HHS does not inadvertently release a child in its custody into a situation that will expose him or her to trafficking or abuse. White Declaration ¶¶ 45-46.

HHS has worked diligently to expedite these processes to enable the Government to comply with the timelines in the Court's order. HHS anticipates, however, in some instances it will not be able to complete the additional processes within the timelines the Court prescribed, particularly with regard to class members who are already not in Government custody (*e.g.*, because they have previously been paroled or released). White Declaration ¶¶ 45-46.

Accordingly, HHS seeks clarification from this Court that it intended for HHS to follow such procedures in the somewhat unique context of reunification following government separation, and in particular for reunification with class members who have been released into the interior. If the Court intended for HHS to follow a different approach, the Government requests clarification regarding the precise inquiry that HHS should be making in these circumstances.[2]

---

[2] HHS's aim it to comply with the Court's injunction, while also following its normal processes under the TVPRA that HHS has implemented to ensure the safety of children upon placement by HHS with a parent or other sponsor. Accordingly, HHS asks that if the Court concludes that HHS must truncate those normal TVPRA processes to meet court-ordered deadlines, then the Court should so order in a manner that provides HHS full clarity with regard to its court-ordered obligations.

18cv428 DMS MDD

1  Further, if the Court concludes that HHS is properly proceeding in light of

2  the Court's order and the relevant statutory provisions, then HHS seeks partial

3  relief from the timelines in the Court's order to allow HHS to comply with these

4  obligations and to safely achieve the reunifications that the order directs,

5  particularly for parents who have previously been released. The Government does

6  not wish to unnecessarily delay reunifications or burden class members. At the

7  same time, however, the Government has a strong interest in ensuring that any

8  release of a child from Government custody occurs in a manner that ensures the

9  safety of that child. The Government can, for the Court's consideration, prepare a

10  proposal for an alternative timeline that that takes HHS's procedures into account.

11  Thus, Defendants seek clarification to ensure that the Government can

12  comply with and implement the Court's order consistent with federal laws

13  protecting child safety in implementing reunification plans.

B.  ICE's Obligations Under Paragraph (1) Of The Preliminary
Injunction.

As described in the Government's declarations, the reunification process

implemented by ICE and HHS for parents who are now in ICE custody requires

extensive and careful coordination between the two agencies so that HHS can

reunify the child with his or her parent in ICE custody. White Declaration ¶¶ 13-

14, 29. HHS is able to reunify families in such cases much faster than it is able to

do so for class members who have already been released from ICE custody. *Id.*

8

18cv428 DMS MDD

Paragraph (1) of the Court's preliminary-injunction order prohibits ICE "from detaining Class Members in DHS custody without and apart from their minor children." Preliminary-Injunction Order at 22 ¶ (1). Consistent with that command, reunification could occur in ICE custody in a family residential center, or by reunifying the parent and child at release. But this paragraph could potentially be read to require that if HHS has not been able to reunify a child with a parent in ICE custody by the deadlines ordered by the Court, ICE would still be required to release the parent from custody before that deadline even without reunification. Such a requirement would, in most cases, delay reunification because release of a parent before HHS completes its suitability determination would trigger additional obligations for HHS to comply with the procedures it has developed to ensure safe release in accordance with the TVPRA. White Declaration ¶¶ 33-45.

If, as discussed above, the Court determines that HHS should continue to follow its TVPRA procedures in making its release decisions, then the Government further asks the Court to clarify whether: (a) Paragraph (1) of the preliminary-injunction order requires that ICE release the parent by the compliance deadlines even if HHS has not completed its processes and where such release might slow reunification; or (b) ICE may continue to hold parents beyond the current deadlines until HHS's processes are complete.

9

C. <u>Scope Of The Class Definition.</u>

The Government also respectfully requests clarification on the scope of the Court's class definition.

First, as issued, the class definition contains no date limitations. It thus could be read to cover individuals who were separated from their children long before this case began, and long before the May 2018 policy that prompted the Court's injunction. The absence of any date limitations, moreover, makes it difficult for the Government to ensure that it has identified all class members.

Accordingly, the Government respectfully requests that the Court clarify a start date for separations that would result in class membership for the separated parent. The Government proposes that the Court use March 9, 2018, as the starting point for the reunification requirement, because that is the date of filing for Plaintiffs' amended complaint which added the class claims in this case.

Relatedly, the class definition does not specify whether it includes parents who had been removed from the United States prior to the issuance of the Court's class-certification order. The order itself does not address such individuals, nor did either named Plaintiff experience such a situation. Moreover, the timelines for the relief ordered by the Court could not encompass such a scenario given the complexities involved in locating individuals who have been removed, determining whether they wish to be reunified with their child, and facilitating such a

18cv428 DMS MDD

reunification outside of the United States. Accordingly, the Government requests that the Court clarify that such individuals are not included within the class definition or, if the Court believes that they are, that the Court allow the Government the opportunity to brief the matter or that the Court at least provide the Government relief from the timelines in the order with regard to the reunification of such individuals, and instead allow the Government the opportunity to propose a timeline to pursue reunifications for removed individuals.

18cv428 DMS MDD

1    DATED: July 5, 2018                    Respectfully submitted,

2

3                                            CHAD A. READLER
                                             Acting Assistant Attorney General
                                             SCOTT G. STEWART
4                                            Deputy Assistant Attorney General
5                                            WILLIAM C. PEACHEY
                                             Director
6                                            WILLIAM C. SILVIS
                                             Assistant Director
7

8                                            */s/ Sarah B. Fabian*
9                                            SARAH B. FABIAN
                                             Senior Litigation Counsel
10                                           NICOLE MURLEY
                                             Trial Attorney
11                                           Office of Immigration Litigation
12                                           Civil Division
                                             U.S. Department of Justice
13                                           P.O. Box 868, Ben Franklin Station
14                                           Washington, DC 20044
                                             (202) 532-4824
15                                           (202) 616-8962 (facsimile)
16                                           sarah.b.fabian@usdoj.gov

17

18                                           ADAM L. BRAVERMAN
                                             United States Attorney
19                                           SAMUEL W. BETTWY
                                             Assistant U.S. Attorney
20

21                                           *Attorneys for Respondents-Defendants*

22

23

24

25

26

27

28

                                  12                        18cv428 DMS MDD

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L., et al. | Case No. 18-cv-428 DMS MDD |
| Petitioner-Plaintiff, | |
| vs. | **CERTIFICATE OF SERVICE** |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Respondents-Defendants. | |

