# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| M.G.U., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | No. 1:18-cv-1458 (PLF) |
| v. | § | |
| | § | Civil Action |
| KIRSTJEN NIELSEN, *et al.*, | § | |
| | § | |
| Defendants. | § | |

# REPLY MEMORANDUM SUPPORTING PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION

TEXAS RIOGRANDE LEGAL AID, INC.

Jerome Wesevich (D.D.C. Bar No. TX0125
Amanda Chisholm (Texas Bar No.
24040684)
Peter McGraw (Texas Bar No. 24081036)
1331 Texas Avenue
El Paso, Texas 79901
(915) 241-0534
jwesevich@trla.org
achisholm@trla.org
pmcgraw@trla.org

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

David J. Ball (DC Bar No. 460055)
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7352
dball@paulweiss.com

Steven C. Herzog (admitted *pro hac vice*)
Meredith A. Arfa (admitted *pro hac vice*)
Katherine Kelly Fell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
sherzog@paulweiss.com
marfa@paulweiss.com
kfell@paulweiss.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................... ii

OVERVIEW ................................................................................................................................... 1

UNDISPUTED FACTS .................................................................................................................. 1

ARGUMENT .................................................................................................................................. 4

    A.    The Plaintiffs Seek to Preserve the *Status Quo* ...................................................... 4

    B.    The Government Has Not Met its Burden of Proving Interference with OrderlyAdministration of Class Claims .................................................................. 6

        1.    It Is Not Clear that M.G.U. Is a Member of the Class in *Ms. L* .................. 7

        *2.*    It Is Premature to Deny Relief to All Three Plaintiffs Based on the Early-Stage Proceedings in *Ms. L* ............................................................... 8

    C.    The Plaintiffs Are Likely to Succeed on the Merits ............................................. 13

    D.    The Balance of Harms and Public Interest Favor Immediate Relief for the Plaintiffs ............................................................................................................... 21

CONCLUSION ............................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aguilar* v. *ICE*,
510 F.3d 1, 22 (1st Cir. 2007) .................................................................................21

*Matter of Application of Dept. of Human Services for Temp. Care, Custody and*
*Control of Barrett*,
No. 91-cv-159, 1995 WL 450466 (D.V.I. Jan. 31, 1995) .......................................16

*Bear* v. *Kautzky*,
305 F.3d 802 (8th Cir. 2002) ..................................................................................22

*Blair* v. *Equifax Check Servs., Inc.*,
181 F.3d 832 (7th Cir. 1999) ....................................................................................9

*Blum* v. *Caldwell*,
446 U.S. 1311 (1980) ...............................................................................................11

*U.S.* v. *Breeden*,
No. 16-cr-0008, 2016 WL 8943168 (D.D.C. June 3, 2016) ....................................15

*Carey* v. *Population Servs. Int'l*,
431 U.S. 678 (1977) .................................................................................................16

*Coal River Mt. Watch* v. *U.S. Dept. of the Int.*,
146 F. Supp. 3d 17 (D.D.C. 2015) ............................................................................9

*Cobell* v. *Babbitt*,
91 F. Supp. 2d 1 (D.D.C. 1999), *aff'd and remanded sub nom. Cobell* v.
*Norton*, 240 F.3d 1081 (D.C. Cir. 2001)..................................................................23

*Colorado River Water Conservation Dist.* v. *United States*,
424 U.S. 800 (1976).................................................................................................8

*Common Cause Indiana* v. *Marion County Election Bd.*,
No 17-cv-01388, 2018 WL 1940300 (S.D. Ind. Apr. 25, 2018)................................5

*Consarc Corp.* v. *U.S. Treasury Dept. of Foreign Assets Control*,
71 F.3d 909 (D.C. Cir. 1995) ....................................................................................4

*Damus* v. *Nielsen*,
No. 18-cv-00578 (D.D.C.) .......................................................................................14

*DuPoutot* v. *Raffaelly*,
424 F.3d 112 (1st Cir. 2005) ...................................................................................21

*Fortin* v. *Commr. of Massachusetts Dept. of Pub. Welfare*,
   692 F.2d 790 (1st Cir. 1982) ........................................................................11

*Franz* v. *United States*,
   707 F.2d 582 (D.C. Cir. 1983) ..........................................................15, 16, 23

*Goff* v. *Menke*,
   672 F.2d 702 (8th Cir. 1982) ........................................................................12

*Kansas* v. *Hendricks*,
   521 U.S. 346 (1997)......................................................................................19

*J.B.* v. *Washington County*,
   127 F.3d 919 (10th Cir.1997) ........................................................................5

*Landis* v. *N. Am. Co.*,
   299 U.S. 248 (1936)...............................................................................10, 11

*Larson* v. *Dom. & For. Com. Corp.*,
   337 U.S. 682 (1949)......................................................................................13

*Lassiter* v. *Dept. of Soc. Services of Durham County, N.C.*,
   452 U.S. 18 (1981)........................................................................................16

*League of Women Voters of U.S.* v. *Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ..........................................................................23

*Lively* v. *Caribbean Cruise Line, Inc.*,
   No. 2:14-CV-00953 JAM CK, 2014 WL 4377924 (E.D. Cal. Sept. 4, 2014) ........................10

*Long* v. *Collins*,
   917 F.2d 3 (5th Cir. 1990) ............................................................................12

*Mills* v. *District of Columbia*,
   571 F.3d 1304 (D.C. Cir. 2009) ....................................................................21

*Ms. L* v. *ICE*,
   302 F. Supp. 3d 1149 (S.D. Cal. 2018)..........................................................14

*Murray* v. *Sears*,
   No. 09-cv-5744, 2014 WL 563264 (N.D. Cal. Feb. 12, 2014) ...........................13

*Nat'l Indus. for Blind* v. *Dep't of Veterans Affairs*,
   296 F. Supp. 3d 131 (D.D.C. 2017) ..............................................................10

*Nicolson* v. *Pappalardo*,
   685 F. Supp. 2d 142 (D. Me. 2010) ..........................................................5, 21

*Oceana* v. *Locke*,
670 F.3d 1238 (D.C. Cir. 2011) ...................................................................................23

*Open Cmtys. All.* v. *Carson*,
286 F. Supp. 3d 148 (D.D.C. 2017) .............................................................................23

*Pittman* v. *Cuyahoga County Dept. of Children and Fam. Services*,
640 F.3d 716 (6th Cir. 2011) .......................................................................................15

*R.I.L-R* v. *Johnson*,
80 F. Supp. 3d 164 (D.D.C. 2015) ...............................................................................21

*Simmat* v. *U.S. Bureau of Prisons*,
413 F.3d 1225 (10th Cir. 2005) ...................................................................................13

*Stanley* v. *Illinois*,
405 U.S. 645 (1972) ........................................................................................................5

*Stark* v. *Wickard*,
321 U.S. 288 (1944) ......................................................................................................12

*T.G. by & through Ta.G.* v. *Hamos*,
No. 12-cv-3320, 2014 WL 1593159 (C.D. Ill. Apr. 21, 2014) ................................8, 9

*Troxel* v. *Granville*,
530 U.S. 57 (2000) ........................................................................................................16

*Trudeau* v. *Fed. Trade Commn.*,
456 F.3d 178 (D.C. Cir. 2006) .....................................................................................13

**STATUTES**

5 U.S.C. § 702 ..........................................................................................................13, 14

8 U.S.C. § 1232(b)(3) ....................................................................................................20

8 U.S.C. § 1325 ...............................................................................................2, 17, 19

D.C. Code Ann. § 14-305(b)(2)(B) ................................................................................18

**OTHER AUTHORITIES**

Fed. R. Civ. P. 15(d) ......................................................................................................14

Fed. R. Civ. P. 23(b)(2) ...............................................................................................6, 8

Plaintiffs M.G.U., A.P.F., and E.F. are three immigrant parents ("Plaintiffs").  The Defendant agencies and officials ("Government") forcibly and indefinitely separated Plaintiffs from their children over a month ago near the U.S.-Mexico border.  Plaintiffs seek a preliminary injunction directing the Government to immediately reunite them with their children.  Dkt. No. 13. The Government responded in opposition.  Dkt. No. 27.  Plaintiffs reply as follows.

## OVERVIEW

Plaintiffs' separation from their children—which now spans over a month, with no certain end in sight—is torturous and Plaintiffs are desperate for it to end.  The Government does not dispute the ongoing harm that separation causes the Plaintiffs and their children.  Instead, the Government offers vague promises that it is working to reunite these families, without committing to a timeline.  Due Process requires more.

These separations violate the Plaintiffs' substantive Due Process rights, and the Plaintiffs urgently seek immediate reunification.  Alternatively, the Plaintiffs request that the Government be required to prove, in an adversarial process at which the Plaintiffs are allowed to be heard, the legal justification for any continued separation.

## UNDISPUTED FACTS

The Government does not dispute any of the facts supporting Plaintiffs' Application for a Preliminary Injunction.  *Compare* Dkt. No. 13 at 1-8 (complete statement of material facts with cites to supporting evidence) *with* Dkt. No. 27 at *passim* (no suggestion of any disagreement).  Most importantly, unanimous medical consensus establishes that separation causes trauma to parents and children, and presents an unacceptable risk of permanent harm to them (Dkt. Nos. 1-7, 8-4, 8-5, 13-10, 13-11, 13-12, 13-13).  Rather than dispute any fact, the Government supplements the Plaintiffs' statement of facts with additional facts as to two subjects that merit further examination.

First, the Government states that it separated M.G.U. from her children because she "had been convicted of making False and Misleading Representations and sentenced to 75 days confinement."  Aguilar Decl. at ¶ 2, Dkt. No. 27-1.  The Government's explanation omits numerous key facts:

(a)     the conviction alleged by the Government is *nineteen years old*, Fluharty Decl. ¶ 20, Dkt. No. 31-4;

(b)     the Government does not allege that the conviction involves children, or allege any reason why any conviction indicates M.G.U. poses any risk to children, Aguilar Decl. at ¶ 2, Dkt. No. 27-1;

(c)     by all indications, M.G.U.'s conviction was for a "petty offense," *see* 18 U.S.C. § 19 (defining "petty offense"); Aguilar Decl. at ¶ 2, Dkt. No. 27-1 (stating M.G.U. was sentenced to 75 days confinement); 8 U.S.C. § 1325(a) (providing that a first-time conviction for false or misleading representation shall be punishable by not more than six months' imprisonment);

(d)     the conviction is M.G.U.'s only criminal history, and occurred when she was 22 years old, Fluharty Decl. ¶ 21, Dkt. No. 31-4;

(e)     the Government detained M.G.U. together with her three children for two weeks prior to citing the conviction as its reason for separation, Fluharty Decl. ¶¶ 12-13, Dkt. No. 31-4;

(f)     the Government separated M.G.U. from her children on the same date that M.G.U. received a positive credible fear determination, permitting M.G.U. to pursue her asylum application, Fluharty Decl. ¶ 13, Dkt. No. 31-4;

(g)      M.G.U. arrived in the United States with her children as members of a "caravan" of refugees that received extensive press coverage and that was repeatedly denounced by Government officials, *see, e.g.,* Brett Samuels, *Trump Orders DHS Not to Let Immigrant Caravans into US*, THE HILL (April 23, 2018), http://thehill.com/homenews/administration/384400-trump-orders-dhs-not-to-let-immigrant-caravans-into-us ; Fluharty Decl. ¶¶ 15-23, Dkt. No. 31-4;

(h)      the Government routinely houses parents who have only minor or old criminal histories together with their children at the South Texas Family Residential Center ("STFRC"), where M.G.U. was housed before she was forcibly separated from her children, Fluharty Decl. ¶ 19, Dkt. No. 31-4; and

(i)      the Government has not published written standards for how it decides what criminal history disqualifies a parent from being detained together with children.

All of these facts point to arbitrary retaliation and an intent to dissuade M.G.U. from pursuing her and her children's asylum claims, rather than concern for child safety.

Second, the Government claims that it is attempting to reunite families consistent with the preliminary injunction entered in *Ms. L* v. *ICE*, No. 18-cv-0428, pending in the U.S. District Court for the Southern District of California.  Dkt. No. 27-2 and 27-3.  Notably, however, at a July 6, 2018 hearing in *Ms. L*, the Government specifically refused to commit to complying with that preliminary injunction, and instead reserved its right to appeal and seek a stay at any time within 60 days following June 26, 2018.  *See* Transcr. at 17:19-18:6, Dkt. No. 31-3; *see also* Dkt. No. 27-2 at 41 (the Government agrees that reports of counsel's statements are properly considered on preliminary injunction).  Indeed, in the Government's Notice Regarding Compliance and Request for Clarification and/or Relief in *Ms. L*, the Government sought

3

unspecified relief from the reunification deadlines set by the court.  Dkt. No. 27-2 at 1

("Defendants thus seek . . . as appropriate, relief from the Court's deadlines"), 8 ("HHS seeks

partial relief from the timelines in the Court's order").  More importantly, the Government's vague

statements regarding *Ms. L* compliance efforts say nothing about it how will treat the Plaintiffs in

this litigation, or exactly how a ruling on the Plaintiffs' claims would impermissibly interfere with

any compliance effort.  *See generally* Dkt. Nos. 27-2 and 27-3 at *passim*.

      Moreover, as indicated in the Parties' Joint Status Report, Dkt. No. No. 26, at 2-5,

the Government has failed to provide Plaintiffs with any information about plans to reunify them

with their children, failed to provide them with adequate means to communicate with their

children, and failed to even provide Plaintiff E.F. with the address where her son, B.Y.A.F., is

being detained.

## ARGUMENT

      No argument, authority, or fact cited by the Government justifies its continued

separation of Plaintiffs from their children.  For ease of reference, this reply follows the order of

argument presented by the Government in its Opposition to Plaintiff's Motion for Preliminary

Injunction, Dkt. No. 27.

### A.     The Plaintiffs Seek to Preserve the *Status Quo*

      The Government argues that because Plaintiffs' motion for preliminary injunction

seeks to alter the *status quo*, their motion is subject to a "heightened standard:" Plaintiffs must

"clearly" show that they are "entitled" to relief or "that extreme or very serious damage will result

from the denial of the injunction."  Dkt. No. 27 at 8 (quoting cases).

      But Plaintiffs' motion only seeks to preserve the *status quo*.  The *status quo* to be

preserved on preliminary injunction is the "last uncontested status which preceded the pending

controversy."  *Consarc Corp.* v. *U.S. Treasury Dept. of Foreign Assets Control*, 71 F.3d 909, 913

(D.C. Cir. 1995) (citations omitted).  Courts may issue mandatory injunctions to preserve this status quo.  *Id.*; *see also Common Cause Indiana* v. *Marion County Election Bd.*, No 17-cv-01388, 2018 WL 1940300 at *7 (S.D. Ind. Apr. 25, 2018) ("[a] mandatory injunction can be used to compel restoration of the status quo, . . .[i.e.,] 'the last peaceable uncontested status that existed before the dispute arose.'") (citations and internal quotation marks omitted).  The Government does not dispute that Plaintiffs arrived in the United States together with their children, or that the Government arrested them together and subsequently separated them.  Each Plaintiff has contested separation ever since the Government initially inflicted it on each of them.  The reunification that Plaintiffs seek on preliminary injunction thus preserves the *status quo*, so no heightened standard is appropriate.

Even if a heightened standard were appropriate, Plaintiffs satisfy both of the alternative tests recommended by the Government.  As discussed in Part C, *infra*, Plaintiffs have stated valid claims on undisputed facts and controlling precedent.  The Government does not dispute the serious damage that would result from continued separation, namely trauma, damage to parent-child relations, and deprivation of constitutional rights.  *See* Declarations of Medical Professionals and Associations, Dkt. Nos. 8-4, 8-5, 13-10, 13-11, 13-12, 13-13; *Stanley* v. *Illinois*, 405 U.S. 645, 647 (1972) ("[P]etitioner suffers from the deprivation of his children, and the children suffers from uncertainty and dislocation."); *J.B.* v. *Washington County*, 127 F.3d 919, 925 (10th Cir.1997) ("[F]orced separation of parent from child, even for a short time, represents a serious infringement upon both the parents' and child's rights.") (internal quotation marks omitted); *Nicolson* v. *Pappalardo*, 685 F. Supp. 2d 142, 146 (D. Me. 2010) ("[e]very additional day" of separation causes further harm).

**B.**     **The Government Has Not Met its Burden of Proving Interference with Orderly Administration of Class Claims**

The Government argues that the Court should deny Plaintiffs' Motion because the District Court for the Southern District of California has certified a class for equitable relief pursuant to FED. R. CIV. P. 23(b)(2).  *See Ms. L v. ICE,* No. 18-cv-0428, 2018 WL 3129486 at *11-12 (S.D. Cal. June 26, 2018) (order granting preliminary injunction).  The Government argues that "Plaintiffs are ***currently believed*** to be class members . . . ."  Opp. at 5, 9 (emphasis added). The Government therefore contends that "allowing these individual claims would interfere with the administration of the *Ms. L* class action by that district court, and would create the risk of conflicting orders on the same claims by the same plaintiffs," and would be prejudicial to Defendants because they "have already undertaken extensive efforts towards compliance with [that] preliminary injunction order."  Opp. at 9.

Plaintiffs are aware of the proceedings in *Ms. L* and appreciate that court's willingness to order relief on behalf of detained parents who have been indefinitely separated from their children in a manner inconsistent with constitutional principles.  It is not clear from the *Ms. L* court's class certification order, however, that Plaintiff M.G.U. meets the definition of a class member, *and* the Government has provided no assurances that it would not challenge M.G.U.'s standing there.  Furthermore, because of the nascent posture of the *Ms. L* matter, and because of the government's continuing efforts to delay and evade the *Ms. L* court's orders, it would be premature and prejudicial to deny Plaintiffs relief here and require them to proceed as a part of that action.  This Court should grant Plaintiffs' Motion and immediately remedy the grave constitutional harms that Plaintiffs and their children are currently suffering.

**1.      It Is Not Clear that M.G.U. Is a Member of the Class in *Ms. L***

In a June 26, 2018 order, the *Ms. L* court certified a class, pursuant to Fed. R. Civ.

P. 23(b)(2), of

> [a]ll adult parents who enter the United States at or between designated ports of entry
> who (1) have been, are, or will be detained in immigration custody by the DHS, and
> (2) have a minor child who is or will be separated from them by DHS and detained
> in ORR custody, ORR foster care, or DHS custody, absent a determination that the
> parent is unfit or presents a danger to the child. [   ] ***The class does not include***
> ***parents with criminal history* or** communicable disease, or those apprehended in the
> interior of the country or subject to the EO.

*Ms. L*, 2018 WL 3129486 at *3 n.5 (emphasis added).  While the Government is careful to state in

its brief here that Plaintiffs are "***currently believed*** to be class members" in *Ms. L*, it also alleges

that M.G.U. was previously charged with and convicted of "false and misleading representations

and sentenced to 75 days confinement" in connection with a prior entry into the United States.

Opp. at 5 (emphasis added).  The Government's assurance in its brief that M.G.U. is a

"beneficiar[y] of the preliminary injunction order in that case" therefore rings hollow, and this

Court should reject the Government's argument and order precise relief here that will remedy the

harms suffered by M.G.U.

To be sure, the prior conviction described by the Government is not the kind of

infraction that one would logically expect a court to be concerned about when considering the

appropriateness of reunification.  Aguilar Decl. at ¶ 2, Dkt. No. 27-1.  M.G.U.'s alleged conviction

occurred nineteen years ago (when M.G.U. was only 22 years old), prior to the birth of M.G.U.'s

children from whom she is currently separated, did not involve children, and did not involve

violent or abusive behavior.  *See* Fluharty Decl. ¶¶ 20-23, Dkt. No. 31-4.  In other words, there is

nothing about M.G.U.'s prior conviction that would lead someone to question M.G.U.'s ability to

parent her children, and the Government has not asserted as much.  However, the Government, in

the *Ms. L* proceedings, has been vague as to what it understands its mandate to be with respect to

evaluating a parent's criminal history prior to reunification.  It states in its Notice Regarding Compliance and Request for Clarification and/or Relief in *Ms. L* that it will "confirm whether an individual has *any* criminal history, *including* a history indicative of abuse," before "a child can be released" to his or her parent.  *M.G.U.*, Dkt. No. 27-2 at 4, 6 (emphasis added).  Thus, it is not clear what criminal history, *other* than that involving abuse, the Government would consider to be incompatible with reunification.

Absent a stipulation from the Government that M.G.U. is a member of the *Ms. L* class, and that she will not be excluded from the *Ms. L* class on the basis of her prior record, it would be inappropriate to limit the substantive relief available to M.G.U. here.  As discussed below, while parallel proceedings are sometimes stayed in favor of an action where a Rule 23(b)(2) class for equitable relief has been certified, courts do not favor limiting relief available to litigants unless it is clear that the litigants' rights can be efficiently and effectively adjudicated in the other venue.  *See, e.g.*, *T.G. by & through Ta.G.* v. *Hamos*, No. 12-cv-3320, 2014 WL 1593159, at *3 (C.D. Ill. Apr. 21, 2014) ("Dismissal is rarely appropriate unless it is absolutely clear that dismissal cannot adversely affect any litigant's interests.") (internal quotation marks omitted)).  This Court therefore should grant M.G.U. the relief sought in this Motion.

**2.      It Is Premature to Deny Relief to All Three Plaintiffs Based on the Early-Stage Proceedings in *Ms. L***

It is true that, "as between federal district courts, [although] though no precise rule has evolved, the general principle is to avoid duplicative litigation."  *See Colorado River Water Conservation Dist.* v. *United States*, 424 U.S. 800, 817 (1976).  However, courts generally do not take steps that would limit litigants' ability to receive substantive relief even when exercising principles of comity in favor of a pending parallel litigation.  *See, e.g.*, *Blair* v. *Equifax Check Servs., Inc.,* 181 F.3d 832, 839 (7th Cir. 1999) ("When overlapping suits are filed in separate

courts, stays (or, rarely, transfers) are the best means of coordination.").  Interestingly, here, the

Government asks the Court to deny Plaintiffs' Motion, rather than to stay or transfer the action,

which would be the ordinary procedure for asking for this relief.  *See, e.g., id.*; *Coal River Mt.*

*Watch* v. *U.S. Dept. of the Int*., 146 F. Supp. 3d 17, 28 (D.D.C. 2015) (denying motion to dismiss

parallel litigation after evaluating all equitable considerations); *T.G. by & through Ta.G.* v.

*Hamos*, No. 12-CV-3320, 2014 WL 1593159, at *3 (C.D. Ill. Apr. 21, 2014) (denying motion to

dismiss or transfer, and in the alternative staying the potentially duplicative litigation).  The

Government does not cite any authority for the proposition that denying relief to Plaintiffs is an

appropriate response to a charge, like the one presented by the Government here, of inefficiency

imposed on the judiciary.

   The more typical way to frame the Government's request is by way of a motion to

stay this proceeding—either entirely, or as to E.F and A.P.F, if M.G.U. is not clearly a member of

the *Ms. L* class.  Viewing the Government's request in this light, the weaknesses of its argument

are apparent.  The Supreme Court cautions lower courts to carefully consider the balance of

hardships between the parties when considering a motion to stay a litigation in favor of a parallel

pending action:

> [T]he power to stay proceedings is incidental to the power inherent in every court to
> control the disposition of the causes on its docket with economy of time and effort
> for itself, for counsel, and for litigants.  How this can best be done calls for the
> exercise of judgment, which must weigh competing interests and maintain an even
> balance. . . . [T]he suppliant for a stay must make out a clear case of hardship or
> inequity in being required to go forward, if there is even a fair possibility that the
> stay for which he prays will work damage to some one else. . . .

*Landis* v. *N. Am. Co.*, 299 U.S. 248, 254-55 (1936).  Courts across the country, echoing *Landis*,

have adopted this standard.  *See, e.g.*, *Nat'l Indus. for Blind* v. *Dep't of Veterans Affairs*, 296

F. Supp. 3d 131, 137–38 (D.D.C. 2017) (citing *Landis* to deny a motion to stay in favor of parallel

consolidated actions, and noting that "[a] stay is not a matter of right, even if irreparable injury

might otherwise result."); *Nat'l Student Mktg. Litig.*, No. 105, 1973 WL 385, at *3 (D.D.C.

Apr. 24, 1973) (same); *Lively* v. *Caribbean Cruise Line, Inc.*, No. 2:14-CV-00953 JAM CK, 2014

WL 4377924, at *3 (E.D. Cal. Sept. 4, 2014) ("The Ninth Circuit has held that district courts

should consider the following three factors in evaluating a motion to stay: 'the possible damage

which may result from the granting of a stay, the hardship or inequity which a party may suffer in

being required to go forward, and the orderly course of justice measured in terms of the

simplifying or complicating of issues, proof, and questions of law which could be expected to

result from a stay.'" (citing *CMAX, Inc.* v. *Hall*, 300 F.2d 265, 268 (9th Cir. 1962)).

      The Government has failed to demonstrate here that the balance of *Landis* factors

weighs in its favor.  While it argues that it would be prejudiced because it is already "in the

process of implementing the relief required by [the *Ms. L* court's] order," its representations to the

*Ms. L* court tell a more nuanced story.  With respect to the reunification relief ordered by that

court, the Government states—not that it has begun implementing the relief—but that it has "been

***working diligently on complying*** with the Court's reunification directives."  *M.G.U.*, Dkt. No. 27-

2 at 1 (emphasis added).  The Government has told the *Ms. L* court that it needs clarification from

the Court as to how "to ***identify*** class members and their children and to ***reunify*** class members

with their children."  *Id*. (emphasis added).  It has told the *Ms. L* court it will need "partial relief

from the timelines" set forth in *Ms. L  Id.* at 8.  So far, the Government has not provided

confirmation of reunification of but two (out of three thousand) parents affected by the *Ms. L*

*or*der with their children, notwithstanding the portion of that order requiring that children under

five be reunited with their parents by Tuesday, July 10, 2018.  *Ms. L*, Dkt. No. 83 at 23.

Moreover, at the July 6, 2018 status conference in *Ms. L*, the Government refused to state whether

it would appeal the order directing preliminary relief in *Ms. L*, stating that such a decision is "entirely within the purview of the Solicitor General."  Transcr. at 18:4-6, Dkt. No. 31-3.

As this Court recognized at the hearing on Plaintiffs' Application for a Temporary Restraining Order, the issues at stake in this proceeding are extraordinarily important, and expedient reunification is necessary to prevent the continuing irreparable harm to Plaintiffs and their children.  *See* Mot. at 19-20.  If this Court were to deny Plaintiffs' Motion or stay this proceeding in favor of *Ms. L* at this stage, it would subject Plaintiffs and their children to uncertainty and limit or delay their ability to obtain substantive relief.  The "damage that may result from the granting of a stay," *Landis*, 299 U.S. at 254, would include unnecessarily prolonged separation of Plaintiffs from their children while the Government continues to analyze how—***and whether***—to comply with its obligations in *Ms. L*, as well as potential additional delays due to Government challenges to class membership (including with respect to M.G.U.).  The damage that may result from granting a stay is especially acute here, where the Plaintiffs and their children face immediate, ongoing, and serious harm from the Government's challenged action. *See Blum* v. *Caldwell*, 446 U.S. 1311, 1315-16 (1980) (nature of health risk tips balance of harm to injunction); *Fortin* v. *Commr. of Massachusetts Dept. of Pub. Welfare*, 692 F.2d 790, 797 (1st Cir. 1982) ("The test of impossibility [of compliance with a court order] may be particularly strict in a case such as this one, in which the needs of applicants are urgent." (citing *White* v. *Mathews*, 559 F.2d 852, 859 (2d Cir.1977), cert. denied, 435 U.S. 908 (1979)).[2]  The Plaintiffs have sought this Court's intervention precisely to avoid the severe and ongoing harm caused by the

---

[2]    If "numerous parallel cases are filed, the courts have ample authority to stay useless litigation until the determination of a test case."  *Stark* v. *Wickard*, 321 U.S. 288, 310 (1944).  The Court's "useless" qualification suggests that courts should not exercise discretion to stay litigation that has a critical use—the alleviation of irreparable harm—while a test case is determined.

Government's challenged actions.  The Court should exercise its jurisdiction to order narrow, tailored relief affecting only Plaintiffs, which would provide urgently needed relief to Plaintiffs and their children.

Plaintiffs are not arguing that courts should allow both a class action and limitless individual actions, adjudicating the same issues, to proceed indefinitely.  But here, it is premature to stay the instant proceedings in favor of the pending litigation in *Ms. L.*  The Government provides no support for the assertion that narrow, tailored relief with respect to these three plaintiffs would interfere "with the orderly administration of the pending class action" in *Ms. L.* Opp. at 8-10.  Unlike a situation where there has been a final adjudication of a class action, here the proceedings in *Ms. L* are in their very early stages and, by the Government's own admissions, may be subject to appeal or other delays or modifications.

Importantly, the cases that the Government cites in favor of the proposition that this Court should deny relief involved successive filings by *pro se* prisoners seeking relief for claims that had been finally adjudicated prior to the filing of the individual action, or where preliminary relief was already resolved in the parallel action.  *See* Opp. at 9 (citing *McNeil* v. *Guthrie*, 945 F.2d 1163, 1165-1166 (10th Cir. 1991) (finding an individual *pro se* prisoner action would not be entertained where the defendant prison was already subject to a consent decree on the same issue); *Long* v. *Collins*, 917 F.2d 3, 4-5 (5th Cir. 1990) (same); *Goff* v. *Menke*, 672 F.2d 702, 704 (8th Cir. 1982) (finding that only "[a]fter rendition of a final judgment [is] a class member [   ] ordinarily bound by the result of a class action" and that a stay would have been appropriate where "the issues had already been preliminarily resolved and were pending final resolution").  Indeed, courts recognize that the principle of comity "require[s] a court to pay respectful attention to the decision of another judge in a materially identical case, but no more than that even if it is a judge

of the same court or a judge of a different court within the same judiciary." *Murray* v. *Sears*, No. 09-cv-5744, 2014 WL 563264 at *5 (N.D. Cal. Feb. 12, 2014) (citation omitted).  This Court should not decline or delay the Plaintiffs the relief they seek in this action, where the parallel pending matter is not materially farther along than the instant proceedings and the scope and availability of relief in that action is far from clear for the Plaintiffs.

## C.   The Plaintiffs Are Likely to Succeed on the Merits

The Government claims that the Plaintiffs are unlikely to succeed on the merits of their claims, and offers four arguments in support.  None withstands scrutiny.

First, the Government argues that the Plaintiffs have failed to carry their burden of proving the Government's waiver of sovereign immunity because the Plaintiffs have not pleaded a waiver of sovereign immunity.  Dkt. No. 27 at 10.  But 5 U.S.C. § 702 explicitly waives sovereign immunity.  This statute waives sovereign immunity from claims directly under the Constitution to secure compliance, independent of the Administrative Procedure Act. *Trudeau* v. *Fed. Trade Commn.*, 456 F.3d 178, 186-90 (D.C. Cir. 2006); *accord Larson* v. *Dom. & For. Com. Corp.*, 337 U.S. 682, 704 (1949); *Simmat* v. *U.S. Bureau of Prisons*, 413 F.3d 1225, 1230 (10th Cir. 2005).  The Plaintiffs so alleged.  Dkt. No. 8 at 4.  To the extent that the Government's argument is only that § 702 is not cited in Plaintiffs' Complaint, the Government cites no authority indicating that citation in the Complaint is required.  If citation is somehow required, Plaintiffs seek leave to supplement their Complaint to cite § 702. *See* FED. R. CIV. P. 15(d).

Second, the Government argues that this Court lacks jurisdiction.  The Government first argues that if Plaintiffs were to seek a writ of habeas corpus, this Court lacks jurisdiction to grant it.  Dkt. No. 27 at 11.  Nowhere have Plaintiffs sought a writ of habeas corpus.  The Government then argues that if Plaintiffs were to seek release (called "parole" in immigration proceedings), this Court lacks jurisdiction to order it.  Dkt. No. 27 at 11-13.  Nowhere have

Plaintiffs sought an order directing parole or release.  The U.S. District Court for the Southern

District of California previously rejected these very jurisdictional arguments.  *See Ms. L* v. *ICE*,

302 F. Supp. 3d 1149, 1158-59 (S.D. Cal. 2018); *see also Damus* v. *Nielsen*, No. 18-cv-00578

(D.D.C.), Dkt. No. 34 (Preliminary Injunction entered July 2, 2018) (discussing D.D.C.

jurisprudence permitting review of parole methodologies that do not require review of individual

parole decisions).  The Government's jurisdictional arguments have no basis in law or fact.

> Third, the Government argues that even if sovereign immunity is waived and this

Court has jurisdiction, the Government's family separation practices cannot be enjoined because

they do not "shock the conscience."  Dkt. No. 27 at 13-14.  This is wrong as a matter of both fact

and of law.  Outcry denouncing the shocking inhumanity of the Government's conduct has been

registered from diverse and authoritative quarters.[3]  Yet the Government offers no evidence at all

---

[3]    *See Ms. L*, 302 F. Supp. 3d at 1167 (a policy of purposefully separating immigrant families "is brutal, offensive, and fails to comport with traditional notions of fair play and decency"); United Nations Office of Human Rights Commissioner, Letter at 2, Dkt. No. 13-9 ("Detention of children is punitive, severely hampers their development, and in some cases may amount to torture . . . .  Children are being used as a deterrent to irregular migration, which is unacceptable."); Amy Kellogg, *Pope Francis says separation of migrant children 'contrary to our Catholic values, immoral,* Fox News (June 20, 2018) ("Pope Francis has called the separation of migrant children from their parents 'contrary to our Catholic values and immoral.'"), http://www.foxnews.com/world/2018/06/20/pope-francis-says-separation-migrant-children-contrary-to-our-catholic-values-immoral.html; Laurie Goodstein, *Conservative Religious Leaders are Denouncing Trump Immigration Policies*, New York Times (June 14, 2018), https://www.nytimes.com/2018/06/14/us/trump-immigration-religion.html (reporting on a near unanimous vote of thousands of members of the Southern Baptist Convention: "We declare that any form of nativism, mistreatment, or exploitation is inconsistent with the Gospel of Jesus Christ," with one delegate explaining, "We're saying we love these people, they're made in God's image, we should care for them, we don't want families to be separated."); American Medical Association Letter (June 19, 2018), Dkt. No. 13-13 at 39 ("It is well known that childhood trauma and adverse childhood experiences created by inhumane treatment often create negative health impacts that can last an individual's entire lifespan.  Therefore, the AMA believes strongly that, in the absence of immediate physical or emotional threats to the child's well-being, migrating children should not be separated from their parents or caregivers.").

that its treatment of parents and children (including babies and toddlers) separated near the border

is humane.  Moreover, unlike First and Ninth Circuit cases holding that a "shock the conscience"

threshold showing is required to show a substantive Due Process violation of the right to family

integrity, the D.C. Circuit has already articulated a specific and firm test that does not require a

"shock the conscience" threshold showing.  *See Franz* v. *United States*, 707 F.2d 582, 602 (D.C.

Cir. 1983) ("Severance of the relationship between a parent and his child will survive

constitutional scrutiny only if" the government's interest is compelling; there is a particularized

showing that the state is interested in terminating the parental relationship; it is "impossible" to

accomplish that interest in a less restrictive way; and the parties are afforded procedural Due

Process rights); *id.* at 603 (the D.C. Circuit expects *Franz* to be applied to decide future cases);

*accord U.S.* v. *Breeden*, No. 16-cr-0008, 2016 WL 8943168 at *2 (D.D.C. June 3, 2016); *see also*

*Pittman* v. *Cuyahoga County Dept. of Children and Fam. Services*, 640 F.3d 716, 728 & n.6 (6th

Cir. 2011) (rejecting a "shock the conscience" threshold where allegations of a violation of the

fundamental right to family integrity are made).

      Finally, the Government argues that its family separation policy does not deprive

the Plaintiffs of substantive Due Process.  Dkt. No. 27 at 13-14.  Settled law shows otherwise.

      Plaintiffs' Due Process right to retain custody and companionship of their

biological children is fundamental, sacred, and "perhaps the oldest of the fundamental liberty

interests protected by [the Supreme Court]."  *See Troxel* v. *Granville*, 530 U.S. 57, 65 (2000);

*Lassiter* v. *Dept. of Soc. Services of Durham County, N.C.*, 452 U.S. 18, 27 (1981).  The

Government violates this right unless it survives strict scrutiny, namely: (a) that it has a

compelling reason for placing any substantial burden on this right; and (b) and that it has narrowly

tailored its burden to serve its compelling reason.  *Carey* v. *Population Servs. Int'l*, 431 U.S. 678,

686 (1977); *Franz*, 707 F.2d at 602-03; *Matter of Application of Dept. of Human Services for Temp. Care, Custody and Control of Barrett*, No. 91-cv-159, 1995 WL 450466 at *5 (D.V.I. Jan. 31, 1995).

The Government's burden on the Plaintiffs' right to custody and companionship is substantial by any measure.  The Government's separation policy indefinitely and absolutely prevents Plaintiffs from having custody and companionship of their children; instead the Government explicitly substituted itself as the entity directing "care and custody" of the Plaintiffs' children, and did so without providing the Plaintiffs any opportunity to be heard.  8 U.S.C. § 1232(b)(1); Dkt. No. 27 at 4; *see also* Dkt. No. 1-4 at 1 ("Children whose parents are referred for prosecution will be placed with [the Government's] Office of Refugee Resettlement (ORR).").  The Government detained Plaintiffs without any access to or virtually any contact with their children for almost a month, at least until June 27, 2018, preventing parents from having any opportunity at all to exercise care, custody, or control over their children.  Dkt Nos. 8-1, 8-2. 8-3, 13-4, 13-5, and 13-6; *see also* Dkt. No. 26 at 1-6 (detailing post-June 27, 2018 experience).

Having substantially burdened Plaintiffs' fundamental rights, *Franz* requires the Government to prove its compelling interest in doing so.  The Government identifies but two interests: its need to protect children at South Texas Family Residential Center from parents with criminal histories like that of M.G.U., and its need to prosecute E.F. and A.P.F. for violating 8 U.S.C. § 1325.  Dkt. No. 27 at 14 and Dkt. No. 27-1 at 1-3.

Importantly, M.G.U. has not been prosecuted for illegal entry for her May 2018 entry into the United States.  Indeed, as discussed above, M.G.U. was detained with her children while awaiting her credible fear interview, which she passed.  But she was nonetheless separated from her children thereafter on the basis of a nineteen-year-old conviction for "false and

16

misleading statements" in connection with a prior entry into the United States.  M.G.U.'s only criminal history dates back to when she was 22 years old, had nothing to do with children or violence, and was not raised as a disqualifying characteristic by the Government until two weeks after M.G.U. had lived in detention together with her children.  Fluharty Decl. at ¶¶ 12-13, 20-23, Dkt. No. 31-4; Aguilar Decl. at ¶ 2, Dkt. No. 27-1.

The Government makes no attempt to explain what features of M.G.U.'s criminal history caused concern sufficient to separate her from her children, the divergence in its treatment of M.G.U. in terms of separation before and after her credible fear interview, or how her criminal history endangers her children or other children at a family residential center.  The Government makes no attempt to compare M.G.U.'s history to the histories of other mothers who are detained together with their children, and follows no written standards to determine which criminal histories disqualify a parent from residing at STFRC together with their children.  Indeed, the State of Texas has written standards for criminal histories, and Texas would permit M.G.U. to work in a licensed child care facility without even a risk evaluation because her conviction is over 10 years old.  *See* Texas Department of Family and Protective Services Criminal History Requirements at 8, Dkt. No. 31-2, https://www.dfps.state.tx.us/Child_Care/Child_Care_Standards_and_Regulations/Criminal_Convictions.asp; *see also* D.C. Code Ann. § 14-305(b)(2)(B) ("no evidence of any conviction of a witness is admissible under this section if a period of more than ten years has elapsed since [release]").  Similarly, while Defendant Office of Refugee Resettlement (ORR) continues to deny M.G.U. access to her own children, it would explicitly permit release of one of M.G.U.'s children to a "sponsor" who had been convicted of a felony involving physical assault as long as the conviction was over five years old.  *See* ORR Release Standard at 21 § 2.7.4, Dkt. No. 31-1,

https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2.  All of these facts indicate a likelihood that the Government did not consider M.G.U.'s criminal history to be an actual threat to anyone, and instead singled M.G.U. out for retaliation for participating in a "caravan" denounced by Government officials, including the President of the United States.  The Government separated M.G.U. from her children not to protect anyone at STFRC, but rather to inflict suffering upon her.

Plaintiffs believe that the following discovery will likely reveal the extent to which the Government used M.G.U.'s criminal history as a pretext for separating her from her children:

(a)     does the Government hire ICE agents with criminal histories comparable to that of M.G.U.?

(b)     does the Government permit its own employees, or employees of private prison company CoreCivic, which operates STFRC, to work with children despite criminal histories comparable to that of M.G.U.?

(c)     what explanation does the Government have for waiting two weeks, until after M.G.U. passed her credible fear interview, before separating her from her children?

(d)     what do emails among ICE agents say about how the decision to separate M.G.U. from her children was made?

(e)     what criminal histories has ICE tolerated among mothers who are detained at STFRC without separating them from their children?

For present purposes, the important fact is that all of the above evidence is *easily and entirely* within the Government's control, and yet the Government has offered no evidence beyond a vague declaration stating only that M.G.U. has a criminal history, and the Government relied on it to separate her from her children.  Dkt. No. 27-1.  On this record, M.G.U. urges the Court to find that

the Government has failed to meet its burden of proving a compelling interest in separating

M.G.U. from her children.[4]

        As for A.P.F. and E.F., the Government has only claimed that it needed to separate

their children from them to prosecute them for violating 8 U.S.C. § 1325(a).  But the parties do not

dispute that all criminal proceedings, and sentences, have concluded (as to E.F. on June 6, 2018,

and concluded as to A.P.F. on June 8, 2018).  Dkt. Nos. 8-1, 8-2, 13-5, 13-6, 13-7.  Now, one

month later, E.F. and A.P.F. remain indefinitely separated from their children.  Consequently even

if the Government had a compelling interest in separating these families to conduct prosecutions,

the Government obviously did so in a way that was not narrowly tailored to minimize the burden

on Plaintiffs' rights.  The Government cites a statutory framework that it claims required DHS to

transfer custody of the Plaintiffs' children to HHS at the commencement of each prosecution.

Dkt. No. 27 at 3-5 (describing statutes on "custody" of "unaccompanied" children).  Critically, the

statutes cited by the Government to separate Plaintiffs from their children explicitly require the

Government to "promptly [place all children] in the least restrictive setting that is in the ***best***

***interest*** of the child."  8 U.S.C. § 1232(c)(2)(A).  This text does not permit the Government to:

(a) deem any child "unaccompanied" prior to the 72-hour period set forth in 8 U.S.C.

§ 1232(b)(3), particularly when, as in the case of A.P.F., prosecutions are concluded within 72

hours; (b) fly separated children thousands of miles away from their parents to enable the

Government to conduct what is typically a week-long prosecution; (c) fail to develop *any*

---

[4]    Evidence that the Government's proffered explanation for separating M.G.U. from her
children is pretext for an intent to punish M.G.U. supports a finding of unconstitutionality.  *See
Kansas* v. *Hendricks*, 521 U.S. 346, 371 (1997) (Kennedy, J., concurring) ("If the object or
purpose of the Kansas law had been to provide treatment but the treatment provisions were
adopted as a sham or mere pretext, there would have been an indication of the forbidden
purpose to punish.").

advanced procedures for promptly reuniting families upon the conclusion of prosecution; and

(d) fail to record reliable information—even a basic photograph—about the adults from whom the

Government separated children, which would obviously help facilitate reuniting these families.

This record indisputably demonstrates that the Government did not narrowly tailor its separation

policies and practices to minimize the burden that the Government placed on parental rights.

Importantly, the Government has not disputed the Plaintiffs' evidence that the

Government separated them from their children with intent to inflict punishment on them. *See*

Dkt. No. 13 at 13-19; Dkt. No. 27 at *passim*. This Court has already held that deterrence

justifications such as the one that the Government has offered for the separations at issue here

"appea[r] out of line with analogous Supreme Court decisions." *R.I.L-R* v. *Johnson*, 80 F. Supp.

3d 164, 189 (D.D.C. 2015) (collecting cases).[5]

---

[5]   The Government argues that the Parents are lawfully detained pursuant to immigration
statutes, and this fact alone destroys their constitutional claims. According to the Government,
lawfully detained immigrants have identical rights as criminal suspects awaiting trial, neither
of whom has a right to be detained with their children. Opp. at 13. But as the Government
acknowledges, the scope of the constitutional right to family integrity "depends on the
circumstances of [each] particular case." *Id.* (citing *Overton* v. *Bzzetta*, 539 U.S. 126, 131
(2003)); *see also Aguilar* v. *ICE,* 510 F.3d 1, 22 (1st Cir. 2007) ("Applying the jurisprudence
of substantive due process is an exercise that is 'highly dependent on context and detail.'
*DuPoutot* v. *Raffaelly*, 424 F.3d 112, 119 (1st Cir. 2005). Were a substantial number of young
children knowingly placed in harm's way, it is easy to imagine how viable claims might lie.").
The context and detail at issue here distinguish the Parents' constitutional claims: (a) the only
reason that the Parents are separated from their children is because the Government forcibly
separated them after arresting them together; (b) the Government is detaining the children
separate from the parents with little communication, in what is necessarily a bewildering
experience for a child of any age; (c) separate detention itself causes anguish to parents and
children. On these facts, the burden that the Government has placed on the Parents' Due
Process right to family integrity far exceeds any burden experienced by a criminal pre-trial
detainee or an immigrant arrested alone.

**D.     The Balance of Harms and Public Interest Favor Immediate Relief for the Plaintiffs**

The Government does not contest Plaintiffs' showing of irreparable harm to support their motion for preliminary injunction.  Dkt. No. 13 at 19-20.  Nor could it.  "[E]very additional day" of separation is irreparable harm.  *Nicolson*, 685 F. Supp. 2d at 146.  Lack of information is but one necessary consequence of separation.  Another consequence of separation is lasting damage to children's well-being and their relationships to their parents.  *See* Dkt. No. 13-13 (chorus of medical associations and experts).  And "loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Mills* v. *District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (internal quotation marks omitted).

The Government argues that the balance of harms and public interest weigh in its favor because: (a) the requested preliminary injunction would "impact" unspecified Government efforts to comply with the preliminary injunction in *Ms. L*; (b) "the Government is devoting significant resources to facilitating compliance for all class members;" (c) the Government and public "have an interest in allowing [unspecified compliance] efforts to move forward;" (d) "orders from other district courts . . . may impact [the Government's] compliance efforts;" and (e) "the Government [should be permitted] to move forward as quickly as possible to comply with [the *Ms. L* injunction]."  Dkt. No. 27 at 14-15.

These vague and conclusory statements are insufficient evidence of harm faced by the Government.  *See, e.g., Bear* v. *Kautzky*, 305 F.3d 802, 805 (8th Cir. 2002) (government's insufficient evidence of harm tips balance toward granting preliminary injunction).  The Government has ready access to any relevant evidence and yet declines to provide any specific facts regarding how an injunction requiring immediate reunification of Plaintiffs with their children could hinder its compliance with the *Ms. L* injunction.  The Government's bald assertions leave the Court with no way to gauge the likelihood or extent of any risk that its compliance with

the *Ms. L* injunction would be hindered by an appropriate order in this case.  As long as the

Government can resist injunction without having to explain exactly why reunification needs to be

delayed or adjusted in specific cases, the Government effectively retains plenary control over the

timing of reunification.[6]

        To the extent that the Government's argument is resource-based, the need to

expend resources cannot outweigh threats to constitutional rights and constitutes insufficient harm

to justify continued illegal action.  That is especially applicable here, where the Government not

only created the problem by implementing a family separation policy, but did so without taking

basic actions to facilitate subsequent reunification, such as taking digital photographs of the

people who it forcibly separated, recording their statements, and housing them in close physical

proximity to one another.  *See Franz*, 707 F.2d at 604 ("Invasion of [a parent's] rights should not

be legitimated by the need to solve a problem the defendants themselves have generated").  If

agencies evade their obligations by citing a lack of resources it "would allow the agency to reserve

to itself effectively complete discretion" as to whether to comply with any law.  *Oceana* v. *Locke*,

670 F.3d 1238, 1242 (D.C. Cir. 2011).  But "the United States may not evade the law simply by

---

[6]   The Government has argued that if a Court wishes to take control of—and responsibility for—
the minutia of administrative decisionmaking required to fix the mess produced by the
Government's separation policy, then the Court should so state in an injunction.  ECF No. 27-
2 at 8 & n.2.  At least in the D.C. Circuit, standard procedure is decidedly otherwise.  Courts
order specific results needed to comply with law—i.e. reunification by a date certain—and
agencies decide all aspects of how to comply on pain of contempt unless, but only unless, the
agency proves by clear and convincing evidence that compliance is impossible.  *S.E.C. v.
Ormont*, 739 F.2d 654, 657 n.7 (D.C.Cir.1984); *Doe v. Gen. Hosp. of D.C.*, 434 F.2d 427, 432-
33 (D.C. Cir. 1970); *Sierra Club v. Jackson*, No. 01-cv-1537, 2011 WL 181097 at *6 (D.D.C.
Jan. 20, 2011), *enforcement granted in part, denied in part sub nom. Sierra Club v. McCarthy*,
61 F. Supp. 3d 35 (D.D.C. 2014); *Am. Rivers v. U.S. Army Corps of Engineers*, 274 F. Supp.
2d 62, 66-67 (D.D.C. 2003); *Morales Feliciano v. Rosello Gonzalez*, 124 F. Supp. 2d 774,
785–86 (D.P.R. 2000).

failing to appropriate enough money to comply with it." *Cobell* v. *Babbitt*, 91 F. Supp. 2d 1, 48

(D.D.C. 1999) (internal quotation marks omitted), *aff'd and remanded sub nom. Cobell* v. *Norton*,

240 F.3d 1081 (D.C. Cir. 2001).

Finally, the Government's assertions indicate nothing about the public interest.

"[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws

that govern their existence and operations.'" *League of Women Voters of U.S.* v. *Newby*, 838 F.3d

1, 12 (D.C. Cir. 2016) (citations omitted).  Indeed, the Government "cannot suffer harm from an

injunction that merely ends an unlawful practice." *Open Cmtys. All.* v. *Carson*, 286 F. Supp. 3d

148, 179 (D.D.C. 2017) (internal quotation marks omitted).

## CONCLUSION

The Plaintiffs respectfully request that this Court enter a preliminary injunction

directing Defendants to immediately reunite M.G.U., A.P.F., and E.F. with their children.

Dated: Washington, D.C.  July 9, 2018       TEXAS RIOGRANDE LEGAL AID, INC.

  /s/ Jerome Wesevich
Jerome Wesevich (D.D.C. Bar No. TX0125)
Amanda Chisholm (Texas Bar No. 24040684)
Peter McGraw (Texas Bar No. 24081036)
1331 Texas Avenue
El Paso, Texas 79901
(915) 241-0534
jwesevich@trla.org
achisholm@trla.org
pmcgraw@trla.org


PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

David J. Ball (DC Bar No. 460055)
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7352
dball@paulweiss.com

Steven C. Herzog (admitted *pro hac vice*)
Meredith A. Arfa (admitted *pro hac vice*)
Katherine Kelly Fell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
sherzog@paulweiss.com
marfa@paulweiss.com
kfell@paulweiss.com

*Attorneys for Plaintiffs*


# CERTIFICATE OF SERVICE

Pursuant to LCvR 5.3, I hereby certify that, on July 9, 2018, I caused to be electronically filed a copy of the foregoing Plaintiffs' Memorandum of Points of Law and Authority in Support of Its Emergency Motion for Expedited Discovery to be served on all counsel of record using the Court's CM/ECF system.


/s/ Jerome Wesevich
Jerome Wesevich (D.D.C. Bar No. TX0125)

# OFFICE OF REFUGEE RESETTLEMENT
An Office of the Administration for Children & Families

# Children Entering the United States Unaccompanied: Section 2
## Safe and Timely Release from ORR Care

Published: January 30, 2015

**Categories: Unaccompanied Children's Services**

## 2.1 Summary of the Safe and Timely Release Process

The Office of Refugee Resettlement (ORR) has policies and procedures in place to ensure the care and safety of children who are apprehended in the United States without a parent or legal guardian available to provide care and custody and without immigration status. These policies require the timely release of children and youth to qualified parents, guardians, relatives or other adults, referred to as "sponsors." Safe and timely release must occur within a setting that promotes public safety and ensures that sponsors are able to provide for the physical and mental well-being of children.

ORR evaluates potential sponsors' ability to provide for the child's physical and mental well-being, as the law requires ORR to protect children from smugglers, traffickers, or others who might seek to victimize or otherwise engage the child in criminal, harmful or exploitative activity.  The process for the safe and timely release of an unaccompanied alien child from ORR custody involves many steps, including:  the identification of sponsors; the submission by a sponsor of the application for release and supporting documentation; the evaluation of the suitability of the sponsor, including verification of the sponsor's identity and relationship to the child, background checks, and in some cases home studies; and planning for post-release.

*Posted 1/27/15*

## 2.2 Application for the Safe and Timely Release of an Unaccompanied Alien Child from ORR Care

ORR begins the process of finding family members and others who may be qualified to care for an unaccompanied alien child as soon as the child enters ORR's care. Parents, other relatives, or close family friends can apply to have the child released to their care.

*Posted 1/27/15*

## 2.2.1 Identification of Qualified Sponsors

The **care provider (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Care Provider)**, the ORR funded facility that cares for the child, interviews the child as well as parents (see the section below on how ORR confirms relationship with child), legal

guardians, and/or family members to identify qualified custodians ("sponsors"). If a child is either too young or there are other factors that prohibit the care provider from obtaining potential sponsor information from the unaccompanied alien child, the care provider may seek assistance from the child's home country consulate in collaboration with the **ORR Federal Field Specialist (ORR/FFS) (https://www.acf.hhs.gov/programs /orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Federal Field Specialist)** or from a reputable family tracing organization. Finding a sponsor for the child is an ongoing process that continues during the unaccompanied alien child's stay in ORR care and custody in the event that the primary potential sponsor or primary release plan is not approved.

ORR releases children to a sponsor in the following order of preference:[1] parent; legal guardian; an adult relative (brother, sister, aunt, uncle, grandparent or first cousin); an adult individual or entity designated by the parent or legal guardian (through a signed declaration or other document that ORR determines is sufficient to establish the signatory's parental/guardian relationship); a licensed program willing to accept legal custody; or an adult individual or entity seeking custody when it appears that there is no other likely alternative to long term ORR care and custody. ORR has grouped these release options into the following categories.[2]

- **Category 1:** Parent or legal guardian (This includes qualifying step-parents that have legal or joint custody of the child or teen)
- **Category 2:** An immediate relative--a brother, sister, aunt, uncle, grandparent or first cousin. (This includes biological relatives, relatives through legal marriage, and half-siblings)
- **Category 3:** Other sponsor, such as distant relatives and unrelated adult individuals
- **Category 4:** No sponsors identified

Although ORR gives preference to a parent or legal guardian when determining release plans, there are instances when ORR would not release an unaccompanied alien child to a parent or legal guardian. These include:

- There has been a court ordered termination of parental rights over the child.
- There is substantial evidence that the child would be at risk of harm if released to the parent or legal guardian.

In some cases, an unaccompanied alien child enters the United States with her biological child. In those cases, ORR will identify a sponsor for the unaccompanied alien child as well as for the infant or toddler. In most instances, it is in the best interest of the unaccompanied alien child and her biological child to be released to the same sponsor. When that occurs, the sponsor is assigned the same category for the infant as for the UAC mother. This is true even if the potential sponsor would be assigned a different category (based on their relationship status) if he or she were to sponsor the infant alone.

*Revised 4/11/16*

## 2.2.2 Contacting Potential Sponsors

The child's **care provider (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Care Provider)** is responsible for implementing safe screening methods when contacting and communicating with potential sponsors. These methods are to ensure that a potential sponsor does not pose a risk to the unaccompanied alien child, to other children in the care provider facility or to care provider staff.
These safe screening methods include:

- Use of appropriate interpreters
- Identity of the sponsor is obtained
- Verification of family relationships
- Coordination with the unaccompanied alien child's parents, legal guardians, or closest relatives prior to contacting non-relative adult potential sponsors
- Screening for exploitation, abuse, trafficking, or other safety concerns
- Engaging the child to communicate openly with care provider staff about his or her own sense of safety

*Posted 1/27/15*

## 2.2.3 The Application for Release

All potential sponsors must complete an application in order for a child to be released to them from ORR custody (the "Family Reunification Application").

Within 24 hours of identification of a potential sponsor for a child or youth, the care provider or the ORR National Call Center sends the sponsor a package with the application and related documents (called the Family Reunification Packet or FRP).

The application package includes the following documents:

- A flyer with contact information on organizations offering a Legal Orientation Program for Custodians (LOPC)
- Family Reunification Packet Cover Letter
- Authorization for Release of Information
- Family Reunification Application
- Sponsor Care Agreement
- Sponsor Declaration
- Fingerprint instructions
- Sponsor Handbook
- (If parent or legal guardian wishes to specify) Letter of Designation for Care of a Minor
- Privacy Notices

The care provider is available to help the potential sponsor complete the application. The care provider also informs potential sponsors that they may submit additional information to support the application and reminds potential sponsors of the deadlines for completing the forms. The sponsor may also receive assistance in completing the application at some fingerprinting locations.

*Revised 6/7/18*

## 2.2.4 Required Documents for Submission with the Application for Release

In addition to completing and signing the Family Reunification Application (FRA) and the *Authorization for Release of Information*, potential sponsors must provide documentation of identity, address, and relationship to the child they seek to sponsor (see also **The Family Reunification Checklist for Sponsors (https://www.acf.hhs.gov/programs/orr/resource/unaccompanied-childrens-services#Family Reunification Packet for Sponsors)**).[3] Potential sponsors must also submit documentation verifying the identity of the children they seek to sponsor, and evidence verifying the identity of all adults residing with the sponsor and all adult care givers identified in a sponsor care plan. In addition to their use as evidence of the

foregoing, all documentation submitted under this section is used as part of the overall sponsor assessment process. See **Section 2.4 Sponsor Assessment Criteria and Home Studies (https://www.acf.hhs.gov /orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.4)**. As a result, ORR may in its discretion require potential sponsors to submit additional documentation beyond the minimums specified below.

**Proof of Sponsor Identity**

To verify their identity, all potential sponsors must submit original versions or legible copies of government-issued identification documents. They may present either one selection from List A or two or more documents from List B. If a potential sponsor presents selections from list B, at least one selection must contain a legible photograph. Expired documents are acceptable for the purpose of establishing identity.

**LIST OF ACCEPTABLE DOCUMENTS**

| LIST A |
| --- |
| U.S. Passport or U.S. Passport Card |
| Permanent Resident Card or Alien Registration Receipt Card (Form I-551) |
| Foreign Passport that contains a photograph |
| Employment Authorization Document that contains a photograph (Form I-766) |
| U.S. Driver's License or Identification Card |

**OR**

| LIST B |
| --- |
| U.S. Certificate of Naturalization |
| U.S. Military Identification Card |
| U.S. Social Security Card |
| Birth Certificate |
| Marriage Certificate |
| Court order for name change |
| Foreign national identification card |
| Consular passport renewal receipt that contains a photograph |
| Mexican consular identification card |
| Foreign driver's license that contains a photograph |
| Foreign voter registration card that contains a photograph |
| Canadian border crossing card that contains a photograph |
| Mexican border crossing card that contains a photograph with valid Form I-94 |
| Refugee travel document that contains a photograph |
| Other similar documents |

**Proof of identify of adult household members and adult care givers identified in a sponsor care plan**

All potential sponsors must submit documentation verifying the identity of non-sponsor adults in their household or in a sponsor care plan. For all such adults, potential sponsors must submit at least one identification document that contains a photograph. The document may be from either List A or List B above,

and may be an original version or a legible copy of the document. Expired documents are acceptable for the purpose of establishing identity. In addition, potential sponsors may submit an original version or legible copy of an ORR Verification of Release Form, but only to verify the identity of adults under the age of 21, and only if the form contains a photograph. ORR will not accept a Verification of Release as proof of identity if it does not contain a photograph, and/or is for anyone 21 and older.

**Proof of Address**

All potential sponsors must submit at least one form of documentation verifying their current address. Acceptable forms of documentation include original versions or legible copies of:

- A current lease or mortgage statement dated within the last two months before submission of the FRA;
- A utility bill, addressed in the sponsor's name and dated within the last two months before submission of the FRA;
- A bank statement dated within the last two months before submission of the FRA;
- A payroll check stub issued by an employer, dated within the last two months before submission of the FRA;
- A piece of mail from a county, state, or federal agency (with the exception of ORR) with the sponsor's name and residential address and dated within the last two months before submission of the FRA;
- A notarized letter from a landlord on the business stationary of the real property owner confirming the sponsor's address; and
- Other similar documents reliably indicating that the sponsor resides at the claimed address, dated within the last two months before submission of the FRA.

ORR may use alternative methods to verify address. For example, ORR may send a letter containing specific instructions to the address given by the sponsor, and provide a timeline by which the sponsor must comply with the instructions.

**Proof of Child's Identity**

The potential sponsor or child's family must provide the unaccompanied alien child's birth certificate or a legible copy of the child's birth certificate.

**Proof of Sponsor-Child Relationship**

The potential sponsor must provide at least one form of evidence verifying the relationship claimed with the child.[4] Acceptable documents include original versions or legible copies of:

- Birth certificates;
- Marriage certificates;
- Death certificates;
- Court records;
- Guardianship records;
- Hospital records;
- School records;
- Written affirmation of relationship from Consulate; and
- Other similar documents.

Category 3 potential sponsors who are unable to provide verifiable documentation of a familial relationship with the unaccompanied alien child must submit evidence that reliably and sufficiently demonstrates a bona

fide social relationship with the child and/or the child's family that existed before the child migrated to the United States. Care providers must attain sufficient corroboration to be confident that they have received needed verification of the relationship between the potential sponsor and the child or child's family. In the absence of sufficient evidence of a bona fide social relationship with the child and/or the child's family that existed before the child migrated to the United States, the child will not be released to that individual.

If a potential sponsor has been charged with or convicted of any crime or investigated for the physical abuse, sexual abuse, neglect, or abandonment of a minor, he or she must provide related court records and police records, as well as governmental social service records or proof of rehabilitation related to the incident.

If a sponsor, household member, or adult caregiver provides any false information in the application of release and/or accompanying documents or submits fraudulent documents for the purposes of obtaining sponsorship of the child, ORR will report the incident to HHS/Office of the Inspector General (OIG) and to U.S. Immigration and Customs Enforcement's Homeland Security Investigations (HSI). Fraudulent documents include documents on which the address, identity, or other relevant information is false or documents that have been manufactured or altered without lawful authorization. ORR will deny release if it is determined that fraudulent documents were submitted during the application of release process.

*Revised 11/14/16*

## 2.2.5 Legal Orientation Program for Custodians

All potential sponsors of children and youth under the care of ORR should attend a presentation provided by the Legal Orientation Program for Custodians (LOPC). The purpose of this program is to inform potential sponsors of their responsibilities in ensuring the child's appearance at all immigration proceedings, as well as protecting the child from mistreatment, exploitation, and trafficking, as provided under the Trafficking Victims Protection Reauthorization Act of 2008. The program also provides information about possible free legal counsel (pro bono legal services) for the youth or child during the immigration court process.

The Office of Legal Access Programs (OLAP), within the Executive Office for Immigration Review (EOIR) at the U.S. Department of Justice, manages the LOPC and contracts with legal service organizations around the country to provide LOPC services to potential sponsors in their local communities or in metropolitan areas served by the program. EOIR is the entity in the federal government that is also responsible for adjudicating immigration cases by fairly, expeditiously, and uniformly interpreting and administering the nation's immigration laws.

The unaccompanied alien child's **case manager (https://www.acf.hhs.gov/programs/orr/resource /children-entering-the-united-states-unaccompanied-guide-to-terms#Case Manager)**is responsible for informing potential sponsors about all procedures related to the child's case--including attendance at an LOPC presentation. The Family Reunification Packet (FRP) that goes to each potential sponsor includes an *Authorization for Release of Information* that the sponsor must sign before the case manager may schedule an appointment for LOPC services. All potential sponsors should submit the *Authorization for Release of Information* immediately and prior to submitting the complete FRP to ensure timely scheduling of their LOPC session.

Upon receipt of the *Authorization*, the case manager schedules an appointment for a potential sponsor to attend a presentation with one of the LOPC providers around the country. Alternatively, the case manager contacts the **LOPC National Call Center at (888) 996-3848** and arranges for the Call Center to schedule an LOPC appointment for the potential sponsor or mail an LOPC Information Packet to the sponsor.

When evaluating family members and other potential sponsors, ORR considers whether they have attended an LOPC presentation.  Attendance at an LOPC presentation is a factor in the release assessment.

*Revised 12/4/17*

## 2.2.6 Additional Questions and Answers about this Topic

**Q: Will sponsors receive the Family Reunification Packet through the mail or electronically?**
A: Case managers will work with sponsors to identify the best way to get the packets to them, whether electronically or by fax transmission or postage paid overnight mail.

**Q: Do sponsors need assistance from an attorney or a paid representative to complete the packet?**
A: No. The unaccompanied alien child's case manager will be able to help the potential sponsor complete the form and explain the process.

**Q: Is it possible for an unaccompanied alien child's spouse to be a sponsor?**
A: ORR considers release to an unaccompanied alien child's adult spouse on a case by case basis.

**Q: Is it possible for family members in the United States to proactively contact ORR about children who may have entered the country unaccompanied?**
A: Yes. Family members may call the ORR National Call Center, at (800) 203-7001.

*Posted 1/27/15*

# 2.3 Key Participants in the Release Process

ORR's sponsor assessment and release decision process requires coordination among care provider staff, nongovernmental third-party reviewers (Case Coordinators), ORR staff, other Federal agencies, stakeholders, and Child Advocates, where applicable.

**Case Managers (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Manager)** communicate with potential sponsors, gather necessary information and documentation, talk to any relevant stakeholders, and assess sponsors to formulate a recommendation to the Case Coordinator. **Case Coordinators (https://www.acf.hhs.gov/programs /orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Coordinators)** concurrently review all assessment information on an unaccompanied alien child and sponsor to also make a recommendation. Once Case Managers and Case Coordinators agree on a particular recommendation for release, the recommendation will be sent to the **ORR/FFS (https://www.acf.hhs.gov /programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR /Federal Field Specialist)** for a final release decision. If the Case Manager and Case Coordinator cannot agree on a recommendation, the case is elevated to the ORR/FFS for further guidance.

*Revised 8/1/16*

## 2.3.1 ORR/Federal Field Specialists (ORR/FFS)

ORR/FFS are ORR's field staff located regionally throughout the country and are assigned to a group of care providers within a region. They have the authority to approve all unaccompanied alien children transfer and release decisions; oversee care providers to ensure all services, policies, and procedures are properly provided and implemented; and serve as a liaison to local stakeholders, including other Federal agencies, local legal service providers, local communities, Child Advocates, etc. ORR/FFS also provide guidance,

direction, and technical assistance to care providers.

With regard to the release process, ORR/FFS oversee individual unaccompanied alien children cases and review Case Manager, Case Coordinator, and Child Advocate recommendations; and make final release and transfer decisions for ORR. ORR/FFS also make final decisions whether home studies are conducted and/or post-release services are provided.[5] ORR/FFS coordinate all aspects of a child's case with care provider staff, Case Coordinators, stakeholders, and other Federal agencies.

*Revised 8/1/16*

## 2.3.2 Case Managers

Care provider Case Managers perform a variety of duties, including coordinating the completion of assessments of unaccompanied alien children, completing individual service plans, assessing potential sponsors, making transfer and release recommendations, and coordinating the release of a child or youth from ORR care and custody. (The care provider provides a range of services through other trained staff that are described in Section 3: Services.)

The role of the Case Manager within the release process is to initiate and maintain ongoing communication with the potential sponsor, gather sponsor information, and assess whether the potential sponsor is a suitable sponsor who can safely provide for the physical and mental well-being of the child or youth. When communicating with the potential sponsor, the Case Manager may:

- Provide direct assistance on completing the sponsor application packet and ensuring provision of supporting documentation;
- Involve the sponsor in making a plan for individualized services for the unaccompanied alien child, as appropriate;
- Keep the sponsor informed of the child's progress and current functioning;
- Provide the sponsor with detailed information about the child's needs in order to fully assess the sponsor's ability to provide care and services, including completing a sponsor care plan, when necessary;
- Discuss services that are available in the sponsor's community for the child; and
- Share relevant information on the unaccompanied alien child in accordance with applicable privacy and information-sharing policies and in collaboration with the unaccompanied alien child and the child's clinician in a way that best serves the child's safety and well-being.

The Case Manager's role is also to ensure that information is gathered or shared with the appropriate staff and stakeholders during the sponsor assessment process. The Case Manager provides weekly status updates to the unaccompanied alien child's Case Coordinator and ORR/FFS on the progress in achieving a safe and timely release with family members as well as potential challenges that may delay a release. The Case Manager provides weekly status updates (monthly for children in LTFC) to the UAC on the child's case and provision of services, preferably in person. The Case Manager informs other stakeholders of the progress of a child's case, including notification that an unaccompanied alien child may not have a potential sponsor, and any final release decisions. Stakeholders may include local legal service providers and attorneys of record, other local service providers, Child Advocates, post-release and home study providers, and other Federal agencies. Case Managers, in collaboration with the ORR/FFS and Case Coordinator, will also work with law enforcement officials regarding an unaccompanied alien child's pending release if the minor has outstanding criminal charges or other issues.

*Revised 6/7/18*

### 2.3.3 Case Coordinators

Case Coordinators are non-governmental contractor field staff assigned to one or more care providers primarily to review unaccompanied alien children cases and provide transfer and release recommendations to ORR staff. The Case Coordinator is responsible for integrating all areas of assessment from the Case Manager, Child Advocates, where applicable, and other stakeholders into a release plan that will provide for the unaccompanied alien child's physical and mental well-being. After staffing and reviewing a case, Case Coordinators and Case Managers must agree on a release recommendation. If there is a disagreement or a particularly complex case, then the case will be elevated to the ORR/FFS for further guidance.

- Providing timely review and assessment of potential sponsors and unaccompanied alien children to make recommendations for release to ORR in conjunction with the Case Manager;
- Assisting ORR in ensuring that children are placed in the least restrictive setting while receiving all appropriate services;
- Meeting with individual unaccompanied alien children and care provider staff at designated ORR-funded care provider sites;
- Providing targeted child welfare-based assistance to care provider staff, as directed by ORR staff;
- Making recommendations for home study and post-release services for at-risk children;
- Making placement recommendations for children who require more specialized levels of care, such as long-term foster care and residential treatment centers;
- Participating in collaborative meetings with local stakeholders; and
- Participating in staffing of cases with care providers and designated ORR staff.

*Revised 8/1/16*

### 2.3.4 Child Advocates

ORR may appoint **Child Advocates (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Child Advocate)** for victims of trafficking and other vulnerable children. Child Advocates are third parties who make independent recommendations regarding the best interests of a child. Their recommendations are based on information that is obtained from the child and other sources (e.g., the child's parents, potential sponsors, government agencies, and other stakeholders). Child Advocates formally submit their recommendations to ORR and/or the immigration court in the form of Best Interest Determinations (BIDs). ORR considers BIDs when making decisions regarding the care, placement, and release of unaccompanied alien children, but it is not bound to follow BID recommendations.

As required by the TVPRA, ORR provides Child Advocates with access to information necessary to effectively advocate for the best interests of children with whom they are working. After providing proof of appointment, Child Advocates have access both to their clients and to their clients' records. Child Advocates may access their clients' entire original case files at care provider facilities, or request copies from care providers.[6] Further, they may participate in case staffings.

Child Advocates and ORR maintain regular communication, informing each other of considerations or updates that impact service provision and release planning.

Child Advocates' duties include:

- Client Visits: The Child Advocate meets with the unaccompanied alien child regularly and speaks with

the child's care provider staff in order to understand the child's background and current situation.

- **Decision Making:** The Child Advocate helps the unaccompanied alien child understand legal and care-related issues, explains the consequences of decisions made in response to those issues, and assists the child in making decisions when the child requests such help.

- **Best Interests Advocacy:** The Child Advocate develops a service plan containing best-interest recommendations with respect to the care, placement, and release options; and keeps the care provider, ORR, and the legal service provider or attorney of record apprised of the plan and advocacy efforts.

- **Case updates:** The Child Advocate collaborates and regularly communicates with the care provider, ORR, and other stakeholders in the planning and performance of advocacy efforts. For children who have been released from ORR care, Child Advocates provide timely updates as appropriate or as requested by ORR.

In most cases, ORR appoints Child Advocates while children are in its custody. However, in its discretion, ORR may appoint Child Advocates for unaccompanied alien children after their release from ORR care.

*Posted 8/1/16*

# 2.4 Sponsor Assessment Criteria and Home Studies

As noted in the **Section 2.2 Application for Safe and Timely Release of an Unaccompanied Alien Child from ORR Care**, the application process for release of an unaccompanied alien child involves a number of steps, including background checks (see **Section 2.5 ORR Policies on Requesting Background Checks**) and submission of the application by the sponsor. This section describes the criteria ORR uses to assess each potential sponsor's ability to provide for the physical and mental well-being of the unaccompanied alien child, and the role of home studies in the process.

The sponsor assessment reviews a sponsor's strengths, resources, risk factors and special concerns within the context of the unaccompanied alien child's needs, strengths, risk factors, and relationship to the sponsor. ORR also determines whether to conduct a home study, as required by the law or as necessary to ensure the welfare of the child

*Revised 3/15/16*

## 2.4.1 Assessment Criteria

ORR considers the following factors when evaluating family members and other potential sponsors:

- The nature and extent of the sponsor's previous and current relationship with the child or youth and the unaccompanied alien child's family, if a relationship exists.
- The sponsor's motivation for wanting to sponsor the child or youth.
- The unaccompanied alien child's parent or legal guardian's perspective on the release to the identified potential sponsor (for cases in which the parent or legal guardian has designated a sponsor).
- The child or youth's views on the release and whether he or she wants to be released to the individual.
- The sponsor's understanding of the unaccompanied alien child's needs, as identified by ORR and the care provider.
- The sponsor's plan to provide adequate care, supervision, access to community resources, and housing.

- The sponsor's understanding of the importance of ensuring the unaccompanied alien child's presence at all future hearings or proceedings, including immigration court proceedings, and the sponsor's attendance at a Legal Orientation Program for Custodians (LOPC) presentation. See section **2.2.5**.
- The linguistic and cultural background of the child or youth and the sponsor, including cultural, social, and communal norms and practices for the care of children.
- The sponsor's strengths, resources, and mitigating factors in relation to any risks or special concerns of the child or sponsor, such as a criminal background, history of substance abuse, mental health issues, or domestic violence and child welfare concerns.
- The unaccompanied alien child's current functioning and strengths in relation to any risk factors or special concerns, such as children or youth who are victims of human trafficking; are a parent or are pregnant; have special needs, disabilities or medical or mental health issues; have a history of criminal, juvenile justice, or gang involvement; or a history of behavioral issues.

*Revised 12/4/17*

## 2.4.2 Home Study Requirement

The care provider screens each case to determine whether to conduct a home study of the potential sponsor as required under the **Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) (http://www.gpo.gov/fdsys/pkg/BILLS-110hr7311enr/pdf/BILLS-110hr7311enr.pdf)**. Information about the child is collected during initial placement into an ORR facility and throughout his or her stay. The care provider then uses the information collected about and from the child in conjunction with the sponsor assessment process to determine whether to conduct a **home study (https://www.acf.hhs.gov/programs/orr/resource /children-entering-the-united-states-unaccompanied-guide-to-terms#Home Study)**. The TVPRA requires home studies under the following circumstances:

1. The child is a victim of a severe form of trafficking in persons;
2. The child is a special needs child with a disability as defined by section 3 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12102);
3. The child has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened; or
4. The child's sponsor clearly presents a risk of abuse, maltreatment, exploitation or trafficking, to the child based on all available objective evidence.

ORR also requires a home study before releasing any child to a non-relative sponsor who is seeking to sponsor multiple children, or who has previously sponsored or sought to sponsor a child and is seeking to sponsor additional children. ORR requires a home study for children who are 12 years and under before releasing to a non-relative sponsor.

In circumstances in which a home study is not required by the TVPRA or ORR policy, the Case Manager and Case Coordinator may recommend that a home study be conducted if they agree that the home study will provide additional information required to determine that the sponsor is able to care for the health, safety and well-being of the child. See **Footnote 5**.

The care provider must inform the potential sponsor whenever a home study is conducted, explaining the scope and purpose of the study and answering the potential sponsor's questions about the process. In addition, the home study report will be provided to the potential sponsor if the release request is denied. See also Section **2.7.7**.

**Home Study Report and Final Recommendation**

A home study consists of interviews, a home visit, and a written report containing the home study case worker's findings. A home study assesses the potential sponsor's ability to meet the child's needs, educates and prepares the sponsor for the child's release, and builds on the sponsor assessment conducted by the care provider staff to verify or corroborate information gathered during that process. The home study is conducted as a collaborative psycho-educational process in which the home study case worker identifies areas where additional support, resources, or information are needed to ensure a successful sponsorship, and provides corresponding psycho-educational assistance. The final recommendation must present a comprehensive and detailed assessment of the sponsor's ability to care for the needs of the child and address any additional information that emerges during the course of the home study regarding the sponsor, the sponsor's household or the child.

The home study provider must contact the care provider within 24 hours of home study referral acceptance, and must also contact the sponsor to schedule the home visit within 48 hours of referral acceptance. The home study provider makes a recommendation to ORR about release with the sponsor. The ORR Federal Field Specialist takes the home study provider's recommendation into consideration when making a release decision. ORR has final authority on release decisions.

The home study provider submits the written report within 10 business days of receipt of the referral. Any requests by the home study provider to extend beyond 10 business days or to cancel a home study must be submitted in writing to the ORR Federal Field Specialist for consideration.

All releases following home studies require post-release services.

**Must a child receive a Trafficking Eligibility or Interim Assistance Letter from HHS prior to being referred for a TVPRA-mandated home study under #1 above?**

No, a child does not need to receive a Trafficking Eligibility Letter from HHS prior to being referred for a home study. A care provider may refer a child for a home study under #1 above if, during the assessment for trafficking, the care provider determines the child is a victim of a severe form of trafficking in persons.

**In determining whether a TVPRA-mandated home study is required under #3 above, care providers consider the following questions:**

**What is physical abuse?**

Physical abuse is an act that results in physical injury, such as red marks, cuts, welts, bruises, broken bones, missing or broken teeth or muscle strains. Acts of physical abuse include but are not limited to punching, beating, kicking, biting, hitting (with a hand, stick, strap or other object), burning, strangling, whipping, or the unnecessary use of physical restraint.

**Is physical abuse intentional?**

Generally, physical abuse is intentional; however, physical abuse can occur when physical punishment goes too far. In other words, an accidental injury of a child may be considered physical abuse if the act that injured the child was done intentionally as a form of punishment.

**Must a child have physical injuries to meet the standard for physical abuse under #3?**

No, in some cases, a child may not have physical injuries at the time the care provider makes an assessment. Children may be in various stages of the healing process or thoroughly healed from the physical abuse by the time they arrive in ORR care.

**For the purposes of #3, who can physically or sexually abuse a child?**

A parent, legal guardian, caregiver or other adult with a special relationship to the child can physically or sexually abuse a child.

**Who is considered to be a caregiver or adult with a special relationship?**

A caregiver is defined as any person who is entrusted with the child's care and who lives with the child. Other adults with a special relationship to the child could include a teacher, priest, or health care provider.

**What is sexual abuse?**

Sexual abuse of a child by a parent, legal guardian, caregiver or other adult with a special relationship to the child includes any of the following acts, with or without the consent of the child or youth:

- Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;
- Contact between the mouth and the penis, vulva, or anus;
- Contact between the mouth and any body part where the adult has the intent to abuse, arouse, or gratify sexual desire;
- Penetration of the anal or genital opening, however slight, by a hand, finger, object, or other instrument where the adult has the intent to abuse, arouse, or gratify sexual desire;
- Any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks where the intent is to abuse, arouse, or gratify sexual desire;
- Any attempt, threat, or request by the adult to engage in the activities described above;
- Any display by the adult of his or her uncovered genitalia, buttocks, or breast in the presence of the child; and
- Voyeurism.

State laws on statutory rape are not the standard in assessing whether a youth has been sexually abused for the purposes of #3. Care providers use the definition from the ORR rule concerning sexual abuse and harassment; however, for the purposes of determining when a home study is required, the perpetrator is limited to a parent, legal guardian, caregiver or other adult with a special relationship to the child.

**Under what circumstances is a child's health or welfare considered to have been significantly harmed or threatened?**

Care providers assess the totality of the circumstances in determining whether a child's health or welfare has been significantly harmed or threatened. In evaluating a specific case, care providers take into consideration not only the definitions of physical and sexual abuse listed

above, but also the circumstances surrounding the incident and any behaviors that the child or youth exhibits as a result of the abuse. Circumstances to consider include but are not limited to: the amount of time that has passed since the abuse, the period of time in which the abuse occurred, the cultural context in which the abuse occurred, the age of the child or youth at the time of the abuse, and the relationship between the youth

and the perpetrator.

Care providers take into consideration the situations and behaviors listed below, but do not make a determination based solely on the presence or absence of one of them.

- The child experiences on-going medical issues from physical injuries.
- The child exhibits negative or harmful behaviors, thoughts or emotions, such as, but not limited to, excessive hostility or aggression towards others, fire setting, cutting, depression, eating disorders suicidal ideation or substance abuse.

In evaluating difficult cases, the care provider should consult with their ORR/FFS.

*Revised 1/9/17*

### 2.4.3 Additional Questions and Answers on This Topic

**Q: What happens if a new sponsor is identified during the sponsor assessment process?**
A: If there are multiple potential sponsors, the ORR-funded care provider will exhaust all efforts to facilitate a release to a parent or legal guardian while also contacting and evaluating other potential sponsors concurrently. ORR has release order preferences and will evaluate sponsors concurrently in accordance with the preference orders to determine the best placement for the child.

*Posted 1/27/15*

## 2.5 ORR Policies on Requesting Background Checks of Sponsors

In order to ensure the safety of an unaccompanied alien child and consistent with the statutory requirements under the TVPRA 2008, ORR requires a background check of all potential sponsors and household members. The background check takes place as soon as the potential sponsor and adult household members have completed the Authorization for Release of Information form, submitted fingerprints, and provided a copy of a valid government issued photo identification. ORR transmits the fingerprints to the Department of Homeland Security to perform criminal and immigration status checks on ORR's behalf.  DHS then submits the results to ORR.

ORR also conducts additional background checks without going through DHS.  Depending on the circumstances, these checks may involve background checks on criminal history (including through the FBI) and child abuse/neglect checks (CA/N)

Adult care givers identified in a sponsor care plan also require background checks, as provided in the chart at section 2.5.1.

*Revised 6/7/18*

### 2.5.1 Criteria for Background Checks

All potential sponsors and adult household members undergo a background check for criminal history and immigration status using fingerprints.  These checks are conducted by the Department of Homeland Security on behalf of ORR and DHS then submits the results to ORR.

In addition, ORR independently conducts background checks without going through DHS. This independent background check process varies, depending in part on the relationship of the potential sponsor to the

unaccompanied alien child:

- Parents and legal guardians (Category 1)
- Other immediate adult relatives, such as brother, sister, aunt, uncle, grandparent or first cousin (Category 2)
- Distant relatives and unrelated adults (Category 3)

As a part of this independent background check process, all potential sponsors must undergo a public records check.

The following indicates the **minimum** requirements for the process for sponsors. ORR may require additional checks, verifications, or procedures for sponsors in any category if there are any unresolved issues or questions related to the well-being of the child.

The following table lists the types of background checks performed, and explains when they are performed, based on the potential sponsor's relationship to the unaccompanied alien child and other release considerations. The chart identifies when DHS performs the check on ORR's behalf. (See also Section **2.7.4 (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7.4)**, listing findings barring release)

| Type of Background Check | Purpose | Persons Checked | When Performed |
|---|---|---|---|
| Public Records Check | Identifies arrests or convictions of sponsors, adult household members, or others. If a check reveals a criminal record or safety issue, it will be used to evaluate the sponsor's ability to provide for a child's physical and mental well-being. | Potential Sponsors in Categories 1-3.<br><br>Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | In all cases |
| Sex Offender Registry Check, conducted through the U.S. Department of Justice National Sex Offender Public Website | Identifies sponsors and others that have been adjudicated as sex offenders through a national search and, if available, a local public registry search. | Potential Sponsors in Categories 1-3.<br><br>Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | In all cases |
| Immigration Status Check conducted by the Department of Homeland Security using fingerprints | Provides information about immigration court actions and immigration statuses, including information about orders of removal. The information is also used to determine whether a sponsor care plan is required for release (see Section 2.7.6). | Potential Sponsors in Categories 1-3.<br>Non-sponsor adult household members. | In all cases. |
| | | Adult care givers identified in a sponsor care plan. | Where a public records check reveals possible disqualifying factors under 2.7.4; or where there is a documented risk to the safety of the unaccompanied alien child, |

| | | | the child is especially vulnerable, and/or the case is being referred for a home study. |
|---|---|---|---|
| National (FBI) Criminal History Check, based on digital fingerprints or digitized paper prints | Determines whether a sponsor or adult household member has a criminal history, has been convicted of a sex crime, or has been convicted of other crimes that compromise the sponsor's ability to care for a child. | Potential Sponsors in Categories 1-3. Non-sponsor adult household members. | In all cases. |
| | | Adult care givers identified in a sponsor care plan. | Where a public records check reveals possible disqualifying factors under 2.7.4; or where there is a documented risk to the safety of the unaccompanied alien child, the child is especially vulnerable, and/or the case is being referred for a home study |
| DHS criminal history check, based on digital fingerprints or digitized paper prints. | Determines whether a sponsor or adult household member has a criminal history, including: biographic criminal check of the national databases, a biographical check for wants and warrants. | Potential Sponsor in Categories 1-3. Non-sponsor adult household members. | In all cases. |
| | | Adult care givers identified in a sponsor care plan. | Where a public records check reveals possible disqualifying factors under 2.7.4; or where there is a documented risk to the safety of the unaccompanied alien child, the child is especially vulnerable, and/or the case is being referred for a home study. |
| Child Abuse and Neglect (CA/N) Check, obtained on a state by state basis as no national CA/N check repository exists | Checks all localities in which the sponsor or household member has resided in the past 5 years. | Potential Sponsors in Categories 1-2. | In cases that require a home study, and cases where a special concern is identified. |
| | | Potential Sponsors in Category 3. | In all cases. |
| | | Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | In any case where a sponsor is required to undergo a CA/N check. |
| State Criminal History Repository Check and/or Local Police Check | Assists in locating police or arrest records, or other criminal offense details, as needed. | Potential Sponsors in Categories 1-3. Non-sponsor adult household members and adult care givers identified | Used on a case-by-case basis when there is an unresolved criminal arrest or issue that is still in process. |

| | | in a sponsor care plan. | |
|---|---|---|---|

## 2.5.2 Results of Background Checks on Release Decisions

As an entity providing for the health and well-being of children and youth, ORR uses the results from background checks to determine whether release to a potential sponsor is safe. A potential sponsor may be denied a release request, based on the results of a background check, and a release decision may remain undecided until ORR obtains the results of a potential sponsor's criminal history, immigration background checks, or child abuse and neglect reports.

The biometric and biographical information, including fingerprints, is shared with Federal, state or local law enforcement agencies and may be used consistent with their authorities, including with the DHS to determine immigration status and criminal history, and with the  DOJ to investigate criminal history through the National Criminal Information Center.

**Criminal History**

In the event that a background check of a potential sponsor or, if applicable, adult household member, reveals criminal history or a safety risk, the care provider and ORR evaluate this information and request the potential sponsor to provide any additional  information that may demonstrate the potential sponsor's ability to provide for the child's physical and mental well-being.

If release is not barred by Section **2.7.4 (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7.4)**, the decision to release a child or youth to a sponsor in these circumstances is based on all the following considerations:

- The severity of the criminal and/or child abuse/neglect history;
- The length of time that has passed since the criminal act or child abuse/neglect allegation occurred;
- The relationship of the potential sponsor and other adult household members to the child or youth; and
- The evidence, if any, of rehabilitation since the criminal act or child abuse/neglect allegation occurred.

In cases where the proposed sponsor or other adult household member has been charged with, but not convicted of, a crime, ORR may postpone a final release decision until the legal issue is resolved.

If the sponsor has an outstanding order of removal, or a pending order of removal that is related to an underlying criminal act, the decision to release a child or youth to a sponsor in these circumstances is based on the considerations described above.

**Sponsor Immigration Status**

ORR does not disqualify potential sponsors on the basis of their immigration status. ORR uses status information to determine whether a sponsor care plan is necessary in the event the sponsor is required to leave the United States. (See Section **2.6 (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.6) Effect of Sponsor Immigration Status on Release of Unaccompanied Alien Children)**

**Summary Table of Results of Background Checks and Next Steps**

The following table shows procedures following the results of background checks.

| Background Check Results | Next Steps |
|---|---|
| No arrest record; check completed | Proceed with release decision-making process. See Section **2.7 Recommendations and Decisions on Release**. |
| Criminal arrest record and/or substantiated adverse child welfare findings; check completed | Determine whether release is barred. See Section 2.7.4 Deny Release Request. If release is not barred, elevate safety issues for third party review. For any findings that could affect safe release, care provider and/or ORR will obtain additional documents to determine current situation (e.g. sponsor is on probation, criminal charges are resolved, etc.). Final release decision shall take into account the criminal records and all other relevant information that is available. |
| Immigration status concern (e.g. out of status, no legal status, prior order of removal, or no immigration record for non-citizen) | Review FBI record and DHS report, and/or Department of Justice/Executive Office of Immigration Review's case status hotline for information related to possible unresolved immigration issues. |
| Pending results; check not complete | ORR/FFS will provide instructions to care provider |

*Revised 6/7/18*

## 2.5.3 Additional Questions and Answers on This Topic

**Q1: Where can a sponsor get his or her fingerprints taken?**
A1: ORR funds a network of digital fingerprint providers at locations that are not affiliated with law enforcement entities. Sponsors may also go to any local police department for paper fingerprinting services in the event a digital fingerprint provider is not conveniently located near a sponsor's location. Fingerprinting services are not available at ORR headquarters and offices.

**Q2: Is there a deadline for complying with a fingerprinting request?**
A2: Yes. When required, fingerprints should be provided within 3 business days of the request. Release may be delayed if fingerprints are not provided promptly.

**Q3: Are potential sponsors required to disclose to the care provider that they have a record of a criminal charge or child abuse?**
A3: Yes. The sponsor must immediately advise the care provider of this situation and gather detailed documentation of the charges, dispositions, police reports, and evidence of rehabilitation.

**Q4: What happens if a public records or sex offender registry check returns disqualifying findings for a sponsor, adult household member, or adult caregiver identified in the sponsor care plan?**
A4: The Case Manager informs the sponsor, and provides the sponsor with a copy of the results. The sponsor and household member/adult care giver may dispute the results, and provide further evidence or information that a check was not performed correctly (e.g., the wrong date of birth was used, the individual's name was spelled incorrectly, etc.). The Case Manager will rerun the check using the corrected information. If further

information is required, such as additional background checks, the Case Manager will work with the sponsor and household member/adult caregiver to obtain the information, or make other arrangements so that the safety risk to the unaccompanied alien child is mitigated (e.g., taking steps so that the household member no longer resides in the sponsor's home, identifying a new adult care giver, etc.).

**Q5: What happens if an adult household member refuses to cooperate with a background check?**
A5: ORR denies release when an adult household member refuses to have a background check.

*Revised 6/7/18*

# 2.6 Sponsor Immigration Status and Release of Unaccompanied Alien Children

ORR does not disqualify potential sponsors on the basis of their immigration status. ORR does seek immigration status information, but this is used to determine if a sponsor care plan will be needed if the sponsor needs to leave the United States; it is not used as a reason to deny a family reunification application.

The biometric and biographical information, including fingerprints, is shared with Federal, state or local law enforcement agencies and may be used consistent with their authorities, including with the DHS to determine immigration status and criminal history, and with the DOJ to investigate criminal history through the National Criminal Information Center.

*Revised 6/7/18*

## 2.6.1 Application Process

**How does ORR obtain information about immigration status?**
ORR asks potential sponsors and adult household members for their Alien Registration Number on the Authorization for Release of Information form. In addition, as described below, ORR requires sponsors to provide fingerprints for background checks, and those checks may produce information about the individual's immigration status. During the sponsor assessment process, case managers also ask sponsors about their immigration status.

*Revised 6/7/18*

## 2.6.2 Fingerprints

**Who must provide fingerprints as part of the release process?**
All individuals seeking to sponsor a UAC and adults in their household are subject to fingerprinting requirements.

**What does ORR use the fingerprints for?**
Using digital fingerprints or digitized paper prints, the HHS PSC, on behalf of ORR, conducts a check of the FBI national criminal history and state repository records. ORR also transmit fingerprints to the Department of Homeland Security to search criminal and immigration databases on ORR's behalf and transmit the results to ORR.

*Revised 6/7/18*

## 2.6.3 Other Background Checks Related to Immigration
**Reserved.**

*Revised 6/7/18*

### 2.6.4 Results of Immigration-Related Checks

**What does ORR do with the results of the FBI fingerprint and DHS checks?**
The information may be used to determine if a sponsor care plan will be needed in the event that the sponsor needs to leave the United States. In addition, if the basis for an immigration action is underlying criminal activity, ORR and its grantee will review the underlying criminal activity to determine if it is reason to disqualify the potential sponsor, as ORR does when evaluating other criminal activity uncovered during the fingerprint process, but unrelated to immigration actions.

**Who else may have access to the results of the FBI fingerprint checks?**
ORR does not release the results of the FBI fingerprints to outside organizations or individuals, other than ORR grantees that are caring for the children. The FBI and DHS databases contain overlapping records, and the FBI system automatically initiates a notification to the DHS system if a particular record has been searched.

**What is in a sponsor care plan?**
A sponsor care plan identifies the individual that will assume care of an unaccompanied alien child if the sponsor becomes unable to care for the child, **see Section 2.7.6**.

*Revised 6/7/18*

## 2.7 Recommendations and Decisions on Release

ORR care providers must make a recommendation to release a child to a potential sponsor after the care provider has evaluated the sponsor, completed the background checks, and collected necessary documentation to prove the sponsor's identity and relationship to the child or youth. The recommendation must take into consideration all relevant information, including the report and recommendations from a home study, if conducted; laws governing the process; and other factors in the case. The ORR care provider makes a recommendation for release if the care provider concludes that the release is safe and the sponsor can care for the physical and mental well-being of the child.

- The care provider **Case Manager (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Manager)**and the **Case Coordinator  (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Coordinators)**must make a recommendation to the **ORR/FFS (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Federal Field Specialist)** on the release of the unaccompanied alien child to a particular sponsor. If the Case Manager and Case Coordinator cannot agree on a particular recommendation, or if the case is particularly complicated, they may refer the case directly to an ORR/FFS for guidance on how to proceed.
- After receiving the recommendation, the **ORR/FFS  (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Federal Field Specialist)**or other **ORR/Headquarters staff  (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Headquarters Staff)**reviews the recommendation.
- The ORR/FFS makes a release decision in consideration of the recommendations from the care provider, the Case Coordinator, and other stakeholders, including the home study provider and the

Child Advocate, where applicable.

Only ORR (or ACF) has the authority to make the final decision on a release. The Case Manager, Case Coordinator, and other stakeholders have an important role in making recommendations. In some cases, the ORR/FFS may send a case back to the Case Coordinator and Case Manager to obtain additional information before he/she makes a release decision.

The ORR/FFS makes one of the following release decisions:

- Approve release to sponsor
- Approve release with post-release services
- Conduct a home study before a final release decision
- Deny release
- Remand for further information

*Revised 06/29/18*

## 2.7.1 Approve Release Decisions

A recommendation for a release without a home study or post-release services is made after a thorough assessment of the sponsor, the sponsor's family unit, and the needs of the child or youth are taken into consideration. The ORR/FFS makes this release decision when he/she determines that the release is a safe release, the sponsor can care for the health and well-being of the child, and the sponsor understands that the child is to appear for all immigration proceedings.

*Posted 1/27/15*

## 2.7.2 Approve Release with Post-Release Services

The ORR/FFS may approve a release with post-release services when the release is determined to be safe and appropriate, but the unaccompanied alien child and sponsor need additional assistance to connect them to appropriate resources in the community or to address other concerns, such as mental health or other needs that could benefit from ongoing assistance from a social welfare agency. The sponsor must consent before services may be provided and may withdraw his or her consent at any time after services have begun, since post-release services are a voluntary service. These services are provided for 6 months after the unaccompanied alien child is released to the sponsor, unless ORR determines that services should be provided for a shorter or longer period of time. Post- release services do not continue under any circumstances beyond an unaccompanied alien child's 18th birthday.

*Posted 1/27/15*

## 2.7.3 Conduct a Home Study Before a Final Release Decision Can Be Made

The Case Manager and Case Coordinator will recommend to the ORR/FFS that a home study be conducted prior to making a release recommendation. If the ORR/FFS agrees, he/she will approve that a home study be conducted before a final release decision can be made. The home study provider uses a standardized template to complete the review; however, the provider may include any additional supporting documentation regarding the sponsor or the child or youth, as applicable.

Once the Case Manager and Case Coordinator receive the home study results, they will review the case in light of the home study and make a release recommendation to the ORR/FFS. (**See Section 2.4.2 Home**

Study Requirements. (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.4.2))

*Posted 1/27/15*

### 2.7.4 Deny Release Request

ORR *will* deny release to a potential sponsor if any one of the following conditions exists:

- The potential sponsor is not willing or able to provide for the child's physical or mental well-being;
- The physical environment of the home presents risks to the child's safety and well-being; or
- Release of the unaccompanied alien child would present a risk to him or herself, the sponsor, household, or the community.

ORR may deny release to a Category 1 potential sponsor, and will deny release to a Category 2 or Category 3 potential sponsor, if any one of the following conditions exists:[8]

- The potential sponsor or a member of the potential sponsor's household:
  - Has been convicted of (including plea of no contest to) a felony involving child abuse or neglect, spousal abuse; a crime against a child or children (including child pornography); or a crime involving violence, including rape, sexual assault or homicide;
  - Has been convicted within the last five years of a felony involving physical assault, battery, or drug-related offenses;
  - Has been convicted of a misdemeanor for a sex crime, an offense involving a child victim, or a drug offense that compromises the sponsor's ability to ensure the safety and well-being of the child;
  - Has been convicted of alien smuggling or a crime related to trafficking in persons; or
  - Has other criminal history or pending criminal charges or child welfare adverse findings from which one could reasonably infer that the sponsor's ability to ensure the safety and well-being of the child is compromised;

or

- A potential sponsor or a member of the potential sponsor's household has one of the following substantiated adverse child welfare findings:[9]
  - Severe or chronic abuse or neglect;
  - Sexual Abuse or other sexual offenses;
  - Abuse or neglect of other children in the household;
  - Long-term mental illness or deficiency;
  - Long-term alcohol or drug induced incapacity; or
  - Involuntary termination of the parental rights to another child.

*Revised 3/15/16*

### 2.7.5 Remand Release Request – Decision Pending

The ORR/FFS may remand the release request, which means that the ORR/FFS is sending the recommendation back to the Case Manager for additional information or additional actions before a final release decision can be made. ORR records the date of the remand and the decision will be pending further

review until the documentation is provided or actions are taken.

*Posted 1/27/15*

## 2.7.6 Issues Related to Recommendations and Decisions

**Safety Plan**

Case managers, in consultation with Case Coordinators, will prepare a safety plan, as needed, to address any outstanding needs the child may have after he/she is released and to ensure the child's safe and successful integration into the sponsor family unit and community. The goal of the safety plan is to ensure the child's safety. The safety plan also has guidance for sponsors on participating in post-release services and on other areas of care critical to the child's adjustment in the family and the community, such as maintaining mental health services for the unaccompanied alien child, accessing any needed special education, helping the child avoid drugs and alcohol, and using appropriate parenting techniques.

**Sponsor Care Plan**

A sponsor care plan identifies an adult care giver who will assume care of an unaccompanied alien child if the sponsor becomes unable to care for the child. ORR requires a sponsor care plan for sponsors who may leave the United States, including all sponsors who are not U.S. citizens or lawful permanent residents (green card holders). The goal is to ensure an unaccompanied alien child has a caregiver, despite any complications resulting from the sponsor's immigration situation.

The plan:

- Identifies an adult care giver, and their relationship to the UAC and sponsor, if any;
- Includes copies of the adult care giver's vetting information (background check results, identifying documentation, etc.);
- Includes the adult care giver's contact information;
- Discusses how the adult care giver is notified that a transfer of care is required, if required;
- Provides that the adult care giver will abide by the terms of the *Sponsor Care Agreement*;
- Includes the date the UAC's Case Manager discusses the plan with the child's sponsor and the adult care giver identified in the plan; and,
- Includes additional information and materials (e.g., a Safety Plan), as appropriate or when required by ORR.

A copy of the sponsor care plan is maintained in the UAC's case file, provided to the sponsor, and to the adult care giver identified in the plan.

*Revised 6/7/18*

## 2.7.7 Notification of Denial

If the ORR Director denies the reunification application of an unaccompanied alien child's parent or legal guardian, the ORR Director notifies the parent/legal guardian by sending a denial letter to the parent/legal guardian within 30 business days of receiving all the required information and documentation in a specific case.  If the sole reason for denial of release is concern that the unaccompanied alien child is a danger to himself/herself or the community, the ORR Director sends a copy of the denial letter to the child.

The denial letter includes:

- An explanation of the reason(s) for the denial;

- Instructions on how to obtain the child's case file;
- The supporting materials and information that formed the basis for ORR's decision; and
- An explanation of the process for requesting an appeal of the denial (see Section **2.7.8 (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7.8)**). The explanation also informs the prospective sponsor that he or she may submit additional information to support an appeal request.

If ORR denies sponsorship to a potential sponsor who is not the parent or legal guardian of the child, the care provider notifies the potential sponsor, providing the reasons for the denial verbally.  If the sole reason for denial of release is concern that the unaccompanied alien child is a danger to himself/herself or the community, the Director notifies the child in writing of the reason for denial as described above.

*Revised 5/2/17*

## 2.7.8 Appeal of Release Denial

The parent/legal guardian may seek an appeal of the ORR Director's denial decision by submitting a written request to the Assistant Secretary for Children and Families within 30 business days of receipt of the final decision from the ORR Director.  The appeal request must state the basis for seeking the appeal, and may include any additional information that the requester believes is relevant to consideration of the request. The request may seek an appeal without a hearing or may seek a hearing.

Without a Hearing: If the requester seeks an appeal without a hearing, the Assistant Secretary will consider only the denial letter and the information referenced therein, as well as the appeal request and any additional supporting materials or information submitted by the requester. The Assistant Secretary will notify the requester of a decision within 30 business days of receiving the request.  If more information is needed to make a decision, or for good cause, the Assistant Secretary may stay the request until he or she has the information needed.  In these cases, the Assistant Secretary will send a written explanation to the parent/legal guardian, communicating a reasonable process and timeframe for addressing the situation and making a determination.

With a Hearing: If the requester seeks a hearing, the Assistant Secretary will schedule a teleconference or video conference, per the requester's preference, at which time the requester (or the requester's representative) may explain the reasons why he or she believes the denial was erroneous. The Assistant Secretary will consider the testimony and evidence presented at the hearing, in addition to the original denial letter and information referenced therein, to make a determination. The Assistant Secretary will notify the requester of the decision in writing within 30 business days following the hearing.

The Assistant Secretary makes a determination based on the relevant law, regulations, and policies concerning release decisions (see Section **2.7.4 (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7.4)** for the basis of a release denial).  Any evidence submitted to the Assistant Secretary by ORR is shared with the requester in compliance with privacy protections.  The Assistant Secretary conducts a de novo review and may affirm or overturn the ORR Director's decision, or send the case back to ORR for further action.  Appeals are recorded, and the requester may request a copy of the recording.  The Assistant Secretary's decision to affirm or overrule the ORR Director's decision to deny release to a parent/legal guardian is the final administrative decision of the agency on the application that had been under consideration.  However, if there is new information or a change in circumstances regarding the reunification application of a parent/legal guardian, or regarding the unaccompanied alien child's circumstances, a new reunification application may be submitted that highlights

the change(s) and explains why such changes should alter the initial decision.  Similarly, if ORR discovers new information or becomes aware of a change in the circumstances of the parent/legal guardian and/or the unaccompanied alien child, ORR may assess the case anew.

**Denial for sole reason that the unaccompanied alien child is a danger to himself/herself or the community**

If the sole reason for denial of release is concern that the unaccompanied alien child is a danger to himself/herself or the community, the unaccompanied alien child may seek an appeal of the denial as described above, provided the parent/legal guardian is not seeking an appeal.  If the child expresses a desire to seek an appeal, ORR appoints a child advocate to assist the unaccompanied alien child in seeking the appeal.  The unaccompanied alien child may seek such appeal at any time after denial of release while the child is in ORR custody.

*Revised 5/2/17*

# 2.8 Release from Office of Refugee Resettlement (ORR) Custody

Release from the ORR custody is a three-step process:

- After care planning, which occurs during the entire safe and timely release process.
- Transfer of physical custody of the child, which occurs as soon as possible once an unaccompanied alien child is approved for release.
- Closing the case file, which occurs within 24 hours of the unaccompanied alien child's discharge.

*Posted 1/27/15*

## 2.8.1 After Care Planning

Throughout the release process, care providers work with the child and sponsor so that they can plan for the child's after care needs. This involves working with the sponsor and the unaccompanied alien child to:

- Prepare them for post-ORR custody
- Assess the sponsor's ability to access community resources
- Provide guidance regarding safety planning, sponsor care plans, and accessing services for the child

Once the sponsor assessment is complete and a sponsor has been approved, the sponsor enters into an agreement with the Federal government in which he or she agrees to comply with the following provisions (see ***Sponsor Care Agreement***) **(https://www.acf.hhs.gov/programs/orr/resource/unaccompanied-childrens-services#Family Reunification Packet for Sponsors)**:

- Provide for the physical and mental well-being of the child, including but not limited to, food, shelter, clothing, education, medical care and other services as needed.
- For those who are not the child's parent or legal guardian, make best efforts to establish legal guardianship with the local court within a reasonable time.
- Attend a legal orientation program provided under the Department of Justice/Executive Office for Immigration Review's (EOIR) Legal Orientation Program for Custodians (Sponsors), if available where he or she resides.
- Depending on where the unaccompanied alien child's immigration case is pending, notify the local

Immigration Court or the Board of Immigration Appeals within 5 days of any change of address or phone number of the child (Form EOIR-33). (If applicable, file a Change of Venue motion on the child's behalf.**10 (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#foot10)** A "change of venue" is a legal term for moving an immigration hearing to a new location.)

- Notify the DHS/U.S. Citizenship and Immigration Services within 10 days of any change of address by filing an Alien's Change of Address Card (AR-11) or electronically at **http://www.uscis.gov/ (http://www.uscis.gov/ar-11)ar-11 (http://www.uscis.gov/ar-11)Visit (https://www.acf.hhs.gov /disclaimers) disclaimer page (https://www.acf.hhs.gov/disclaimers)**.

- Ensure the unaccompanied alien child's presence at all future proceedings before the DHS/Immigration and Customs Enforcement (ICE) and the DOJ/EOIR.

- Ensure the unaccompanied alien child reports to ICE for removal from the United States if an immigration judge issues a removal order or voluntary departure order.

- Notify local law enforcement or state or local Child Protective Services if the child has been or is at risk of being subjected to abuse, abandonment, neglect or maltreatment or if the sponsor learns that the child has been threatened, has been sexually or physically abused or assaulted, or has disappeared. (Notice should be given as soon as it is practicable or no later than 24 hours after the event or after becoming aware of the risk or threat.)

- Notify the National Center for Missing and Exploited Children at 1-800-843-5678 if the unaccompanied alien child disappears, has been kidnapped, or runs away. (Notice should be given as soon as it becomes practicable or no later than 24 hours after learning of the child's disappearance.)

- Notify ICE at 1-866-347-2423 if the unaccompanied alien child is contacted in any way by an individual(s) believed to represent an alien smuggling syndicate, organized crime, or a human trafficking organization. (Notice should be provided as soon as possible or no later than 24 hours after becoming aware of the information.)

- In case of an emergency, such as serious illness, destruction of home, etc., temporarily transfer physical custody of the child to another person who will comply with the terms of the *Sponsor Care Agreement.*

- In the event that a sponsor who is not the child's parent or legal guardian is no longer able and willing to care for the unaccompanied alien child and is unable to temporarily transfer physical custody, notify ORR using the ORR National Call Center, at 1-800-203-7001.

The agreement includes the notice that the release of the unaccompanied alien child to the sponsor's care does not grant the child any legal immigration status and that the child must present himself or herself for immigration court proceedings.

The care provider also provides the sponsor with a Sponsor Handbook that outlines the responsibilities in caring for the unaccompanied alien child's needs for education, health, obtaining legal guardianship, finding support to address traumatic stress, keeping children safe from child abuse and neglect and from trafficking and exploitation. The handbook reiterates the importance of continuing with immigration proceedings and includes links to EOIR's website and forms. The handbook discusses laws related to employment, such as the Federal law prohibiting minors under the age of 18 from working in hazardous occupations.

After care planning includes the care provider explaining the following to the unaccompanied alien child and the sponsor:

- The U.S. child abuse and neglect standards and child protective services that are explained on the Administration for Children and Families **Child Welfare Information Gateway (https://www.childwelfare.gov/)** website.

- Human trafficking indicators and resources
- Basic safety and how to use the 9-1-1 number in emergency situations.

The care provider notifies all stakeholders of the child's discharge date and change of address and venue, as applicable. Where applicable, ORR also provides Child Advocates with access to their clients' documents and forms, and helps child advocates to remain informed about their clients' after-care plans and legal proceedings. The care provider coordinates with the legal service provider or attorney of record to help complete the necessary legal forms. Stakeholders notified of the change of address and, if applicable, request for change of venue for the immigration case include the U.S. Immigration and Customs Enforcement (ICE) Office of Chief Counsel and the U.S. Executive Office for Immigration Review (EOIR) Immigration Court Administrator.

*Revised 6/7/18*

## 2.8.2 Transfer of Physical Custody

Once ORR approves an unaccompanied alien child for release, the care provider collaborates with the sponsor to ensure physical discharge happens as quickly as possible (within 3 calendar days after ORR approves the release). The care provider notifies DHS prior to the physical release to allow DHS an opportunity to comment on the imminent release as well as time to prepare any DHS paperwork for the ICE Chief Counsel's office.

The care provider ensures that all the child's belongings—including those he or she had at the time they entered ORR custody and any they acquired during their stay—are given to the child and sponsor at time of release. The care provider also makes sure that the child and sponsor have copies of files or papers needed for the child to obtain medical, educational, legal or other services following release.
Whenever possible, sponsors are expected to come to the care provider or to an offsite location designated by the care provider for the transfer of physical custody of the child.

Under extenuating circumstances (e.g., a sponsor cannot travel due to a medical condition), ORR may approve an unaccompanied alien child to be escorted to a sponsor. Similarly, if a sponsor pick-up would result in delay of a timely release of the child, ORR may approve an escort for an unaccompanied alien child.

If an unaccompanied alien child's final destination involves air travel and the sponsor will not be traveling with the child, the care provider must follow the procedures in the table below concerning care provider escorts and airline escorts.

Unaccompanied alien children who are under the age of 14 years old traveling via air may only be escorted by care provider staff, unless an ORR/FFS Supervisor has approved the use of an airline escort in advance.

The sponsor is responsible for the unaccompanied alien child's transportation costs and, if the care provider is escorting the child, for the care provider's transportation or airfare. If an airline escort is used, the sponsor is responsible for paying the airline's unaccompanied alien minor service fee.

Under no circumstances will ORR pay for the sponsor's airfare.

The following table summarizes procedures for each method of transfer.

| Method of Transfer | Pre-transfer Steps | At point of Transfer |
|---|---|---|

| | | |
|---|---|---|
| Sponsor pick-up at care provider facility | <ul><li>Case manager collaborates with the sponsor on selecting a date and time for the sponsor to pick-up the child</li><li>Case manager notifies the sponsor that he/she is required to bring the same valid government issued photo identification previously submitted by the sponsor in the FRP (see Section **2.2.4**)</li></ul> | <ul><li>Care provider checks the sponsor's identification upon arrival by comparing it to the identification previously submitted by the sponsor in the FRP (see Section **2.2.4**)</li><li>If the sponsor's identification matches the identification previously submitted, care provider gives the sponsor the unaccompanied alien child's release documents and personal possessions</li><li>Care provider advises the sponsor, if traveling by airplane, to check in the child at the ticket counter with a copy of the child's DHS form I-862, Notice to Appear</li><li>Care provider may not release the child unless the sponsor presents the same valid government issued photo identification he or she submitted in the FRP.</li></ul> |
| Care provider escort to offsite transfer location | <ul><li>Case manager collaborates with the sponsor in selecting a time and location for transfer, and flights for the child and care provider escort</li><li>Case manager notifies the sponsor that he/she is required to bring the same valid government issued photo identification previously submitted by the sponsor in the FRP to the transfer location</li><li>Case manager arranges for the sponsor to pay for the child and care provider escort's transportation costs, including airline tickets where applicable</li><li>Case manager prepares a copy of the sponsor's identification that was submitted in the FRP, for the care provider escort to take to the transfer location</li></ul> | <ul><li>If traveling by air, at the departure airport, care provider escort checks in the child at the ticket counter with a copy of the child's DHS form I-862, Notice to Appear</li><li>At the transfer location, care provider escort compares the sponsor's identification with the copy previously submitted by the sponsor in the FRP. If the identification documents correspond, care provider escort releases the child to the sponsor and provides the sponsor with the release documents and the child's personal effects and papers</li><li>Care provider escort may not release the child unless the sponsor presents the same valid government issued photo identification he or she submitted in the FRP. If the sponsor does not produce valid identification, if the care provider escort has concerns regarding the sponsor's identity, or if the care provider escort has concerns regarding the safety of the situation upon meeting the sponsor, the care provider escort will return with the child to the care provider facility</li></ul> |
| Travel via airline's unaccompanied alien minor escort policy | <ul><li>Case manager contacts the airline to obtain information on airline escort requirements, in</li></ul> | <ul><li>At the departure airport, care provider checks in the unaccompanied alien child at the ticket counter with a copy of the DHS form I-862, Notice to Appear, and a</li></ul> |

| (only for youth 14 years of age and older) | order to ensure that they are adequate to protect the safety of the child, and to ensure that both the sponsor and the care provider can meet the requirements | copy of the approved identification of the sponsor picking up the child |
|---|---|---|
| | • Case manager arranges for the sponsor to pay for the child's airplane ticket and for the airline unaccompanied alien minor escort fee | • At the departure airport, care provider gives the child their personal possessions and documents and a copy of the sponsor's approved identification, and mails an additional copy of the release documents to the sponsor |
| | • Case manager ensures that the government issued photo identification submitted by the sponsor in the FRP will be acceptable to the airline to complete custody transfer | • At the destination airport, the sponsor arrives two hours before the child's arrival time, and contacts the care provider immediately to check in. |
| | • The care provider instructs the sponsor to meet the unaccompanied alien child and escort at the airport with the identification they submitted in the FRP, and to follow the requirements of the airline's unaccompanied alien minors escort policy | • The airline follows its standard procedures for escorting a child traveling alone to the designated parent or guardian |
| | | • The care provider contacts the sponsor shortly after the child's scheduled arrival time to confirm the child's transfer from the airline representative to the sponsor |
| | | • If the sponsor fails to arrive at the airport or fails to contact the care provider upon arrival at the airport, the care provider will notify the ORR/FFS and the Project Officer, and the child will either be returned to the care provider or taken to another nearby care provider facility. |

When arranging for children to travel with airline escorts, care providers should also refer to the U.S. Department of Transportation recommendations for unaccompanied alien minors traveling by air ("When Kids Fly Alone").

*Revised 3/14/16*

## 2.8.3 Closing the Case File

The care provider completes a Discharge Notification form within 24 hours of the physical discharge of a youth, and then emails the form to DHS and other stakeholders. Once a child is released to a sponsor, ORR's custodial relationship with the child terminates.

Although the custodial relationship ends, the care provider keeps the case file open for 30 days after the release date in order to conduct the Safety and Well Being Follow Up Call (see Section **2.8.4**) and document the results of the call in the case file. The care provider closes the case file record after completing the Safety and Well Being Follow Up Call.

*Revised 3/14/16*

## Section 2.8.4 Safety and Well Being Follow Up Call

Care providers must conduct a Safety and Well Being Follow Up Call with an unaccompanied alien child and his or her sponsor 30 days after the release date. The purpose of the follow up call is to determine whether the child is still residing with the sponsor, is enrolled in or attending school, is aware of upcoming court dates, and is safe. The care provider must document the outcome of the follow up call in the child's case file, including if the care provider is unable to contact the sponsor or child after reasonable efforts have been exhausted. If the follow up call indicates that the sponsor and/or child would benefit from additional support or services, the care provider must refer the sponsor or child to the ORR National Call Center and provide the sponsor or child the Call Center contact information. If the care provider believes that the child is unsafe, the care provider must comply with mandatory reporting laws, State licensing requirements, and Federal laws and regulations for reporting to local child protective agencies and/or law enforcement.

*Revised 3/14/16*

## 2.8.5 Post-Release Services for UC with Zika Virus Disease or Infection

### Testing

ORR follows CDC guidance and recommendations for Zika virus laboratory testing. CDC recommends testing for all pregnant UC without symptoms, but who are from or traveled through areas with ongoing Zika virus transmission and are within 2–12 weeks of arrival in the United States. Other UC who develop two or more symptoms consistent with Zika may be tested for Zika virus upon consultation with a healthcare provider.

### Post-Release Referrals

Pregnant UC who are diagnosed with Zika virus disease, have laboratory results compatible with Zika virus infection, or have laboratory results that cannot rule out Zika virus infection will be referred for post-release services. Similarly, UC who delivered while in ORR care will be referred for post-release services if they were diagnosed with Zika virus disease, had laboratory results compatible with Zika virus infection, or had laboratory results that cannot rule out Zika virus infection while pregnant.

In some cases, asymptomatic pregnant UC are released pending lab results. In those cases, ORR will communicate their test results to them and their new healthcare provider. If their results are compatible with Zika virus infection or if Zika virus infection cannot be ruled out, ORR will refer them for post-release services.

### Post-Release Services

Post-release services for eligible UC described above include the full range of post-release services with a focus on connecting the UC to prenatal care and maternal-child resources.

For more information about the Zika virus, please go to the CDC website at: **www.cdc.gov/zika/index.html (http://www.cdc.gov/zika/index.html)**

*Posted 5/2/16*

## 2.8.6 Release for Children with Legal Immigration Status

Some unaccompanied alien children may obtain legal immigration status while in ORR care.  ORR may also discover during the process of placing and providing services to a child that he or she already has legal immigration status or is a U.S. citizen. By law, ORR is not authorized to have custody of children with legal immigration status or U.S. citizenship. Therefore, these children cannot remain in ORR's care, and ORR must

release them from ORR-funded care provider facilities.

As soon as ORR determines that an unaccompanied alien child may be eligible for legal status, ORR begins development of a Post Legal Status Plan. The case manager develops the plan, and ORR approves it, tailoring it to the needs and pending immigration status of the child.

As is the case for all UAC, ORR continually makes efforts to reunify children who have promising immigration cases with family members. However, if no parent, legal guardian, relative, or other suitable adult is available, ORR and the care provider, as part of the development of the Post Legal Status Plan, identify alternative placements for the child, including specialized programs, state or county entities or licensed nonprofit organizations that will take custody of the child. In limited circumstances, children with certain types of immigration status may be eligible for release into ORR's Unaccompanied Refugee Minors (URM) Program. Placement in the URM Program is limited by type of immigration status and the availability of appropriate placement options. ORR will not release children on their own recognizance under any circumstances.

*Posted 5/8/17*

## 2.9 Bond Hearings for Unaccompanied Alien Children

Consistent with the Ninth Circuit Court of Appeals decision in Flores v. Sessions, unaccompanied alien children have the opportunity to seek a bond hearing with an immigration judge.

In a bond hearing, an immigration judge decides whether the child poses a danger to the community.[11] For the majority of children in ORR custody, ORR has determined they are not a danger and therefore has placed them in shelters, group homes, and in some cases, staff secure facilities. For these children, a bond hearing is not beneficial.

The burden is on the requestor to demonstrate that the child can be released because he or she is not a danger to the community. An immigration judge's decision that the unaccompanied alien child is not a danger to the community supersedes an ORR determination on that question, unless the immigration judge's decision is overturned by the Board of Immigration Appeals (BIA). However, even if an immigration judge decides the child is eligible for bond (meaning the child does not pose a danger to the community and need not remain in an ORR facility for that reason), in all cases release from ORR custody cannot occur until ORR has identified, evaluated and approved an appropriate sponsor in accordance with **Section 2 (https://www.acf.hhs.gov /orr/resource/children-entering-the-united-states-unaccompanied-section-2)** of this policy guide.  An immigration judge does not rule on any of the following:

- release to a sponsor;
- the unaccompanied alien child's placement or conditions of placement while in ORR custody; or,
- releasing the child on his or her own recognizance.

ORR also takes into consideration the immigration judge's decision in the bond hearing about the youth's level of danger when assessing the youth's placement and conditions of placement.[12]

Although these hearings are known as "bond hearings," ORR does not require payment of any money in the event a court grants bond.

### Requesting a Bond Hearing

A request for a bond hearing may be made by the child in ORR care, by a legal representative of the child, or

by parents/legal guardians on their children's behalf. These parties may submit a written request for a bond hearing to the care provider using the ORR form, *Notice of Right to Request a Bond Hearing*, or through a separate written request that provides the information requested in the form. ORR provides the *Notice of Right to Request a Bond Hearing* to UAC in secure and staff secure facilities.

A request for a bond hearing must minimally include:

- The full name and alien registration number ("A number") of the child;
- If a parent or legal guardian, or an appointed legal representative, is making the request, the parent/legal guardian's or legal representative's name;
- The location of the care provider facility;
- The date of the request; and
- The signature(s) of the requesting child, the parent/legal guardian, and/or legal representative.

There is no filing fee to submit a request for a bond hearing to the care provider.

A child (or his or her legal representative) may also request a bond hearing by making an oral request in immigration court.

### Bond Hearings Proceedings

Bond hearings are usually held at the immigration court where the request for a bond hearing is filed.

If the immigration judge finds an unaccompanied alien child eligible for bond, and ORR does not appeal, then ORR follows its sponsor assessment and release procedures as described in **Section 2 (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2)** of this policy guide.

### Appeals

Either party may appeal the immigration judge's decision to the BIA. Because ORR cannot release a child until it identifies a suitable sponsor, an immigration judge's finding that the unaccompanied child is not a danger to the community does not necessarily result in a release of the child while an appeal is pending.

### Age Outs

If an unaccompanied alien child becomes 18 years old during the pendency of a bond hearing or bond hearing appeal, ORR forwards the request for a bond hearing and any relevant information to the local DHS/ICE Office of Chief Counsel's office.

### Further Requests for Bond Hearing

If an immigration judge (or BIA, when appealed) determines that an unaccompanied alien child is ineligible for bond, such decision is final unless the child can demonstrate a material change in circumstance to support a second request for a bond hearing.

*Revised 7/19/17*

1. As per the release order preference outlined in Flores v. Reno Stipulated Settlement Agreement, No. 85-4544-RJK (Px) (C.D. Cal., Jan 17, 1997).

2. These categories were created for program use, to help identify potential sponsors. They are not intended to replace the legal order of preference established in Flores.

3. The care provider may offer assistance to potential sponsors in securing necessary documentation, but it is ultimately the potential sponsor's responsibility to find and submit them.

4. Verification of the potential sponsor's relationship to the child is a minimum step required by the TVPRA to determine a potential sponsor's suitability and capability of providing for the child's physical and mental well-being. See 8 U.S.C. § 1232. As a result, as stated above, ORR may in its discretion require the submission of multiple forms of evidence.

5. ORR/FFS Supervisors are the final authority for approving discretionary home studies (See Section **2.4.2**)

6. Child advocates must keep the information in the case file, and information about the child's case, confidential from non-ORR grantees, contractors, and Federal staff.

7. An *Authorization for Release of Information* is not required for sponsors, adult household members, or adult care givers identified in a sponsor care plan undergoing a sex offender registry check. An *Authorization for Request of Information* also is not required for sponsors, adult household members and adult caregivers identified in a sponsor care plan undergoing a public records check. However, sponsors will receive notice that public records and sex offender registry checks will be performed, and will have an opportunity to explain the results of these checks to ORR. ORR will also provide a method for disputing the results of checks.(See Section **2.5.3 (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.5.3)**, Q4).

8. ORR will also reject any sponsor care plans that identify an adult care giver who has any of the disqualifying criteria.

9. See U.S. Dept. of Health and Human Services, Children's Bureau. *Grounds for involuntary termination of parental rights*, at 2. Washington, DC: Child Welfare Information Gateway, Jan. 2013.

10. The Change of Venue motion must contain information specified by the Immigration Court. A Change of Venue motion may require the assistance of an attorney. For guidance on the "motion to change venue," see the Immigration Court Practice Manual at **www.justice.gov/eoir/vll/OCIJPracManual/ocij_page1.htm (http://www.justice.gov/eoir/vll/OCIJPracManual/ocij_page1.htm)**. For immigration case information please contact EOIR's immigration case information system at 1-800-898-7180. Visit EOIR's website for additional information at: **www.justice.gov/eoir/formslist.htm (http://www.justice.gov/eoir/formslist.htm)**.

11. Immigration judges also consider risk of flight. However, ORR does not make a determination of flight risk for the purpose of deciding whether a child is released. If an immigration judge offers an opinion about a youth's risk of flight, ORR takes the judge's opinion into consideration when assessing the child's placement and conditions of placement, but the decision does not affect release.

12. Please see footnote above concerning risk of flight.

**<Back (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-1) - Next (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-3)>**

Last Reviewed: June 29, 2018

## Licensed or Certified Child Care Operations: Criminal History Requirements

In accordance with §745.651 (What types of criminal convictions may affect a person's ability to be present at an operation?), this chart notes criminal convictions that may affect a person's ability to be present in <u>Licensed or Certified Child Care Operations</u> - including Independent Foster Homes, Child-Care Centers, Licensed Child-Care Homes, School-Age and Before or After-School Programs, General Residential Operations, Shelter Care, Small Employer Based Child-Care, and qualifying persons at Child Placing Agencies, excluding Foster and Adoptive Homes.

**In this chart the words below have the following meaning:**

- "Absolute Bar" means a person convicted of a particular crime is permanently prohibited from being present at the operation while children are in care; and the person does NOT qualify for a risk evaluation.
- "N/A" has two meanings in this chart. "N/A" under the "FELONY" or "MISDEMEANOR" column means there is no such relevant felony or misdemeanor crime. "N/A" under the "If this person is eligible for a risk evaluation . . . "question column means the question is not applicable, because a person with this conviction is not eligible for a risk evaluation.
- "No Action Required" means there is such a crime, but no action is required.
- "Risk Evaluation" means a person convicted of a particular crime is eligible for a risk evaluation based solely on that particular conviction. However, a person's overall eligibility for a risk evaluation is based on the entirety of the person's criminal and DFPS Central Registry history.
- "Risk Evaluation if conviction was in the last 10 years" means a risk evaluation is only required for 10 years from the date of the conviction. After the 10 years have passed, the particular crime no longer requires any action by DFPS, unless the person is on parole for a felony offense.

**In reviewing this chart, you must understand the following:**

- This chart applies to all criminal history checks conducted under Title 40, Texas Administrative Code, Chapter 745, Licensing, Subchapter F, Background Checks.
- Time limits are based on the date of conviction.
- When a final disposition has not yet been rendered, an arrest or charge for an offense listed on this chart may affect a person's ability to be present at an operation if:
  - a conviction would bar the person from being present permanently or on a time-limited basis;
  - a conviction would prohibit the person from being present pending the outcome of a risk evaluation; or
  - the Centralized Background Check Unit (CBCU) determines that the person poses an immediate threat to the health or safety of children.
- Although the crimes listed in this chart reflect only offenses in Texas statutes, the same criminal history requirements apply to similar criminal offenses under the laws of another state or federal law.

- For purposes of this chart, a Criminal Attempt conviction will be treated as falling under the same section of the Penal Code as the offense that was attempted. For example, a conviction for Attempt to Commit Murder would be treated in the same manner as Murder and would result in an absolute bar. Likewise, a conviction for Criminal Conspiracy or Criminal Solicitation will be treated as falling under the same section of the Penal Code as the offense that was the subject of the conspiracy or the solicitation.
- In accordance with §745.651(c), a person currently on parole for any felony offense not otherwise barrable must have an approved risk evaluation prior to being present at an operation.

**Table of Contents**

Texas Penal Code, Title 4, Inchoate Offenses ...................................................................................................3
Texas Penal Code, Title 5, Offenses Against the Person...................................................................................3
Texas Penal Code, Title 6, Chapter 25, Offenses Against the Family................................................................3
Texas Penal Code, Title 7, Offenses Against Property .....................................................................................6
Texas Penal Code, Title 8, Offenses Against Administration ..........................................................................10
Texas Penal Code, Title 9, Disorderly Conduct and Related Offenses ...........................................................10
Texas Penal Code, Title 10, Offenses Against Public Health, Safety, and Morals ..........................................14
Texas Penal Code, Title 11, Organized Crime ................................................................................................16
Texas Education Code....................................................................................................................................17
Texas Family Code .........................................................................................................................................18
Texas Health and Safety Code .......................................................................................................................18
Texas Human Resources Code ......................................................................................................................20
Texas Alcoholic Beverage Code .....................................................................................................................24
Texas Business and Commerce Code.............................................................................................................25
Texas Code of Criminal Procedure ................................................................................................................26
Texas Civil Practice and Remedies Code .......................................................................................................26
Any other Title under the Texas Penal Code or any other Texas Code not specifically mentioned above.........27

## Texas Penal Code, Title 4, Inchoate Offenses

| Offense | Texas Penal Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Criminal Solicitation of a Minor (felony or misdemeanor) | 15.031 | Absolute Bar | Risk Evaluation†† | Felony: N/A<br><br>Misdemeanor: No |

## Texas Penal Code, Title 5, Offenses Against the Person

| Offense | Texas Penal Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Murder (felony) | 19.02 | Absolute Bar† | N/A | N/A |
| Capital Murder (felony) | 19.03 | Absolute Bar† | N/A | N/A |
| Manslaughter (felony) | 19.04 | Absolute Bar† | N/A | N/A |
| Criminally Negligent Homicide (felony) | 19.05 | Absolute Bar† | Absolute Bar^ | N/A |
| Unlawful Restraint (felony or misdemeanor) | 20.02 | Absolute Bar† | Risk Evaluation†† | Felony: N/A<br><br>Misdemeanor: No |
| Kidnapping (felony) | 20.03 | Absolute Bar† | N/A | N/A |
| Aggravated Kidnapping (felony) | 20.04 | Absolute Bar† | N/A | N/A |

| Offense | Texas Penal Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Smuggling of Persons (felony) | 20.05 | Absolute Bar | N/A | N/A |
| Continuous Smuggling of Persons (felony) | 20.06 | Absolute Bar | N/A | N/A |
| Trafficking of Persons (felony) | 20A.02 | Absolute Bar | N/A | N/A |
| Continuous Trafficking of Persons (felony) | 20A.03 | Absolute Bar | N/A | N/A |
| Continuous Sexual Abuse of Young Child or Children (felony) | 21.02 | Absolute Bar† | N/A | N/A |
| Public Lewdness (misdemeanor) | 21.07 | N/A | Risk Evaluation | No |
| Indecent Exposure (misdemeanor) | 21.08 | N/A | Risk Evaluation | No |
| Bestiality (felony) | 21.09 | Absolute Bar | Absolute Bar^ | N/A |
| Indecency with a Child (felony) | 21.11 | Absolute Bar† | N/A | N/A |
| Improper Relationship Between Educator & Student (felony) | 21.12 | Absolute Bar† | N/A | N/A |
| Improper Photography or Visual Recording (felony) or Invasive Visual Recording (felony)* | 21.15 | Absolute Bar | Absolute Bar^ | N/A |
| Unlawful Disclosure or Promotion of Intimate Visual Material (misdemeanor) | 21.16** | N/A | Risk Evaluation | No |

| Offense | Texas Penal Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Voyeurism (felony or misdemeanor) | 21.17 | Absolute Bar | Risk Evaluation†† | Felony: N/A<br><br>Misdemeanor: No |
| Sexual Coercion (felony) | 21.18 | Absolute Bar | Absolute Bar^ | N/A |
| Assault  (felony or misdemeanor) | 22.01 | Absolute Bar† | Risk Evaluation†† | Felony: N/A<br><br>Misdemeanor: No |
| Sexual Assault (felony) | 22.011 | Absolute Bar† | N/A | N/A |
| Aggravated Assault (felony) | 22.02 | Absolute Bar† | N/A | N/A |
| Aggravated Sexual Assault (felony) | 22.021 | Absolute Bar† | N/A | N/A |
| Injury to a Child, Elderly Individual, or Disabled Individual (felony) | 22.04 | Absolute Bar† | Absolute Bar^ | N/A |
| Abandoning or Endangering Child (felony) | 22.041 | Absolute Bar† | Absolute Bar^ | N/A |
| Deadly Conduct (felony or misdemeanor) | 22.05 | Absolute Bar | Risk Evaluation†† | Felony: N/A<br><br>Misdemeanor: No |
| Terroristic Threat (felony or misdemeanor) | 22.07 | Absolute Bar | Risk Evaluation†† | Felony: N/A<br><br>Misdemeanor: No |
| Aiding Suicide (felony or misdemeanor) | 22.08 | Absolute Bar | Risk Evaluation†† | Felony: N/A<br><br>Misdemeanor: No |
| Tampering with a Consumer Product (felony) | 22.09 | Absolute Bar | N/A | N/A |

Revised January 2018

| Offense | Texas Penal Code | FELONY<br>(Includes All Levels Unless Otherwise Specified) | MISDEMEANOR<br>(Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Leaving a Child in a Vehicle (misdemeanor) | 22.10 | N/A | Risk Evaluation | No |
| Harassment by Persons in Certain Correctional Facilities; Harassment of a Public Servant (felony) | 22.11 | Absolute Bar | N/A | N/A |

## Texas Penal Code, Title 6, Chapter 25, Offenses Against the Family

| Offense | Texas Penal Code | FELONY<br>(Includes All Levels Unless Otherwise Specified) | MISDEMEANOR<br>(Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Bigamy (felony) | 25.01 | Risk Evaluation | N/A | No |
| Prohibited Sexual Conduct (felony) | 25.02 | Absolute Bar | N/A | N/A |
| Interference with Child Custody (felony) | 25.03 | Absolute Bar† | Absolute Bar^ | N/A |
| Agreement to Abduct from Custody (felony) | 25.031 | Absolute Bar† | Absolute Bar^ | N/A |
| Enticing a Child (felony or misdemeanor) | 25.04 | Absolute Bar† | Risk Evaluation | Felony: N/A<br><br>Misdemeanor: No |
| Criminal Nonsupport (felony) | 25.05 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years^ | Yes^^ |
| Harboring Runaway Child (misdemeanor) | 25.06 | N/A | Risk Evaluation | No |

| Offense | Texas Penal Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Violation of Certain Court Orders or Conditions of Bond in a Family Violence, Child Abuse or Neglect, Sexual Assault or Abuse, Stalking, or Trafficking Case (felony or misdemeanor)* | 25.07 | Absolute Bar† | Risk Evaluation†† | Felony: N/A<br><br>Misdemeanor: No |
| Violation of Protective Order Preventing Offense Caused by Bias or Prejudice (felony or misdemeanor) | 25.071 | Absolute Bar | Risk Evaluation | Felony: N/A<br><br>Misdemeanor: No |
| Repeated Violation of Certain Court Orders or Conditions of Bond in Family Violence, Child Abuse or Neglect, Sexual Assault or Abuse, Stalking, Trafficking Case (felony or misdemeanor) | 25.072 | Absolute Bar | Risk Evaluation†† | Felony: N/A<br><br>Misdemeanor: No |
| Sale or Purchase of Child (felony) | 25.08 | Absolute Bar† | N/A | N/A |
| Unregulated Custody Transfer of Adopted Child (felony) | 25.081 | Absolute Bar | N/A | N/A |
| Advertising for Placement of Child (felony or misdemeanor) | 25.09 | Absolute Bar† | Risk Evaluation | Felony: N/A<br><br>Misdemeanor: No |
| Interference with Rights of a Guardian of the Person (felony) | 25.10 | Absolute Bar† | Absolute Bar^ | N/A |
| Continuous Violence Against the Family (felony) | 25.11 | Absolute Bar† | N/A | N/A |

**Texas Penal Code, Title 7, Offenses Against Property**

| Offense | Texas Penal Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Arson (felony) | 28.02 | Absolute Bar† | Absolute Bar^ | N/A |
| Criminal Mischief (felony or misdemeanor) | 28.03 | Risk Evaluation | No Action Required | No |
| Robbery (felony) | 29.02 | Absolute Bar | N/A | N/A |
| Aggravated Robbery (felony) | 29.03 | Absolute Bar | N/A | N/A |
| Burglary (felony) | 30.02 | Risk Evaluation if conviction was in the last 10 years | No Action Required^ | Yes^^ |
| Theft (felony or misdemeanor) | 31.03, 31.04, 31.05, 31.12, 31.16 | Risk Evaluation if conviction was in the last 10 years | No Action Required | Yes^^ |
| Forgery (felony or misdemeanor) | 32.21 | Risk Evaluation if conviction was in the last 10 years | No Action Required | Yes^^ |
| Credit Card or Debit Card Abuse (felony) | 32.31 | Risk Evaluation if conviction was in the last 10 years | N/A | Yes^^ |
| False Statement to Obtain Property or Credit in the Provision of Certain Services (felony or misdemeanor) | 32.32 | Risk Evaluation if conviction was in the last 10 years | No Action Required | Yes^^ |
| Hindering Secured Creditors (felony or misdemeanor) | 32.33 | Risk Evaluation if conviction was in the last 10 years | No Action Required | Yes^^ |
| Misapplication of Fiduciary Property (felony or misdemeanor) | 32.45 | Risk Evaluation if conviction was in the last 10 years | No Action Required | Yes^^ |

| Offense | Texas Penal Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Securing Execution of Fiduciary Property (felony or misdemeanor) | 32.46 | Risk Evaluation if conviction was in the last 10 years | No Action Required | Yes^^ |
| Exploitation of Child, Elderly Individual, or Disabled Individual (felony) | 32.53 | Risk Evaluation†† | N/A | No |
| Breach of Computer Security (felony or misdemeanor) | 33.02 | Risk Evaluation if conviction was in the last 10 years | No Action Required | Yes^^ |
| Online Solicitation of a Minor (felony) | 33.021 | Absolute Bar† | N/A | N/A |
| Electronic Data Tampering (felony or misdemeanor) | 33.023 | Risk Evaluation if conviction was in the last 10 years | No Action Required | Yes |
| Unlawful Decryption (felony or misdemeanor) | 33.024 | Risk Evaluation if conviction in the last 10 years | No Action Required | Yes |
| Telecommunications Crimes (felony or misdemeanor) | 33A | Risk Evaluation if conviction was in the last 10 years | No Action Required | Yes^^ |
| Money Laundering (felony) | 34.02 | Risk Evaluation if conviction was in the last 10 years | N/A | Yes^^ |
| Insurance Fraud (felony or misdemeanor) | 35.02 | Risk Evaluation if conviction was in the last 10 years | No Action Required | Yes^^ |
| Medicaid Fraud  (felony or misdemeanor) | 35A.02 | Risk Evaluation if conviction was in the last 10 years | No Action Required | Yes^^ |

**Texas Penal Code, Title 8, Offenses Against Administration**

| Offense | Texas Penal Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Bribery (felony) | 36.02 | Risk Evaluation if conviction was in the last 10 years | N/A | Yes^^ |
| Coercion of Public Servant or Voter (felony or misdemeanor) | 36.03 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| Improper Influence (misdemeanor) | 36.04 | N/A | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| Tampering with Witness (felony) | 36.05 | Risk Evaluation | N/A | No |
| Obstruction or Retaliation (felony) | 36.06 | Absolute Bar | N/A | N/A |
| Acceptance of Honorarium (misdemeanor) | 36.07 | N/A | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| Gift to Public Servant by Person Subject to His Jurisdiction (misdemeanor) | 36.08 | N/A | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| Offering Gift to Public Servant (misdemeanor) | 36.09 | N/A | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| Perjury (misdemeanor) | 37.02 | N/A | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| Aggravated Perjury (felony) | 37.03 | Risk Evaluation if conviction was in the last 10 years | N/A | Yes^^ |
| Tampering with or Fabricating Physical Evidence (felony or misdemeanor) | 37.09 | Risk Evaluation | Risk Evaluation if conviction was in the last 10 years | Felony: No<br><br>Misdemeanor: Yes^^ |

| Offense | Texas Penal Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Tampering with Governmental Record (felony or misdemeanor) | 37.10 | Risk Evaluation | • For Class A: Risk Evaluation if conviction was in the last 10 years<br>• For Class B or C: No Action Required | Yes^^ |
| Fraudulent Filing of Financing Statement (felony or misdemeanor) | 37.101 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| Impersonating a Public Servant (felony) | 37.11 | Risk Evaluation if conviction was in the last 10 years | N/A | Yes^^ |
| Record of a Fraudulent Court (felony or misdemeanor) | 37.13 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| False Statement Regarding Child Custody Determination Made in Foreign Country (felony) | 37.14 | Risk Evaluation if conviction was in the last 10 years | N/A | Yes^^ |
| Failure to Identify (misdemeanor) | 38.02 | N/A | • For Class A: Risk Evaluation if conviction was in the last 5 years<br>• For Class B or C: No Action Required | Yes^^ |
| Resisting Arrest, Search, or Transportation (felony or misdemeanor) | 38.03 | Risk Evaluation | Risk Evaluation if conviction was in the last 10 years | Felony: No<br><br>Misdemeanor: Yes^^ |
| Evading Arrest or Detention (felony or misdemeanor) | 38.04 | Risk Evaluation | Risk Evaluation if conviction was in the last 10 years | Felony: No<br><br>Misdemeanor: Yes^^ |
| Hindering Apprehension or Prosecution (felony or misdemeanor) | 38.05 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| Escape (felony or misdemeanor) | 38.06 | Risk Evaluation | Risk Evaluation if conviction was in the last 10 years | Felony: No<br><br>Misdemeanor: Yes^^ |

| Offense | Texas Penal Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Permitting or Facilitating Escape (felony or misdemeanor) | 38.07 | Risk Evaluation | Risk Evaluation if conviction was in the last 10 years | Felony: No<br><br>Misdemeanor: Yes^^ |
| Implements for Escape (felony) | 38.09 | Risk Evaluation | N/A | No |
| Bail Jumping and Failure to Appear (felony and misdemeanor) | 38.10 | Risk Evaluation if conviction was in the last 10 years | No Action Required | Yes^^ |
| Improper Contact with Victim (felony and misdemeanor) | 38.111 | Risk Evaluation if conviction was in the last 10 years | No Action Required | Yes^^ |
| Violation of Protective Order Issued on Basis of Sexual Assault or Abuse, Stalking, or Trafficking (misdemeanor) | 38.112 | N/A | Risk Evaluation†† | No |
| Unauthorized Absence from Community Corrections Facility, County Correctional Center, or Assignment Site (felony) | 38.113 | Risk Evaluation if conviction was in the last 10 years | No Action Required^ | Yes^^ |
| Falsely Holding Oneself Out as a Lawyer (felony) | 38.122 | Risk Evaluation if conviction was in the last 10 years | N/A | Yes^^ |
| Unauthorized Practice of Law (felony or misdemeanor) | 38.123 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| Taking or Attempting to Take Weapon from Peace Officer, Federal Special Investigator, Employee or Official of Correctional Facility, Parole Officer, Community Supervision and Corrections Department Officer, or Commissioned Security Officer (felony) | 38.14 | Risk Evaluation | Risk Evaluation^ | No |
| Interference with Police Service Animals (felony or misdemeanor) | 38.151 | Risk Evaluation | • For Class A: Risk Evaluation if conviction was in the last 10 years<br>• For Class B or C: No Action Required | Felony: No<br><br>Misdemeanor: Yes^^ |

| Offense | Texas Penal Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Interference with Radio Frequency Licensed to Government Entity (felony or misdemeanor) | 38.152 | Risk Evaluation if conviction was in the last 10 years | No Action Required | Yes^^ |
| Failure to Stop or Report Aggravated Sexual Assault of Child  (misdemeanor) | 38.17 | N/A | Risk Evaluation | No |
| Failure to Report Felony  (misdemeanor) | 38.171 | N/A | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| Abuse of Official Capacity (felony or misdemeanor) | 39.02 | Risk Evaluation if conviction was in the last 10 years | No Action Required | Yes^^ |
| Official Oppression (felony or misdemeanor) | 39.03 | Risk Evaluation | Risk Evaluation | No |
| Violations of the Civil Rights of Person in Custody; Improper Sexual Activity with Person in Custody (felony or misdemeanor) | 39.04 | Risk Evaluation | Risk Evaluation | No |
| Failure to Report Death of Prisoner (misdemeanor) | 39.05 | N/A | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| Misuse of Official Information (felony or misdemeanor) | 39.06 | Risk Evaluation if conviction was in the last 10 years | No Action Required | Yes^^ |

**Texas Penal Code, Title 9, Disorderly Conduct and Related Offenses**

| Offense | Texas Penal Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Harassment (misdemeanor) | 42.07 | N/A | Risk Evaluation†† | No |
| Stalking (felony) | 42.072 | Absolute Bar | N/A | N/A |
| Abuse of Corpse (felony or misdemeanor) | 42.08 | Risk Evaluation | Risk Evaluation if conviction was in the last 10 years | No |
| Cruelty to Livestock Animals (felony or misdemeanor) | 42.09 | Risk Evaluation | Risk Evaluation if conviction was in the last 10 years | No |
| Attack on Assistance Animal (felony or misdemeanor) | 42.091 | Risk Evaluation | Risk Evaluation if conviction was in the last 10 years | No |
| Cruelty to Nonlivestock Animals (felony or misdemeanor) | 42.092 | Risk Evaluation | Risk Evaluation if conviction was in the last 10 years | No |
| Dog Fighting (felony or misdemeanor) | 42.10 | Risk Evaluation | Risk Evaluation if conviction was in the last 10 years | No |
| Cockfighting (felony or misdemeanor) | 42.105 | Risk Evaluation | Risk Evaluation if conviction was in last 10 years | No |
| Prostitution (felony or misdemeanor) | 43.02 | Absolute Bar | Risk Evaluation | Felony: N/A Misdemeanor: No |
| Promotion of Prostitution (felony or misdemeanor) | 43.03 | Absolute Bar | Risk Evaluation | No |
| Aggravated Promotion of Prostitution (felony) | 43.04 | Absolute Bar | N/A | N/A |

| Offense | Texas Penal Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Compelling Prostitution (felony) | 43.05 | Absolute Bar | N/A | N/A |
| Obscene Display or Distribution (misdemeanor) | 43.22 | N/A | Risk Evaluation | No |
| Obscenity (felony or misdemeanor) | 43.23 | Absolute Bar | Risk Evaluation | Felony: N/A<br><br>Misdemeanor: No |
| Sale, Distribution, or Display of Harmful Material to Minor (felony or misdemeanor) | 43.24 | Absolute Bar | Risk Evaluation | Felony: N/A<br><br>Misdemeanor: No |
| Sexual Performance by a Child (felony) | 43.25 | Absolute Bar† | N/A | N/A |
| Employment Harmful to Children (felony) | 43.251 | Absolute Bar† | N/A | N/A |
| Possession or Promotion of Child Pornography (felony) | 43.26 | Absolute Bar† | N/A | N/A |
| Electronic Transmission of Certain Visual Material Depicting Minor (misdemeanor) | 43.261 | N/A | Risk Evaluation | No |
| Possession or Promotion of Lewd Visual Material Depicting Child (felony) | 43.262 | Risk Evaluation | N/A | No |

**Texas Penal Code, Title 10, Offenses Against Public Health, Safety, and Morals**

| Offense | Texas Penal Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Hoax Bombs (misdemeanor) | 46.08 | N/A | Risk Evaluation | No |
| Making a Firearm Accessible to a Child (misdemeanor) | 46.13 | N/A | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| Firearm Smuggling (felony) | 46.14 | Risk Evaluation | N/A | No |
| Prohibition of the Purchase and Sale of Human Organs (misdemeanor) | 48.02 | N/A | Risk Evaluation | No |
| Prohibition on Purchase and Sale of Human Fetal Tissue (felony) | 48.03 | Risk Evaluation | Risk Evaluation^ | No |
| Public Intoxication (misdemeanor) | 49.02 | N/A | Risk Evaluation if conviction was in the last 5 years | Yes^^ |
| Possession of Alcoholic Beverage in Motor Vehicle (misdemeanor) | 49.031 | N/A | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| Driving While Intoxicated (felony or misdemeanor) | 49.04 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Felony: No Misdemeanor: Yes^^ |
| Driving While Intoxicated with Child Passenger (felony) | 49.045 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years^ | No |
| Flying While Intoxicated (felony or misdemeanor) | 49.05 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Felony: No Misdemeanor: Yes^^ |
| Boating While Intoxicated (felony or misdemeanor) | 49.06 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Felony: No Misdemeanor: Yes^^ |

| Offense | Texas Penal Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Assembling or Operating an Amusement Ride While Intoxicated (felony or misdemeanor) | 49.065 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Felony: No  Misdemeanor: Yes^^ |
| Intoxication Assault (felony) | 49.07 | Absolute Bar† | N/A | N/A |
| Intoxication Manslaughter (felony) | 49.08 | Absolute Bar† | N/A | N/A |

## Texas Penal Code, Title 11, Organized Crime

| Offense | Texas Penal Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Engaging in Organized Criminal Activity (felony or misdemeanor) | 71.02 | Risk Evaluation | Risk Evaluation | No |
| Violation of Court Order Enjoining Organized Criminal Activity (misdemeanor) | 71.021 | N/A | Risk Evaluation | No |
| Coercing, Inducing, or Soliciting Membership in a Criminal Street Gang (felony) | 71.022 | Risk Evaluation | N/A | No |
| Directing Activities of Certain Criminal Street Gangs (felony) | 71.023 | Risk Evaluation | N/A | No |

**Texas Education Code**
**Chapter 37 Discipline; Law and Order**

| Offense | Education Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Personal Hazing Offense (felony or misdemeanor) or Hazing (felony or misdemeanor)* | 37.152 | Risk Evaluation†† | Risk Evaluation if conviction was in the last 10 years | No |

**Texas Family Code**

**Chapter 107 Special Appointments and Social Studies**
**Chapter 156 Modification**
**Chapter 162 Adoption**
**Chapter 261 Investigation of Report of Child Abuse or Neglect**
**Chapter 262 Procedures in Suit by Governmental Entity to Protect Health and Safety of Child**

| Offense | Family Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Disclosing confidential information obtained from DFPS social study (misdemeanor) | 107.05145 | N/A | Risk Evaluation | No |
| Modification of order on conviction for Child Abuse (misdemeanor) | 156.104 | N/A | Risk Evaluation | No |
| Modification of order on conviction for Family Violence (misdemeanor) | 156.1045 | N/A | Risk Evaluation | No |
| Placement by Unauthorized Person (misdemeanor) | 162.025 | N/A | Risk Evaluation | No |
| General Penalty: Violating the Interstate Compact on the Placement of children (misdemeanor) | 162.107 | N/A | Risk Evaluation | No |

| Offense | Family Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at the Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Prohibited Acts: Criminal Penalties (felony or misdemeanor) | 162.421 | Risk Evaluation | Risk Evaluation | No |
| Making a False Report of Abuse or Neglect (felony) | 261.107 | Risk Evaluation | Risk Evaluation^ | Yes^^ |
| Failure to Report; Penalty (felony or misdemeanor) | 261.109 | Absolute Bar | Risk Evaluation | Felony: N/A Misdemeanor: No |
| Conduct of Investigation (misdemeanor) | 261.302 | N/A | Risk Evaluation | No |
| Interference with Investigation; Criminal Penalty (misdemeanor) | 261.3032 | N/A | Risk Evaluation | No |
| Removal of Alleged Perpetrator; Offense (felony or misdemeanor) | 262.1015 | Absolute Bar | Risk Evaluation | Felony: N/A Misdemeanor: No |

**Texas Health and Safety Code**

**Chapter 81 Communicable Diseases**
**Chapter 161 Public Health Provisions**
**Chapter 260 Boarding Home Facilities**
**Chapter 464 Facilities Treating Alcoholics or Drug-Dependent Persons**
**Chapter 481 Texas Controlled Substances Act**
**Chapter 482 Simulated Controlled Substances**
**Chapter 483 Dangerous Drugs**
**Chapter 485 Abusable Volatile Chemicals**
**Chapter 555 State Supported Living Centers**

| Offense | Health and Safety Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at a Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Evading or Resisting Apprehension or Transport by Person Subject to Custody or Temporary Detention (misdemeanor) | 81.212 | N/A | Risk Evaluation | No |
| Reports of Abuse and Neglect or of Illegal, Unprofessional or Unethical Conduct (misdemeanor) | 161.132 | N/A | Risk Evaluation | No |
| Failure to Report: Criminal Penalty (misdemeanor) | 260A.012 | N/A | Risk Evaluation | No |
| Bad Faith, Malicious or Reckless Reporting: Criminal Penalty (misdemeanor) | 260A.013 | N/A | Risk Evaluation | Yes^^ |
| Criminal Penalty (misdemeanor) | 464.016 | N/A | Risk Evaluation | No |
| Manufacture or Delivery of Controlled Substances (felony) | 481.112 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years^ | Felony: No  Misdemeanor: Yes^^ |
| Manufacture or Delivery of Substance in Penalty Group 1-A (felony) | 481.1121 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years^ | Felony: No  Misdemeanor: Yes^^ |

| Offense | Health and Safety Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at a Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Manufacture or Delivery of Substance in Penalty Group 2 or 2-A (felony) | 481.113 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years^ | Felony: No  Misdemeanor: Yes^^ |
| Manufacture or Delivery of Substance in Penalty Group 3 or 4 (felony) | 481.114 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years^ | Felony: No  Misdemeanor: Yes^^ |
| Possession of Substance in Penalty Group 1 (felony) | 481.115 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years^ | Felony: No  Misdemeanor: Yes^^ |
| Possession of Substance in Penalty Group 1-A (felony) | 481.1151 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years^ | Felony: No  Misdemeanor: Yes^^ |
| Possession of Substance in Penalty Group 2 (felony) | 481.116 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years^ | Felony: No  Misdemeanor: Yes^^ |
| Possession of Substance in Penalty Group 2-A (felony or misdemeanor) | 481.1161 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Felony: No  Misdemeanor: Yes^^ |
| Possession of Substance in Penalty Group 3 (felony or misdemeanor) | 481.117 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Felony: No  Misdemeanor: Yes^^ |
| Possession of Substance in Penalty Group 4 (felony or misdemeanor) | 481.118 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Felony: No  Misdemeanor: Yes^^ |
| Manufacture, Delivery, or Possession of Miscellaneous Substances (felony or misdemeanor) | 481.119 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Felony: No  Misdemeanor: Yes^^ |
| Delivery of Marijuana (felony or misdemeanor) | 481.120 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Felony: No  Misdemeanor: Yes^^ |
| Possession of Marijuana (felony or misdemeanor) | 481.121 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Felony: No  Misdemeanor: Yes^^ |
| Delivery of Controlled Substance or Marijuana to Child (felony) | 481.122 | Risk Evaluation if conviction was in the last 10 years | N/A | No |

| Offense | Health and Safety Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at a Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Possession or Transport of Certain Chemicals with Intent to Manufacture Controlled Substance (felony or misdemeanor) | 481.124 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Felony: No<br><br>Misdemeanor: Yes^^ |
| Possession or Transport of Anhydrous Ammonia: Use of or Tampering with Equipment (felony) | 481.1245 | Risk Evaluation if conviction was in the last 10 years | N/A | No |
| Possession or Delivery of Drug Paraphernalia (felony or misdemeanor) | 481.125 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Felony: No<br><br>Misdemeanor: Yes^^ |
| Illegal Barter, Expenditure, or Investment (felony) | 481.126 | Risk Evaluation if conviction was in the last 10 years | N/A | No |
| Unauthorized Disclosure of Information (felony) | 481.127 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years^ | Felony: No<br><br>Misdemeanor: Yes^^ |
| Commercial Matters (felony) | 481.128 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years^ | Felony: No<br><br>Misdemeanor: Yes^^ |
| Diversion of Controlled Substance by Restraints, Dispensers, and Certain Other Persons (felony) | 481.1285 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years^ | Felony: No<br><br>Misdemeanor: Yes^^ |
| Fraud (felony or misdemeanor) | 481.129 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Felony: No<br><br>Misdemeanor: Yes^^ |
| Diversion of Controlled Substance Property or Plant (felony) | 481.131 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years^ | Felony: No<br><br>Misdemeanor: Yes^^ |
| Falsification of Drug Test Results (misdemeanor) | 481.133 | N/A | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| Unlawful Transfer or Receipt of Chemical Precursor (felony) | 481.136 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years^ | Felony: No<br><br>Misdemeanor: Yes^^ |

| Offense | Health and Safety Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at a Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Transfer of Precursor Substance for Unlawful Manufacture (felony) | 481.137 | Risk Evaluation if conviction was in the last 10 years | N/A | No |
| Unlawful Transfer or Receipt of Chemical Laboratory Apparatus (felony) | 481.138 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years^ | Felony: No<br><br>Misdemeanor: Yes^^ |
| Transfer of Chemical Laboratory Apparatus for Unlawful Manufacture (felony) | 481.139 | Risk Evaluation if conviction was in the last 10 years | N/A | No |
| Unlawful Delivery or Manufacture with Intent to Deliver; Criminal Penalty (felony) | 482.002 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years^ | Felony: No<br><br>Misdemeanor: Yes^^ |
| Possession of Dangerous Drug (misdemeanor) | 483.041 | N/A | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| Delivery or Offer of Delivery of Dangerous Drug (felony) | 483.042 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years^ | Felony: No<br><br>Misdemeanor: Yes^^ |
| Manufacture of Dangerous Drug (felony) | 483.043 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years^ | Felony: No<br><br>Misdemeanor: Yes^^ |
| Forging or altering prescription (misdemeanor) | 483.045 | N/A | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| Possession and Use (misdemeanor) | 483.031 | N/A | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| Delivery to a Minor (felony or misdemeanor) | 485.032 | Risk Evaluation if conviction was in the last 10 years | Risk Evaluation if conviction was in the last 10 years | Felony: No<br><br>Misdemeanor: Yes^^ |
| Inhalant Paraphernalia (misdemeanor) | 485.033 | N/A | Risk Evaluation if conviction was in the last 10 years | Yes^^ |

| Offense | Health and Safety Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at a Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Hampering, Obstructing, Tampering with or Destroying Electronic Monitoring Device, Tape or Recording from Resident's Room at State Supported Living Center (misdemeanor) | 555.162 | N/A | Risk Evaluation | No |

**Texas Human Resources Code**
**Chapter 40 Department of Family and Protective Services**
**Chapter 42 Regulation of Certain Facilities, Homes and Agencies that Provide Childcare Services**
**Chapter 43 Regulation of Childcare and Child Placing Agency Administrators**
**Chapter 48 Investigations and Protective Services For Elderly and Disabled Persons**

| Offense | Human Resource Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at a Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Confidentiality of Information (misdemeanor) | 40.005 | N/A | Risk Evaluation | Yes^^ |
| False Report: Criminal Penalty (felony or misdemeanor) | 42.0447 | Risk Evaluation | Risk Evaluation | Yes^^ |
| Required Background and Criminal History Checks: Criminal Penalties (misdemeanor) | 42.056 | N/A | Risk Evaluation | No |
| Administering Medication (misdemeanor) | 42.065 | N/A | Risk Evaluation | Yes^^ |
| Criminal Penalties (misdemeanor) | 42.076 | N/A | Risk Evaluation | Yes^^ |

| Offense | Human Resource Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at a Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Criminal Penalty for Operating Daycare Center without Qualified Director (misdemeanor) | 42.0761 | N/A | Risk Evaluation | Yes^^ |
| Penalty (misdemeanor) | 43.012 | N/A | Risk Evaluation | Yes^^ |
| Failure to Report; Penalty (felony or misdemeanor) | 48.052 | Absolute Bar | Risk Evaluation | No |
| False Report; Penalty (misdemeanor) | 48.053 | N/A | Risk Evaluation | Yes^^ |

## Texas Alcoholic Beverage Code
## Chapter 106 Provisions Related to Age

| Offense | Texas Alcoholic Beverage Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at a Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Purchase of Alcohol for a Minor; Furnishing Alcohol to a Minor (misdemeanor) | 106.06 | N/A | Risk Evaluation if conviction was in the last 10 years | Yes^^ |
| Prohibited Activities by Persons Younger than 18 (misdemeanor) or Inducing a Minor to Dance with Another in Exchange for a Benefit by Alcoholic Beverage Permittee (misdemeanor)* | 106.15 | N/A | Risk Evaluation if conviction was in the last 10 years | Yes^^ |

## Texas Business and Commerce Code
## Chapter 110 Computer Technicians Required to Report Child Pornography

| Offense | Texas Business and Commerce Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at a Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Failure to Report Child Pornography by Computer Technician (misdemeanor) | 110.003 | N/A | Risk Evaluation | No |

## Texas Code of Criminal Procedure

## Chapter 62 Sex Offender Registration Program

| Offense | Texas Code of Criminal Procedure | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at a Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Failure to Comply with Sex Offender Registration Requirements (felony) | 62.102 | Risk Evaluation | Risk Evaluation^ | No |

## Texas Civil Practice and Remedies Code

## Chapter 81 Sexual Exploitation by Mental Health Services Provider

| Offense | Texas Civil Practice and Remedies Code | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at a Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Failure to Report Possible Sexual Exploitation of Mental Health Patient (misdemeanor) | 81.006 | N/A | Risk Evaluation if conviction was in the last 10 years | Yes^^ |

**Any other Title under the Texas Penal Code or any other Texas Code not specifically mentioned above**

| Offense | Texas Penal Code or any other various Texas Codes | FELONY (Includes All Levels Unless Otherwise Specified) | MISDEMEANOR (Includes All Levels Unless Otherwise Specified) | If This Person Is Eligible for a Risk Evaluation, May the Person be Present at a Child-Care Operation While Children are in Care Pending the Outcome of the Risk Evaluation? |
|---|---|---|---|---|
| Varies – Any offense DFPS determines is a financial crime | Varies | Risk Evaluation if conviction was in the last 10 years | No Action Required | Yes^^ |
| Varies | Varies | Risk Evaluation if conviction was in the last 10 years | No Action Required | No |

\* Indicates an offense that has been renamed with the Regular Session of the 84th Legislature (2015). Both current and previous offense names have been provided on the chart.

† These offenses result in a bar based on federal requirements set forth in *42 USC 9858f.658H(c)(1)*.

†† These convictions result in an absolute bar if it is determined that the offense was a violent misdemeanor and committed by an adult offender against a child victim, per federal requirements set forth in 42 USC 9858f.658H(c)(1)(E).

^ While these offenses are not normally prosecuted as misdemeanors, action is described should the offense be reduced to a misdemeanor per *TPC 12.44(b)*.

^^ Even though persons may be present at a child-care operation pending the outcome of the risk evaluation, DFPS may place conditions or restrictions on a person's duties in order for the person to be present at the operation. For example, a person convicted of Driving While Intoxicated may be permitted to be employed but will not be permitted to transport children in the care of the operation.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


BEFORE HONORABLE DANA M. SABRAW, JUDGE PRESIDING

_____
                                             )
MS. L. AND MS. C.,                           )
                                             )CASE NO. 18CV0428-DMS
              PETITIONERS-PLAINTIFFS,        )
VS.                                          )
                                             )SAN DIEGO, CALIFORNIA
U.S. IMMIGRATION AND CUSTOMS                 ) FRIDAY JULY 6, 2018
ENFORCEMENT ("ICE"); U.S. DEPARTMENT         ) 12:00 P.M. CALENDAR
OF HOMELAND SECURITY ("DHS"); U.S.           )
CUSTOMS AND BORDER PROTECTION ("CBP");       )
U.S. CITIZENSHIP AND IMMIGRATION             )
SERVICES ("USCIS"); U.S. DEPARTMENT          )
OF HEALTH AND HUMAN SERVICES ("HHS");        )
OFFICE OF REFUGEE RESETTLEMENT ("ORR");      )
THOMAS HOMAN, ACTING DIRECTOR OF ICE;        )
GREG ARCHAMBEAULT, SAN DIEGO FIELD           )
OFFICE DIRECTOR, ICE; ADRIAN P. MACIAS,      )
EL PASO FIELD DIRECTOR, ICE; FRANCES M.      )
JACKSON, EL PASO ASSISTANT FIELD             )
OFFICE DIRECTOR, ICE; KIRSTJEN NIELSEN,      )
SECRETARY OF DHS; JEFFERSON BEAUREGARD       )
SESSIONS III, ATTORNEY GENERAL OF THE        )
UNITED STATES; L. FRANCIS CISSNA,            )
DIRECTOR OF USCIS; KEVIN K.                  )
MCALEENAN, ACTING COMMISSIONER OF            )
CBP; PETE FLORES, SAN DIEGO FIELD            )
DIRECTOR, CBP; HECTOR A. MANCHA JR.,         )
EL PASO FIELD DIRECTOR, CBP;                 )
ALEX AZAR, SECRETARY OF THE                  )
DEPARTMENT OF HEALTH AND HUMAN               )
SERVICES; SCOTT LLOYD, DIRECTOR              )
OF THE OFFICE OF REFUGEE RESETTLEMENT,       )
                                             )
              RESPONDENTS-DEFENDANTS.        )
-------------------------------------------

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**STATUS CONFERENCE**

```
COUNSEL APPEARING:

FOR PLAINTIFF:              LEE GELERNT, ESQ.
                           ANAND VENKATA BALAKRISHNAN, ESQ.
                           ACLU IMMIGRANT RIGHTS PROJECT
                           125 BROAD STREET 18TH FLOOR
                           NEW YORK, NEW YORK 10004

                           BADIS VAKILI, ESQ.
                           ACLU FOUNDATION OF SAN DIEGO
                           AND IMPERIAL COUNTIES
                           P.O. BOX 87131
                           SAN DIEGO, CALIFORNIA 92138

FOR DEFENDANT:             SARAH B. FABIAN, ESQ.
                           SCOTT G. STEWART, ESQ.
                           U.S. DEPARTMENT OF JUSTICE
                           OFFICE OF IMMIGRATION LITIGATION
                           P.O. BOX 868
                           BEN FRANKLIN STATION
                           WASHINGTON, DC 20044




REPORTED BY:               LEE ANN PENCE,
                           OFFICIAL COURT REPORTER
                           UNITED STATES COURTHOUSE
                           333 WEST BROADWAY, ROOM 1393
                           SAN DIEGO, CALIFORNIA 92101
```

1   <u>SAN DIEGO, CALIFORNIA – FRIDAY, JULY 6, 2018 – 12:00 P.M.</u>

2                               *   *   *

3           **THE CLERK:**  CALLING NO. 9 ON CALENDAR, CASE

4   NO. 18CV0428, MS. L. VERSUS U.S. IMMIGRATION AND CUSTOMS

5   ENFORCEMENT; ON FOR STATUS HEARING.

6           **THE COURT:**  GOOD AFTERNOON.  MAY I HAVE APPEARANCES,

7   PLEASE?

8           **MS. FABIAN:**  YOUR HONOR, SARAH FABIAN WITH THE

9   DEPARTMENT OF JUSTICE ON BEHALF OF THE DEFENDANTS.

10          I HAVE WITH ME TODAY SCOTT STEWART AS WELL, ALSO

11   WITH THE DEPARTMENT OF JUSTICE.

12          **THE COURT:**  YES.  THANK YOU.  GOOD AFTERNOON.

13          **MR. GALERNT:**  GOOD AFTERNOON, YOUR HONOR.  LEE

14   GELERNT FOR ACLU FOR PLAINTIFFS.

15          **MR. BALAKRISHNAN:**  GOOD AFTERNOON, YOUR HONOR.

16   ANAND BALAKRISHNAN FROM THE ACLU FOR PLAINTIFFS.

17          **MR. VAKILI:**  GOOD AFTERNOON, YOUR HONOR.  BARDIS

18   VAKILI FROM THE ACLU SAN DIEGO.

19          **THE COURT:**  THANK YOU.  GOOD AFTERNOON, AND WELCOME.

20          IT IS MY UNDERSTANDING THAT WE HAVE ABOUT 55 CALLERS

21   ON THE LINE, MEDIA AND OTHERS.  AND SO AGAIN I WILL ASK

22   COUNSEL TO SPEAK DIRECTLY INTO THE MICROPHONE SO THAT THEY CAN

23   HEAR CLEARLY.

24          A GENTLE REMINDER TO ALL WHO ARE PARTICIPATING

25   TELEPHONICALLY THAT THERE IS NOT ANY RECORDING OR BROADCASTING

1    PERMITTED UNDER CIVIL LOCAL RULE 83.7C.

2            I WOULD LIKE TO GET RIGHT TO THE ISSUES.

3            I RECEIVED THE GOVERNMENT'S NOTICE REGARDING

4    COMPLIANCE AND REQUEST FOR CLARIFICATION AND/OR RELIEF.  I DID

5    NOT GET IT UNTIL THIS MORNING, MID WAY THROUGH MY MORNING

6    CALENDAR, AND I JUST FINISHED MY MORNING CALENDAR TEN MINUTES

7    AGO.  I DID, DURING THE RECESS, READ IT, BUT IT WAS A QUICK

8    READ.  AND THERE ARE SOME SIGNIFICANT ISSUES THAT HAVE BEEN

9    RAISED.  SO I WOULD LIKE TO START THERE.

10           IF WE CAN FOCUS ON THE REUNIFICATION ISSUE AND,

11   MS. FABIAN, IF YOU WANT TO GIVE A STATUS AS TO WHERE WE ARE,

12   THE COMPLIANCE.  AND THEN WHAT THE ISSUES ARE WITH RESPECT TO

13   COMPLETING REUNIFICATION.

14           AS I UNDERSTAND THE BRIEFING, THE GOVERNMENT HAS

15   DEVOTED ENORMOUS RESOURCES IN AN ATTEMPT TO COMPLY, TO

16   REUNIFY, AND TO MAKE THIS HAPPEN.  BUT IN GOOD FAITH IS

17   RAISING ISSUES THAT COULD AFFECT THE TIMING OF REUNIFICATION,

18   PARTICULARLY WITH REGARD TO THE YOUNGER CHILDREN, FIVE AND

19   UNDER.

20           AM I CORRECT?

21           **MS. FABIAN:**  THAT'S CORRECT, YOUR HONOR.  I THINK

22   WHAT WE WANT TO DO IS TO -- WELL, FIRST I DO WANT TO SAY I

23   AGREE WITH YOUR HONOR'S ASSESSMENT.  THE GOVERNMENT HAS

24   SUBMITTED -- DEVOTED SIGNIFICANT RESOURCES TO THIS, HHS AND

25   ICE ARE WORKING TOGETHER.  THEY HAVE FOLKS WORKING IN A

1    COMMAND CENTER WORKING TOGETHER.  THEY HAVE FOLKS OUT DEPLOYED

2    OUT INTO THE FIELD ON THE GROUND WORKING TOGETHER.  THAT IS

3    ALL IN OUR BRIEFING.  BUT THERE REALLY HAS BEEN A MASSIVE

4    EFFORT ON THE PART OF THE GOVERNMENT TO GET THE RESOURCES IN

5    PLACE AND ON THE GROUND TO MAKE REUNIFICATION HAPPEN IN

6    ACCORDANCE WITH THE COURT'S ORDER.

7          THERE HAS ALSO BEEN GUIDANCE OUT TO THE FIELD TO

8    ENSURE THAT FOR FOLKS COMING IN AND ENTERING THAT ANY

9    SEPARATIONS THAT MIGHT OCCUR WOULD OCCUR IN ACCORDANCE WITH

10   THE COURT'S ORDER AS WELL.

11         SO WITH REGARD TO THE COMMUNICATION ISSUE, I KNOW

12   THAT WAS ONE OF -- A PART OF THE COURT'S ORDER.  IT IS OUR

13   UNDERSTANDING THAT COMMUNICATION HAS BEEN FACILITATED.

14         THE WAY IT WORKS IS IT IS RECORDED IN A WAY THAT I

15   CAN'T PULL IT IN AN AGGREGATE WAY TO SORT OF SHOW THE COURT

16   THAT IT HAS BEEN DONE IN EACH CASE.  SO WE DID REVIEW TO

17   ENSURE, AND THAT IS IN ONE OF OUR DECLARATIONS, THAT FOR THE

18   UNDER-FIVE GROUP COMMUNICATION HAS BEEN FACILITATED IN EACH OF

19   THOSE FAMILY GROUPS.  AND IT IS OUR BELIEF THAT IT HAS ALSO

20   BEEN FACILITATED FOR THE REMAINDER OF THE CLASS.

21         AND WHAT WE WOULD ASK THAT IF FOLKS ARE AWARE OF

22   SITUATIONS WHERE IT HASN'T, WE CAN CHECK THAT ON AN

23   INDIVIDUALIZED BASIS.  AND WE ARE HAPPY TO DO SO AND

24   FACILITATE THAT COMMUNICATION IMMEDIATELY.  BUT THE GOVERNMENT

25   DOES BELIEVE THAT WE HAVE DONE THAT.

1      AND IMPORTANT FOR THAT IS THAT O.R.R. FIELD STAFF

2  HAVE BEEN REALLY PUT IN TOUCH WITH THE FIELD OFFICE FOLKS FOR

3  ICE WHERE THE PARENTS WOULD BE HELD SO THAT THEY ARE SORT OF

4  DIRECTLY COMMUNICATING TO FACILITATE THAT COMMUNICATION.

5      THERE HAS ALSO BEEN -- I BELIEVE IT IS TABLETS OF

6  SOME SORT THAT HAVE BEEN DEPLOYED OUT INTO THE ICE FACILITIES

7  THAT MAKE VIDEO CONVERSATIONS POSSIBLE.

8      **THE COURT:**  SO IT IS YOUR UNDERSTANDING THAT OF

9  THESE APPROXIMATELY 3,000 WHERE REUNIFICATION IS IN PROGRESS

10 THAT YOU HAVE BEEN ABLE TO PUT THE PARENTS IN TOUCH WITH THOSE

11 MINOR CHILDREN TO COMMUNICATE, AT LEAST TELEPHONICALLY, WITHIN

12 THIS TEN-DAY TIME FRAME.

13      **MS. FABIAN:**  I MIGHT WANT TO QUIBBLE WITH YOU A

14 LITTLE BIT ON THE NUMBER, BUT, YES, IT IS OUR UNDERSTANDING

15 THAT FOR THE CLASS MEMBERS THAT WE ARE AWARE OF THAT THOSE

16 HAVE BEEN PUT IN -- BEEN ABLE TO COMMUNICATE BETWEEN THE

17 PARENTS AND CHILDREN.

18      **THE COURT:**  ALL RIGHT.  AND BEFORE YOU CONTINUE WITH

19 THE STATUS I HAD A QUESTION ABOUT, FOR THE UNDER-FIVE GROUP,

20 DO YOU KNOW -- MY UNDERSTANDING IS THERE ARE FEWER THAN 100.

21 DO YOU KNOW HOW MANY HAVE ALREADY BEEN REUNITED, AND WHAT

22 THE -- HOW MANY WILL BE REUNITED BY JULY 10?

23      **MS. FABIAN:**  WHAT I CAN SAY IS, YOUR HONOR, THAT --

24 AND SOME OF THIS GETS TO SOME OF THE ISSUES THAT I WOULD LIKE

25 TO RAISE WITH THE COURT TODAY.

1       THERE ARE APPROXIMATELY 46 -- AND I AM GOING TO SAY

2  APPROXIMATELY BECAUSE THESE NUMBERS -- THE PROCESS THAT HHS

3  HAS UNDERGONE -- AND IT IS WHY I ALSO SORT OF QUIBBLE WITH THE

4  3,000 NUMBER.

5       HHS HAS RECORDS IN THE FIRST INSTANCE -- HAS

6  IDENTIFIED INDIVIDUALS WHO HAVE BEEN SEPARATED, BUT THEY HAVE

7  ALSO MADE AN EFFORT TO GO OUT INTO THE FIELD AND TO SORT OF

8  LOOK AGAIN AT CHILDREN IN THEIR CUSTODY AND TO REALLY SEE IF

9  THERE ARE ANY INDICIA OF A SEPARATION, THEN TO SORT OF PULL

10 THEM INTO THE GROUP FOR FURTHER EVALUATION OF WHETHER THIS IS

11 A SITUATION THAT FALLS UNDER THE CLASS.

12      SO THOSE NUMBERS -- FOLKS MIGHT SORT OF COME INTO

13 THE GROUP THAT IS BEING LOOKED AT AND GO BACK OUT AS IT IS

14 DETERMINED NO, ALTHOUGH THE CHILD MAY HAVE SAID HE OR SHE WAS

15 SEPARATED FROM THE PARENT BUT WHEN WE LOOKED AT IT IT LOOKS

16 LIKE THAT OCCURRED BEFORE THEY EVER ARRIVED IN THE UNITED

17 STATES.

18      SO THAT IS WHY WHEN I SAY THESE NUMBERS THEY ARE

19 SORT OF ALWAYS A LITTLE BIT IN FLUX UNTIL IN A GIVEN SITUATION

20 IT CAN BE FINALLY DETERMINED THAT WE HAVE A CLASS MEMBER AND

21 THE CHILD AND A REUNIFICATION.

22      SO IN THAT NUMBER OF FOLKS, THE UNDER-FIVE GROUP

23 THAT WE HAVE IDENTIFIED THERE IS -- APPROXIMATELY HALF OF THEM

24 ARE WHERE THE PARENT IS IN ICE CUSTODY AND THE CHILD IS IN

25 O.R.R. CUSTODY.  FOR THOSE THE -- THAT REUNIFICATION PROCESS

1    IS EXPECTED TO OCCUR WITHIN THE TIME FRAME.

2            THERE IS -- AND IF WE WANT TO MOVE INTO SOME OF THE

3    ISSUES WE WANT TO RAISE WITH THE COURT, THERE ARE THEN SOME

4    GROUPS FOR WHOM THE REUNIFICATION PROCESS IS MORE DIFFICULT.

5    AND ONE OF THOSE IS FOR INDIVIDUALS WHOSE PARENT HAS BEEN

6    RELEASED FROM ICE CUSTODY.  IN THOSE CASES -- IN SOME CASES --

7    AND WE ARE STILL DRILLING DOWN ON SORT OF THE FURTHER DIVISION

8    OF THAT NUMBER.

9            BUT FOR THOSE FOLKS IN SOME CASES IF WE ARE NOT, FOR

10   EXAMPLE, AWARE OF WHERE THE PARENT IS THERE -- I CAN'T COMMIT

11   TO SAYING THAT THAT REUNIFICATION WOULD BE ABLE TO OCCUR BY

12   THE DEADLINE.  IF, FOR EXAMPLE, O.R.R. HAS REACHED OUT TO THE

13   PARENT AND NOT RECEIVED ANY RETURN CALL.

14           SO IN THOSE SITUATIONS I BELIEVE THERE IS MAYBE

15   20 PERCENT OF THAT NUMBER ARE FOLKS WHO WERE RELEASED FROM ICE

16   CUSTODY AND WE ARE STILL DETERMINING WHAT THE SITUATION IS

17   THERE AND WHETHER THOSE ARE SITUATIONS WHERE REUNIFICATION MAY

18   NOT BE ABLE TO OCCUR WITHIN THE TIME FRAME.

19           I THINK THAT SORT OF HIGHLIGHTS, REALLY, ONE OF THE

20   MAIN ISSUES, UNLESS YOUR HONOR HAS OTHER SPECIFIC QUESTIONS.

21           **THE COURT:**  NO.

22           **MS. FABIAN:**  ONE OF THE BIG ISSUES THAT WE WANTED TO

23   BRING TO THE COURT'S ATTENTION TODAY, AND THAT IS THE PROCESS

24   FOR HHS TO REUNIFY MINORS.  IN GENERAL, I WOULD SAY THAT THE

25   COURT'S ORDER SEEMS TO BE CONSISTENT WITH O.R.R.'S

1    REQUIREMENTS -- WITH O.R.R.'S OBLIGATIONS UNDER THE TVPRA.

2            **THE COURT:**  YES.

3            **MS. FABIAN:**  AND, HOWEVER, O.R.R. HAS DEVELOPED A

4    SIGNIFICANT NUMBER OF PROCESSES UNDER THE TVPRA THAT IT

5    BELIEVES ARE ESSENTIAL FOR FULFILLING ITS OBLIGATION THERE TO

6    ENSURE THE SAFETY OF MINORS WHEN THEY ARE RELEASED.

7            O.R.R. HAS MADE EFFORTS, HHS HAS MADE EFFORTS TO

8    STREAMLINE THAT PROCESS AS MUCH AS POSSIBLE IN LIGHT OF THE

9    TIMELINES CONTAINED IN THE COURT'S ORDER.  BUT THERE IS

10   POTENTIALLY, OR SORT OF INHERENTLY, A TENSION ALWAYS -- AND I

11   HAVE SAID THIS IN OTHER CASES AS WELL, THERE IS ALWAYS GOING

12   TO BE A TENSION BETWEEN A FAST RELEASE AND A SAFE RELEASE.

13           AND IN THIS CASE THERE IS -- I THINK HHS IS ASKING

14   FOR SOME CLARIFICATION WITH REGARD TO THOSE PROCESSES THAT IT

15   FEELS ARE ESSENTIAL UNDER -- FOR FULFILLING ITS OBLIGATIONS

16   UNDER THE TVPRA AND THE DESIRE TO NOT MISS THE COURT'S

17   DEADLINES.  SPECIFICALLY, REALLY, ASKING THE COURT TO CLARIFY

18   WHETHER COMMITTING -- OR COMPLETING THE SAFE PROCESSES UNDER

19   THE TVPRA THAT O.R.R. HAS DEVELOPED OVER THE YEARS THAT HAVE

20   REALLY COME FROM EXPERIENCE WITH RELEASING CHILDREN AND THEY

21   ARE -- I THINK IT IS MENTIONED IN OUR BRIEFING, IF NOT IT IS

22   SOMETHING I FOUND ELSEWHERE.  BUT CONGRESS HAS LOOKED AT THIS

23   ISSUE AND ENCOURAGED O.R.R. TO ADD SOME PROCESSES TO THAT.

24           SO THESE PROCESSES HAVE BEEN DEVELOPED AND ARE WHAT

25   HHS BELIEVE ARE VERY IMPORTANT TO FULFILL THAT OBLIGATION.

1    AND WOULD LIKE –– HHS WOULD LIKE SOME CLARIFICATION FROM THE

2    COURT ON WHETHER THAT PROCESS SHOULD CONTINUE IN PLACE, EVEN

3    WHERE IT MIGHT TAKE THEM PAST THE COURT'S 30-DAY DEADLINE; OR

4    WHETHER THE COURT WOULD LIKE TO SPEAK, OR INTENDS TO SPEAK, ON

5    HOW O.R.R. SHOULD TRUNCATE THAT PROCESS OR PERHAPS NOT FULFILL

6    WHAT IT BELIEVES ARE ALL OF ITS OBLIGATIONS UNDER THE TVPRA IN

7    ORDER TO COMPLY WITH THE COURT'S DEADLINES.

8         **THE COURT:**  ON THAT, I HAVE A GENERAL OBSERVATION

9    AND QUESTION, AND I WOULD BE PARTICULARLY INTERESTED IN MR.

10   GELERNT'S RESPONSE.

11        THE TVPRA, WHILE IT WAS DESIGNED TO FOCUS ON A

12   DIFFERENT GROUP OF CHILDREN, THE TRUE UNACCOMPANIED MINORS,

13   THAT HISTORICALLY THAT HAS BEEN OLDER CHILDREN SHOWING UP AT

14   THE BORDER ALONE, THE TVPRA WAS DESIGNED TO SPEAK TO THAT

15   GROUP; NOT SO MUCH TO THIS SITUATION WHERE CHILDREN SHOW UP

16   ACCOMPANIED WITH THEIR PARENT, AND THEN ARE SEPARATED AND GO

17   INTO A TVPRA PROCESS.

18        THAT SAID, THE TVPRA IS A FEDERAL STATUTE THAT IS IN

19   PLACE.  IT HAS PROCEDURES FOR RELEASING CHILDREN TO THE CARE

20   AND CUSTODY OF SOMEONE, HISTORICALLY THAT WOULD BE A

21   NONPARENT, IN MANY CASES, AN AUNT, AN UNCLE, OR SOMEBODY LIKE

22   THAT.  AND THE TVPRA PROCESS BECOMES PARTICULARLY IMPORTANT IN

23   THAT KIND OF SITUATION.

24        THIS SITUATION IS DIFFERENT IN THAT IT INVOLVES

25   SEPARATION, AND THE CLASS IS DEFINED TO INCLUDE PARENTS ONLY,

1    AND SO THE CONTEXT IS DIFFERENT.  BUT THE TVPRA IS IN PLACE,

2    IT HAS REUNIFICATION PROCEDURES THAT HHS HAS TO FOLLOW.  AND

3    THE COURT CAN'T SIMPLY BRUSH IT ASIDE.  IT RAISES A NUMBER OF

4    VERY COMPLICATED, IMPORTANT ISSUES THAT ARE NOT BRIEFED AND

5    HAVE JUST BEEN RAISED THIS MORNING.

6            SO PERHAPS I CAN INQUIRE OF MR. GELERNT, IF YOU

7    WOULD SPEAK TO THAT ISSUE.

8            I GUESS THE QUESTION IS --

9            YOU COULD SHARE THE PODIUM WITH MS. FABIAN.

10            I GUESS THE QUESTION IS WHETHER IN THE NEED TO BE

11    URGENT IN REUNITING AND SAFE IN REUNITING CHILDREN, WHAT DO WE

12    DO ABOUT THE TVPRA REQUIREMENTS THAT MAY ENCUMBER THE

13    GOVERNMENT FROM REUNITING WITHIN THIS 14-DAY TIME FRAME?

14            **MS. FABIAN:**  YOUR HONOR, I ASKED MR. GELERNT BECAUSE

15    I WOULD LIKE -- I THINK YOU WILL WANT HIM TO RESPOND TO THIS

16    POINT.

17            I WANT TO POINT -- AND I SORT OF GLOSSED OVER THIS

18    POINT.  BUT YOUR HONOR POINTS OUT THAT THE CLASS MEMBER DOES

19    -- OR THE CLASS DEFINITION DOES REFERENCE PARENTS.  AND I

20    THINK THAT IS PART OF WHAT WE BRIEFED AND PART OF THE PROCESS.

21    AND THAT MADE -- THE FIRST STEP IS, OF COURSE, CONFIRMING THAT

22    WHAT WE ARE DEALING WITH IS A PARENT AND CHILD.

23            AND SO WITHIN OUR REQUEST FOR CLARIFICATION THE

24    FIRST STEP IS THIS -- WHAT WE HAVE BEEN DOING IS A DNA

25    ANALYSIS, AND THAT IS TO CONFIRM -- FOR THE PROCESS OF

1   CONFIRMING PARENTAGE.  AND IN MANY SITUATIONS I BELIEVE -- I

2   DON'T WANT TO SAY IN ALL SITUATIONS BUT IN MANY SITUATIONS

3   THAT PROCESS WILL BE ABLE TO BE COMPLETED -- IF WE HAVE A

4   PARENT IN CUSTODY AND THE CHILD IN CUSTODY THAT THE PROCESS OF

5   DNA ANALYSIS CAN BE COMPLETED TO ALLOW THE PROCESS TO MOVE

6   FORWARD IN THE TIMELINES.  BUT THERE IS -- THERE ARE

7   SITUATIONS, FOR EXAMPLE IN A NONBIOLOGICAL PARENT SITUATION,

8   WHERE THE -- WHERE THERE MAY NEED TO BE ADDITIONAL REVIEW OF

9   PAPERWORK, PERHAPS COMMUNICATIONS WITH THE CONSULATES.

10          SO EVEN CONFIRMING THAT FIRST STEP OF PARENTAGE --

11  AND MAYBE I SHOULD HAVE SORT OF TEED THIS UP AT THE BEGINNING.

12  BUT THAT IS ALSO PART OF THIS PROCESS THAT O.R.R. HAS

13  IMPLEMENTED HERE.  AND IT -- FOR -- SO WE WOULD ALSO LIKE

14  CLARIFICATION ON FOR WHERE PARENTAGE CAN'T BE CONFIRMED IN

15  SORT OF THE EASIEST SETTING OF A PARENT IN DETENTION AND A

16  CHILD IN DETENTION AND A DNA CONFIRMATION.  IF THERE IS ALSO

17  RELIEF TO BE HAD ON THE TIMELINES WHERE IT IS NECESSARY TO

18  REALLY DRILL DOWN MORE OR LOCATE THE PARENT OR ASK THE PARENT

19  TO COME IN AND SUBMIT TO DNA TESTING TO MAKE THAT

20  CONFIRMATION.  SO WE WOULD ALSO ASK FOR CLARIFICATION ON THAT.

21  I JUST -- IN CASE MR. GELERNT WANTED TO ADDRESS THAT AS WELL,

22  I WILL MOVE ASIDE.

23          **THE COURT:**  YES.  THANK YOU.

24          **MR. GALERNT:**  THANK YOU, YOUR HONOR.

25          WE ARE ALSO SCRAMBLING A LITTLE BIT TO LOOK AT ALL

1    OF THE DETAILS IN THE GOVERNMENT'S FILINGS, SINCE THEY WERE

2    LATE LAST NIGHT.

3           BUT I WOULD SAY JUST TO START OFF I WANT TO RESPOND

4    SPECIFICALLY TO YOUR TVPRA POINT.  BUT I THINK THE INJUNCTION

5    IS WORKING BECAUSE THIS IS THE FIRST TIME THE GOVERNMENT HAS

6    PUT FORTH THESE RESOURCES TO GET THE JOB DONE.  SO WE STRONGLY

7    BELIEVE THAT THE INJUNCTION SHOULD NOT BE ALTERED.

8           LET ME ADDRESS JUST A FEW POINTS, START WITH YOUR

9    QUESTION ABOUT THE TVPRA.  TO BEGIN WITH, THE TVPRA DOESN'T

10   ACTUALLY HAVE ALL OF THE REQUIREMENTS THAT O.R.R. IS NOW

11   ENGAGING IN.  THOSE WERE DECISIONS O.R.R. MADE TO ADD TO THE

12   TVPRA.

13          THE MAIN THING THAT TVPRA DOES IS HOME STUDIES BUT

14   SO MUCH OF WHAT O.R.R. IS DOING NOW WAS ADDED AS A POLICY

15   MATTER.  BUT WE DON'T BELIEVE THAT YOU ARE NOT IN A POSITION

16   TO SAY, LOOK, THIS IS A DIFFERENT SITUATION, AS YOUR HONOR HAS

17   STATED A FEW TIMES.

18          THE TVPRA WAS FOR A SITUATION WHERE IT WAS A -- AS

19   YOU PUT IN YOUR OPINION, A TRUE UNACCOMPANIED INDIVIDUAL, AND

20   YOU ARE THEN LOOKING AT RELEASING THE PERSON TO SOMEONE YOU

21   DON'T KNOW, DIDN'T COME WITH THE CHILD.

22          I DON'T KNOW OF ANY CHILD ADVOCACY GROUP DEALING

23   WITH THIS ISSUE WHO BELIEVES THAT IN THIS SITUATION WHERE THE

24   PARENT -- THE CHILD WAS TAKEN FROM THE PARENT THAT O.R.R.

25   SHOULD GO THROUGH ALL OF THIS LENGTHY PROCEDURES.  IT JUST

1   DOESN'T MAKE SENSE.  YOU HAVE TAKEN THE CHILD FROM THE PARENT,

2   THEY NEED TO GIVE THE CHILD BACK.

3          I DON'T THINK -- WE ARE PREPARED TO SAY -- AND I

4   THINK EVERY CHILD ADVOCACY GROUP WAS PREPARED TO SAY THAT

5   O.R.R. SHOULD NOT BE FOLLOWING THE LENGTHY, CUMBERSOME

6   PROCEDURES THEY USE WHEN THEY ARE JUST NOT SURE WHO THIS

7   PERSON IS WHO IS COMING FORWARD FOR THE CHILD.

8          **THE COURT:**  ARE THOSE PROCEDURES, THOUGH, A MATTER

9   OF REGULATION; IN OTHER WORDS, ARE THEY IN THE CFR OR

10   SOMETHING SIMILAR?

11          **MR. GALERNT:**  YOUR HONOR, I DON'T KNOW IF ALL OF

12   THEM ARE.  I DON'T THINK ALL OF THEM ARE.  BUT, YOU KNOW, I

13   THINK ONE OVERARCHING POINT I WOULD MAKE -- AND I PROBABLY

14   SHOULD HAVE STARTED WITH THIS -- IS YOUR HONOR'S DECISION WAS

15   OF COURSE BASED ON DUE PROCESS.  SO DUE PROCESS -- AND YOUR

16   HONOR HAS POINTED THIS OUT BEFORE -- ULTIMATELY HAS TO TRUMP

17   THE TVPRA.

18          WHAT I UNDERSTAND HHS TO BE ASKING FOR, IF I AM

19   READING THEIR DECLARATIONS RIGHT, IS NOT SAYING THEY HAVE TO

20   DO IT, BUT THEY WANT CLARIFICATION FROM YOU THAT THEY CAN

21   STREAMLINE THE PROCEDURE.

22          **THE COURT:**  TO BE CLEAR, THE DUE PROCESS CLAUSE

23   WOULD OVERRIDE A FEDERAL STATUTE ON THIS SPECIFIC ISSUE OF

24   SEPARATION AND WHETHER OR NOT THERE IS A VIOLATION OF THE

25   CONSTITUTION OR A FAILURE TO REUNIFY.  THIS REQUEST IS

DIFFERENT, THOUGH.  IT IS THE GOVERNMENT SAYING, WE ARE DOING

EVERYTHING WE CAN TO REUNITE, WE JUST CAN'T MEET THIS DEADLINE

AND MEET THE TVPRA REQUIREMENTS.

SO IT IS A DISTINCT ISSUE.  AND AS A COURT I WOULD

BE VERY RELUCTANT JUST TO SWEEP ASIDE THE TVPRA OR RULE-MAKING

UNDER IT THAT MAY HAVE THE SAME FORCE AND EFFECT AS FEDERAL

LAW.

**MR. GALERNT:**  YOUR HONOR, I THINK THAT THE FAMILY --

THE DUE PROCESS RIGHT HERE IS TO BE TOGETHER WITH YOUR CHILD,

SO I DO THINK EVEN WITH RESPECT TO THE TIMING IT WOULD

OVERRIDE.

I JUST DON'T UNDERSTAND THE TVPRA TO HAVE MANY

REQUIREMENTS OR EVEN THE FEDERAL REGULATIONS TO HAVE MANY

REQUIREMENTS.  AND I DON'T THINK -- I THINK A PROPER

INTERPRETATION OF THE TVPRA WOULDN'T SAY THAT IF THE

GOVERNMENT GOES AND TAKES YOUR CHILD AND SAY YOU ARE NOT

GETTING IT BACK UNTIL WE DO ALL OF THESE SIX MONTHS' WORTH OF

PROCEDURES IT JUST DOESN'T -- IT IS SORT OF -- IT IS APPLES

AND ORANGES IN SOME RESPECTS.

**THE COURT:**  LET ME ASK A QUESTION HERE.

ARE YOU INDICATING THAT -- WELL, FIRST OFF, THE

TVPRA AND THESE POLICIES THAT O.R.R. HAS TO FOLLOW TO REUNIFY,

FROM YOUR PERSPECTIVE IS THAT -- ARE THOSE REGULATIONS,

FEDERAL, LIKE C.F.R.'S, WHERE THEY ARE TANTAMOUNT TO RULES AND

PROCEDURES THAT THE COURT CAN'T SIMPLY SWEEP ASIDE WITHOUT

1    MAKING A DETERMINATION, FOR EXAMPLE, THAT THE CONSTITUTIONAL

2    CONSIDERATIONS OVERRIDE?

3              **MS. FABIAN:**  YOUR HONOR, THOSE PROCEDURES ARE

4    PUBLISHED IN O.R.R.'S POLICY GUIDE WHICH IS -- IT IS PUBLISHED

5    PUBLICLY BUT IT -- THEY ARE NOT CFR REGULATIONS.

6              **THE COURT:**  SO ARE YOU INDICATING THAT IF THE COURT

7    WERE TO SAY O.R.R. DOES NOT NEED TO COMPLY WITH THOSE INTERNAL

8    POLICIES THAT THAT IS NOT AN ISSUE YOU WOULD CONTEST OR SEEK

9    TO APPEAL?

10             **MS. FABIAN:**  YOUR HONOR, I DON'T BELIEVE THAT WE

11   WOULD CONTEST THAT THE COURT HAS THE AUTHORITY TO ORDER THAT

12   THOSE PROCEDURES NOT BE FOLLOWED SPECIFICALLY.  WE WOULD ASK

13   FOR A SPECIFIC RULING THAT THE COURT'S ORDER AND ORDER FOR

14   RELIEF OVERRULE O.R.R.'S OWN POLICIES.

15             **THE COURT:**  DO YOU AGREE THAT THE COURT'S ORDER WITH

16   RESPECT TO REUNIFYING UNDER CERTAIN TERMS AND CONDITIONS WHICH

17   RELATE TO FITNESS, DANGER TO THE CHILD, THE CLASS CARVING OUT

18   CRIMINAL HISTORY, CONTAGIOUS DISEASE AND OTHER FACTORS, THAT

19   WHAT IS IN PLACE, IF THE GOVERNMENT FOLLOWS THE COURT ORDER,

20   IS VERY CONSISTENT WITH THE TVPRA REQUIREMENTS WHERE THE

21   SAFETY OF THE CHILD IS BEING ADDRESSED PRIOR TO REUNIFICATION?

22             DO YOU HAVE ANY INFORMATION WHICH WOULD INDICATE

23   THAT SIMPLY FOLLOWING THE COURT'S ORDER IN LIGHT OF THE

24   NARROWNESS OF THE CLASS DEFINITION AND THE PARAMETERS OF

25   REUNIFICATION ARE IN ANY WAY INCONSISTENT WITH THE TVPRA OR

1  THESE POLICIES?

2          **MS. FABIAN:**  I THINK I WOULD FIRST ASK FOR A

3  CLARIFICATION FROM THE COURT AS TO WHETHER THE COURT DID

4  INDEED INTEND TO CARVE OUT ALL CRIMINAL HISTORY AS FAR AS

5  CLASS MEMBERSHIP.  I THINK, ASSUMING THAT, THAT DOES GET A

6  LITTLE BIT OF THE WAY TO AT LEAST REMOVING SOME OF THE

7  NECESSARY PROCEDURES, OR THE PROCEDURES THAT MIGHT OTHERWISE

8  BE NECESSARY.

9          I WOULD SAY THAT IT STILL REMAINS THAT -- THE

10 COURT -- WE AGREE THAT THE COURT'S STANDARD IN THE ORDER IS

11 CONSISTENT WITH THE TVPRA.  BUT WHAT THE COURT'S STANDARD

12 DOESN'T GIVE US IS HOW TO -- WHICH PARTS STILL OF HOW HHS HAS

13 HISTORICALLY IMPLEMENTED THE TVPRA MIGHT NO LONGER APPLY UNDER

14 THE COURT'S STANDARD.

15         IT WOULD SEEM THAT THEY ARE VERY PARALLEL AND IN

16 THAT IT IS VERY DIFFICULT FOR HHS TO MAKE THE DECISION WHICH

17 PARTS OF ITS PROCEDURES UNDER THE TVPRA WOULD NO LONGER BE

18 REQUIRED UNDER THE COURT'S ORDER.

19         **THE COURT:**  WE ARE WELL INTO THE INJUNCTIVE RELIEF

20 AND THE GOVERNMENT'S ATTEMPTS TO MEET THESE REQUIREMENTS.  IS

21 THIS AN INDICATION THAT THE GOVERNMENT IS NOT APPEALING, NOT

22 GOING TO APPEAL?

23         **MS. FABIAN:**  YOUR HONOR, THAT IS A QUESTION FOR THE

24 SOLICITOR GENERAL.  I CAN'T INDICATE IT THAT TIME -- THE

25 PROCESS OF MAKING THAT DETERMINATION IS UNDERWAY.  WE HAVE NOT

```
1   SOUGHT A STAY AS FAR AS THE REUNIFICATION PROCESS.  THAT IS
2   NOT UNDERWAY.  SO GIVEN THE TIMING I FEEL THAT IS NOT
3   SOMETHING THAT EVEN COULD OCCUR WITHIN THAT TIME FRAME NOW.
4   BUT I CAN'T GIVE AN ANSWER AS TO THE APPEAL BECAUSE THAT IS A
5   DECISION ENTIRELY WITHIN THE PURVIEW OF THE SOLICITOR
6   GENERAL'S OFFICE.
7            THE COURT:  WHAT I DON'T WANT TO OCCUR IS, AT THE
8   INVITATION OF THE GOVERNMENT, FOR THE COURT TO MAKE SOME
9   INDICATION ABOUT THE SCOPE OF THE PRELIMINARY INJUNCTION AND
10  THEN TO USE THAT AS A BASIS TO APPEAL.
11           THE OVERARCHING OBJECTIVE HERE IS TO REUNITE.  AND
12  SO THE WAY I HEAR THE GOVERNMENT TODAY AND RECEIVED THE
13  BRIEFING IS SIMPLY FOR WHAT YOU ARE STATING; AND THAT IS
14  CLARIFICATION, HOW BEST CAN WE PROCEED BEING IN COMPLIANCE
15  WITH THE COURT'S ORDER AND ACHIEVE REUNIFICATION.
16           AM I MAKING A CORRECT ASSUMPTION?
17           MS. FABIAN:  I THINK I AGREE WITH THAT.  IF WHAT
18  YOUR HONOR IS SAYING THAT IT IS A COMMITMENT NOT TO APPEAL AT
19  ALL, I CAN'T SAY THAT.  BUT I WOULD AGREE -- AND I HAVE WITH
20  ME HERE FROM OUR FRONT OFFICE SOMEONE WITH EVEN MORE ABILITY
21  TO MAKE THAT COMMITMENT.
22           SO I -- WHAT I WOULD SAY IS I -- WE ARE NOT SEEKING
23  TO SNEAK AROUND THE INJUNCTION HERE AND GET AN ORDER THAT WE
24  CAN, YOU KNOW, BETTER GET OUT FROM UNDER THE COURT'S ORDER, WE
25  ARE SEEKING CLARIFICATION FOR THE PURPOSE OF COMPLYING WITH
```

1  THE REUNIFICATION PROVISIONS OF THE ORDER.  IF WE APPEAL THEM

2  ON A DIFFERENT BASIS THAT REMAINS TO BE SEEN AND IS WITH THE

3  OFFICE OF THE SOLICITOR GENERAL.

4          **THE COURT:**  I WOULD MAKE THIS TENTATIVE OBSERVATION,

5  THEN, AND THEN COUNSEL CAN WEIGH IN.

6          MY UNDERSTANDING, BASED ON WHAT HAS JUST BEEN

7  REPRESENTED, IS THE O.R.R. POLICIES, THEY ARE NOT IN THE

8  CFR'S, IT IS NOT RULE—MAKING, IT DOESN'T HAVE THE SAME FORCE

9  AND EFFECT AS FEDERAL PROVISIONS OR STATUTES.  THEY ARE SIMPLY

10  INTERNAL POLICIES OR PROCEDURES THAT O.R.R. USES TO ENSURE

11  THAT WHEN THEY RELEASE THE CHILD TO A CUSTODIAN THAT THE CHILD

12  IS BEING RELEASED TO A RESPONSIBLE, SAFE CUSTODIAN.

13          IF THAT'S THE CASE, THEN I WOULD BE PREPARED TO

14  INDICATE THAT THE O.R.R., HHS SHOULD NOT FEEL OBLIGATED TO

15  COMPLY WITH THOSE INTERNAL PROCEDURES BECAUSE THIS CASE IS SO

16  DIFFERENT, IT INVOLVES SEPARATION OF MINOR CHILDREN FROM

17  PARENTS.  AND THE CLASS DEFINITION IS IMPORTANT.  IT INVOLVES

18  THE PARENT, NOT A RELATIVE OR A CUSTODIAN THAT MIGHT SUFFICE

19  BUT THE PARENT.  AND CARVED OUT FROM THE CLASS IS CRIMINAL

20  HISTORY, IS CONTAGIOUS DISEASE.  AND THERE ARE A NUMBER OF

21  FACTORS THAT ARE SET OUT IN NARROWLY DEFINING THE CLASS.

22          AND THE PURPOSE OF THAT WAS TO DEFINE A CLASS AND

23  PROVIDE INJUNCTIVE RELIEF THAT IS CONSISTENT, AS FAR AS

24  REUNIFICATION GOES, WITH THE TVPRA.  AND TO DO IT IN AN

25  EFFICIENT, QUICK MANNER; BUT OF COURSE NEVER LOSING SIGHT OF

1   THE SAFETY OF THE CHILDREN.

2          AND AS INDICATED IN THE COURT'S ORDER, THE ATTORNEY

3   GENERAL MAKES HIS OWN DETERMINATIONS AS TO WHETHER OR NOT TO

4   DETAIN OR TO PAROLE OR RELEASE.  THIS ORDER DOESN'T IMPACT

5   THAT IN ANY WAY.

6          OBVIOUSLY THE ATTORNEY GENERAL HAS TO MAKE THOSE

7   DETERMINATIONS CONSISTENT WITH LAW, BUT THIS IS AN ORDER THAT

8   DEALS WITH SEPARATION IN ONE INSTANCE AND THE CIRCUMSTANCES

9   UNDER WHICH THAT MIGHT OCCUR, AND THEN REUNIFICATION IN THE

10  CIRCUMSTANCE WHERE FAMILIES HAVE ALREADY BEEN SEPARATED.

11         SO I WANT TO BE CLEAR THAT I STAND ON THE ORDER, AND

12  MY COMMENTS HERE TODAY DON'T IN ANY WAY SUGGEST THAT THE

13  ATTORNEY GENERAL MUST RELEASE OR MUST DETAIN OR WHEN HE CAN

14  RELEASE OR DETAIN.  THOSE ARE WITHIN THE GOVERNMENT'S

15  PREROGATIVE, CONSISTENT WITH LAW.

16         **MS. FABIAN:**  AND I THINK AS I UNDERSTAND WHAT YOUR

17  HONOR JUST SAID, IF THE CLARIFICATIONS THAT WE ARE ASKING FOR

18  FIT EXACTLY WITHIN WHAT THE COURT HAS JUST SAID, WHICH IS

19  FIRST -- I MENTIONED THE CRIMINAL HISTORY.  IF THE COURT DID

20  INTEND TO EXCLUDE CLASS MEMBERS WITH ANY CRIMINAL HISTORY THEN

21  I THINK THAT THAT IS A CLARIFICATION WE WOULD -- WE WOULD

22  WELCOME FROM THE COURT THAT WOULD BEAR DOWN ON THIS.

23         **THE COURT:**  YES.  AND OF COURSE ALL OF THIS ASSUMES

24  GOOD FAITH.  IT ASSUMES THAT THE GOVERNMENT IS USING THE

25  CRITERIA THAT IT PROPERLY USED BEFORE WITH RESPECT TO CRIMINAL

1    HISTORY.  SOME CRIMINAL HISTORY, I UNDERSTAND, DOES NOT RESULT

2    IN SEPARATE DETENTION OF THE PARENT AND THUS SEPARATION OF THE

3    FAMILY; OTHER CRIMINAL HISTORY COULD.

4            I SIMPLY CARVED OUT CRIMINAL HISTORY FROM THE CLASS

5    DEFINITION BECAUSE I THINK IT IS WITHIN THE GOVERNMENT'S

6    PREROGATIVE TO DETERMINE WHAT TYPE OF CRIMINAL HISTORY MIGHT

7    PROPERLY EFFECT SEPARATION.

8            SO I DON'T INTEND TO INTERVENE IN THAT.  THAT'S AN

9    ISSUE THAT WOULD NEED SEPARATE BRIEFING AND CONSIDERATION.

10   AND HERE AGAIN IT ASSUMES ABSOLUTE GOOD FAITH ON THE PART OF

11   THE GOVERNMENT THAT IF IT ELECTS TO SEPARATE A FAMILY BASED ON

12   CRIMINAL HISTORY THAT IT IS DOING IT UNDER ITS CRITERIA THAT

13   IT ORDINARILY FOLLOWS.

14           **MS. FABIAN:**  I THINK, AS I UNDERSTAND IT, THE --

15   WHAT THE COURT IS SAYING IS THAT YOU READ THE CRIMINAL HISTORY

16   EXCLUSION TO BE PART OF THE SEPARATION DECISION RATHER THAN --

17   BECAUSE, AS I READ THE ORDER, THERE IS -- THE EXCLUSION OF ANY

18   PARENT WITH A CRIMINAL HISTORY, AS A WHOLE, WOULD EXCLUDE

19   THEM -- WOULD EXCLUDE THEM FROM THE CLASS REGARDLESS OF THAT

20   -- WHETHER THAT WAS THE BASIS FOR THE SEPARATION.

21           **THE COURT:**  YES.  AND I MADE CLEAR THAT IF

22   PLAINTIFFS WANTED TO MODIFY THE SCOPE OF THE CLASS THEY COULD

23   DO THAT, BUT GIVEN THE URGENCY AND PRESS OF TIME I SIMPLY

24   ELECTED TO EXCLUDE FROM THE CLASS PARENTS WITH CRIMINAL

25   HISTORY.

1      **MS. FABIAN:** AND THEN I THINK THE SECOND POINT THAT

2   IS RAISED BY WHAT YOUR HONOR HAS SAID ABOUT THE ORDER IS --

3   REMAINS THE PARENTAGE QUESTION.  IT SOUNDS LIKE IF -- ON THE

4   LAST POINT THE COURT MAY BE RELYING HEAVILY ON THE PARENTAGE

5   DETERMINATION.

6          SO I THINK WE WOULD STILL ASK FOR A CLARIFICATION AS

7   TO THAT PROCESS AND WHETHER THE CONTINUED USE OF THE DNA

8   ANALYSIS AND THE FOLLOWUP IF THE DNA ANALYSIS IS NOT

9   CONCLUSIVE, AND RELATEDLY ANY DIFFICULTIES THAT MIGHT ARISE

10  OUT OF THE DNA PROCESS IN TERMS OF LOCATING THE PARENT OR

11  OBTAINING DNA.

12          I THINK WE WOULD ASK FOR CLARIFICATION IF THAT IS A

13  PERMISSIBLE APPROACH IN LIGHT OF THE FACT THAT PARENTAGE IS AN

14  IMPORTANT PART OF THE COURT'S ORDER.  AND THE INHERENT -- ANY

15  INHERENT DELAYS THAT MIGHT OCCUR FROM THAT WE WOULD ASK FOR

16  SOME RELIEF TO ALLOW FOR THAT PROCESS.

17      **THE COURT:** ALL RIGHT.  SO THE CLASS IS DEFINED TO

18  INCLUDE PARENTS.

19          MR. GELERNT, DO YOU WANT TO SPEAK TO THAT?  I MEAN,

20  ARGUABLY THAT COULD MEAN ADOPTIVE PARENTS, NONBIOLOGICAL.

21      **MR. GALERNT:** I GUESS ONE QUESTION THAT I WANTED TO

22  SPEAK TO IS THE VERIFICATION PROCESS.  I MEAN, THE GOVERNMENT,

23  I GATHER, IS SAYING, WE ARE GOING TO DNA EVERY SINGLE PERSON

24  AND THAT IS GOING TO DELAY THINGS.

25          IF IT IS NOT -- YOU KNOW, WE WOULD SAY THAT DNA IS A

1   LAST RESORT.  I THINK EVERY CHILD EXPERT HAS SAID THAT, AND I

2   THINK YOUR HONOR HAS POINTED THAT OUT.

3          SO TO THE EXTENT THAT DELAYS OF YOUR DEADLINES IS

4   OCCURRING BECAUSE THEY ARE DNA TESTING EVERYONE, EVEN WHERE

5   THE CASE MANAGER SAYS THERE IS ABSOLUTELY NO QUESTION, THE

6   PARENT HAS BIRTH CERTIFICATES, ALL OF THAT.

7          **THE COURT:**  I THINK THE GOVERNMENT INDICATED THEY

8   COULD DNA SWAB EVERYONE AND MEET THE DEADLINE.  I GUESS THE

9   QUESTION IS WHETHER THAT IS NECESSARY.

10         **MR. GALERNT:**  WELL, YOUR HONOR, RIGHT.  ABSOLUTELY.

11  YOU ARE PULLING APART TWO IMPORTANT POINTS.

12         IF THE GOVERNMENT IS GOING TO REPRESENT THAT THE DNA

13  TESTING IS NOT GOING TO MOVE THE DEADLINES THAT SOLVES ONE

14  PROBLEM.

15         I THINK WE WOULD SAY, YOU KNOW, THAT DNA TESTING IS

16  INTRUSIVE AND IT SHOULDN'T BE DONE.  AND THE PARENT -- MAKES

17  THE PARENTS NERVOUS, THEY ARE NOT SURE WHY IT IS BEING DONE.

18  THAT IT SHOULDN'T BE DONE IN EVERY CASE.

19         BUT IF IT IS GOING TO BE DONE IN EVERY CASE AND THE

20  DEADLINES AREN'T GOING TO MOVE BECAUSE OF THAT, THE ONLY THING

21  WE WOULD ASK IS THAT IT BE USED ONLY FOR REUNIFICATION, AND

22  THEN EXPUNGED.  BECAUSE I DON'T KNOW THAT WE WANT TO BE A

23  CREATING A DNA DATABASE OF ALL OF THESE PEOPLE.

24         I WANT TO TOUCH ON A COUPLE OF OTHER THINGS, YOUR

25  HONOR, IF I MIGHT.

1          **THE COURT:**  YES.

2          **MR. GALERNT:**  JUST GOING BACK TO THE BEGINNING OF

3     THE DISCUSSION YOU HAD WITH THE GOVERNMENT ON THE TENDER AGE

4     KIDS, THE KIDS UNDER FIVE.  I WASN'T -- I WASN'T SURE EXACTLY

5     WHAT THE GOVERNMENT WAS SAYING ABOUT WHAT IS HAPPENING WITH

6     THEM.

7          WE UNDERSTAND THE GOVERNMENT TO HAVE SAID THERE IS

8     101 CHILDREN, AND THAT THEY HAVE IDENTIFIED 49 PARENTS.  THE

9     GOVERNMENT SAID THEY CAN'T REUNIFY ALL OF THEM, POTENTIALLY,

10    BY THE DEADLINE BECAUSE THEY ARE NOT SURE WHERE THE PARENT IS,

11    ESPECIALLY IF THE PARENT HAS BEEN RELEASED.  BUT THEY HAVE

12    ALSO REPRESENTED, I THINK --

13          AND I APOLOGIZE IF THIS IS MISSTATING WHAT YOU

14    REPRESENTED TO THE COURT.

15          -- THAT EVERY KID HAS TALKED TO THEIR PARENTS.  SO I

16    AM NOT SURE HOW THOSE SQUARE.

17          WE WOULD JUST LIKE A SORT OF SIMPLE REPRESENTATION

18    HERE THAT EVERY ONE OF THE 101 KIDS HAS TALKED TO THEIR

19    PARENTS AND WHY -- IF THAT IS TRUE, WHY THE REUNIFICATION

20    CAN'T BE DONE BY THIS WEDNESDAY.  BECAUSE THOSE OBVIOUSLY, AS

21    THE COURT NOTED, THOSE ARE THE PARTICULARLY VULNERABLE

22    CHILDREN.

23          AND WE ARE NOT SURE EVEN WHETHER THE GOVERNMENT IS

24    REPRESENTING THAT THEY HAVE ACTUALLY MATCHED EVERY PARENT AND

25    CHILD OF THAT AGE, BECAUSE THEY ARE TALKING ABOUT 49 OF THE

PARENTS, 40 OF WHOM ARE IN DHS CUSTODY AND NINE OF WHOM ARE IN U.S. MARSHAL CUSTODY.  BUT IT IS NOT CLEAR WHETHER THE OTHER 52 PARENTS AND CHILDREN HAVE BEEN MATCHED OR WHETHER THEY JUST HAVE CHILDREN UNDER FIVE WHO THEY DON'T EVEN KNOW WHO THE PARENT IS.

SO I WOULD MAYBE STEP ASIDE FOR A SECOND JUST IF THE GOVERNMENT WANTED TO ADDRESS THAT SPECIFIC POINT, AND I HAD A FEW OTHER THINGS.

**THE COURT:**  YES.

MS. FABIAN.

**MS. FABIAN:**  YOUR HONOR, I APOLOGIZE IF THIS WASN'T CLEAR.  IN PART I THINK IT IS NOT -- IT IS NOT SIMPLE MATH AND SO -- AND AS I SAID IT IS SORT OF AN ISSUE -- A NUMBER IN FLUX.  AND SO I AM TRYING TO AVOID GIVING SPECIFIC NUMBERS BUT TO GIVE SORT OF AN OVERVIEW.

WHEN I SAY THAT THE CHILDREN AND THE PARENTS HAVE BEEN IN COMMUNICATION, THAT IS FOR PARENTS WHO ARE IN THE CUSTODY OF THE GOVERNMENT AND CHILDREN IN THE CUSTODY OF THE GOVERNMENT.  I CAN'T REPRESENT, AND I DON'T THINK THERE IS ANY WAY THAT I COULD, THAT IF THERE ARE CHILDREN IN O.R.R. CUSTODY WHERE THE GOVERNMENT IS NOT AWARE OF WHERE THE PARENT IS THAT WE COULD FACILITATE COMMUNICATION.  I DON'T THINK -- I JUST COULD NEVER REPRESENT THAT.

SO THERE -- WHEN WE SAY WE HAVE FACILITATED, WHAT IS POSSIBLE FOR THE INDIVIDUALS IN GOVERNMENT CUSTODY, SO THAT'S

1    THE COMMITMENT THAT I AM MAKING ON THAT POINT.

2              **THE COURT:**  AND THAT'S 49?

3              **MS. FABIAN:**  FOR THE UNDER-FIVES IT IS -- I BELIEVE

4    IT IS 46.

5              ICE HAS DOCUMENTED THAT IN -- WHEN THE PARENT IN ICE

6    CUSTODY COMMUNICATES WITH THE CHILD ICE IS MAKING A NOTE OF

7    THAT IN THEIR SYSTEM OF RECORD.  SO IT IS -- THAT CAN BE -- WE

8    CAN GO BACK AND LOOK AT THAT.

9              BUT -- SO WHAT I AM SAYING THE WAY IT IS PUT IN THE

10   SYSTEM OF RECORD IS NOT IN ANY SORT OF AGGREGATABLE FORM SO WE

11   CAN'T JUST RUN IT ALL, BUT FOR THE UNDER-FIVES THEY HAVE GONE

12   AND LOOKED AND CONFIRMED THAT FOR PARENTS IN ICE CUSTODY WITH

13   CHILDREN UNDER FIVE THAT COMMUNICATION HAS BEEN MADE IN THOSE

14   CASES.

15             **THE COURT:**  WHAT ABOUT CHILDREN IN CBP OR PARENTS IN

16   CBP CUSTODY?  THERE HAS BEEN INFORMATION, I THINK AS EARLY AS

17   THIS MORNING, THAT THERE ARE PARENTS WHO HAVE BEEN SEPARATED

18   AND THE GOVERNMENT DOESN'T KNOW WHERE THEY ARE BECAUSE CBP

19   DOESN'T HAVE THE INFORMATION.  SO YOU HAVE A CHILD IN O.R.R.

20   AND YOU HAVE A PARENT IN CBP AND NO WAY TO CONNECT THE TWO.

21             **MS. FABIAN:**  YOUR HONOR, I THINK THAT THAT

22   INFORMATION THAT HAS BEEN RECEIVED BY THE MEDIA MAY HAVE BEEN

23   MISUNDERSTOOD.  BUT I THINK THAT WHAT THE COURT IS REFERRING

24   TO, IF IT IS THIS MORNING'S NEW YORK TIMES ARTICLE, IS

25   MISLEADING.

```
 1            FIRST OF ALL LET ME EXPLAIN.  CBP CUSTODY, I THINK

 2    THAT WITH EVERYTHING THAT FOLKS HAVE HEARD IT CAN -- IF YOU

 3    DON'T WORK IN THIS BUSINESS IT CAN BE HARD TO KEEP IT

 4    STRAIGHT.

 5            CBP CUSTODY IS SHORT-TERM.  IT IS UPON INITIAL

 6    ARRIVAL.  NO ONE IS DETAINED, AS THE WORD IS UNDERSTOOD IN

 7    SORT OF MORE DETENTION -- DETENTION BUSINESS.  DETENTION IS

 8    LONG-TERM, CBP IS -- IT IS A CUSTODY DURING PROCESSING.  SO

 9    YOU ARE NOT GOING TO HAVE A SITUATION WHERE A PARENT WOULD BE

10    HELD FOR ANY LENGTH OF TIME IN CBP CUSTODY WITHOUT THE CHILD.

11            CBP LIKELY WOULD BE WHERE THE SEPARATION WOULD

12    PHYSICALLY OCCUR, AND THAT IS THAT THE PARENT -- IN THE

13    SITUATIONS WE ARE FREQUENTLY TALKING ABOUT TODAY, IT IS THAT

14    THE PARENT WOULD GO INTO THE MARSHAL'S SERVICE CUSTODY OUT OF

15    CBP AND THE CHILD WOULD GO TO HHS CUSTODY OUT OF CBP.

16            THE PARENT THEN MIGHT RETURN TO CBP TO BE

17    TRANSFERRED TO ICE.  BUT CBP'S FUNCTION IS PROCESSING AND

18    TRANSFER ON TO THE NEXT LOCATION.  SO THE NUMBER THAT YOU ARE

19    --

20            THE COURT:  ARE YOU SAYING THAT THIS HAS NOT

21    OCCURRED, SO THAT WE DON'T HAVE A SITUATION WHERE CBP HAS THE

22    PARENT, THE CHILD IS IN O.R.R., AND THE GOVERNMENT IS NOT ABLE

23    TO DETERMINE WHERE THE PARENT IS BECAUSE CBP EITHER DID NOT

24    TAKE THE INFORMATION OR DESTROYED THE INFORMATION?

25            MS. FABIAN:  THE NUMBER -- THE NEWS REPORT THAT YOUR
```

1   HONOR IS REFERENCING IS, I BELIEVE, REFERENCING THE SYSTEM OF

2   RECORD THAT IS USED BY DHS.  AND THAT IS THAT WHEN A FAMILY

3   UNIT IS ENCOUNTERED BY DHS, IN CBP, MOST LIKELY, THEY ARE

4   GOING TO BE FLAGGED IN OR LOGGED INTO THE SYSTEM AS A FAMILY

5   UNIT.

6           AND THEN IF THE FAMILY IS THEN SEPARATED BECAUSE THE

7   CHILD IS TRANSFERRED TO O.R.R. CUSTODY AND THE PARENT REMAINS

8   WITH ICE OR GOES ELSEWHERE, THAT SYSTEM OF RECORD WILL BE

9   UPDATED TO REFLECT THAT YOU NOW HAVE A PARENT AND A CHILD.

10          INFORMATION ISN'T LOST FROM THE SYSTEM IT -- ANY

11  CHANGE TO THAT DESIGNATION IS -- AND I AM NOT A COMPUTER

12  PERSON SO I AM PROBABLY NOT USING THE RIGHT WORDS FOR THIS,

13  BUT IT IS LOGGED IN THE HISTORY OF THE SYSTEM.

14          SO ONE WAY TO TELL THAT AN INDIVIDUAL IS A MEMBER OF

15  A FAMILY GROUP THAT HAS BEEN SEPARATED IS THAT YOU WOULD LOOK

16  AT THAT CHANGE IN THEIR DESIGNATION.

17          SO AS -- I BELIEVE THAT THAT WAS MISUNDERSTOOD TO BE

18  THAT CBP LOST RECORDS.  IF IT IS SOMETHING ELSE THEN I -- YOU

19  KNOW, I DON'T WANT TO MISLEAD THE COURT, I DON'T KNOW THAT.

20  BUT THAT IS -- CBP RECORDS INDIVIDUALS AS A FAMILY GROUP AND

21  THEN WILL -- IF THE SEPARATION OCCURS THEY WILL REDESIGNATE

22  THEM AS AN INDIVIDUAL.  AND THAT IS WHAT ALLOWS THEM TO MOVE

23  TO THEIR NEXT LOCATION.  IT IS ACTUALLY A SYSTEM THAT ENSURES

24  THAT THEY ARE PROPERLY HANDLED IN THE -- THROUGH THE SYSTEM.

25          **THE COURT:**  AS I UNDERSTAND THE GOVERNMENT'S

1   REPRESENTATION IT IS THAT IF PARENT IS IN GOVERNMENT CUSTODY,

2   EITHER WITH ICE OR CBP OR SOME OTHER AGENCY, YOU ARE ABLE TO

3   REUNIFY THEM WITH THEIR CHILD.  THE TIMING MIGHT BE AN ISSUE

4   BUT YOU ARE ABLE -- YOU KNOW WHERE THEY ARE AND YOU ARE ABLE

5   TO REUNIFY THEM.

6           THE ONES THAT YOU ARE NOT ABLE TO REUNIFY AT THIS

7   POINT ARE THE PARENTS WHO ARE RELEASED FROM DETENTION OR

8   CUSTODY AND YOU HAVEN'T BEEN ABLE TO LOCATE THEM.  IS THAT

9   FAIR?

10          **MS. FABIAN:**  I WOULDN'T SAY NOT IN THAT IT COULD

11  NEVER HAPPEN, I WOULD SAY, BUT I THINK THAT IS CORRECT IN THAT

12  WE CERTAINLY CAN'T WHILE WE DON'T KNOW WHERE THE PARENT IS AND

13  IT WOULD BE A LONGER PROCESS.

14          **THE COURT:**  BUT THOSE PARENTS THAT ARE IN DETENTION

15  OR CUSTODY WITH SOME GOVERNMENTAL AGENCY, YOU KNOW WHERE THEY

16  ARE AND YOU CAN REUNITE THEM WITH THEIR CHILD.

17          **MS. FABIAN:**  YES.  AND I WOULD SAY SORT OF FOR

18  PURPOSES HERE, BECAUSE I DON'T -- I DON'T WANT TO COMMIT.  WE

19  HAVE -- I MEAN, CBP IS -- A PARENT IN CBP CUSTODY IS GOING TO,

20  AS QUICKLY AS POSSIBLE, BE MOVING INTO ICE CUSTODY.  THAT IS

21  THE FUNCTION OF CBP AND -- TO MOVE FOLKS OUT TO THE NEXT

22  LOCATION.

23          SO THEN FOR OUR PURPOSES WE ARE TALKING ABOUT IF A

24  PARENT IS IN ICE CUSTODY AND A CHILD IS IN THE CUSTODY OF

25  O.R.R., THOSE REUNIFICATIONS ARE THE -- SORT OF THE MOST

 1   STRAIGHTFORWARD THAT WE HAVE.

 2          BECAUSE WE ARE TALKING ABOUT A LOT OF ISSUES, I

 3   DON'T WANT TO SAY THERE IS NEVER GOING TO BE ANOTHER SITUATION

 4   THAT COULD ARISE, BUT WHAT -- THOSE ARE THE STRAIGHTFORWARD

 5   CASE AND THOSE ARE THE ONES THAT -- WHERE THE ISSUES THAT WE

 6   ARE IDENTIFYING AS THE MOST PRESSING NEED DO NOT ARISE.

 7          **THE COURT:**  ALL RIGHT.

 8          MR. GELERNT.

 9          **MR. GALERNT:**  YES, YOUR HONOR.  SO IF I AM

10   UNDERSTANDING THE GOVERNMENT CORRECTLY THERE -- I WILL JUST

11   START WITH THE 49 THAT APPEAR TO BE IN SOME TYPE OF CUSTODY.

12          OUR UNDERSTANDING FROM PEOPLE, ADVOCATES WHO FOLLOW

13   THIS, THAT THE CBP RECORDS HAVE BEEN DESTROYED AND NOT

14   TRANSFERRED, BUT I AM GOING TO PUT THAT ASIDE FOR THE MOMENT.

15          THOSE 49 CHILDREN UNDER FIVE, I AM ASSUMING THE

16   GOVERNMENT IS GOING TO REPRESENT THAT THEY CAN BE REUNITED BY

17   YOUR DEADLINE.  49 CHILDREN IS NOTHING.

18          AND, YOU KNOW, I WANTED TO SAY THAT THIS IS ONE OF

19   THOSE SITUATIONS WHERE THERE CAN BE AN ENORMOUS PUBLIC/PRIVATE

20   EFFORT.  I MEAN THE WHOLE COUNTRY IS FOCUSED ON IT.  THERE ARE

21   SO MANY PRIVATE COMPANIES THAT ARE WILLING TO PROVIDE WHATEVER

22   RESOURCES ARE NEEDED, TRANSPORTATION, HOTELS.  49 KIDS IS

23   NOTHING.  SO I AM HOPING THE GOVERNMENT IS GOING TO SAY BY

24   WEDNESDAY THOSE 49 ARE GOING TO BE IN THEIR PARENT'S ARMS.

25          BUT I WANT TO FOCUS ON THE 52, BECAUSE I AM NOT SURE

1    I CAN SORT OF PUT IT BETTER THAN YOUR HONOR DID, THAT IT IS
2    STARTLING THAT THE RECORDKEEPING IS NOT THERE.

3            I DON'T UNDERSTAND WHY THEY DON'T KNOW WHERE THE
4    PARENT IS.  WHEN THEY RELEASE A PARENT THEY DON'T JUST WALK --
5    LET THEM WALK OUT THE DOOR WITH NO RECORDS.  I MEAN, THE
6    GOVERNMENT'S WHOLE POINT IS, WE WANT TO KEEP TRACK OF THEM SO
7    THEY APPEAR FOR THEIR ASYLUM HEARING.

8            SO THERE MUST BE ADDRESSES.  AND IF THE GOVERNMENT
9    IS HAVING TROUBLE TRACKING DOWN THE PARENT THEN PRIVATE GROUPS
10   AND THE ADVOCATES WILL DO IT WITH HELP ON THE CHILD'S SIDE.

11           AND I THINK THAT GOES TO THE RELATED POINT.  WE HAVE
12   ASKED THE GOVERNMENT FOR A LIST OF ALL -- SO THAT WE CAN THEN
13   GET PRIVATE LAWYERS TO SEE ALL, WHATEVER IT IS, 3,000, 2500,
14   ALL PARENTS.  WE HAVE THOUSANDS OF INDIVIDUAL PRIVATE LAWYERS
15   WHO ARE READY TO SEE EACH PARENT.  TO DESCRIBE THEIR CHILD,
16   SAY WHERE THEY ARE FROM, SO WE CAN GO FIND THE CHILDREN.

17           AND IF THE 52 PARENTS ARE FOR SOME REASON NOT BEING
18   ABLE TO BE TRACKED BY THE PARENT WE WILL TRACK THEM, BUT WE
19   NEED THE LIST.

20           MS. FABIAN HAS REPRESENTED THAT WE ARE GOING TO GET
21   A LIST OF EVERYONE, SHE NEEDS -- BUT WE HAVEN'T GOT THAT YET.
22   I MEAN, WE ARE HOPING WE CAN GET THAT TODAY SO WE CAN GET THE
23   PRIVATE BAR INVOLVED.

24           THERE ALSO HASN'T BEEN NOTICE TO THE CLASS.  WE HAVE
25   SENT HER A DRAFT NOTICE SO PEOPLE UNDERSTAND THEIR RIGHTS.

1        BUT I DON'T WANT TO MOVE OFF THESE TENDER-AGE KIDS

2   UNTIL WE SORT OF CAN COME TO SOME AGREEMENT ABOUT WHAT IS

3   GOING ON.  BECAUSE IT IS NOT THAT MANY KIDS.  YOUR HONOR GAVE

4   THEM A FAIR AMOUNT OF TIME.  AS YOUR HONOR KNOWS, WE ASKED FOR

5   TEN DAYS, YOU UNDERSTANDABLY DECIDED TWO WEEKS WOULD BE MORE

6   REASONABLE, GAVE THEM TWO WEEKS.

7        101 KIDS, I REALLY FEEL LIKE WE SHOULD NOT LEAVE THE

8   COURT UNTIL WE AND THE GOVERNMENT CAN REACH SOME CONCLUSION

9   ABOUT HOW WE ARE GOING TO DEAL WITH THE KIDS, BECAUSE WE WILL

10  GET AS MANY LAWYERS AS NECESSARY TO TRACK THOSE FAMILIES DOWN.

11       THERE MUST BE DATA ON THOSE PARENTS WHERE THEY WENT

12  TO AND A WAY TO REACH THEM.  I JUST DON'T UNDERSTAND THAT THE

13  GOVERNMENT WOULD TAKE THE CHILD AWAY, LET THE PARENT WALK WITH

14  NO WAY TO REACH THE PARENT.  AND A PRE-VERBAL CHILD IS

15  OBVIOUSLY IS NOT GOING TO EXPLAIN WHERE MY PARENT IS.

16       SO IF THE GOVERNMENT WANTS TO STAND UP NOW, BEFORE I

17  MOVE TO OTHER POINTS, AND TALK ABOUT WHETHER THEY ARE GOING TO

18  GIVE US A LIST, BUT ALSO PRECISELY WHAT IS GOING TO HAPPEN TO

19  THESE 101 KIDS, I WOULD WELCOME THAT.

20       **MS. FABIAN:**  AND I APOLOGIZE, YOUR HONOR.  I AM NOT

21  TRYING TO HIDE THE BALL HERE ON THESE NUMBERS.  I AM TRYING TO

22  TALK ABOUT IT IN TERMS OF ISSUES, BECAUSE WE ARE TALKING ABOUT

23  THE SMALLER SORT OF STAGE ONE, AND THERE IS ANOTHER STAGE

24  COMING DOWN.  AND TO FACILITATE THESE REUNIFICATIONS WE WANT

25  TO DEAL WITH THESE ISSUES THAT WILL ALLOW US TO FIGURE OUT HOW

1  TO DO THIS AS QUICKLY AS POSSIBLE.  SO IF I AM GETTING

2  DISTRACTED WITH THE ISSUES THAT WE ARE TRYING TO DEAL WITH IT

3  IS NOT BECAUSE I AM TRYING TO AVOID GIVING YOUR HONOR THE

4  INFORMATION.

5          OF THE 100 -- APPROXIMATELY 100 INDIVIDUALS, IT IS

6  46 NOT 49 WHO ARE IN ICE CUSTODY, I BELIEVE.  AND SO THERE ARE

7  86 PARENTS THAT HAVE BEEN MAPPED TO -- HAVE BEEN MAPPED TO 83

8  OF THE CHILDREN.  OF THESE THOSE 86 PARENTS YOU HAVE -- YOU

9  HAVE 46 IN ICE CUSTODY, 19 WHO WE UNDERSTAND HAVE BEEN REMOVED

10 FROM THE COUNTRY.  19 WHO WERE RELEASED FROM ICE CUSTODY.  TWO

11 OF THOSE 86 THEN HAVE BEEN DETERMINED TO HAVE A CRIMINAL

12 HISTORY THAT WOULD MAKE THEM UNFIT OR A DANGER, AND THAT IS

13 CRIMINAL CONVICTIONS RELATING TO CHILD CRUELTY AND KIDNAPPING

14 OR RAPE.  AS WE UNDERSTAND TODAY -- AND AS THIS IS DEVELOPING

15 THAT MAY DROP THEM OUT OF THE CLASS.

16         SO THAT IS WHY I SAY THAT THESE NUMBERS ARE IN FLUX

17 BECAUSE WHAT STARTS OUT AS A CLASS MEMBER SITUATION MIGHT

18 LATER JUST BE RESOLVED BY NOT FALLING WITHIN THE CLASS RATHER

19 THAN BY CONSIDERING THE REUNIFICATION OPTION.

20         **MR. GALERNT:**  SO I AM SORRY, YOUR HONOR.

21         COULD YOU STATE THOSE NUMBERS AGAIN?  YOU HAD THEM

22 AT 19, IF YOU COULD.

23         **MS. FABIAN:**  19.

24         **MR. GALERNT:**  THE 80'S.

25         I AM SORRY, YOUR HONOR.

 1          **THE COURT:**  THAT'S OKAY.  I WOULD LIKE THAT

 2    CLARIFICATION, TOO.

 3               IF YOU COULD RUN THROUGH THOSE NUMBERS.

 4          **MR. GALERNT:**  IF YOU COULD START FROM THE BEGINNING.

 5          **MS. FABIAN:**  WE ARE TALKING -- WE ARE -- 83 MINORS

 6    WHO HAVE BEEN MAPPED TO 86 PARENTS.  AND 16 MINORS WHO HAVE

 7    NOT BEEN MAPPED TO PARENTS, SO WE CAN'T CONFIRM THAT -- THOSE

 8    ARE THE SITUATIONS WHERE I MENTIONED WHERE PERHAPS THE MINOR

 9    HAS REPORTED A SEPARATION BUT IT MAY BE THAT WHEN WE DRILL

10    DOWN -- THIS IS WHY WE HAVE ICE AND O.R.R. IN ROOMS TOGETHER

11    DRILLING THROUGH THESE NUMBERS.  SO IT MAY BE THAT SOME OF

12    THOSE GO INTO THE CLASS, SOME DON'T.

13               I DON'T HAVE IT WRITTEN DOWN.  I KNOW THERE WAS SOME

14    NUMBER THAT WERE -- AT ONE POINT WERE -- REMAINED IN MARSHAL

15    SERVICE CUSTODY.  I DON'T HAVE THAT NUMBER FOR YOU, IF THAT IS

16    PART OF THIS.  46 ARE IN ICE CUSTODY.  19 HAVE BEEN REMOVED

17    FROM THE COUNTRY.  AND 19 WERE RELEASED FROM CUSTODY.

18               AND I AM NOT SURE IF THAT MATH ADDS UP WITHOUT MY

19    PHONE.

20          **THE COURT:**  AND THE CLASS DEFINITION WOULD NOT

21    INCLUDE THOSE THAT ARE REMOVED, BECAUSE IT ASSUMES THE

22    DEFINITION IS THAT THEY ARE WITHIN ICE DETENTION.

23          **MS. FABIAN:**  THAT'S -- THAT HAS BEEN -- AND THAT IS

24    ONE OF THE ISSUES WE RAISED FOR THE COURT.  WE DID NOT

25    UNDERSTAND THE ORDER TO BE REFERRING TO PARENTS WHO WERE

```
 1   REMOVED BECAUSE THAT WAS NOT A SITUATION FOR THE NAMED

 2   PLAINTIFFS, IT IS NOT SOMETHING THAT WAS DISCUSSED IN THE

 3   ORDER.  SO WE WOULD CONSIDER THOSE OUTSIDE OF THE CLASS

 4   DEFINITION.

 5           THE COURT:  YES.  THE CLASS DEFINITION HAS BEEN SET,

 6   I JUST SIMPLY INVITED PLAINTIFFS' COUNSEL, IF THEY WANTED TO,

 7   MOVE TO MODIFY THE SCOPE OF THE CLASS THEY COULD, BUT GIVEN

 8   THE URGENCY THE CLASS DEFINITION WAS SET.  AND I THINK SOME OF

 9   THESE ANSWERS OR QUESTIONS THAT YOU HAVE CAN BE ANSWERED BY

10   LOOKING AT THE SCOPE OF THE CLASS AS PRESENTLY DEFINED.

11           MR. GALERNT:  YOUR HONOR, IF I COULD JUST SPEAK TO

12   THAT CLASS DEFINITION POINT.

13           THE COURT:  YES.

14           MR. GALERNT:  WE UNDERSTOOD YOUR CLASS DEFINITION,

15   BECAUSE IT SAYS WHO HAVE BEEN IN DHS CUSTODY, TO COVER PEOPLE

16   WHO HAVE BEEN REMOVED.  AND I THINK IN SOME WAYS THOSE ARE THE

17   MOST ACUTE SITUATIONS, THE MOST HORRIBLE SITUATIONS, BECAUSE

18   THEN YOU HAVE A PARENT FAR AWAY WONDERING, WHERE IS MY CHILD?

19   AM I EVER -- YOU KNOW, WHAT IS HAPPENING TO MY CHILD IN A

20   FOREIGN COUNTRY?

21           SO WE DID NOT UNDERSTAND THAT.  AND IN TERMS OF

22   CLARIFICATION I THINK YOU WERE VERY PRECISE IN SAYING HAVE

23   BEEN, ARE, OR WILL BE IN DHS CUSTODY.

24           THE COURT:  YES.  AND YOU ARE CORRECT, AND I

25   APPRECIATE THAT.
```

1      THAT TERMINOLOGY WAS ADDED IN LIGHT OF THE BRIEFING

2  THAT CAME IN, I THINK ON THE MONDAY MORNING BEFORE THE

3  PRELIMINARY INJUNCTION ISSUED.

4      SO WHAT WOULD BE YOUR POSITION, THEN, FOR PARENTS

5  WHO HAVE BEEN REMOVED?  THEY OBVIOUSLY WERE OR HAD BEEN IN ICE

6  DETENTION, WHAT IS YOUR POSITION WITH RESPECT TO THAT?

7      **MR. GALERNT:**  WE DEFINITELY BELIEVE THEY ARE WITHIN

8  THE CLASS AND BE REUNITED.  I MEAN, WE WOULD BE WILLING TO

9  TALK TO THE GOVERNMENT AND TALK ABOUT EACH OF THE 19 CASES IF

10  THEY SAID, WELL, LOOK, WE NEED A LITTLE BIT MORE TIME ON

11  PARTICULAR CASES.

12      AND WE WOULD BE HAPPY TO FACILITATE AND -- BECAUSE

13  WE HAVE PEOPLE IN CENTRAL AMERICA AND OTHER PLACES READY TO

14  BRING THE PARENT.  SO WE WOULD LIKE TO WORK WITH THE

15  GOVERNMENT.

16      I MEAN, I THINK THE 19 CAN GET -- ASSUMING THEY ARE

17  NOT BY THIS WEDNESDAY -- EVEN IF THEY ARE BY THIS WEDNESDAY,

18  BUT THAT THAT CAN BE DONE.

19      YOU GAVE A LONG DEADLINE, AND WE CERTAINLY ARE

20  PREPARED TO HELP THE GOVERNMENT LOCATE THOSE PARENTS AND DO

21  THE REUNIFICATION.  BUT I THINK THOSE PARENTS ARE PROBABLY IN

22  MORE DIRE STRAITS, MORE WORRIED ABOUT THEIR CHILDREN THAN

23  OTHER PARENTS, EVEN.

24      **THE COURT:**  WHAT ABOUT THE TIME FRAME, BECAUSE

25  JULY 10 IS TUESDAY.

1           **MR. GALERNT:**  RIGHT.

2           **THE COURT:**  SEEMS THAT WITH PARENTS THAT HAVE

3    ALREADY BEEN REMOVED THERE NEEDS TO BE SOME RELAXATION OF

4    THAT.

5           **MR. GALERNT:**  RIGHT.  YOU KNOW, I THINK THERE

6    PROBABLY DOES, BUT MAYBE NOT.  I DON'T KNOW WHETHER THE

7    GOVERNMENT IS REPRESENTING OR WHETHER THE GOVERNMENT KNOWS

8    WHETHER ANY OF THE 100 CHILDREN WHO ARE UNDER FIVE HAVE

9    PARENTS REMOVED.  I GUESS THEY ARE SAYING THAT 19 OF THEM HAVE

10   BEEN REMOVED.

11          IS THAT RIGHT, SARAH?

12          **MS. FABIAN:**  THAT'S CORRECT.

13          **MR. GALERNT:**  OKAY.

14          I THINK WHAT WE WOULD WANT TO DO -- AND THIS GOES TO

15   BACK TO HAVING A LIST OF THE INDIVIDUALS -- IS IF THE

16   GOVERNMENT CAME TO US AND SAID, THESE ARE THE 19, DO YOU KNOW

17   WHERE THESE PARENTS ARE?  CAN YOU -- I THINK IT PROBABLY CAN

18   GET DONE BY TUESDAY.

19          BUT WE WOULD BE WILLING TO TALK TO THE GOVERNMENT

20   ABOUT SOME RELAXATION AS LONG AS IT KEPT THAT AMOUNT OF

21   URGENCY AND THE GOVERNMENT WOULD WORK WITH US.  BECAUSE TO THE

22   EXTENT THE GOVERNMENT IS HAVING TROUBLE FINDING THE PARENT, WE

23   COULD PROBABLY ASSIST IN THAT.

24          **THE COURT:**  WHAT WOULD MAKE SENSE IS FOR THE

25   GOVERNMENT TO PROVIDE A LIST AND TO PUT IN WRITING THE STATUS

1   OF EACH OF THESE 101, MEET AND CONFER WITH PLAINTIFFS'

2   COUNSEL, AND REPORT BACK TO THE COURT MONDAY MORNING.

3          THE INJUNCTIVE RELIEF IS NECESSARILY BROAD BECAUSE

4   THERE ARE MANY NUANCED ISSUES THAT THE COURT CAN'T POSSIBLY

5   ADDRESS.  MUCH OF THIS ASSUMES GOOD FAITH ON THE PART OF THE

6   GOVERNMENT, THE CLASS DEFINITION, AND THEN COMMUNICATION.

7          SO IT MAKES PERFECT SENSE TO ME THAT THE GOVERNMENT

8   WOULD IDENTIFY, BY LIST, THESE 101, GIVE THE STATUS.  AND THEN

9   WE CAN HAVE A MORE INTELLIGENT CONVERSATION MONDAY MORNING

10  ABOUT WHICH CHILDREN WILL BE REUNITED BY JULY 10, WHICH WILL

11  NOT.  AND THEN THE COURT CAN DETERMINE WHETHER IT -- IT WOULD

12  MAKE SENSE TO RELAX THE DEADLINE AS FAR AS REUNIFICATION.  BUT

13  I WOULD NEED MORE INFORMATION.

14          **MS. FABIAN:**  YOUR HONOR, THE ISSUE I WOULD TAKE WITH

15  THAT -- AND I UNDERSTAND YOUR HONOR, AND WE HAVE PUT FORWARD

16  OR -- TO SOME EXTENT THIS 101 NUMBER.  BUT WHAT WE ARE DOING

17  THEN IS DEFINING THE CLASS NOT BY VIRTUE OF THE CLASS MEMBERS.

18  I MEAN, THE 101 NUMBER IS BASED ON O.R.R., HHS SORT OF GOING

19  OVER AND ABOVE TO IDENTIFY ALL CHILDREN WHOSE PARENTS MIGHT BE

20  CLASS MEMBERS.  SO I THINK --

21          **THE COURT:**  I THINK THAT IS A GOOD THING.

22          **MS. FABIAN:**  I AGREE.  AND I WOULD SAY THAT THAT IS,

23  I HOPE, AN INDICATOR OF THE GOVERNMENT'S EFFORTS TO BE WORKING

24  IN GOOD FAITH.

25          BUT WHAT YOUR HONOR I THINK RECOGNIZES IS THAT THESE

1  ARE THEN A VARIETY OF SITUATIONS THAT WE ARE COMING ACROSS.

2  AND I UNDERSTAND THE COURT'S GOAL WAS TO CERTIFY A CLASS AND

3  ISSUE IMMEDIATE INJUNCTIVE RELIEF THAT WOULD REALLY GET TO

4  SOME REALLY CORE GROUP OF WHAT THE COURT IDENTIFIED.  AND THAT

5  IS THE FOCUS AND THOSE ARE THE ONES, REALLY, WITH SORT OF

6  LEVELS OF -- I DON'T WANT TO SAY SPEED BUT WITH LEVELS OF

7  SUCCESS THAT WE CAN ACHIEVE, REALLY.

8        AND WHEN YOU START TALKING ABOUT INDIVIDUALS WHO

9  HAVE BEEN REMOVED, YOU REALLY ARE GETTING INTO INDIVIDUALS NOT

10  REPRESENTED BY THE NAMED CLASS MEMBERS.  INDIVIDUALS FOR

11  WHOM -- I MEAN IT IS NOT -- THIS IS NOT -- WHEN I SAY IT WOULD

12  TAKE TIME, ICE DOES NOT HAVE THE ABILITY TO GO INTO THESE

13  COUNTRIES.

14        I UNDERSTAND THE OFFER FOR PRIVATE MEMBERS OF THE

15  BAR, BUT YOU ARE REALLY GETTING OUTSIDE OF WHAT INJUNCTIVE

16  RELIEF IN A PRELIMINARY BASIS TO A DEFINED CLASS THAT THE

17  GOVERNMENT NEEDS TO BE ABLE TO IDENTIFY, REALLY.  I MEAN, IT

18  IS -- WE ARE ACTING IN GOOD FAITH ON THE CRIMINAL HISTORY.  I

19  THINK IT IS STILL DIFFICULT.  EITHER ALL CRIMINAL HISTORY IS

20  EXCLUDED, OR IF IT STARTS TO GET INTO AN EVALUATION MADE BY

21  ICE YOU REALLY GET OUTSIDE OF THE IDEA OF CLASS RELIEF BECAUSE

22  YOU NEED TO HAVE AN IDENTIFIABLE CLASS THAT ICE CAN LOOK AT

23  SOMEONE AND SAY WE KNOW YOU ARE IN THIS CLASS, OR NOT.

24        AND HAVING THE MORE REALLY DISCERNIBLE, IDENTIFIABLE

25  MARKERS WE HAVE THERE, THE FASTER WE CAN MOVE FOR THOSE PEOPLE

1    WHO CAN BE READILY IDENTIFIED.

2             AND WHAT I AM -- THE COURT HAS INVITED PLAINTIFFS TO

3    ASK FOR SEPARATE RELIEF FOR THESE OTHER BUCKETS, AND I THINK

4    THAT IS -- IF THE COURT IS CONSIDERING THAT RELIEF IS

5    NECESSARY I THINK THAT REALLY HAS TO BE THE WAY TO APPROACH

6    IT, BECAUSE EFFORTS MADE TO -- THE MORE WE ARE DRILLING DOWN

7    INTO THESE SORT OF SEPARATE SITUATIONS THE MORE IT IS HARD TO

8    KEEP THE FOCUS ON A DISCERNIBLE SET THAT IS WHAT THE COURT

9    INTENDED TO GRANT RELIEF ON THIS EXPEDITED PRELIMINARY BASIS.

10   AND SO THAT IS WHY WE ARE COMING FOR THIS CLARIFICATION.

11            I DON'T WANT TO GET AWAY FROM THE QUESTION OF THE

12   PROCEDURES UNDER THE TVPRA.  I KNOW WE HAVE GOTTEN INTO SOME

13   OTHER THINGS.  SO I RESERVE TIME BEFORE WE LEAVE TODAY TO MAKE

14   SURE I CAN SAY A LITTLE MORE ON THAT SUBJECT.

15            I WANT TO FIRST -- SINCE WE ARE TALKING ABOUT THE

16   CLASS DEFINITION, I WANT TO MAKE SURE THAT WE ARE NOT ARGUING

17   HERE TODAY WHETHER RELIEF MIGHT OR SHOULD BE AVAILABLE TO

18   THOSE INDIVIDUALS, I THINK THAT IS SOMETHING THAT SHOULD BE

19   BRIEFED.  AND I THINK IT SHOULD BE DEALT WITH IN A SEPARATE

20   ORDER SO THAT WE DON'T TAKE AWAY FROM GIVING THE GOVERNMENT AN

21   IDENTIFIABLE CLASS TO DEAL WITH HERE TODAY.  AND THE MORE WE

22   TAKE AWAY FROM THAT, I THINK, THE MORE WE TAKE AWAY FROM THE

23   ABILITY TO COMPLY, TO THE BEST OF OUR ABILITY, WITH WHAT IS

24   ORDERED TODAY.

25            **THE COURT:**  MR. GELERNT.

1      **MR. GALERNT:**  YOUR HONOR, I WOULD JUST SAY WITH THE

2  100 KIDS UNDER FIVE, OR 101 KIDS, I AM NOT SURE I UNDERSTAND

3  THE GOVERNMENT'S POSITION THAT THERE IS NOT SOME DISCERNIBLE

4  OBJECTIVE CRITERIA.  WE KNOW THE PARENTS WHO HAVE BEEN REMOVED

5  ARE PART OF THE CLASS.  WE HAVE JUST SAID THAT WE WILL WORK

6  WITH THEM IF THEY NEED MORE TIME.  CERTAINLY THE PARENTS WHO

7  ARE RELEASED FROM DETENTION ARE WITHIN THE CLASS.

8      SO I THINK YOUR HONOR'S SUGGESTION THAT THERE BE, BY

9  MONDAY MORNING, A LIST.  AND IF THE GOVERNMENT WANTS TO SAY,

10  LOOK, THESE FIVE ARE NOT GOING TO BE REUNITED, WE FOUND

11  CRIMINAL CONVICTIONS, THEN THAT COMES OUT OF YOUR CLASS

12  DEFINITION AND THAT IS -- WE SAY, OKAY, NOW WE UNDERSTAND

13  ABOUT THOSE FIVE.  WE BELIEVE IF THERE -- WE WOULD LIKE TO SEE

14  WHETHER THEY ARE SERIOUS CONVICTIONS AND TAKE THOSE UP

15  INDIVIDUALLY.

16      BUT WE, RIGHT NOW, ARE COMPLETELY IN THE DARK.  THE

17  GOVERNMENT HOLDS ALL OF THE INFORMATION.  THE 19 RELEASED

18  INDIVIDUALS, I MEAN, WE CERTAINLY CAN HELP THE GOVERNMENT TRY

19  AND TRACK IT DOWN.  BUT I JUST DON'T UNDERSTAND WHY YOUR

20  CRITERIA AND THE CLASS ARE NOT OBJECTIVE AND DISCERNIBLE.  I

21  THINK YOUR HONOR USED THOSE CRITERIA PRECISELY, AS YOUR HONOR

22  SAID IN THE OPINION, BECAUSE OF THAT.

23      SO I WOULD HOPE ON MONDAY MORNING WE COULD -- THE

24  GOVERNMENT IS GOING TO REUNITE EVERYONE THEY CAN REUNITE.  AND

25  BY MONDAY MORNING IF THEY THINK THERE IS INDIVIDUALS THEY

1   CAN'T REUNITE WE CAN DISCUSS THOSE.  AND WHETHER WE COME TO

2   YOU OR WHETHER YOU WANT TO HAVE THE MAGISTRATE DEAL WITH THAT

3   NITTY-GRITTY, I DON'T KNOW.  BUT I THINK THAT IS WHERE WE ARE.

4           THE OTHER THING I WOULD SAY, YOUR HONOR, JUST

5   RELATED TO THIS, IS I DON'T WANT US TO BE BACK HERE, AND I AM

6   SURE YOU DON'T, ON THE 25TH, THE DAY BEFORE THE 30-DAY, WITH

7   THE GOVERNMENT FILING SAYING, WE NEED THIS OR THAT.

8           WE HAVE ASKED THE COURT FOR A FULLER LIST, NOT JUST

9   UNDER-FIVE.  NOW, THAT DOESN'T HAVE TO BE DONE BY MONDAY

10  MORNING, OBVIOUSLY, BUT WE THINK IT SHOULD BE DONE FAIRLY

11  PROMPTLY THEREAFTER SO WE CAN ACTUALLY FIGURE OUT -- YOU KNOW,

12  WE CAN HELP YOU WITH THESE 400 PEOPLE.  WE KNOW WHERE THEY

13  ARE.  OR THESE INDIVIDUALS YOU ARE SAYING HAVE CRIMINAL

14  CONVICTIONS, OKAY, WE GET IT.  WE WILL HAVE TO TAKE THOSE UP

15  INDIVIDUALLY.  BUT I THINK ULTIMATELY THAT'S THE WAY IT NEEDS

16  TO GO.

17          I ALSO THINK THERE NEEDS TO BE NOTICE TO THE CLASS.

18  I TAKE IT THE GOVERNMENT IS LOOKING AT THE NOTICE AND IS GOING

19  TO GET BACK TO US, BUT THE GOVERNMENT HAS BEEN USING A FORM

20  NOW FOR REUNIFICATION WITH THE PARENTS, BUT IT IS DIRECTLY

21  LINKED TO REMOVAL.  AND IT IS BEING GIVEN TO PEOPLE WHO ARE

22  NOT CLOSE TO BEING REMOVED, ACCORDING TO PEOPLE ON THE GROUND.

23  AND SO IT IS VERY CONFUSING, AND IT DOESN'T SORT OF EXPLAIN

24  ALL OF THE RIGHTS.

25          SO WE ASK THAT THE GOVERNMENT GET BACK TO US ON OUR

1    PROPOSED NOTICE.  AND IF WE CAN'T AGREE WE SUBMIT IT TO YOU TO
2    SEE IF IT WORKS.
3            BUT WE DO BELIEVE THAT THERE IS SOME COERCION GOING
4    ON, WHETHER IT IS INTENDED OR NOT, WHERE PARENTS ARE NOT
5    UNDERSTANDING THEY DON'T HAVE TO WAIVE THEIR RIGHT TO CONTEST
6    REMOVAL OR GIVE UP THEIR ASYLUM CLAIM IN ORDER TO GET THEIR
7    CHILDREN BACK.
8            **THE COURT:**  ON THE LIST OF CHILDREN, CAN'T YOU
9    PROVIDE THAT INFORMATION, IF ORDERED, RIGHT AWAY?  YOU HAVE
10   THE NAMES, I ASSUME.
11           **MS. FABIAN:**  WE CAN, YOUR HONOR.  AGAIN, WHAT WE
12   HAVE DISCUSSED SO FAR AND I -- MY UNDERSTANDING IS THE
13   DISCUSSIONS HAVE NOT BEEN COMPLETED IN PART BECAUSE OF TRAVEL
14   AND OTHER THINGS.  BUT WE HAVE AGREED TO PROVIDE A LIST OF
15   CLASS MEMBERS.  THAT IS NOT AT ISSUE.  AND THEN THE -- WE CAN
16   CERTAINLY PROVIDE A LIST, IF ORDERED BY THE COURT.  WE ARE
17   STILL SORT OF DISCUSSING IN WHAT WAY THAT WOULD BE
18   APPROPRIATE.  BUT CERTAINLY UNDER A COURT ORDER WE CAN PROVIDE
19   WHAT WE HAVE AVAILABLE.
20           **THE COURT:**  A COURT ORDER SUBJECT TO A PROTECTIVE
21   ORDER PENDING FURTHER COURT ORDER, AND SOMETHING THAT COULD BE
22   DONE TODAY?
23           **MS. FABIAN:**  TODAY MIGHT BE TOUGH JUST BECAUSE WE
24   HAVE FOLKS HERE WHO WOULD NEED TO BE WORKING ON IT.  BUT
25   CERTAINLY BY MONDAY.

1    WHAT I -- AND I DON'T WANT TO -- I DON'T WANT TO

2  REPEAT MYSELF TOO MUCH.  BUT I GET -- I DO HAVE SOME CONCERNS

3  WITH IDENTIFYING THE CLASS WITH REGARD TO THE CHILDREN

4  IDENTIFIED BY O.R.R. ONCE -- IT IS TO THE GOVERNMENT TO

5  IDENTIFY CLASS MEMBERS, AND IN DOING THAT -- TO DO THAT THE

6  GOVERNMENT HAS MAYBE OVERLY-IDENTIFIED POTENTIAL CHILDREN TO

7  ASSIST IN MAKING SURE THAT THEY HAVEN'T MISSED OR THAT THEY

8  CAN LOCATE OR IDENTIFY THE CLASS MEMBERS THEMSELVES.

9    AND SO IT IS -- THE CHALLENGE WITH US FOR GIVING A

10  LIST THAT IS NOT TIED TO CLASS MEMBERSHIP IS THAT THEN WE ARE

11  SORT OF INVITING ARGUMENT ABOUT HOW THE GOVERNMENT -- HOW THE

12  GOVERNMENT IS GOING THROUGH THIS PROCESS OF USING THAT LIST

13  WHICH MAY NOT BE RELEVANT TO CLASS MEMBERSHIP TO GET TO THE --

14  TO GET TO THE IDENTIFICATION OF CLASS MEMBERS AND THEN REUNIFY

15  THEM.

16    SO OF THAT -- FOR EXAMPLE YOU SAY TO GIVE THE LIST

17  OF 101.  WE WOULD SAY THAT -- AND WHEN I HAVE THE NUMBER 19

18  REMOVED I DON'T KNOW -- I DON'T KNOW THE TIMING OF THAT.  BUT

19  WE WOULD SAY THAT FOR THOSE REMOVED PRIOR TO THE COURT'S ORDER

20  THAT WE WOULD -- DO NOT READ THOSE AS BEING MEMBERS OF THE

21  CLASS.  FOR THE -- INDIVIDUALS WITH CRIMINAL HISTORY WOULD NOT

22  BE MEMBERS OF THE CLASS.  SO IF YOU HAD THAT LIST OF CHILDREN

23  YOU WOULD HAVE CHILDREN WHO ARE NOT TIED TO ANY IDENTIFIED

24  CLASS MEMBER.

25    AND SO I WORRY THAT THAT GETS US INTO -- AWAY FROM

1    THE FOCUS OF WHAT FOLKS ARE CURRENTLY DOING WITH ICE AND

2    O.R.R. RIGHT NOW, WHICH IS DRILLING DOWN ON THOSE LISTS, AND

3    THEN REALLY INVITING MORE CONFUSION INTO THAT PROCESS.

4         WHAT -- THE REASON THAT WE ARE ASKING FOR

5    CLARIFICATION IS TO ASSIST US IN COMPLETING THIS

6    IDENTIFICATION PROCESS.  AND SO OF COURSE WE WOULD COMPLY WITH

7    ANY ORDER FROM THE COURT, BUT I JUST WANT TO SORT OF IDENTIFY

8    WHY WE WOULD THINK THAT THAT IS NOT A PRODUCTIVE WAY OF MOVING

9    FORWARD IN OUR PROCESS OF IDENTIFYING CLASS MEMBERS AND

10   FACILITATING REUNIFICATION.  THAT NUMBER DOES NOT NECESSARILY

11   MEAN THE TOTAL NUMBER WHO MUST BE REUNIFIED UNDER THE COURT'S

12   ORDER.

13        **THE COURT:**  A COUPLE OF OBSERVATIONS.

14        FIRST, THE IDEA OF BEING OVER-INCLUSIVE IS A GOOD

15   ONE.  PART OF THE INJUNCTIVE RELIEF IS TO PUT IN PLACE

16   REUNIFICATION FOR CLASS MEMBERS, BUT ALSO TO ESTABLISH A

17   PROCESS THAT CAN INCLUDE OTHERS AND GOING FORWARD IN THE

18   FUTURE WILL RESULT IN TRACKING AND PRODUCTION OF CHILDREN SO

19   THAT THEY CAN BE REUNIFIED WITH THEIR PARENTS AT THE

20   APPROPRIATE TIME.  SO BEING OVER-INCLUSIVE IS ENCOURAGED.

21        THE SPECIFIC INJUNCTION, HOWEVER, IS TIED TO THE

22   CLASS DEFINITION.  THE CLASS DEFINITION, IN MY VIEW, IS CLEAR.

23   IT SETS THE DEFINITION OF THE CLASS AND IT ALSO ESTABLISHES

24   THE CARVE-OUTS TO THE CLASS.  SO TO THE EXTENT SOME OF THE 101

25   FALL OUT OF THE CLASS, THAT'S A REALITY.  MY ENCOURAGEMENT

1  WOULD BE THAT IF YOU HAVE IDENTIFIED 101 AND A SMALL HANDFUL

2  OF THEM FALL OUTSIDE OF THE CLASS THAT YOU STILL -- YOU TRY TO

3  REUNITE, BECAUSE THAT'S THE SPIRIT OF THE INJUNCTIVE RELIEF

4  AND WHAT EVERYONE IS TRYING TO DO, INCLUDING THE GOVERNMENT.

5       SO THE GOVERNMENT CAN TAKE SOME VERY HARD, NUANCED

6  PARSING OF THE CLASS AND CARVE CHILDREN OUT OF IT.  BUT TO THE

7  EXTENT YOU HAVE 101, AND TO THE EXTENT SOME OF THEM MIGHT FALL

8  OUT OF THE CLASS, MY ENCOURAGEMENT WOULD BE THAT YOU INCLUDE

9  THEM AND YOU TRY TO REUNIFY THEM.

10       BUT AS A MATTER OF ENFORCING THE INJUNCTION, I WOULD

11  STAND ON THE CLASS DEFINITION, THE OBJECTIVE STANDARDS THAT

12  ARE SET OUT THEREIN.  AND THEN STAND ON THE DEADLINE.

13       I AM PREPARED TO ISSUE AN ORDER, AND IT CAN BE A

14  PROTECTIVE ORDER AT THIS POINT, FOR COUNSEL AND THEIR

15  DESIGNATED AGENTS TO HAVE A LIST OF THESE CHILDREN, THE 101,

16  WE ARE FOCUSING ON THE UNDER-FIVE NOW, VERY SOON; WITH AN

17  ARTICULATION BY THE GOVERNMENT AS TO THE CATEGORIES WHEN THEY

18  ARE GOING TO BE REUNIFIED, CATEGORIES WHERE YOU MAY BE HAVING

19  DIFFICULTY IDENTIFYING WHERE THE PARENTS ARE OR LOCATING THEM

20  OR COMMUNICATING WITH THEM, CATEGORIES LIKE THE REMOVED GROUP,

21  THE 19, WHERE MORE TIME MAY BE NECESSARY.

22       THE COURT NEEDS THAT INFORMATION.  PLAINTIFFS

23  CERTAINLY NEED THAT INFORMATION.  ONCE THEY HAVE THAT

24  INFORMATION THEN THE PARTIES CAN AGREE THAT HERE IS A GROUP

25  THAT WE CAN REUNIFY WITHOUT PROBLEMS BY JULY 10, HERE IS A

1    GROUP, FOR EXAMPLE IT IS THE 19 WHO HAVE ALREADY BEEN REMOVED,

2    THE PLAINTIFFS WILL MARSHAL THEIR ENORMOUS RESOURCES AND

3    ATTEMPT TO LOCATE THOSE PARENTS.

4            I WOULD FULLY EXPECT A STIPULATION, JOINT MOTION AND

5    ORDER BY THE PARTIES THAT PERHAPS AS TO THAT GROUP SOME

6    ADDITIONAL TIME MAY BE NEEDED.  BUT THAT IS GOING TO REQUIRE

7    INFORMATION TO PLAINTIFFS' COUNSEL AND THE COURT, AND THEN IT

8    IS GOING TO REQUIRE COUNSEL TO MEET AND CONFER.

9            **MS. FABIAN:**  JUST TO CLARIFY.  I THOUGHT YOUR HONOR

10   HAD SAID BEFORE THAT PARENTS WHO HAD BEEN REMOVED ARE NOT

11   MEMBERS OF THE CLASS.  IS IT -- IS THE CLARIFICATION THAT YOU

12   BELIEVE THAT THEY ARE?

13           **THE COURT:**  YES.  I MISSPOKE, BECAUSE THE CLASS, AS

14   IT WAS DEFINED, WAS HAVE BEEN, ARE, OR WILL BE IN ICE

15   DETENTION.  SO IT DOES INCLUDE THEM.

16           **MS. FABIAN:**  CAN I ASK.  WE HAD ALSO ASKED WHETHER

17   THERE WAS A DATE LIMITATION ON THE HAS BEEN, BECAUSE THERE ARE

18   GOING TO BE SITUATIONS.  I THINK WE HAVE A CASE THAT WAS

19   FILED, YOU HAVE A MANDATORY INJUNCTION THAT'S ASKING THE

20   GOVERNMENT TO UNDERGO A SIGNIFICANT AMOUNT OF EFFORT HERE.

21   AND I THINK WHEN WE ARE GOING BACK ON DATES THAT WELL PRE-DATE

22   THE -- OUTSIDE OF THIS LITIGATION I THINK YOU ARE LOOKING AT

23   SOME NUMBER OF FOLKS WHO MAY HAVE BEEN REMOVED WHOSE CHILDREN

24   MAY HAVE REMAINED IN O.R.R. CUSTODY.

25           I UNDERSTAND YOUR HONOR'S POINT THAT OF COURSE TO

1   THE EXTENT THERE IS AN ABILITY TO LOOK AT THOSE AS PROCESSES

2   ARE DEVELOPED THAT MAY BE SOMETHING.  BUT AS PART OF THE

3   INJUNCTION IN DEALING WITH DIFFICULT DATES I THINK IT WOULD BE

4   HELPFUL FOR THE GOVERNMENT -- WE HAVE PROPOSED THE DATE THAT

5   THE AMENDED COMPLAINT WAS FILED, WHICH I BELIEVE IS MARCH 9TH,

6   THAT THERE BE A DATE FOR THOSE SEPARATIONS THAT AFTER WHICH --

7   OR BEFORE WHICH AN INDIVIDUAL WOULD NOT BE A MEMBER OF THE

8   CLASS.

9          **THE COURT:**  MR. GELERNT.

10         **MR. GALERNT:**  YOUR HONOR, I AM NOT SURE I COMPLETELY

11  UNDERSTAND THAT.  I THINK IT NECESSARILY WOULD, BECAUSE, FOR

12  EXAMPLE, MS. L. WAS BEFORE WE AMENDED THE COMPLAINT.  I THINK

13  WE FILE A COMPLAINT AND WE SAY STOP IT GOING FORWARD AND

14  REUNIFY ALL OF THOSE CHILDREN UNDER THE PRIOR PRACTICE.  I

15  THINK THAT IS FAIRLY STANDARD AND I ASSUME THAT IS WHAT YOUR

16  HONOR MEANT IN THE CLASS DEFINITION:  HAVE, ARE, OR WILL BE.

17  OTHERWISE IT WOULD MAKE NO SENSE THAT MS. L. IS THE LEAD

18  PLAINTIFF.

19         **THE COURT:**  I AM NOT SURE A DATE IS NEEDED BECAUSE

20  THE CLASS IS SELF-DEFINING IN SO MANY WAYS.  SO I AM

21  RELUCTANT, ABSENT FURTHER BRIEFING OR DISCUSSION, SIMPLY TO

22  PICK A DATE.  IT SEEMS TO ME, GIVEN THE CLASS DEFINITION, THAT

23  YOU ARE GOING TO KNOW THE INDIVIDUALS.  AND IT IS A FINITE

24  NUMBER.  WE ARE NOT -- RELATIVELY SPEAKING WE ARE NOT TALKING

25  ABOUT THOUSANDS UPON THOUSANDS.

1          AND SO IT SEEMS TO ME, GIVEN THE PRESENT CLASS

2   DEFINITION, THE GOVERNMENT CAN IDENTIFY, FOR EXAMPLE, THOSE

3   THAT HAVE ALREADY BEEN REMOVED.  IT WILL BE A FINITE NUMBER.

4   IT MAY BE THE 19.  WE MOVE TO THE OLDER GROUP, THERE MAY BE A

5   FEW MORE.  I DON'T KNOW WHETHER FASHIONING A DATE BY WHICH THE

6   CLASS GOES BACK IN TIME IS WARRANTED.

7          **MS. FABIAN:**  I WOULD HAVE TO GET MORE INFORMATION

8   FROM MY CLIENT ON THIS.  BUT I THINK IT WOULD ALSO INCLUDE,

9   FOR EXAMPLE, YOU HAVE A CHILD IN O.R.R. CUSTODY WHO WAS --

10  WHOSE PARENT HAS NEVER COME FORWARD TO SPONSOR THEM WHO MAY BE

11  IN THE UNITED STATES FOR YEARS.  AND THE CHILD HAS BEEN UNABLE

12  TO BE RELEASED FROM HSS CUSTODY BECAUSE THE PARENT HAS NEVER

13  OFFERED TO SPONSOR.  THERE ARE, SADLY, SITUATIONS LIKE THAT.

14         AND I THINK, AGAIN -- AND MAYBE THIS REALLY BRINGS

15  US BACK TO PART OF WHAT WE ARE ASKING FOR TODAY IS THE

16  RECOGNITION THAT THERE ARE THESE SITUATIONS THAT -- I DON'T

17  WANT TO -- THEY ARE PERIPHERAL BUT THEY ARE ALSO NOT

18  INSUBSTANTIAL.  AND TO HAVE TO REALLY GET TO WHAT WE CAN DO TO

19  MEET THE COURT DEADLINES IT IS TO CARVE OUT THE PERIPHERAL

20  SITUATIONS FROM THE GOVERNMENT'S EFFORTS SO THAT THE

21  GOVERNMENT CAN FOCUS ITS EFFORTS ON THE IMMEDIATE NEED, WHICH

22  IS THE CENTRAL, THE SORT OF CORE OF THE COURT'S CLASS AND

23  RELIEF ORDER.

24         AND I TAKE YOUR HONOR'S POINT THAT THERE ARE --

25  THERE IS THE HOPE THAT THERE COULD BE OTHER RESULTS.  BUT I

1    THINK RIGHT NOW WE REALLY DO NEED TO FOCUS THE EFFORTS ON THE

2    CORE IDENTIFIABLE GROUP.  AND THAT IS WHY WE HAVE REALLY TRIED

3    TO IDENTIFY THE PLACES WHERE THESE DIFFICULTIES, WHERE THESE

4    DIFFERENCES FROM WHAT THE CLASS SITUATION WAS DIFFERENT --

5    OUTSIDE THE MAYBE POLICY CONCERNS THAT THE COURT WAS

6    ADDRESSING IN ITS ORDER.  AND WHERE, IF THOSE ARE NOT PART OF

7    THE CLASS AND NOT PART OF THE RELIEF ORDER, THAT ALLOWS US TO

8    FOCUS ON THE CORE GROUP THAT WE UNDERSTOOD TO BE WHAT YOUR

9    HONOR INTENDED US TO FOCUS ON.

10              **MR. GALERNT:**  YOUR HONOR, MAY I JUST MAKE ONE POINT.

11              I THINK -- I DON'T HAVE MUCH TO ADD TO WHAT I SAID

12   BEFORE, THE CLASS NECESSARILY HAS TO GO BACK BEFORE THE

13   AMENDED COMPLAINT.

14              THE GOVERNMENT COUNSEL BROUGHT UP A CASE WHERE MAYBE

15   THE CHILD HAS BEEN IN O.R.R. FOR YEARS AND THE PARENT HASN'T

16   COME FORWARD.  THAT IS NOT A SEPARATED PARENT.  THAT MAY BE A

17   CHILD WHO CAME BY HIMSELF AND A PARENT WHO IS LIVING IN THE

18   U.S.  THOSE ARE OBVIOUSLY NOT PART OF THE CLASS.  I JUST THINK

19   IT WOULD BE ARTIFICIAL TO HAVE A PRIOR DEADLINE.

20              THE ONLY THING I WOULD SAY, AND THEN I WILL SIT

21   DOWN -- I ASSUME WE ARE COMING TO A CLOSE -- IS THAT IF MONDAY

22   WE COULD NOT ONLY HAVE THE LIST OF UNDER-FIVE BUT THE

23   GOVERNMENT COULD SIGN OFF OR SAY, WE CAN'T SIGN OFF ON THE

24   NOTICE TO CLASS MEMBERS.

25              BECAUSE WHAT WE ARE ASKING FOR IS THAT THEY POST IT

1   OR WE CAN HAVE PRIVATE ATTORNEYS POST IT IN DETENTION CENTERS

2   SO PARENTS HAVE SOME SENSE THERE HAS BEEN A RULING, THEY ARE

3   SUPPOSED TO GET THEIR CHILDREN BACK.  THEY DON'T HAVE TO WAIVE

4   THEIR RIGHT TO APPLY FOR ASYLUM.

5           THE CLASS NOTICE WE DRAFTED IS VERY SHORT, WE THINK

6   VERY SIMPLE, AND THERE SHOULDN'T BE A LOT OF DISAGREEMENT.

7   BUT WE UNDERSTAND THE GOVERNMENT MAY, OF COURSE, HAVE

8   DISAGREEMENT.  AND IF WE CAN'T OVER THE WEEKEND AGREE ON THE

9   DISAGREEMENTS WE WOULD LIKE TO SUBMIT IT TO YOU MONDAY FOR YOU

10  TO EYEBALL AND SAY, THIS LOOKS OKAY, DOESN'T LOOK OKAY, MAKE

11  THESE MODIFICATIONS.

12          BUT WE DO THINK AT THIS POINT, GIVEN THIS VULNERABLE

13  POPULATION, THEY OUGHT TO AT LEAST KNOW ABOUT YOUR RULING.

14          **MS. FABIAN:**  WE HAVE ALREADY BEEN IN DISCUSSIONS

15  ABOUT THE CLASS NOTICE.  I THINK WE HAVE SORT OF CROSS

16  NOTICES.  SO WE WILL LOOK AT THAT AND WE WILL HAVE AN ANSWER

17  BY MONDAY, HOPEFULLY BEFORE.

18          **THE COURT:**  WHAT ABOUT THE O.R.R. POLICIES,

19  PROCEDURES?

20          **MS. FABIAN:**  YEAH.  THANK YOU, YOUR HONOR.  I WANT

21  TO MAKE SURE THAT WE DON'T LEAVE WITHOUT ADDRESSING THAT,

22  BECAUSE I THINK IT IS VERY IMPORTANT.

23          I WANT TO SORT OF I THINK TO YOUR HONOR'S QUESTION

24  WHICH WAS, YOU KNOW, ARE THESE -- THESE ARE POLICIES OF THE

25  AGENCY BUT THEY ARE POLICIES THAT IMPLEMENT THE TVPRA AND THE

1    STATUTORY REQUIREMENTS.  SO THEY ARE NOT -- I THINK MAYBE TO

2    REALLY CLARIFY WHAT I WAS ARGUING BEFORE, THE COURT CAN ORDER

3    THAT O.R.R. NOT FOLLOW THOSE POLICIES, BUT O.R.R. BELIEVES

4    THAT IT IS NOT A SIMPLE MATTER OF HHS JUST DECIDING NO LONGER

5    TO FOLLOW THESE PROCEDURES.

6            IT REALLY -- WHAT -- IF THE COURT BELIEVES THAT

7    THESE REUNIFICATIONS SHOULD FALL OUTSIDE THE PROTECTIONS OF

8    THESE TVPRA POLICIES, THEN THE AGENCY WOULD ASK THAT THE COURT

9    SPECIFICALLY STATE THAT AND SAY THAT THESE POLICIES DO NOT

10   APPLY IN THE SITUATION OF THESE REUNIFICATIONS.  AND RELATEDLY

11   WE WOULD ASK THE COURT TO CLARIFY IF THAT INITIAL STEP OF

12   DETERMINING PARENTAGE, IF THAT ALSO -- IF THAT DOES APPLY, IF

13   THAT IS A NECESSARY STEP, AND IF THE PROCEDURES THAT THE

14   GOVERNMENT IS EMPLOYING TO DO THAT ARE NECESSARY AND

15   PERMISSIBLE UNDER THE COURT'S ORDER.

16           I THINK, AGAIN, THE THIRD ASK REALLY RELATED TO ALL

17   OF THAT IS THAT IS -- IS THE GOAL THEN TO THE EXTENT THAT ANY

18   OF THOSE PROCEDURES REMAIN -- THE COURT BELIEVES THOSE REMAIN

19   NECESSARY, IS THAT -- DOES THAT THEN MEAN THAT THOSE

20   PROCEDURES, IF THEY TAKE LONGER, THEN THE COURT'S DEADLINE, IS

21   THAT PERMISSIBLE AND CAN THE COURT GIVE THE GOVERNMENT THE

22   RELIEF OF ALLOWING THEM MORE TIME TO COMPLETE THE PROCEDURES

23   THAT THE COURT AGREES THAT THE GOVERNMENT SHOULD CONTINUE TO

24   FOLLOW.

25           **THE COURT:**  ONE OF THE GREAT DIFFICULTIES IS I DON'T

1   KNOW WHAT PROCEDURES AND POLICIES YOU ARE SPECIFICALLY TALKING

2   ABOUT.  SO FOR THE COURT SIMPLY TO SAY WE ARE GOING TO BRUSH

3   THOSE ASIDE, I AM NOT PREPARED TO DO WITHOUT A STIPULATION OR

4   A JOINT MOTION AND ORDER OR ADDITIONAL BRIEFING.

5           WHAT I AM PREPARED TO SAY IS, IF THE POLICIES AND

6   PROCEDURES YOU ARE TALKING ABOUT ARE INTERNALLY CONSISTENT

7   WITH THE COURT'S ORDER, AND THAT IS TO REUNIFY ABSENT

8   CONSIDERATIONS OF DANGER OR UNFITNESS OR CRIMINAL HISTORY OR

9   DISEASE, THAT KIND OF THING, THEN THE GOVERNMENT SHOULD DO

10  THAT.  THEY SHOULD NOT WORRY ABOUT THOSE TYPES OF POLICIES AND

11  PROCEDURES BECAUSE, AS I UNDERSTAND IT, THEY WOULD BE

12  CONSISTENT WITH THE COURT'S ORDER.

13          BUT IF THERE ARE OTHER POLICIES AND PROCEDURES THAT

14  ARE HAMSTRINGING THE O.R.R. AND THE REUNIFICATION PROCESS, I

15  WOULD LIKE TO KNOW WHAT THEY ARE.  AND THEN I CAN DETERMINE

16  WHETHER I HAVE THE LEGAL AUTHORITY AND WHETHER IT IS PRUDENT

17  TO SET THOSE ASIDE.

18          SO I THINK WHAT -- WHAT I AM CONTEMPLATING IS THAT

19  GOVERNMENT PROVIDE A LIST TO PLAINTIFFS' COUNSEL TOMORROW BY

20  5:00 P.M., WITH AN IDENTIFICATION OF THE CHILDREN AND THE

21  STATUS.  YOU CAN GROUP THEM.  AND A TIMELINE:  YES, WE CAN

22  MEET THE DEADLINE, WE ARE HAVING TROUBLE WITH THIS GROUP

23  MEETING THE DEADLINE BECAUSE OF, AND SET OUT THE REASONS.

24          AND THEN I WOULD LIKE COUNSEL TO MEET AND CONFER AND

25  THEN SUBMIT MONDAY MORNING, OR EARLIER, SO I HAVE TIME TO

1    DIGEST IT, A STIPULATION, JOINT MOTION AND ORDER, OR AREAS

2    WHERE THERE ARE DISAGREEMENTS.  THEN I CAN RULE ON THOSE.  I

3    DON'T HAVE ENOUGH INFORMATION NOW TO SIMPLY SAY TO THE

4    GOVERNMENT YOU CAN IGNORE THE O.R.R. POLICIES, AND I DON'T

5    KNOW WHICH ONES YOU ARE TALKING ABOUT.

6         **MS. FABIAN:**  I THINK PART OF THE PROBLEM IS THAT

7    THEY REALLY WILL BE CASE BY CASE.  AND I DON'T THINK THEY ARE

8    INCONSISTENT WITH THE COURT'S ORDER.  AND I DON'T KNOW THAT

9    THE CONCERN IS CONSISTENCY SO MUCH AS THAT THEY ALL, IN

10   O.R.R.'S MIND, ARE NECESSARY TO ENSURE SAFETY BUT THEY TAKE

11   LONGER THAN THE DEADLINE PROVIDED BY THE COURT.

12        **THE COURT:**  YES.  SO IN THAT REGARD, AGAIN I GO BACK

13   TO THE OVERARCHING OBSERVATION, AND THAT IS THAT THE

14   GOVERNMENT MUST REUNITE.  IT MUST COMPLY WITH THE TIME FRAME,

15   UNLESS THERE IS AN ARTICULABLE REASON.  AND IT MAY WELL BE

16   THAT ONCE THE PLAINTIFFS KNOW WHAT THE REASON IS AND WHAT

17   GROUP IT APPLIES TO, THEY WILL AGREE.  AND IT MAY BE THAT A

18   MORE RELAXED DATE CAN APPLY TO A CERTAIN GROUP OF THESE CLASS

19   MEMBERS.

20        BUT NO ONE CAN MAKE ANY INFORMED DECISION, INCLUDING

21   THE COURT, AND PARTICULARLY PLAINTIFFS' COUNSEL, WHETHER OR

22   NOT TO OBJECT OR TO ASK THE COURT TO MAKE ADDITIONAL ORDERS

23   WITHOUT ADDITIONAL INFORMATION.  SO THAT HAS TO BE THE

24   STARTING POINT.

25        AND SO I ASK THE GOVERNMENT TO FOCUS ON THE CLASS

1    DEFINITION, THE CARVE-OUTS TO THE CLASS.  TO PROVIDE THIS LIST

2    BY 5:00 O'CLOCK TOMORROW.  PLAINTIFFS' COUNSEL TO RESPOND BY

3    MONDAY, 9:00 A.M.

4           HOPEFULLY THERE WILL BE A NUMBER OF JOINT MOTIONS

5    AND ORDERS, STIPULATIONS, IF YOU WILL.  OR IF THERE IS

6    DISAGREEMENT IT CAN BE A PRINCIPLED, FOCUSED BRIEFING AND I

7    CAN RULE ON IT MONDAY.

8           **MS. FABIAN:**  THANK YOU, YOUR HONOR.

9           I HAD ONE OTHER POINT THAT WE HAD RAISED IN OUR

10   BRIEF.  I THINK THIS ONE WILL BE EASIER FOR THE COURT, I HOPE.

11          IT WAS THE SECOND POINT IN OUR BRIEF AND IT HAS TO

12   DO WITH -- I THINK IT IS PARAGRAPH 1 OF THE COURT'S ORDER

13   WHICH SUGGESTS -- IT ORDERS THAT DHS SHALL NOT HOLD AN ADULT

14   CLASS MEMBER IN ITS CUSTODY WITHOUT THE MINOR CHILD.

15          READ IN CONJUNCTION WITH -- THE PROCESSES THAT ARE

16   UNDERWAY FOR REUNIFICATION, HHS CAN REUNIFY FASTER IN

17   ACCORDANCE WITH ITS POLICIES UNDER THE TVPRA TO AN ADULT WHO

18   REMAINS IN CUSTODY THAN TO AN ADULT WHO HAS BEEN RELEASED FROM

19   CUSTODY.

20          SO DHS IS CONCERNED THAT IF REUNIFICATION HASN'T

21   HAPPENED IMMEDIATELY BEFORE THE COURT'S DEADLINE THAT IN ORDER

22   TO COMPLY WITH PARAGRAPH 1 IT WOULD NEED TO RELEASE

23   INDIVIDUALS FROM ITS CUSTODY.  BUT THAT WOULD BE INCONSISTENT

24   WITH THE GOVERNMENT'S GOAL OF A FASTER REUNIFICATION IN

25   CONJUNCTION WITH SORT OF PARAGRAPHS 1 AND 2.

1        SO WE WOULD ASK FOR CLARIFICATION THAT PARAGRAPH 1

2   DOES NOT REQUIRE RELEASE OF THE PARENT PRIOR TO THE DEADLINE

3   IF THAT RELEASE WOULD ULTIMATELY SLOW DOWN THE REUNIFICATION

4   PROCESS.

5        ESSENTIALLY IT WOULD BE, I THINK, THAT REUNIFICATION

6   IS THE GOAL HERE AND THAT PARAGRAPH 1, TO THE EXTENT IT COULD

7   BE READ TO REQUIRE RELEASE UNRELATED TO REUNIFICATION, THAT IT

8   SHOULD SORT OF BE READ SECONDARY TO THE REUNIFICATION GOAL.

9        **THE COURT:**  THE COURT IS SPEAKING ONLY TO

10  REUNIFICATION.  WHETHER THE GOVERNMENT RELEASES OR DETAINS IS

11  UP TO THE GOVERNMENT.  BUT IT HAS TO EXERCISE DISCRETION AND

12  DECIDE WHETHER TO RELEASE OR DETAIN, AND YET COMPLY WITH THE

13  COURT'S ORDER.  BUT I AM NOT ORDERING EITHER RELEASING OR

14  DETENTION, THAT WOULD BE UP TO THE GOVERNMENT.

15       SO IT MAY BE A QUANDARY THAT THE GOVERNMENT FEELS IT

16  HAS, BUT IT IS REALLY -- IT COMES DOWN TO THE GOVERNMENT'S

17  EXERCISE OF DISCRETION.  IT HAS GOT TO DO ONE OR THE OTHER.

18       **MS. FABIAN:**  I THINK THAT CLARIFIES IT, YOUR HONOR.

19  I THINK WE JUST WANT TO BE ABLE TO SAY THAT REUNIFICATION

20  SHOULD NOT BE SLOWED DOWN ON THE BASIS THAT PARAGRAPH 1 MIGHT

21  BE READ TO REQUIRE ICE TO RELEASE A PARENT EVEN IF THEY ARE

22  NOT TO BE REUNIFIED AT THAT TIME I THINK IS REALLY -- I THINK

23  IT WOULD GO AGAINST THE OVERALL TENOR OF THE COURT'S ORDER

24  WHICH IS THAT REUNIFICATION IS THE GOAL.  BUT WE JUST WANTED

25  TO GET CLARIFICATION THAT PARAGRAPH 1 DOESN'T, IN AND OF

1    ITSELF, REQUIRE RELEASE.

2         I THINK WHAT YOUR HONOR IS SAYING IS THAT RELEASE IS

3    NOT THE GOAL OF THE ORDER, REUNIFICATION IS THE GOAL OF THE

4    ORDER.  AND I THINK THAT WOULD CLARIFY THE POINT.

5         **THE COURT:**  MR. GELERNT.

6         **MR. GALERNT:**  I APOLOGIZE.  I AM NOT FULLY FOLLOWING

7    THE LOGISTICAL PROBLEM THE GOVERNMENT IS SUGGESTING.  BUT WE

8    AGREE, YOUR HONOR, WITH YOUR POINT, THE OVERARCHING POINT THAT

9    THE RULING DOESN'T REQUIRE RELEASE, IT DOESN'T REQUIRE

10   DETENTION; IT REQUIRES REUNIFICATION.

11        I AM NOT SURE I COMPLETELY UNDERSTAND THE LOGISTICS

12   POINT.  IF THE REUNIFICATION OCCURS WITHIN THE DEADLINE THEN I

13   THINK THAT IS WHAT WE CARE ABOUT.

14        I APOLOGIZE, I AM NOT COMPLETELY FOLLOWING.  BUT IT

15   SOUNDS LIKE YOU TWO ARE FOLLOWING IT, SO THAT IS OKAY.

16        THE ONLY THING I WANTED TO JUST CLARIFY, THEN I

17   THINK THAT IS IT FOR US, IS, SO WE WILL GET -- I ASSUME 5:00

18   O'CLOCK PACIFIC TIME SATURDAY.

19        **THE COURT:**  YES.

20        **MR. GALERNT:**  THE LIST OF INDIVIDUALS AND THE

21   GOVERNMENT'S EXPLANATION FOR WHY THEY MAY NEED MORE TIME OR

22   WHY THEY THINK AN INDIVIDUAL FALLS OUT OF THE CLASS.  AND THAT

23   IS PERFECT BECAUSE IT ALLOWS US TO RESPOND, AS YOUR HONOR

24   SAID.

25        IN TERMS OF THE O.R.R. PROCEDURES, THE ONLY THING I

1    WOULD SAY IS, I THINK YOU ARE RIGHT, YOUR HONOR, THAT I ALSO

2    AM NOT SURE EXACTLY ALL OF THE PROCEDURES THEY ARE TALKING

3    ABOUT, AND WHICH ONES THEY WANT TO CONTINUE FOLLOWING IN THIS

4    UNIQUE SITUATION AND WHICH ONES THEY DON'T FEEL LIKE THEY NEED

5    TO FOLLOW.  IT WOULD BE HELPFUL FOR US TO KNOW SPECIFICALLY SO

6    WE COULD STIPULATE.

7         I THINK MOST OF THEM ARE, OF COURSE, DESIGNED FOR

8    EXACTLY WHAT YOUR HONOR POINTED OUT IS THE CHILD COMES HERE BY

9    THEMSELVES, THEY HAVE TO FIND A DISTANT RELATIVE.  AND SO, FOR

10   EXAMPLE, THE TVPRA, THE ONLY REAL REQUIREMENT OF TVPRA IS A

11   HOME VISIT.  BUT THAT MAKES LITTLE SENSE IN THIS CONTEXT.  OR

12   INVESTIGATING THE RELATIVE, YOU KNOW, THE THIRD UNCLE, THAT

13   MAKES LITTLE SENSE.

14        THEY ARE ALSO APPARENTLY FINGERPRINTING, AS O.R.R.

15   DOES, FINGERPRINTING EVERYONE.  IN THE CONTEXT OF AN UNCLE

16   COMING FORWARD THAT MAKES SENSE.  BUT IN THIS CASE EVERY

17   PARENT AND CHILD WHO CROSSED THE BORDER AND WAS APPREHENDED

18   WAS FINGERPRINTED AT THAT TIME, SO A SECOND FINGERPRINTING

19   ROUND CLEARLY DOESN'T MAKE SENSE.  AND IF THERE IS NO REASON

20   TO BELIEVE THE PARENT AND CHILD ARE NOT ACTUALLY THE PARENT

21   AND CHILD, THE TIME AND CUMBERSOMENESS OF A DNA TEST MAKES

22   LITTLE SENSE.

23        SO THAT IS WHY WE THINK THERE IS VERY LITTLE THAT

24   O.R.R. DOES IN THE GENERAL SITUATION, WHICH IS GREAT, MAKES

25   SENSE HERE.  AND SO WE WOULD JUST HOPE THAT THE GOVERNMENT

1   COULD TELL US WHICH THINGS THEY STILL THINK THEY NEED TO DO.

2   AND IF WE DISAGREE WE COULD COME TO YOU, BUT THEN IT WOULD BE

3   A VERY CONCRETE DISCUSSION.

4          WE JUST DON'T WANT -- BECAUSE WE WANT TO DEAL WITH

5   THE UNDER-FIVE RIGHT NOW, BUT OBVIOUSLY THE GOVERNMENT NEEDS

6   TO CONTINUE WITH THE PROCESS TO MEET THE 30-DAY DEADLINE, WE

7   CAN GET THAT SQUARED AWAY ABOUT WHAT PROCEDURES THEY ARE GOING

8   TO USE GOING FORWARD.

9          THANK YOU, YOUR HONOR.

10          **THE COURT:**  I WOULD ASSUME THIS IS AN AREA WHERE

11   COUNSEL CAN MEET AND CONFER AND STIPULATE.  THAT IS MY HOPE,

12   AND THAT IS WHAT I WOULD URGE THE PARTIES TO DO.  AND SUBMIT A

13   JOINT MOTION AND ORDER MONDAY MORNING ON THESE O.R.R. POLICIES

14   AND PROCEDURES THAT ARE BEING REFERENCED.

15          **MR. GALERNT:**  YES, YOUR HONOR.

16          **MS. FABIAN:**  I WILL -- WE WILL DO OUR BEST, YOUR

17   HONOR.  I THINK THERE IS A CHALLENGE.  I THINK IT IS DIFFICULT

18   FOR AGENCIES TO STIPULATE AWAY WHAT THEY FEEL ARE THEIR

19   STATUTORY RESPONSIBILITIES.  AND SO I THINK THAT IS WHY -- AND

20   I THINK WE NEED TO THINK CREATIVELY ABOUT HOW TO TEE IT UP FOR

21   THE COURT TO GIVE YOU SOMETHING MORE CONCRETE.  I UNDERSTAND

22   WE HAVE SORT OF TEED THIS UP, BUT IT IS SOMETHING THAT WE

23   WOULD LIKE AN ANSWER ON QUICKLY AND MORE BROADLY.  SO

24   HOPEFULLY --

25          I WANTED TO CLARIFY THAT YOU MEAN A LIST OF THE

1    UNDER-FIVE POPULATION FOR MONDAY.

2            **THE COURT:**  YES.

3            **MS. FABIAN:**  SO HOPEFULLY -- I CAN'T PROMISE A

4    STIPULATION BUT I THINK MAYBE IN THE CONTEXT OF EXAMPLES WE

5    COULD TEE UP FOR THE COURT THE TYPES OF TVPRA PROCEDURES THAT

6    WE ARE TALKING ABOUT, AND IDENTIFY FOR THE COURT HOW THOSE

7    APPLY AND MAYBE GIVE THE COURT MORE INFORMATION --

8            **THE COURT:**  YES.

9            **MS. FABIAN:**  -- TO BE ABLE TO DO THAT.

10           AGAIN, I JUST DON'T WANT TO -- I DON'T WANT TO

11   OPTIMISTICALLY SAY I WILL BE HERE WITH A STIPULATION BECAUSE I

12   DO THINK THAT THAT IS A DIFFICULT THING FOR THE AGENCY TO

13   STIPULATE AWAY, BUT WOULD ASK FOR THE COURT'S INPUT.

14           AND I AM TOLD BY MY CLIENT THAT PERHAPS WE DON'T

15   FULLY UNDERSTAND ON MY OTHER POINT.  I JUST WANT TO SAY THE

16   CLARIFICATION WE ARE ASKING FOR IS THAT PARAGRAPH 1 OF THE

17   COURT'S ORDER IS NOT ORDERING RELEASE OF ANY PARENT BY THE

18   COURT'S THE DEADLINE.  THAT RELEASE, IN AND OF ITSELF, BY THE

19   COURT'S DEADLINE UNDER PARAGRAPH 1, WOULD NOT SATISFY WHAT THE

20   COURT IS ORDERING IN ITS PRELIMINARY INJUNCTION, WHICH IS IN

21   FACT REUNIFICATION.

22           **THE COURT:**  MR. GELERNT, DO YOU HAVE ANY --

23           **MR. GALERNT:**  I THINK, YOUR HONOR, IF I AM

24   UNDERSTANDING NOW, IT IS THAT RELEASE OF THE PARENT DOESN'T

25   SATISFY THE COURT'S ORDER, IT HAS TO BE REUNIFICATION.  JUST

1    PUTTING THE PARENT OUT ON THE STREET AND SAYING, NOW GO FIND

2    YOUR KID, IS NOT GOING TO COMPLY WITH THE ORDER, SO THAT IT

3    HAS TO ACTUALLY BE REUNIFICATION.  AND THAT IS THE WAY WE

4    UNDERSTAND IT AS WELL, SO I THINK WE ARE ON THE SAME PAGE,

5    THEN.

6            **MS. FABIAN:**  AND THE GOVERNMENT SHOULD FOLLOW THE

7    PROCEDURES THAT WILL LEAD TO THE -- THE EARLIER REUNIFICATION,

8    RATHER THAN READING PARAGRAPH 1 AS TO REQUIRE RELEASE

9    INDEPENDENT OF THAT REUNIFICATION.  I THINK THAT IS WHAT WE

10   INTEND TO DO, AND WE JUST WANTED TO CLARIFY THAT THAT IS, IN

11   FACT, THE INTENT OF THE ORDER.

12           **THE COURT:**  DO YOU AGREE?

13           **MR. GALERNT:**  YES, YOUR HONOR.

14           THE ONLY OTHER THING I WOULD SAY IS SOMETHING THAT

15   WAS IN THE AFFIDAVIT, AND THIS MAY BE SOMETHING WE CAN WORK

16   OUT PRIVATELY.  AND MY UNDERSTANDING IS THAT DHS MAY BE

17   TALKING TO CHILD ADVOCATES.

18           OUR UNDERSTANDING FROM THE AFFIDAVIT IS THEY ARE

19   GOING TO BRING PARENTS TO A FACILITY.  TO THE EXTENT THEY ARE

20   GOING TO REUNIFY BY THE 10TH, BRING PARENTS TO A FACILITY

21   CLOSE TO WHERE THE CHILD IS BEING DETAINED.  AND THEN RELEASE

22   THE PARENT.

23           WE WOULD ASK THAT WE BE NOTIFIED WHERE THE PARENT IS

24   GOING TO BE RELEASED, BECAUSE THE PARENTS ARE GOING TO HAVE NO

25   MONEY, THEY ARE GOING TO JUST BE PUT OUT ON THE STREET IN

```
 1   DETROIT OR WHEREVER.  AND WE ARE PREPARED TO MAKE SURE EVERY
 2   ONE OF THOSE PARENTS HAS SOMEONE THERE WITH THEM WHEN THEY
 3   WALK OUT.  A CAR SERVICE, WHATEVER THEY NEED.  A HOTEL ROOM.
 4   TO GET THEIR CHILD.
 5           SO I THINK IF THE GOVERNMENT CAN ALERT US TO, WE ARE
 6   GOING TO SEND THE PARENT TO THIS FACILITY IN DETROIT, THE
 7   CHILD IS SOMEWHERE CLOSE BY IN DETROIT, WE WILL FACILITATE.
 8   THAT IS OBVIOUSLY NOT SOMETHING WE ARE ASKING THE GOVERNMENT
 9   TO DO ON TAXPAYER MONEY, TO REUNITE AND PAY FOR A HOTEL AND
10   ALL THAT.  BUT WE ARE PREPARED TO DO THAT, AND I THINK ALL OF
11   THE VOLUNTEERS ARE.  WE JUST NEED TO KNOW WHERE THAT
12   REUNIFICATION IS GOING TO HAPPEN.  WE CAN WORK THAT OUT, I
13   THINK, AT SOME POINT.
14           MS. FABIAN:  THAT IS NOT A PROBLEM, YOUR HONOR.
15           MR. GALERNT:  OKAY.
16           MS. FABIAN:  AND THOSE TRANSFERS IN LARGE PART HAVE
17   ALREADY OCCURRED, AND WE WILL WORK WITH PLAINTIFFS ON THAT.
18           THE COURT:  ALL RIGHT.
19           WILL COUNSEL BE HERE THIS WEEKEND, OR ARE YOU GOING
20   BACK?
21           MR. GALERNT:  WE WILL DO WHATEVER.  WE WILL DO
22   WHATEVER IS EASY.  IF IT IS BETTER FOR US TO BE HERE, WE WILL
23   STAY THE WEEKEND.
24           MS. FABIAN:  I HAVE DOG SITTING RESPONSIBILITIES
25   THAT REQUIRE ME TO GO BACK TO COLORADO, BUT I WILL BE BACK ON
```

1    MONDAY.

2              **THE COURT:**  I WOULD LIKE TO MEET AGAIN, PERHAPS

3    MONDAY AT 10:00 A.M.  IT DOES NOT HAVE TO BE IN PERSON, IT CAN

4    BE TELEPHONIC.  BUT WHAT I AM EXPECTING IS A LOT OF WORK OVER

5    THE WEEKEND, SO THAT THE GOVERNMENT IS PROVIDING THIS

6    INFORMATION TO COUNSEL BY 5:00 O'CLOCK PACIFIC STANDARD TIME

7    TOMORROW.  PLAINTIFFS SUBMIT THEIR BRIEFING 9:00 A.M. MONDAY,

8    PACIFIC STANDARD TIME.  THAT THE PARTIES IN GOOD FAITH MEET

9    AND CONFER AND ATTEMPT TO ARRIVE AT AS MANY STIPULATIONS AS

10   POSSIBLE.  AND THAT WE WILL MEET AGAIN AT 10:00 O'CLOCK

11   TOMORROW -- I AM SORRY -- ON MONDAY.

12              AND I AM CONTENT TO PROCEED TELEPHONICALLY, SO

13   COUNSEL DON'T HAVE TO BE HERE IN PERSON.  IF YOU ARE HERE,

14   FINE, WE CAN MEET IN THE COURTROOM, OTHERWISE WE WILL MEET

15   TELEPHONICALLY.

16              THEN ON MONDAY AT 10:00 WE WILL SEE WHERE WE ARE,

17   WHAT NEEDS TO BE RULED ON.  AND I WILL RULE ON ANY REMAINING

18   ISSUES THAT ARE PROPERLY FRAMED AND ADDRESSED IN WRITING.

19              AND THEN I WOULD LIKE TO SET FUTURE STATUS

20   CONFERENCES SO THAT WE ADDRESS THE REMAINDER OF THE GROUP, AND

21   GOING FORWARD THE PROCESSES THAT ARE BEING IMPLEMENTED TO

22   ELIMINATE THIS PROBLEM IN THE FUTURE SO THAT WE HAVE TRACKING

23   AND THE ABILITY TO REUNIFY AT APPROPRIATE TIMES.

24              SO THERE ARE MANY REMAINING ISSUES THAT WE NEED TO

25   ADDRESS, BUT TODAY IS NOT THE OCCASION.  I WOULD LIKE TO, AS

1    WE HAVE BEEN DOING, FOCUS SIMPLY ON THE UNDER-FIVE GROUP.

2           WITH RESPECT TO THE LIST, DO WE NEED A PROTECTIVE

3    ORDER OR ARE THE PARTIES CONTENT SIMPLY TO PROVIDE THE LIST TO

4    MR. GELERNT?

5           **MS. FABIAN:**  I HAVE ONE DRAFTED ALREADY, YOUR HONOR,

6    THAT I HAVE BEEN -- I JUST NEED TO FINALIZE.  AND WE CAN GET

7    THAT OVER.  IT SHOULDN'T BE A PROBLEM TO HAVE ONE READY FOR

8    THE COURT TO SIGN.

9           **THE COURT:**  YES.

10          **MR. GALERNT:**  YOUR HONOR, YOU KNOW, I THINK WE ARE

11   IN AGREEMENT ABOUT WHAT THE PROTECTIVE ORDER WOULD DO, IS THAT

12   WE WOULD CERTAINLY NOT PUBLICIZE THE LIST BUT THAT WE WOULD BE

13   ABLE TO SHARE.  WE WOULD SAY THERE IS A VOLUNTEER WHO IS

14   WILLING TO GO TO TEXAS RIGHT NOW, THAT WOULD BE OUR AGENT, AND

15   WE WOULD GIVE THEM THE NAME OF THIS PARENT WHO THINKS THEIR

16   CHILD IS SOMEWHERE IN THE COUNTRY.  AND SO THAT WE WOULD BE

17   ABLE TO SHARE IT WITH THE VOLUNTEERS THAT ARE GOING TO MEET

18   WITH THE PARENTS.  I THINK THE GOVERNMENT HAS SAID THAT IS

19   OKAY.

20          **MS. FABIAN:**  I THINK SO.  I WOULD LIKE TO WORK WITH

21   THE WORDING JUST BECAUSE THERE HAVE BEEN A LOT OF INFORMATION

22   PUT OUT ABOUT THIS ISSUE.  AND I WOULD LIKE TO AVOID THE

23   DANGER OF THINGS BEING PUT OUT ABOUT THE CHILDREN,

24   PARTICULARLY SINCE THEY ARE NOT CLASS MEMBERS.  BE WE CAN

25   CERTAINLY WORK ON LANGUAGE TO THAT EFFECT BECAUSE I UNDERSTAND

1 THE PURPOSE OF THE LIST, AS WELL.

2     **THE COURT:**  YES.  ALL RIGHT.  ANY --

3     **MR. GALERNT:**  THANK YOU, YOUR HONOR.

4     **THE COURT:**  -- MORE COMMENTS?

5     WHEN YOU MEET AND CONFER, DO IT IN THE SPIRIT OF THE

6 ORDER.  WE CAN SPEND A LOT OF TIME AND ENERGY QUIBBLING OVER

7 THE DETAILS AND THE LEGAL OBLIGATIONS OF THE PRELIMINARY

8 INJUNCTION, BUT IT IS APPARENT THAT EVERYONE IS ROWING IN THE

9 SAME DIRECTION, AND THAT'S AN ATTEMPT TO REUNIFY AS QUICKLY

10 AND AS SAFELY AS POSSIBLE.  AND IT IS IN THAT SPIRIT THAT THE

11 PARTIES SHOULD BE ABLE TO MEET AND CONFER AND MAKE A LOT OF

12 GOOD THINGS HAPPEN, WITHOUT COURT INVOLVEMENT.

13     I THINK, AGAIN, THE OBJECTIVE STANDARDS ARE SET OUT

14 WITH TODAY'S DISCUSSION.  I THINK THERE IS MORE CLARITY TO

15 THAT PROCESS.  AND THEN IT IS REALLY -- IN THESE SITUATIONS IT

16 IS REALLY IMPORTANT THAT THE PARTIES EXERCISE UTMOST GOOD

17 FAITH, WHICH I KNOW YOU WILL.  AND IN THAT PROCESS, THIS

18 REUNIFICATION FOR ALL OF THE CHILDREN WITH THEIR PARENTS CAN

19 HAPPEN IN A RELATIVELY SEAMLESS MANNER.

20     I UNDERSTAND THE SIGNIFICANCE OF THE UNDERTAKING

21 THAT THE GOVERNMENT IS BEING ORDERED TO DO.  THAT'S ABUNDANTLY

22 CLEAR.  BUT IT CAN DO IT, AND IT HAS MADE THE DETERMINATION

23 PUBLICLY, THROUGH THE SECRETARY OF HHS AND HERE TODAY, THAT IT

24 IS GOING TO REUNIFY.  SO IT IS IN THAT SPIRIT THAT A LOT OF

25 THESE DETAILS CAN BE WORKED OUT COOPERATIVELY.  AND THAT IS

```
 1   WHAT I URGE THE PARTIES TO DO, AND I WILL LOOK FORWARD TO

 2   MEETING WITH EVERYONE EITHER TELEPHONICALLY OR IN PERSON

 3   MONDAY AT 10:00 A.M.

 4              MR. GALERNT:  THANK YOU, YOUR HONOR.

 5              MS. FABIAN:  WOULD YOU LIKE US TO NOTIFY YOU IN

 6   ADVANCE WHICH WE WILL BE DOING?

 7              THE COURT:  SURE.  THAT WOULD BE --

 8              MS. FABIAN:  I EXPECT I WILL BE HERE IN PERSON, I

 9   WILL LET YOUR CLERK KNOW.

10              THE COURT:  ALWAYS DELIGHTED TO SEE YOU IN PERSON.

11   I WILL LEAVE IT TO YOU.

12              MS. FABIAN:  THANK YOU, YOUR HONOR.

13              MR. GALERNT:  THANK YOU, YOUR HONOR.

14              THE COURT:  THANK YOU VERY MUCH.

15

16                        *   *   *

17              I CERTIFY THAT THE FOREGOING IS A CORRECT
                TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
18              IN THE ABOVE-ENTITLED MATTER.

19              S/LEEANN PENCE                    7/7/2018
                LEEANN PENCE, OFFICIAL COURT REPORTER   DATE
20

21

22

23

24

25
```

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| M.G.U. *et. al.*, <br> *Plaintiff,* <br><br> v. <br><br> Kirstjen Nielsen *et. al.*, <br><br> *Defendants.* | CASE NO. 18-CV-01458 |

## DECLARATION OF SHALYN FLUHARTY

I,  Shalyn Fluharty, make the following declaration based on my personal knowledge:

1. I am an attorney and have been licensed and admitted in the State of California since 2010.  I currently serve as the Managing Attorney of the Dilley Pro Bono Project ("the Dilley Project"), where I provide free legal services to asylum-seeking mothers and children who are detained at the South Texas Family Residential Center ("STFRC") in Dilley, Texas.  I have served in this capacity since December 2016.

2. The Dilley Project is an informal association of four non-profit organizations who work in collaboration with a robust national volunteer network. In my role as Managing Attorney, I am the attorney of record for all clients represented by the Dilley Project.

3. The Dilley Project has represented over 19,700 families  in credible or reasonable fear proceedings between January 1, 2017 and May 31, 2018.

**STFRC Has Not Been at Full Capacity for at Least the Last 18 months.**

4. STFRC has the capacity to detain up to 2,400 mothers and children combined at any given time. To my knowledge, during the 18 months that I have been the Managing Attorney of the Dilley Project, STFRC has never been at full capacity. My knowledge is based upon stated disclosures of total capacity at STFRC that I have obtained from individuals employed by U.S. Immigration and Customs Enforcement ("ICE"), STFRC private prison operator CoreCivic, and the United States Citizenship and Immigration Services Asylum Office, and from the total number of mothers and children the Dilley Project has represented at STFRC.

5. The Dilley Project does not receive a daily census of the total population of mothers and children detained at STFRC. However, we frequently receive information regarding the total daily population during informal conversations with employees of ICE, CoreCivic, and the Asylum Office. We also receive information from individuals who have access to STFRC data pursuant to continuous monitoring operations that are conducted in accordance with the court's administration of the settlement in *Flores* v. *Sessions*, No. 85-cv-4544, pending in the U.S. District Court for the Central District of California (the "*Flores* Settlement").

6. Based upon this information-sharing, I have recorded the total population at STFRC to be approximately the following, on the following dates:

- April 9, 2018: 1,000
- April 18, 2018: 1,200
- May 2, 2018: 2,000
- June 5, 2018: 2,000
- June 14, 2018: 2,000
- June 28, 2018: 1,500
- July 2, 2018: 1,300

2

7. The Dilley Project is the only on-site legal services provider at STFRC. Mothers and children who are detained at STFRC are able to seek legal services from the Dilley Project at any time by entering the legal visitation trailer at STFRC, where Dilley Project staff and volunteers are available Monday-Friday from 7:30 a.m. to 8:00 p.m.

8. In May 2018 the Dilley Project began representation for 804 new families. In June 2018 the Dilley Project began representation for 1371 families.

9. Between May 1, 2018 and June 30, 2018 the Dilley Project recorded five families that did not seek representation from the Dilley Project because they retained outside private counsel.

10. I believe that the Dilley Project represented the overwhelming majority, if not all, of the families detained at STFRC between May 1, 2018 and June 30, 2018, other than the five families who were represented by outside counsel. The total number of families represented by the Dilley Project from May 1, 2018 to June 30, 2018 therefore I believe reflects more or less the total number of families detained at STFRC during this period of time.

**Representation of M.G.U.**

11. M.G.U. is a client of the Dilley Project. In connection with that representation, I represented M.G.U. in conjunction with her credible fear proceeding and have met with her numerous times. I am therefore personally familiar with the facts of M.G.U.'s immigration proceedings.

12. On May 4, 2018 M.G.U. was placed in immigration detention after crossing the San Ysidro, California port of entry ("POE"). Shortly thereafter she was transferred with her children to STFRC. M.G.U. participated in a credible fear interview on May 16, 2018. A

3

positive credible fear determination was made by Asylum Officer Lisa Raney the same day. Supervisory Asylum Officer Christopher McNary concurred with the positive credible fear determination on May 17, 2017. Incorporated into M.G.U.'s positive credible fear determination is a finding that the asylum officer found her credible in all aspects of her testimony.

13. ICE agents forcibly separated M.G.U. from her children on May 17, 2018, the same day her positive credible fear determination was issued by the asylum office. ICE subsequently transferred M.G.U. alone to the South Texas Detention Complex in Pearsall, Texas.

14. During M.G.U.'s credible fear interview, the asylum officer affirmatively asked M.G.U. if she was a member of the "Refugee Caravan" that entered the United States. M.G.U. responded affirmatively. The Refugee Caravan has been the subject of numerous public media reports. As described *infra*, asylum officers began screening all asylum applicants for participation in the Refugee Caravan after it arrived at the U.S.-Mexico border.

**I Believe M.G.U.'s Separation From her Children Was Punishment for her Participation in the Refugee Caravan.**

15. The Dilley Project, myself included, noticed specific changes to both USCIS Asylum Office and ICE procedures subsequent to the arrival of the Refugee Caravan. The Asylum Office began asking every asylum applicant if they were a part of the Refugee Caravan during all credible fear interviews that were conducted at STFRC. In many cases, asylum officers questioned asylum applicants for an extended period of time regarding their participation in the Refugee Caravan.

16. On April 27, 2018 Deportation Officer Richard Carrasquillo entered the STFRC visitation trailer and asked Dilley Project clients—while they were receiving legal

4

services—if they traveled to the United States with the Refugee Caravan. The next day I was informed by STFRC ICE Deportation Officers that they were instructed to identify and document which detained families participated in the Refugee Caravan for ICE leadership.

17. I have reason to believe M.G.U.'s separation from her children was direct retaliation for her participation in the Refugee Caravan for multiple reasons. In my experience prior to this Administration's strategic separation of non-citizen parents from their children, separation of a mother from her child at STFRC was a rare occurrence justified only by concrete evidence that the mother presented a danger to her child or other children.

18. Previously ICE has separated a mother from her child while they were detained at STFRC in three circumstances. First, ICE has separated a mother from her child shortly after the family's arrival to STFRC (within days) after determining through a records search evidence of the mother's prior criminal conduct that indicates a possible danger to a child. Second, ICE has separated a mother from her child after specific conduct at STFRC is observed and documented that indicates the mother presents a danger to the child. This type of separation has occurred in conjunction with a report by ICE or CoreCivic employees of child abuse or neglect to the Texas Department of Family and Protective Services. Lastly, parent-child separation has occurred when the government questioned the biological relationship between a mother and child who are detained as a family unit at STFRC. In my experience, all three types of separation have happened extremely rarely prior to this Administration's strategic separation of non-citizen parents from their children, and occurred within days (if not the same day) of the discovery of the fact that precipitated parent-child separation.

5

19. During my time with the Dilley Project, and prior to this Administration's strategic separation of non-citizen parents from their children, I have never seen a mother separated from her child because of an adverse credibility finding, misdemeanor non-violent crime, or allegation or conviction related to a past misrepresentation or false statement. Excluding this Administration's strategic separation of non-citizen parents from their children, I have represented mothers with actual or alleged past criminal convictions who were not separated, even when the past criminal charge or conviction, or allegation thereof, indicated violent conduct.

20. A Dilley Project legal assistant accompanied M.G.U. to her credible fear interview that took place on May 16, 2018. During the interview, M.G.U. testified that she previously entered the United States approximately 19 years ago. M.G.U. recalls her first entry to the United States, which occurred prior to the birth of her three youngest children. She remembers going to court after she presented herself at a U.S. port of entry and appearing before a judge. Ms. M.G.U. recalls being detained for at least 75 days after her entry to the United States approximately 19 years ago. She was unable to confirm whether she appeared before a judge in criminal court or immigration court, and whether she was charged with or convicted of a crime for making a false claim or false representation.

21. I have attempted to secure records regarding any and all past federal criminal convictions for M.G.U. and have found none. When I was unable to locate records regarding M.G.U.'s alleged past criminal conviction on PACER, I requested the assistance of Swanson & McNamara, a private law firm that specializes in criminal defense. The firm agreed to assist in M.G.U.'s case pro bono. Swanson & McNamara paralegals and attorneys attempted to secure copies of any criminal records regarding M.G.U. The firm

searched PACER for any and all records containing M.G.U's name and variations of it and reviewed all criminal cases filed with a charge of 18 U.S.C. § 911 (impersonating a United States citizen) during the period of time in which we understood M.G.U. would have been prosecuted. These efforts were also unsuccessful.

22. M.G.U.'s recent separation from her children stands in stark contrast to the extremely limited number of parent-child separations I have observed at STFRC prior to this Administration's strategic separation of non-citizen parents from their children because M.G.U.'s separation occurred (1) approximately two weeks after she presented herself at a POE and was fingerprinted and by immigration officials, (2) without any new facts that indicated she posed a danger to her children or others, and (3) subsequent to issuance of her positive credible fear finding.

23. Immediately after ICE agents informed M.G.U. that she obtained a positive credible fear determination, the agents informed her that she was being separated from her children because she has a "record." M.G.U. was not provided with any documents describing what the government believed her "record" to be or an opportunity to respond to the government's assertion. She was not given any information in writing or afforded a hearing before her children were taken away from her. Similarly, I was not provided any information regarding M.G.U.'s transfer from STFRC before or after her transfer, even though I was M.G.U.'s attorney of record.


I declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct, to the best of my personal knowledge.

Executed in Dilley, Texas on July 9, 2018.