IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| M.G.U. *et. al.*, <br>                 *Plaintiff,* <br> v. <br> Kirstjen Nielsen *et. al.*, <br>                 *Defendants.* | CASE NO. 18-CV-01458 |

## DECLARATION OF SHALYN FLUHARTY

I, Shalyn Fluharty, make the following declaration based on my personal knowledge:

1. I am an attorney and have been licensed and admitted in the State of California since 2010. I currently serve as the Managing Attorney of the Dilley Pro Bono Project ("the Dilley Project"), where I provide free legal services to asylum-seeking mothers and children who are detained at the South Texas Family Residential Center ("STFRC") in Dilley, Texas. I have served in this capacity since December 2016.

2. The Dilley Project is an informal association of four non-profit organizations who work in collaboration with a robust national volunteer network. In my role as Managing Attorney, I am the attorney of record for all clients represented by the Dilley Project.

3. The Dilley Project has represented over 19,700 families in credible or reasonable fear proceedings between January 1, 2017 and May 31, 2018.

1

**STFRC Has Not Been at Full Capacity for at Least the Last 18 months.**

4. STFRC has the capacity to detain up to 2,400 mothers and children combined at any given time. To my knowledge, during the 18 months that I have been the Managing Attorney of the Dilley Project, STFRC has never been at full capacity. My knowledge is based upon stated disclosures of total capacity at STFRC that I have obtained from individuals employed by U.S. Immigration and Customs Enforcement ("ICE"), STFRC private prison operator CoreCivic, and the United States Citizenship and Immigration Services Asylum Office, and from the total number of mothers and children the Dilley Project has represented at STFRC.

5. The Dilley Project does not receive a daily census of the total population of mothers and children detained at STFRC. However, we frequently receive information regarding the total daily population during informal conversations with employees of ICE, CoreCivic, and the Asylum Office. We also receive information from individuals who have access to STFRC data pursuant to continuous monitoring operations that are conducted in accordance with the court's administration of the settlement in *Flores* v. *Sessions*, No. 85-cv-4544, pending in the U.S. District Court for the Central District of California (the "*Flores* Settlement").

6. Based upon this information-sharing, I have recorded the total population at STFRC to be approximately the following, on the following dates:
    - April 9, 2018: 1,000
    - April 18, 2018: 1,200
    - May 2, 2018: 2,000
    - June 5, 2018: 2,000
    - June 14, 2018: 2,000
    - June 28, 2018: 1,500
    - July 2, 2018: 1,300

7. The Dilley Project is the only on-site legal services provider at STFRC. Mothers and children who are detained at STFRC are able to seek legal services from the Dilley Project at any time by entering the legal visitation trailer at STFRC, where Dilley Project staff and volunteers are available Monday-Friday from 7:30 a.m. to 8:00 p.m.

8. In May 2018 the Dilley Project began representation for 804 new families. In June 2018 the Dilley Project began representation for 1371 families.

9. Between May 1, 2018 and June 30, 2018 the Dilley Project recorded five families that did not seek representation from the Dilley Project because they retained outside private counsel.

10. I believe that the Dilley Project represented the overwhelming majority, if not all, of the families detained at STFRC between May 1, 2018 and June 30, 2018, other than the five families who were represented by outside counsel. The total number of families represented by the Dilley Project from May 1, 2018 to June 30, 2018 therefore I believe reflects more or less the total number of families detained at STFRC during this period of time.

**Representation of M.G.U.**

11. M.G.U. is a client of the Dilley Project. In connection with that representation, I represented M.G.U. in conjunction with her credible fear proceeding and have met with her numerous times. I am therefore personally familiar with the facts of M.G.U.'s immigration proceedings.

12. On May 4, 2018 M.G.U. was placed in immigration detention after crossing the San Ysidro, California port of entry ("POE"). Shortly thereafter she was transferred with her children to STFRC. M.G.U. participated in a credible fear interview on May 16, 2018. A

positive credible fear determination was made by Asylum Officer Lisa Raney the same day. Supervisory Asylum Officer Christopher McNary concurred with the positive credible fear determination on May 17, 2017. Incorporated into M.G.U.'s positive credible fear determination is a finding that the asylum officer found her credible in all aspects of her testimony.

13. ICE agents forcibly separated M.G.U. from her children on May 17, 2018, the same day her positive credible fear determination was issued by the asylum office. ICE subsequently transferred M.G.U. alone to the South Texas Detention Complex in Pearsall, Texas.

14. During M.G.U.'s credible fear interview, the asylum officer affirmatively asked M.G.U. if she was a member of the "Refugee Caravan" that entered the United States. M.G.U. responded affirmatively. The Refugee Caravan has been the subject of numerous public media reports. As described *infra*, asylum officers began screening all asylum applicants for participation in the Refugee Caravan after it arrived at the U.S.-Mexico border.