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 450 Fifth Street, NW, Washington, DC 20001. I am not a party to the above-entitled action. I have caused service of the accompanying RESPONDENTS' NOTICE REGARDING COMPLIANCE AND REQUEST FOR CLARIFICATION AND/OR RELIEF on all counsel of record, by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically provides notice.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: July 5, 2018

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division, U.S. Department of Justice

*Attorney for Respondents-Defendants*

1 | CHAD A. READLER
Acting Assistant Attorney General
2 | WILLIAM C. PEACHEY
Director, Office of Immigration Litigation (OIL)
3 | U.S. Department of Justice
WILLIAM C. SILVIS
4 | Assistant Director, OIL District Court Section
SARAH B. FABIAN
5 | Senior Litigation Counsel
NICOLE MURLEY
6 | Trial Attorney
Office of Immigration Litigation
7 | U.S. Department of Justice
Box 868, Ben Franklin Station
8 | Washington, DC 20442
Telephone: (202) 532-4824
9 | Fax: (202) 616-8962

10 | ADAM L. BRAVERMAN
United States Attorney
11 | SAMUEL W. BETTWY
Assistant U.S. Attorney
12 | California Bar No. 94918
Office of the U.S. Attorney
13 | 880 Front Street, Room 6293
San Diego, CA 92101-8893
14 | 619-546-7125
619-546-7751 (fax)
15 |
Attorneys for Federal Respondents-Defendants
16 |
17 | UNITED STATES DISTRICT COURT
18 | SOUTHERN DISTRICT OF CALIFORNIA
19 |
20 | MS. L, et al.,
21 |                Petitioners-Plaintiffs,
22 |        vs.
23 | U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT, et al.,
24 |
25 |                Respondents-Defendants.

Case No. 18cv428 DMS MDD

**DECLARATION OF
JONATHAN WHITE**

I, Jonathan White, for my declaration pursuant to 28 U.S.C. § 1746, hereby state and depose as follows, based on my personal knowledge and information provided to me in the course of my official duties:

1.      I am a career officer in the United States Public Health Service Commissioned Corps and have served in the Department of Health & Human Services in three Administrations.  I am presently assigned to the Office of the Assistant Secretary for Preparedness and Response, and previously served as the Deputy Director of the Office of Refugee Resettlement for the Unaccompanied Alien Children's Program.

2.      I have been involved directly in the actions which HHS has taken to implement Executive Order (EO) 13841 ("Affording Congress an Opportunity to Address Family Separation") and comply with the orders in *Ms. L., et al., v. U.S. Immigration and Customs Enforcement, et al.*, Case No. 18-cv-428 (S.D.Cal.).  President Trump issued EO 13841 on June 20, 2018, and the Court issued its orders on June 26, 2018.

**KEY HHS ACTIONS ON REUNIFICATION**

3.      <u>Focus on Child Safety</u>:  The Secretary of Health and Human Services has directed HHS to take all reasonable actions to comply with the Court's orders and to prioritize child safety and well-being when doing so.

4.      <u>Deployment of Additional Personnel</u>:  On June 22, 2018, the Secretary of Health and Human Services directed ASPR to deploy personnel and resources to help the Office of Refugee Resettlement (ORR) of the Administration for Children and Families (ACF) of HHS reunify children in ORR custody with parents.

5.      <u>Determination of Class Members</u>:  HHS has worked closely with U.S. Department of Homeland Security (DHS)—including U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE)—to try to determine all individuals who meet the

18cv428 DMS MDD

Court's criteria for class members. The determination of class membership involves real-time, inter-agency collection and analysis of facts and data to: verify parentage; determine location of DHS apprehension and separation; determine parental fitness; and evaluate whether reunification would present a danger to the child. Class membership is not static; it can change due to transfers of putative parents from ICE to the Bureau of Prisons (BOP) (or vice-versa), and newly-acquired information.

6. <u>Facilitation of Regular Communication Between Class Members and Children in ORR Custody</u>: HHS has deployed field personnel to help putative class members communicate with children in ORR care.

**DEPLOYMENT OF ADDITIONAL PERSONNEL**

7. As noted above, on June 22, 2018, the Secretary of Health and Human Services activated ASPR to augment the resources that ORR had already devoted to expeditiously discharge children from ORR care. ORR has had to continue performing core program functions for minors who cross the border without parents (and who far outnumber separated children in ORR care). The augmenting of resources has helped ORR continue performing those core functions.

8. The activating of ASPR included the Secretary's Operation Center (SOC), which is a command center that operates 24 hours per day, 365 days per year. The mission of the SOC is to synthesize critical public health and medical information for the U.S. Government. While typically used for a public health emergency or natural disaster (e.g., Hurricane Maria in Puerto Rico), the SOC can also serve as a communications hub for large, data-intensive, inter-departmental operations.

9. ASPR activated an Incident Management Team. As of July 3, 2018, the Incident Management Team had 33 members (in addition to the permanent staff of the SOC). It works full-time to provide logistical and administrative support.

10. ASPR has also dispatched approximately 115 personnel to the field to engage directly with putative class members in DHS custody. Those personnel—who are organized into four field

18cv428 DMS MDD

teams— are from ACF, ASPR, the US Public Health Service Commissioned Corps, and the National Disaster Medical System's Disaster Medical Assistance Team (DMAT). The DMAT is a cadre of trained health and medical professionals and para-professionals that augments ASPR's capabilities during public emergencies.

11. Finally, HHS has executed a contract with BCFS Health and Human Services, Inc. ("BCFS"), to provide an additional 100 reunification case managers, plus approximately 40 staff for logistical and administrative support. HHS has trained the case managers from BCFS, and is deploying them on Thursday, July 5, and Friday, July 6, 2018, to augment existing field operations. They too will engage directly with putative class members in ICE custody.

**DETERMINATION OF CLASS MEMBERS**

12. ORR has a process for placing unaccompanied alien children (UAC) with parents or other sponsors that is designed to comply with the 1997 Flores Settlement Agreement, the Homeland Security Act of 2002 (HSA), and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), as described in more detail below. This process ensures the care and safety of children who are apprehended in the United States and then referred to HHS as unaccompanied children.

13. HHS has modified and expedited its ordinary process so that it can determine class membership using the Court's criteria and, to the extent possible, reunify class members and their children within the Court's deadlines.