**I Believe M.G.U.'s Separation From her Children Was Punishment for her Participation in the Refugee Caravan.**

15. The Dilley Project, myself included, noticed specific changes to both USCIS Asylum Office and ICE procedures subsequent to the arrival of the Refugee Caravan. The Asylum Office began asking every asylum applicant if they were a part of the Refugee Caravan during all credible fear interviews that were conducted at STFRC. In many cases, asylum officers questioned asylum applicants for an extended period of time regarding their participation in the Refugee Caravan.

16. On April 27, 2018 Deportation Officer Richard Carrasquillo entered the STFRC visitation trailer and asked Dilley Project clients—while they were receiving legal

4

services—if they traveled to the United States with the Refugee Caravan. The next day I was informed by STFRC ICE Deportation Officers that they were instructed to identify and document which detained families participated in the Refugee Caravan for ICE leadership.

17. I have reason to believe M.G.U.'s separation from her children was direct retaliation for her participation in the Refugee Caravan for multiple reasons. In my experience prior to this Administration's strategic separation of non-citizen parents from their children, separation of a mother from her child at STFRC was a rare occurrence justified only by concrete evidence that the mother presented a danger to her child or other children.

18. Previously ICE has separated a mother from her child while they were detained at STFRC in three circumstances. First, ICE has separated a mother from her child shortly after the family's arrival to STFRC (within days) after determining through a records search evidence of the mother's prior criminal conduct that indicates a possible danger to a child. Second, ICE has separated a mother from her child after specific conduct at STFRC is observed and documented that indicates the mother presents a danger to the child. This type of separation has occurred in conjunction with a report by ICE or CoreCivic employees of child abuse or neglect to the Texas Department of Family and Protective Services. Lastly, parent-child separation has occurred when the government questioned the biological relationship between a mother and child who are detained as a family unit at STFRC. In my experience, all three types of separation have happened extremely rarely prior to this Administration's strategic separation of non-citizen parents from their children, and occurred within days (if not the same day) of the discovery of the fact that precipitated parent-child separation.

19. During my time with the Dilley Project, and prior to this Administration's strategic separation of non-citizen parents from their children, I have never seen a mother separated from her child because of an adverse credibility finding, misdemeanor non-violent crime, or allegation or conviction related to a past misrepresentation or false statement. Excluding this Administration's strategic separation of non-citizen parents from their children, I have represented mothers with actual or alleged past criminal convictions who were not separated, even when the past criminal charge or conviction, or allegation thereof, indicated violent conduct.

20. A Dilley Project legal assistant accompanied M.G.U. to her credible fear interview that took place on May 16, 2018. During the interview, M.G.U. testified that she previously entered the United States approximately 19 years ago. M.G.U. recalls her first entry to the United States, which occurred prior to the birth of her three youngest children. She remembers going to court after she presented herself at a U.S. port of entry and appearing before a judge. Ms. M.G.U. recalls being detained for at least 75 days after her entry to the United States approximately 19 years ago. She was unable to confirm whether she appeared before a judge in criminal court or immigration court, and whether she was charged with or convicted of a crime for making a false claim or false representation.

21. I have attempted to secure records regarding any and all past federal criminal convictions for M.G.U. and have found none. When I was unable to locate records regarding M.G.U.'s alleged past criminal conviction on PACER, I requested the assistance of Swanson & McNamara, a private law firm that specializes in criminal defense. The firm agreed to assist in M.G.U.'s case pro bono. Swanson & McNamara paralegals and attorneys attempted to secure copies of any criminal records regarding M.G.U. The firm

searched PACER for any and all records containing M.G.U's name and variations of it and reviewed all criminal cases filed with a charge of 18 U.S.C. § 911 (impersonating a United States citizen) during the period of time in which we understood M.G.U. would have been prosecuted. These efforts were also unsuccessful.

22. M.G.U.'s recent separation from her children stands in stark contrast to the extremely limited number of parent-child separations I have observed at STFRC prior to this Administration's strategic separation of non-citizen parents from their children because M.G.U.'s separation occurred (1) approximately two weeks after she presented herself at a POE and was fingerprinted and by immigration officials, (2) without any new facts that indicated she posed a danger to her children or others, and (3) subsequent to issuance of her positive credible fear finding.

23. Immediately after ICE agents informed M.G.U. that she obtained a positive credible fear determination, the agents informed her that she was being separated from her children because she has a "record." M.G.U. was not provided with any documents describing what the government believed her "record" to be or an opportunity to respond to the government's assertion. She was not given any information in writing or afforded a hearing before her children were taken away from her. Similarly, I was not provided any information regarding M.G.U.'s transfer from STFRC before or after her transfer, even though I was M.G.U.'s attorney of record.

I declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct, to the best of my personal knowledge.

Executed in Dilley, Texas on July 9, 2018.

_____

8