14. Under its modified process, HHS identifies putative class members with children in ORR custody and verifies parentage. Also, HHS determines the putative class member's immigration history to confirm where they were apprehended and separated from their child. Finally, HHS collects and analyzes criminal, medical (e.g., communicable disease), and other information to

3

18cv428 DMS MDD

determine the parental fitness of the putative class member and confirm that reunification would not present a danger to the child. HHS generally performs these checks concurrently.

15. Putative class members who are not verified as parents are not included in the class by HHS. Putative class members apprehended in the interior, who have relevant criminal history, have a communicable disease, or are otherwise parentally unfit or present a danger to a child, are not included in the class either.

16. In general, HHS knows the names and locations of all children who are in ORR care and custody at all times because ORR maintains that data in its online case management portal. The ORR portal includes data about each child that DHS provided when DHS transferred the child to ORR custody. It also includes health and social data collected or entered by ORR personnel, grantees, or contractors. While the ORR portal may contain some data about the child's parents, the ORR portal was not designed to determine class membership or facilitate reunification under the criteria and deadlines established by the Court's Order. Some of the data required to determine the class membership of a putative class member resides with DHS, while HHS must collect some data directly from the putative class member.

17. The data collection, sharing, and analysis required to determine class membership is extraordinarily time and resource intensive. There are myriad reasons for this. For instance, DHS has different information systems, and those systems were not designed to neatly capture and readily share all of the data required to determine class membership. The departments must therefore map their data manually. Also, the class potentially encompasses parents who were separated from their children *before* the Administration implemented the zero-tolerance policy, and those groups may not have received the same family unit identifiers from DHS as the groups separated *after* the Administration implemented the zero-tolerance policy. Absent reliable and consistent identifiers, HHS must glean the separations of class members and children (and related details) from the case

18cv428 DMS MDD

management files on the ORR portal. On top of these variables, a parent's class membership can change if the parent is transferred between ICE and the Bureau of Prisons (BOP), or if information obtained directly from the parent affects the class membership analysis.

18. To ensure that every separated child in ORR custody who belongs to a class member is identified and reunified, HHS has had each grantee at one of ORR's approximately 110 shelters certify the separated children who the grantee reasonably believes are in its care. HHS has also conducted a full manual review of the case management file for each one of the approximate 11,800 children in ORR custody—the substantial majority of whom were not separated from a putative parent at the border—to confirm or rule out any indicia of separation. The manual review was conducted by dozens of HHS personnel working nights and over the weekend. The results of both the manual review and the grantee certifications are undergoing validation.

19. As of July 5, 2018, we have identified approximately 101 minors under age 5, within ORR care, whose records contain indicia of separation. Class membership analysis for putative class members associated with the larger group of minors 5 through 18 is ongoing. Also, some of the identified minors may have been separated prior to crossing the border, or there may be other factors that need to be explored that would not make their parents members of the class. HHS has received confirmation from DHS that approximately 40 parents of children in the under-5 group are in DHS custody and another 9 are in U.S. Marshal's custody. The class membership analysis for putative class members associated with the remaining children in the group of 101 is ongoing.

<u>Verifying Parentage</u>

20. HHS is using DNA testing to try to verify parentage of <u>*all*</u> putative class members, as well as all children in ORR custody who ORR reasonably believes were separated from a putative class member. HHS is conducting the DNA testing concurrent with collecting and reviewing

documentation of parentage, interviewing putative class members and family members, and observing communications or interactions between putative class members and children.

21.     DNA testing is a faster but costlier method for confirming parentage than collecting and assessing documentation and anecdotal information.  When ORR implements its safety and suitability policies in the ordinary course of administering its program, it confirms parentage through DNA testing as a last resort.  HHS has dual-tracked global DNA testing to ensure child safety and to expedite parentage verifications to try to comply with the deadlines in the Court's order.

22.     ORR grantees are swabbing the cheeks of the children in ORR custody, while DHS personnel or the field teams deployed by HHS are swabbing the cheeks of the putative class members in ICE custody.  The cheek swabs are then sent to a third-party laboratory services provider to complete the DNA testing.  The results are then transmitted electronically to the Incident Management Team at the SOC, which shares them with the grantees.  HHS will use the results only for verifying parentage.

23.     The DNA testing process takes nearly one week to complete for each putative class member and child.  Once HHS has made a data match between a putative class member and child, it may take the field teams and grantees up to two days to further validate the match and swab cheeks. It may then take up to three days for laboratory services provider to collect the sample and conduct the test.  Once the laboratory services provider completes the testing, it may take up to 24 hours for the Incident Management Team to receive and transmit the results back to the grantees and field teams.

24.     The field teams are concurrently facilitating the completion of reunification applications by putative class members.  The packets seek medical and social data that bear on the criteria for class membership, including parentage, parental fitness, and child endangerment.  A copy of a blank reunification application is attached at Tab 1.

25.     My opinion is that DNA testing is the method of parental verification most likely to protect children from harm given the compressed timeframe imposed by the court's order.  The risk of placing children with adults who are not their parents is a real and significant child welfare concern for HHS because the experience of ORR is that children are smuggled across the border or trafficked by adults who fraudulently hold themselves out as parents.  The children may not disclose the situation to CBP, ICE, or ORR because they may fear retaliation by the adults who brought them across the border.  In some instances, they may fear retaliation by their parents in their home country, who have given them to the smuggler or trafficker so that they may earn money in the United States. My opinion is that DNA testing mitigates the risk of the United States Government placing children back with adults who are not their parents and who would endanger them.

26.     If, however, HHS concludes that it can reliably and more quickly determine the parentage of a putative class member based on documentation or anecdotal information collected from the putative class member, then HHS will make that determination to try to comply with the Court's reunification deadlines.

Background Checks for Parental Fitness

27.     HHS is assessing the backgrounds of putative class members by reviewing summaries of prior criminal background checks provided by ICE.  Already such background check information has come back with two results that show that two putative parents of children under five may endanger the child (charges of kidnapping/rape and child cruelty), and 12 more need to be further assessed.

Parental Fitness and Child Endangerment

28.     As discussed below, HHS' ordinary process for placing children with sponsors involves a safety and suitability analysis, as well as a home study in certain circumstances.  These checks can sometimes take weeks or months.

18cv428 DMS MDD

29. HHS has modified and expedited its ordinary process when further assessing parental fitness and potential child endangerment for a potential reunification with a putative class member in DHS custody. For potential reunifications with putative class members in DHS custody, any further assessment of parental fitness and potential child endangerment involves only the review of the case management records (which includes, for example, case review notes and other electronic files) and the putative class member's completed reunification packet for indicia of child abuse or neglect. If there are no such indicia, then HHS will not conduct further assessment.

30. When further assessing parental fitness and potential child endangerment for potential reunifications of putative class members who are no longer in DHS custody, HHS is modifying and expediting its ordinary process on a case-by-case basis to try to comply with court-ordered deadlines in ways that do not endanger child welfare.

31. For example, when placing a child with a putative parental sponsor who is no longer in DHS custody, HHS would ordinarily verify the potential sponsor's residential address and conduct background checks of adult cohabitants to try to ensure that the potential sponsor is capable of providing shelter and care – and that the potential sponsor's cohabitants do not endanger the child— after placement. To try to comply with the Court's deadlines, HHS will likely need to streamline its address verification process for putative class members. But HHS does not believe that it can streamline background checks.

32. UAC sponsors have always included the parents of UACs , and close to half of the sponsors to whom ORR ordinarily releases UACs are parents.

33. The *Flores* settlement agreement ("FSA") prioritizes release to parents, if they are available, and also specifically provides for ORR to ensure the suitability of such releases, and to protect the child from danger. *See* FSA paragraphs 14-18.

18cv428 DMS MDD

34.     The FSA describes a variety of criteria to consider before the government releases a UAC to a parent (or other sponsor).  *See* FSA paragraphs 14-18.  These factors include:

- Verifying the identity of the parent;

- Verifying the identity and employment of the individuals offering support to the parent and minor;

- Receiving information from their address and any future change of address;

- Ensuring the parent will provide for the minor's physical, mental, and financial well-being;

- Investigating the living conditions in which the minor would be placed and the standard of care he would receive;

- Interviewing the members of the household where the parent will live with the child, and in some cases a home visit; and

- Requiring the parent to ensure the minor's presence at all future immigration proceedings.

35.     Furthermore, under the HSA and TVPRA, HHS has developed a series of safety and suitability requirements that ensure child welfare, upon release, is protected.  These policies, many of which were refined after Congressional oversight, are contained in Section 2 of the ORR Policy Guide: Children Entering the United States Unaccompanied, available at:

https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.1 .

36.     The policies include identifying the sponsor; submitting the application for release and supporting documentation; evaluating the suitability of the sponsor, including verification of the sponsor's identity and relationship to the child; background checks; and in some cases home studies; and planning for post-release.

18cv428 DMS MDD

37.     ORR requires all potential sponsors, including parents, to undergo fingerprinting in order to ensure the safety and suitability of release.  The fingerprints are used to run background checks of databases involving criminal history. ORR also checks sexual abuse information, child abuse information, and other public record sources.

38.     ORR also requires that, if there are other adults living in the household with a sponsor (including a parent), those adults also undergo background checks.  This ensures the child will not be endangered if, for example, those household members have a history of child abuse or sexual abuse that ORR must further consider before approving the release.

39.     ORR also requires that sponsors, including parents, identify an alternative caregiver, who will be able to provide care in the event the original sponsor is unavailable.  These adult caregivers must also be identified and undergo background checks.

40.     To ensure safety and suitability for children, ORR considers the following factors when evaluating release of a UAC to parents, other family members, and other potential sponsors in the community:

a.  The nature and extent of the sponsor's previous and current relationship with the child or youth and the unaccompanied alien child's family, if a relationship exists.

b.  The sponsor's motivation for wanting to sponsor the child or youth.

c.  The UAC's parent or legal guardian's perspective on the release to the identified potential sponsor (for cases in which the parent or legal guardian is not  the sponsor).

d.  The child or youth's views on the release and whether he or she wants to be released to the individual.

e.  The sponsor's understanding of the unaccompanied alien child's needs, as identified by ORR and the care provider.

18cv428 DMS MDD

f. The sponsor's plan to provide adequate care, supervision, access to community resources, and housing.

g. The sponsor's understanding of the importance of ensuring the unaccompanied alien child's presence at all future hearings or proceedings, including immigration court proceedings, and the sponsor's receipt of Legal Orientation Program for Custodians information that ORR provides to all potential sponsors.

h. The linguistic and cultural background of the child or youth and the sponsor, including cultural, social, and communal norms and practices for the care of children.

i. The sponsor's strengths, resources, and mitigating factors in relation to any risks or special concerns of the child or sponsor, such as a criminal background, history of substance abuse, mental health issues, or domestic violence and child welfare concerns.

j. The unaccompanied alien child's current functioning and strengths in relation to any risk factors or special concerns, such as children or youth who are victims of human trafficking; are a parent or are pregnant; have special needs, disabilities or medical or mental health issues; have a history of criminal, juvenile justice, or gang involvement; or a history of behavioral issues.

41. In certain cases, the TVPRA requires a home study, prior to release. 8 U.S.C. § 1232(c)(3)(B) states: "A home study shall be conducted for a child who is a victim of a severe form of trafficking in persons, a special needs child with a disability (as defined in section 12102 of title 42), a child who has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened, or a child whose proposed sponsor clearly presents a risk of abuse, maltreatment, exploitation, or trafficking to the child based on all available objective evidence." In circumstances in which a home study is not required by the TVPRA or ORR policy, the Case Manager and an independent third party Case

Coordinator may recommend that a home study be conducted if they agree that the home study will provide additional information required to determine that the sponsor is able to care for the health, safety and well-being of the child.

42.    ORR does not disqualify potential sponsors on the basis of their immigration status, but does require sponsors (including parents) to complete a sponsor care plan.  Among other things, the care plan identifies the adult caregiver who will act for the sponsor, should the sponsor become unavailable, and how such caregiver will be notified of such situation.  It also includes a safety plan in some circumstances.

43.    Throughout the release process, care providers work with the child and sponsor so that they can plan for the child's after care needs. This involves working with the sponsor and the unaccompanied alien child to prepare them for post-ORR custody, assess the sponsor's ability to access community resources, and provide guidance regarding safety planning, sponsor care plans, and accessing services for the child.  The care provider explains the U.S. child abuse and neglect standards and child protective services that are explained on https://www.childwelfare.gov, human trafficking indicators and resources, and basic safety and how to use the 9-1-1 number in emergency situations.

44.    Once the assessment is complete and a sponsor has been approved, the sponsor enters into an agreement with the Federal government in which he or she agrees to:

    a.    Provide for the physical and mental well-being of the child, including but not limited to, food, shelter, clothing, education, medical care and other services as needed.

    b.    Attend a legal orientation program provided under the Department of Justice/Executive Office for Immigration Review's (EOIR) Legal Orientation Program for Custodians (Sponsors), if available where he or she resides.

c.  Depending on where the unaccompanied alien child's immigration case is pending, notify the local Immigration Court or the Board of Immigration Appeals within 5 days of any change of address or phone number of the child (Form EOIR-33). (If applicable, file a Change of Venue motion on the child's behalf.10 A "change of venue" is a legal term for moving an immigration hearing to a new location.)

d.  Notify the DHS/U.S. Citizenship and Immigration Services within 10 days of any change of address by filing an Alien's Change of Address Card (AR-11) or electronically at http://www.uscis.gov/ar-11.

e.  Ensure the unaccompanied alien child's presence at all future proceedings before the DHS/Immigration and Customs Enforcement (ICE) and the DOJ/EOIR.

f.  Ensure the unaccompanied alien child reports to ICE for removal from the United States if an immigration judge issues a removal order or voluntary departure order.

g.  Notify local law enforcement or state or local Child Protective Services if the child has been or is at risk of being subjected to abuse, abandonment, neglect or maltreatment or if the sponsor learns that the child has been threatened, has been sexually or physically abused or assaulted, or has disappeared. (Notice should be given as soon as it is practicable or no later than 24 hours after the event or after becoming aware of the risk or threat.)

h.  Notify the National Center for Missing and Exploited Children at 1-800-843-5678 if the unaccompanied alien child disappears, has been kidnapped, or runs away. (Notice should be given as soon as it becomes practicable or no later than 24 hours after learning of the child's disappearance.)

13

i.  Notify ICE at 1-866-347-2423 if the unaccompanied alien child is contacted in any way by an individual(s) believed to represent an alien smuggling syndicate, organized crime, or a human trafficking organization. (Notice should be provided as soon as possible or no later than 24 hours after becoming aware of the information.)

j.  In case of an emergency, such as serious illness, destruction of home, etc., temporarily transfer physical custody of the child to another person who will comply with the terms of the Sponsor Care Agreement.

k.  In the event that a sponsor who is not the child's parent or legal guardian is no longer able and willing to care for the unaccompanied alien child and is unable to temporarily transfer physical custody, notify ORR using the ORR National Call Center, at 1-800-203-7001.

45.  If HHS cannot reasonably complete processes that are material to ensuring the welfare of the children presently in ORR custody within the deadlines ordered by the Court, then HHS has no choice but to make class membership determinations with incomplete information.  The use of incomplete information increases the risk of not only incorrect class membership determinations, but also reunifications that endanger the welfare of the children presently in ORR care.

46.  My opinion is that some relaxing of the Court's deadlines is needed to allow HHS, on a case-by-case basis, to complete processes that HHS determines are necessary to make informed class membership determinations and to protect the welfare of the children presently in ORR custody.

**FACILITATION OF CLASS MEMBER COMMUNIATIONS**

47.  HHS has facilitated communication between putative class members by helping putative class members connect with case managers.  HHS has directed field staff to help facilitate a conversation between a putative class member and his or her child.  For example, field staff may call

14

18cv428 DMS MDD

a case manager in a minor's shelter and ask the case manager to call or contact the detained parent. In other instances, the detained adult may be given the shelter case manager's telephone number.

48. The ORR Helpline is a bilingual call center that ordinarily works with ORR grantees to facilitate communications between potential sponsors and the children in the care of the grantees. *See* https://www.acf.hhs.gov/orr/about/ucs/contact-info (last visited July 5, 2018). Potential sponsors who call the ORR Helpline provide their name, contact information, relationship to the child, and other information to the ORR Helpline representative, who communicates the information to the ORR grantee caring for the child. The ORR grantee then responds to the potential sponsor and facilitates direct communications with the child and a case worker. The ORR Helpline does not verify parentage or make determinations regarding parental fitness or child endangerment.

49. HHS operates with the goal of facilitating communications between putative class members and children in ORR custody twice a week.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 5, 2018.

Jonathan White,

18cv428 DMS MDD

# Please wait...

If this message is not eventually replaced by the proper contents of the document, your PDF viewer may not be able to display this type of document.

You can upgrade to the latest version of Adobe Reader for Windows®, Mac, or Linux® by visiting  http://www.adobe.com/go/reader_download.

For more assistance with Adobe Reader visit  http://www.adobe.com/go/acrreader.

Windows is either a registered trademark or a trademark of Microsoft Corporation in the United States and/or other countries. Mac is a trademark of Apple Inc., registered in the United States and other countries. Linux is the registered trademark of Linus Torvalds in the U.S. and other countries.

CHAD A. READLER
Acting Assistant Attorney General
AUGUST E. FLENTJE
Special Counsel to the Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director
COLIN KISOR
Deputy Director
SARAH B. FABIAN
Senior Litigation Counsel
U.S. Department of Justice
Office of Immigration Litigation
District Court Section
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>JEFFERSON B. SESSIONS III,<br>Attorney General of the<br>United States; *et al.*,<br><br>Defendants. | Case No. CV 85-4544-DMG<br><br>**DEFENDANTS' NOTICE OF COMPLIANCE** |

The Government's June 21, 2018, ex parte application explained that the Flores Agreement—as interpreted by this Court and the Ninth Circuit—put the Government in the difficult position of having to separate families if it decides it should detain parents for immigration purposes. Defendants wish to inform the Court that, following the filing of our application to this Court, a federal district court in the Ninth Circuit held that such separation likely violates substantive due process under the Fifth Amendment. *Ms. L v. U.S. Immigration and Customs Enforcement*, No. 18-428 (S.D. Cal. June 26, 2018) (attached as exhibit). The *Ms. L* court certified a class and entered a class-wide preliminary injunction requiring reunification—both for parents released into the interior of the United States and for parents in DHS custody— and barring future separations for families in DHS custody.

Defendants are submitting this notice of compliance to explain how the government is applying the Flores Agreement in light of this injunction. To comply with the *Ms. L* injunction barring parents in DHS custody from being separated from their children, the Government will not separate families but detain families together during the pendency of immigration proceedings when they are apprehended at or between ports of entry. As explained below, we believe that the Flores Agreement permits the Government to detain families together to comply with the nationwide order in *Ms. L*. We nevertheless continue to believe that an

1

amendment of the Flores Agreement is appropriate to address this issue. Until that amendment, this submission sets out the Government's interpretation and application of the Agreement in light of *Ms. L.*

**A.** There are many legitimate justifications for detaining arriving aliens under the immigration laws, including well-established rules that allow arriving aliens at the border to be detained pending a determination of whether they may legally be admitted to the United States. Such detention, which Congress has made mandatory in many circumstances under 8 U.S.C. § 1225(b), is essential to protecting our southwest border, discouraging families that are not entitled to remain in this country from making the dangerous journey to the border, and returning families promptly when they are not entitled to relief in this country. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 843 (2018); *cf. Demore v. Kim*, 538 U.S. 510, 526 (2003) (discussing the Supreme Court's "longstanding view that the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings").

We have explained over a period of years that one impact of the *Flores* requirements, if applied to minors that come into DHS custody accompanied by their parents, would be the separation of parents from their children. In construing the Flores Agreement, over the government's objection, to apply to children taken into custody with their families, the Ninth Circuit understood that the separation of

parents from their children was a direct consequence of its holding.  *Flores v. Lynch*, 828 F.3d 898, 908-09 (9th Cir. 2016).  But the Ninth Circuit also made clear that neither the Flores Agreement nor court rulings applying it impose any legal barrier on the critical authority of DHS to detain adults who come into immigration custody at the border with their children.  *Flores*, 828 F.3d at 908-09.

The *Ms. L* court reached the same conclusion in considering the situation of the separation of accompanied children from their parents, this time from the point of view of the parents, who were not parties to the *Flores* case or the Settlement Agreement.  The *Ms. L* court issued class-wide relief requiring that, in most circumstances, parents be kept with their children during the pendency of immigration proceedings.  Notably, like the Ninth Circuit, the court in *Ms. L* recognized the authority of DHS to detain parents in immigration custody pending resolution of their immigration cases.  As the court emphasized, even in light of the court's injunction requiring families to be kept together and reunified, the "Government would remain free to enforce its criminal and immigration laws, and to exercise its discretion in matters of release and detention consistent with law." Order at 20; *see also id*. at 3 ("Order does not implicate the Government's discretionary authority to enforce immigration laws . . . including its decision to release or detain class members.").  Thus, while the Government must keep families together when it chooses to exercise its discretion to detain or release a

parent under the INA, the court cited the *Flores* in explaining that the Government otherwise remains "free" to exercise "discretion in matters of release and detention." *Id* at 20 (citing *Flores*); *see id.* at 7 (for "children placed in federal custody, there are two options," the first option is separating the family and placing the child alone in ORR custody and "the second option is family detention").

**B.** Reading the Flores Agreement together with the subsequent nationwide order in *Ms. L*, we understand the courts to have provided that minors who are apprehended with families may not be separated from their parents where it is determined that continued detention is appropriate for the parent. The Flores Agreement allows this result for two reasons.

*First*, the Agreement's express terms accommodate court orders like the one recently issued in *Ms. L.* Paragraph 12A of the Flores Agreement provides for the release of minors to a parent (or others) when possible under Paragraph 14 or, alternatively, transfer to an appropriate facility with a licensed program under Paragraph 19. *See Flores v. Lynch*, 828 F.3d 898, 901 (9th Cir. 2016) ("Settlement creates a presumption in favor of releasing minors and requires placement of those not released in licensed, non-secure facilities that meet certain standards"). But these provisions include exceptions to releasing or transferring minors to accommodate a ruling like that in *Ms. L* requiring families to be kept together, and those exceptions permit family detention in these circumstances.

4

*Release provision.* In Paragraph 14, the Flores Agreement specifies that a minor should be "release[d] from its custody *without unnecessary delay*" to a parent or other relative. Flores Agreement ¶ 14 (emphasis added). The court's order in *Ms. L*, which requires that the minor be kept with the parent, makes delay necessary in these circumstances. The minor cannot be released under Paragraph 14 without separating him or her from their parent, as such a separation would violate the injunction issued in *Ms. L. See Ms. L* Order at 22 (DHS is "enjoined from detaining Class Members in DHS custody without and apart from their minor children"). Under those circumstances, the release of the minor from custody must be "delay[ed]" pursuant to the Agreement during the period the parent is detained by DHS. Flores Agreement ¶ 14. Indeed, the court's order in *Ms. L* envisions that a parent would be "reunited with the child *in DHS custody*" and that a child would be released only "*[i]f Defendants choose* to release Class Members [*i.e.*, parents] from DHS custody" or if a parent consents. Order at 23 (emphasis added). This application of the Flores Agreement is also consistent with another aspect of Paragraph 14 of the Agreement – which sets placing the minor with "a parent" as the first "order of preference." Flores Agreement ¶ 14; *id.* ¶ 18 (requiring "continuous efforts . . . *toward family reunification* and . . . release") (emphasis added); *see Flores*, 828 F.3d at 903 ("[t]he settlement creates a presumption in favor of release *and favors family reunification*") (emphasis added).

5

*Transfer provision.* The Flores Agreement also permits transfer of a child to a licensed program under Paragraph 19. *See* Flores Agreement ¶ 12A. Under Paragraph 12A, during an influx DHS is required to transfer a minor for placement in a licensed program "as expeditiously as possible." *Id*. ¶ 12A.3. But the obligation to transfer applies "except . . . as otherwise required by any court decree or court-approved settlement." *Id*. ¶ 12A.2. Here, the court decree in *Ms. L* prohibits the transfer of the minor to a licensed program, because such a transfer would separate the child from his or her parent. *Ms. L* Order at 22. A transfer therefore cannot occur consistent with that court decree.[1]

**Second**, both *Ms. L* and *Flores* expressly envision that adults who arrive at the United States with children are properly subject to detention – a critical aspect of border enforcement. Given that express conclusion in each decision, it would be remarkable to read the orders together as mandating the opposite conclusion – that detention may never occur. Doing so would undermine the express holdings in both cases. *Ms. L*, for its part, held that DHS would retain the same authority to detain the parent as it had before – it simply required that such detention be of the

---

[1] The issue regarding how the Flores Agreement licensing provisions apply to family detention centers is the subject of ongoing litigation. But to the extent that family detention centers are treated as licensed consistent with the Flores Agreement, a transfer under this provision could occur consistent with *Ms. L*. We have also asked this Court to modify the Agreement to permit the transfer of families together to family residential centers without requiring a state license.

family as a unit.  *See Ms. L* Order at 3 ("Order does not implicate the Government's discretionary authority to enforce immigration laws . . . including its decision to release or detain class members"); *id*. at 22 (DHS may "choose to release" class members).

Likewise, the Ninth Circuit ruling in *Flores* held that the "settlement does not require the government to release parents."  *Flores*, 828 F.3d at 908; *see also Bunikyte v. Chretoff*, 2007 WL 1074070, at *16 (W.D. Tex. 2007) (rejecting argument that Flores Agreement required release of both minors and parents).  As the Ninth Circuit explained, providing rights to minors under the agreement "does not mean that the government must also make a parent available" by releasing the parent with the child.  *Flores*, 828 F.3d at 908; *id*. at 909 ("parents were not plaintiffs in the *Flores* action, nor are they members of the certified class," and the settlement "therefore provides no affirmative releases rights for parents").  Because the Flores Agreement does not require the release of parents, and *Ms. L* requires DHS to keep parents and children together when the parents are in detention, the rulings work together to permit detention of parents with their minor children with whom they are apprehended.

**C.** No other aspect of the Flores Agreement or *Ms. L* require the United States to release all individuals held in border-related detention when they arrive at the border with children.  Instead, other aspects of the rulings lead to the opposite

7

conclusion.  The *Ms. L* ruling addresses reunification of children with their parents, and specifically requires reunification "when the parent is returned to immigration custody" after a release from criminal custody.  Order at 10; *see id*. at 11 (court order provides for "reunification during intervening . . . ICE detention prior to actual removal, which can take months").  But this aspect of the *Ms. L* ruling would make little sense if that reunification would necessitate an immediate release of the parents from immigration custody under the Flores Agreement.

The *Ms. L* decree also provides that the parent may consent to the release of the child without the parent.  Order at 23 (parent may "affirmatively, knowingly, and voluntarily decline[] to be reunited with the child in DHS custody").  This authority permits the continued operation of the provisions of the Flores Agreement governing release of the child – albeit with the accompanying parent's consent before they go into effect.  Relying on a parent's consent in these circumstances where the family is together makes sense, particularly because plaintiffs in this case have always agreed that detention of the family together is permissible if the parent consents.  *See Flores*, Transcript at 37-38 (April 24, 2015) (in response to question whether the "agreement allows[s] for an accommodation to . . . a parent who wishes to remain in the [family residential] facility," "the plaintiffs' positions is . . . a class member is entitled to waive those rights" and that waiver may "parents speak for children all the time") (relevant

8

pages attached as exhibit); *see also*

https://www.npr.org/2018/06/22/622678753/the-history-of-the-flores-settlement-and-its-effects-on-immigration (June 22, 2018) (last visited June 29, 2018) (counsel for plaintiffs explaining that "choice" to remain in family detention "is not something the Flores settlement itself addresses or prevents"). That is a preference expressed by other plaintiffs who have challenged family separation.[2] This aspect of the *Ms. L* order – allowing release of the child with the consent of the parent – would make little sense if the Government was under an affirmative obligation to release the entire family together.

**D.** Accordingly, for the reasons explained, the Flores Agreement permits the Government to detain families together given the nationwide order in *Ms. L* that bars the separation of families in DHS custody. To comply with the *Ms. L* injunction, the government will not separate families but detain families together during the pendency of immigration proceedings when they are apprehended at or between ports of entry and therefore subject to the *Ms. L* injunction.

---

[2] *See Mejia-Mejia v. ICE*, No. 18-1445, Complaint ¶ 4 (D.D.C. filed June 19, 2018) ("If, however, the government feels compelled to continue detaining these parents and young children, it should at a minimum detain them together in one of its immigration family detention centers"); *Padilla v. ICE*, NO. 18-928 (W.D. Wash), Complaint ¶ 12 ("If, however, the government insists on continuing to detain these parents and children, it must at a minimum detain them together in one of its immigration family detention centers.").

DATED:     June 29, 2018                Respectfully submitted,


                                        CHAD A. READLER
                                        Acting Assistant Attorney General

                                        /s/ August E. Flentje
                                        AUGUST E. FLENTJE
                                        Special Counsel to the Assistant Attorney
                                        General
                                        Civil Division

                                        WILLIAM C. PEACHEY
                                        Director
                                        COLIN KISOR
                                        Deputy Director
                                        SARAH B. FABIAN
                                        Senior Litigation Counsel
                                        U.S. Department of Justice
                                        Office of Immigration Litigation
                                        District Court Section
                                        Box 868, Ben Franklin Station
                                        Washington, DC 20442
                                        Telephone: (202) 532-4824
                                        Fax: (202) 616-8962



                                        *Attorneys for Defendants*

CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2018, I served the foregoing pleading on all counsel of record by means of the District Clerk's CM/ECF electronic filing system.

/s/ August E. Flentje
August E. Flentje
Attorney for Defendants

CHAD A. READLER
Acting Assistant Attorney General
WILLIAM C. PEACHEY
Director, Office of Immigration Litigation (OIL)
U.S. Department of Justice
WILLIAM C. SILVIS
Assistant Director, OIL District Court Section
SARAH B. FABIAN
Senior Litigation Counsel
NICOLE MURLEY
Trial Attorney
Office of Immigration Litigation
U.S. Department of Justice
Box 868, Ben Franklin Station
Washington, DC 20442
Telephone: (202) 532-4824
Fax: (202) 616-8962

ADAM L. BRAVERMAN
United States Attorney
SAMUEL W. BETTWY
Assistant U.S. Attorney
California Bar No. 94918
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
619-546-7125
619-546-7751 (fax)

Attorneys for Federal Respondents-Defendants

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. L, et al., | Case No. 18-cv-428 DMS MDD |
| Petitioners-Plaintiffs, | **Declaration of Robert Guadian** |
| vs. | |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Respondents-Defendants. | |

## DECLARATION OF ROBERT GUADIAN

I, Robert Guadian, hereby make the following declaration with respect to the above-caption matter:

1. I am currently serving as the Acting Deputy Assistant Director (DAD), Domestic Operations Division, Western Operations, Enforcement and Removal Operations (ERO), U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (DHS), a position I have held since April 2018. In this capacity, I oversee, direct, and coordinate the ERO field operations in 12 of the 24 ERO field offices.

2. I have been employed by ICE, and the former Immigration and Naturalization Service before it, since 1997. I was promoted to the position of Supervisory Detention and Deportation Officer in the San Antonio Field Office in 2005 and Assistant Field Office Director in 2009. In January of 2014, I was named Chief of Staff for the San Antonio Field Office Director. I have been the Deputy Field Office Director for the Dallas Field Office since March 2016.

3. In my current role as Acting DAD, I am aware of the preliminary injunction issued by this Court on June 26, 2018, *Ms. L v. I.C.E.*, ---F. Supp. 3d---, 2018 WL 3129486 (S.D. Cal. June 26, 2018), and I have been personally involved in the management of implementing this Court's order.

4. In order to effectuate the reunification of class members and their minor children, pursuant to the requirements of the preliminary injunction, ICE is working closely with U.S. Customs and Border Protection (CBP) and the U.S. Department of Health and Human Services (HHS), Office of Refugee Resettlement (ORR).

5. Immediately after the order was issued, ICE's senior leadership met internally and with leadership from across the federal government to

1

18cv428 DMS MDD

determine the various ways in which implementation could be achieved. For ICE, implementation requires several labor intensive steps, such as, but not limited to providing guidance to ERO's field offices, gathering data from other agencies within and outside DHS, conducting case-by-case reviews of all potential class members, transferring class members of children four years of age and younger to detention facilities near their children, developing a reunification plan for class members with children five years of age and over, facilitating access of HHS employees to detention facilities to conduct DNA testing, facilitating communication between class members and their children, communicating with HHS about each case, and providing details about criminal history and location of detention or location of class members who had been released from ICE custody.

6. The first step toward reunifying separated families was the difficult and time-consuming task of identifying potential class members. The data necessary to determine class membership is not maintained as part of ICE's regular business process. Rather, ICE had to create a new dataset using information collected from CBP and HHS. To create an initial dataset for consideration, ICE had to reconcile CBP data against HHS data manually and new methodologies were developed by ICE to identify separated parents. This data was then sent to the relevant ERO field offices so immigration officers could review available information for each case in order to determine whether the particular alien qualifies as a class member.

7. 19 of ERO's 26 field offices have been affected by this order. Field Office Directors (FODs) around the country have reassigned officers from other duties, such as fugitive operations and case management, to review cases of each potential class member, which includes reviewing available DHS databases, the alien file, and the National Crime Information Center database.

2                          18cv428 DMS MDD

As class members are identified, FODs have also had to reassign officers to track these cases, arrange transfers from detention facilities across the United States, share information with HHS, and facilitate communication between separated alien parents and their children.

8. Employees within ERO's Custody Management Division have also committed significant resources to ensuring compliance with the order. They have deployed two deportation officers and six other ERO staff to three detention facilities in which a significant percentage of separated parents are detained to provide surge support related to identification of family units, identification of the location of separated parents and their respective children, responding to detainee inquiries, and facilitating telephone calls between parents and their children. ERO also deployed three dedicated policy/data analysts to HHS's Special Operations Center, which was established to address the operational challenges of coordinating family reunification across different departments.

9. As of today, our information indicates that potential class members with children under five years of age are detained in 23 facilities across 13 states.

10. As of July 5, 2018, ICE has confirmed that all individuals detained in DHS custody and known by ICE to be parents separated from a minor child age four and under who is detained in ORR custody, ORR foster care, or DHS custody, have had telephonic contact with their children. ICE continues to work to ensure that all remaining class members have had such contact.

11. For those individuals detained in ICE custody for whom it is determined that a minor child has been separated and is in HHS custody, ICE has directed its field offices to review and prepare summaries of the adult alien's criminal and immigration histories, as well as indicators of gang membership. These summaries are sent to HHS. To date, ICE has completed approximately 300

18cv428 DMS MDD

1  such summaries.  Based upon currently available information, ICE has
2  approximately 1400 more summaries to complete for potential class
3  members.

4  12. ICE will need to complete the same criminal and immigration history reviews
5  for the remaining individuals.  ICE and HHS will also need to facilitate
6  reunification for the class members.

7  13. Based upon this information, ICE and/or HHS, depending upon the
8  circumstances, will determine whether the separated alien parent is excluded
9  from the class due to criminal history.  Based upon available information ICE
10  has determined that some alien parents of children age four and under have
11  convictions that would exclude them from the class.  These convictions
12  include drug offenses, aggravated assault, rape, robbery, kidnapping, and
13  domestic violence.

14  14. In order to facilitate the reunification process, ICE has taken steps to move
15  the detained parents of children four years of age or under to a detention
16  facility in the area of responsibility (AOR) close to the location of the minor
17  child in HHS custody.  To date, ICE has moved 23 such individuals from
18  across the country on commercial airlines, which requires officer escorts.
19  Some class members who were recently identified have not been transferred
20  at the request of HHS, so that HHS can more efficiently take DNA samples
21  of the parents.

22  15. ICE must carry out a similar process to reunify detained parents of children
23  five years of age or over.  For these class members, ICE is considering using
24  a few dedicated staging facilities for reunification purposes.

25  16. Upon HHS's completion of vetting and a determination of suitability for
26  reunification in accordance with law and the injunction, in many cases, ICE
27  will release the parent on Alternatives to Detention (ATD) to enable

28

4                                    18cv428 DMS MDD

1      reunification to be completed. Because ICE does not have authority to

2      transport the parent once released from its custody, reunification will

3      generally occur at the detention facility concurrent with the parent's release.

4      17. In accordance with longstanding practices for alien parents, ICE has removed

5      class members who have administratively final orders of removal. This is

6      done after the class member has had an opportunity to request relief. He or

7      she may request to be reunited with his or her minor child prior to removal or

8      he or she can request to be removed without his or her minor child who will

9      then remain in the United States to pursue available relief.

10      18. Class members who are still pursuing claims for relief or protection and,

11      therefore, do not have administratively final orders of removal, will be

12      reunited with their children, where appropriate, pursuant to the process

13      describe above in this declaration.

14

15

16      Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is

17      true and correct.

18      Executed this 5th day of July 2018, in Washington, D.C.

19

20

21      Robert Guadian

22      Acting Deputy Assistant Director

23      Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement

24

25

26

27

28