IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| M.G.U., *et al.*, | |
| Plaintiff, | Civil Action No. 1:18-cv-1458 (PLF) |
| v. | |
| KIRSTJEN NIELSEN, *et al.*, | |
| Defendants. | |

## MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

BACKGROUND ........................................................................................................................ 3

I.    Defendants' Family Separation Policy ........................................................................ 3

II.    Forced Separation of Plaintiffs from Their Children ................................................ 4

    A.    Plaintiff M.G.U. ............................................................................................ 4

    B.    Plaintiff A.P.F. .............................................................................................. 4

    C.    Plaintiff E.F. .................................................................................................. 5

III.    The *Ms. L.* Class Action Litigation ........................................................................ 5

IV.    The Government Has Not Renounced Separation ...................................................... 7

ARGUMENT .......................................................................................................................... 11

I.    The Complaint is not moot ........................................................................................ 11

    A.    This controversy is "capable of repetition, yet evading review" ......................... 12

        1.    The family separations at issue inflicted harm for durations
                sufficiently short to evade review .............................................................. 12

        2.    There is a reasonable expectation that the challenged actions
                in this matter will recur ............................................................................. 12

    B.    Defendants cannot moot this case by voluntarily ceasing their
        unlawful conduct .......................................................................................... 16

II.    The Complaint should not be dismissed or stayed on the basis of comity. ................... 18

    A.    Comity does not require dismissal or a stay in the instant case ........................... 18

    B.    In the alternative, the court should stay this matter rather than
        dismiss it, and ensure that the existing stay of removal protecting
        Plaintiffs remains in place ............................................................................. 20

III.    Plaintiffs have stated facts and a cognizable legal theory sufficient to state claims ......... 21

    A.    Plaintiffs have sufficiently pleaded a claim for violation of their
        due process rights to family integrity ............................................................. 21

    B.    Defendants entirely fail to address one of Plaintiffs' claims .............................. 22

CONCLUSION ...................................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adamski* v. *McHugh*,
    304 F. Supp. 3d 227 (D.D.C. 2015) .........................................................................21

\* *Aref* v. *Lynch*,
    833 F.3d 242 (D.C. Cir. 2016) ...............................................................................16

*Baker Industries, Inc.* v. *Cerberus, Ltd.*,
    549 F. Supp. 312 (S.D.N.Y. 1982) .......................................................................20

*Bell* v. *Wolfish*,
    441 U.S 520 (1979) ...............................................................................................22

\* *Burlington N. R. Co.* v. *Surface Transp. Bd.*,
    75 F.3d 685 (D.C. Cir. 1996) ...............................................................................12

*Citizen Center* v. *Gessler*,
    770 F.3d 900 (10th Cir. 2014) .............................................................................17

*Clark* v. *Martinez*,
    543 U.S. 371 (2005) ..............................................................................................13

*Clarke* v. *United States*,
    915 F.2d 699 (D.C. Cir. 1990) .............................................................................11

*Colorado River Water Conservation District* v. *United States*,
    424 U.S. 800 (1976) ..............................................................................................18

*D.L.* v. *D.C.*,
    187 F. Supp. 3d 1 (D.D.C. 2016) .........................................................................16

*D.C. Prof'l Taxicab Drivers Ass'n* v. *D.C.*,
    880 F. Supp. 2d 67 (D.D.C. 2012) .......................................................................16

*Doe* v. *Annucci*,
    No. 14-cv-2953, 2015 WL 4393012 (S.D.N.Y. July 15, 2015) ...........................15

*Doe* v. *Hills*,
    217 F. Supp. 3d 199 (D.D.C. 2016) .....................................................................20

---

\* Denotes cases on which Plaintiffs chiefly rely, in accordance with D.D.C. Local Rule LCvR 7(a).

*East Bay Sanctuary Covenant, et al.* v. *Trump, et al.*,
No. 18-cv-6810 (N.D. Cal. 2018) ..............................................................9

*Edwards* v. *Johnson*,
209 F.3d 772 (5th Cir. 2000) ...................................................................22

\* *Flanigan's Enters., Inc., of Ga.* v. *City of Sandy Springs*,
868 F.3d 1248 (11th Cir. 2017) ...............................................................17

*Golden* v. *Mgmt. & Training Corp.*,
319 F. Supp. 3d 358 (D.D.C. 2018) ...........................................................7

\* *Honig* v. *Doe*,
484 U.S. 305 (1988).................................................................11, 12, 13

*Indian River Cty.* v. *Rogoff*,
254 F. Supp. 3d 15 (D.D.C. 2017) ............................................................16

*In re Hutto Family Detention Center*,
No. 07-cv-00164 (SS) (W.D. Tex.) (May 10, 2007).........................................13, 14

*Jacinto-Castanon de Nolasco* v. *U.S. Immigration & Customs Enf't*,
319 F. Supp. 3d 491 (D.D.C. 2018) .........................................................21, 22

*Lake Pilots Ass'n, Inc.* v. *U.S. Coast Guard*,
257 F. Supp. 2d 148 (D.D.C. 2003) ...........................................................16

*Ms. L.* v. *ICE*,
No. 18-cv-428 (S.D. Cal. 2018) ....................................................... *passim*

\* *Northwest Forest Resource Council* v. *Dombeck*,
107 F.3d 897 (D.C. Cir. 1997) .................................................................18

*Pashby* v. *Delia*,
709 F.3d 307 (4th Cir. 2013) ...................................................................17

*Porter* v. *Clarke*,
852 F.3d 358 (4th Cir. 2017) ...................................................................17

*Reeve Aleutian Airways, Inc.* v. *United States*,
889 F.2d 1139 (D.C. Cir. 1989) ................................................................18

*Rodriguez* v. *Hayes*,
591 F.3d 1105 (9th Cir. 2010) .................................................................13

*Rosales-Garcia* v. *Holland*,
322 F.3d 386 (6th Cir. 2003) ...................................................................13

*United States* v. *Sanchez-Gomez*,
    138 S. Ct. 1532 (2018) ................................................................................................ 12

*Turner* v. *Rogers*,
    564 U.S. 431 (2011) .................................................................................................... 12

*Wall* v. *Wade*,
    741 F.3d 492 (4th Cir. 2014) ...................................................................................... 17

*Zadvydas* v. *Davis*,
    533 U.S. 678 (2001) .................................................................................................... 21

**INTRODUCTION**

Plaintiffs are three parents who claim that the Defendant agencies and officials ("the Government") violated their Due Process rights by forcibly separating them from their children. After this Court entered a preliminary injunction requiring reunification, the Government filed a motion to dismiss (ECF No. 53) based on three grounds. Each should be rejected.

First, Defendants argue that Plaintiffs' claims are moot. They are not. Plaintiffs' claims clearly satisfy both the "capable of repetition, yet evading review" and "voluntary cessation" exceptions to the mootness doctrine. While Plaintiffs have been reunited with their children, Defendants threaten to once again adopt a policy of separating parents from children, and continue to experiment with new actions designed to deny immigrants and asylum seekers their legal rights. Those actions continue to create chaos and fear. Indeed, less than three weeks ago, a federal court enjoined a Presidential Proclamation that would have prevented asylum seekers from filing applications for asylum because it found the Proclamation to be contrary to a federal statute. And on November 15, the President's nominee for Director of ICE testified before the U.S. Senate and stated, in response to questions about reinstating family separations, that "That option and that discussion is underway," and "it is an option."

Nor does the pendency of the *Ms. L.* litigation in California make Plaintiffs' claims here moot. The Government has appealed the preliminary injunction entered in that case, and that injunction does not adequately protect the Plaintiffs here, and may not even cover Plaintiff M.G.U. In sum, Plaintiffs are still at risk of being separated from their children, and Defendants should not be permitted to moot their claims by ceasing (perhaps only temporarily) their illegal conduct.

Second, Defendants argue that this Court should dismiss or stay this action as a matter of comity in light of the *Ms. L.* lawsuit. Plaintiffs respectfully submit that neither dismissal nor a stay is appropriate here. As detailed below, the claims here and in *Ms. L.* are not identical,

and the preliminary injunction in that case is less protective of Plaintiffs' rights and likely does not extend to at least one of the Plaintiffs here.  Moreover, Defendants have appealed the *Ms. L.* injunction, and have not been willing to state (let alone convincingly state) that they will not reinstate their policy of separating parents from their children if given the opportunity to do so.

Third, Defendants argue that Plaintiffs have failed to state a claim.  But there is no real dispute that there is a substantive due process right to family integrity, and Plaintiffs have indisputably pleaded that Defendants violated that right by forcibly separating them from their children.  This Court has already found that Plaintiffs demonstrated a likelihood of success on this claim.  Order on Mot. for Preliminary Injunction, ECF No. 47 at 10-15.  Plaintiffs also pleaded an additional claim, that Defendants improperly punished them as civil detainees in violation of their rights to substantive due process, and Defendants fail to address this claim in their motion.

# BACKGROUND

## I.    Defendants' Family Separation Policy

Until mid-2017, Defendants and their predecessor agencies maintained a policy to keep immigrant families intact while immigration laws were enforced.    Complaint ¶ 30. Immigrations and Customs Enforcement (ICE) recognized the need to "maintain a comprehensive process for identifying, placing, monitoring, accommodating, and removing alien parent or legal guardians of minors while safeguarding their parental rights." Complaint ¶ 31.  ICE acknowledged that "parental rights" include "[t]the fundamental rights of parents to make decisions concerning the care, custody, and control of their minor children without regard to the child's citizenship[.]" Complaint ¶ 31.

On August 29, 2017, Defendants rescinded this "parental rights" language. Complaint ¶ 32.    Thereafter, although there was no formal policy change announcement, Defendants began to routinely separate immigrant parents from their children.  Complaint ¶ 34. On April 6, 2018, the Attorney General announced a so-called "zero tolerance" policy for unlawful entry into the United States in violation of 8 U.S.C. § 1325(a), directing the Department of Justice to accept for prosecution all § 1325(a) referrals.  Complaint ¶ 35.  On June 15, 2018, the U.S. Department of Homeland Security (DHS) published a policy stating, in part, that all parents charged with violating § 1325(a) will be separated from their children at or near the time of arrest. These separations were indefinite, with no guarantee of future reunification.  Complaint ¶ 41.  As a direct result of Defendants' policy, and despite the trauma it caused, Defendants separated some two thousand parents from their children between November 2017 and June 2018.  Complaint ¶ 42.  Plaintiffs are among the parents whom Defendants separated from their children.

## II.     Forced Separation of Plaintiffs from Their Children

### A.     Plaintiff M.G.U.

M.G.U. and her three sons aged 2, 6, and 13 are citizens of Guatemala who fled their country after receiving threats due to the community organizing efforts of M.G.U.'s husband. Complaint ¶¶ 45, 48-49.   On May 4, 2018, M.G.U. and her children presented themselves to Defendants' employees at the port of entry in San Ysidro, California, seeking asylum under 8 U.S.C. § 1158.   Complaint ¶ 50.   Defendants' employees initially detained M.G.U. and her children together at the South Texas Family Residential Center (STFRC) near Dilley, Texas. Complaint ¶ 51.   On May 18, 2018, M.G.U. and her children underwent a "credible fear interview" before an Asylum Officer.   Complaint ¶ 52.   Two days later, and despite M.G.U. receiving a positive credible fear determination, Defendants' employees separated M.G.U from her children, detaining M.G.U. in Texas but transporting her three children to New York.   Complaint ¶ 54.   All four burst out in tears when they were told they would be separated, with M.G.U.'s 13-year-old son having to hold her 2-year-old child as the Defendants' employees led the children away from their mother.   Complaint ¶¶ 54, 56.   On June 20, 2018, Plaintiff M.G.U. filed this lawsuit seeking, in part, reunification with her children.   Complaint ¶ 105.   On July 11, 2018, the day before the scheduled hearing on M.G.U.'s application for preliminary injunction, the Government reunited M.G.U. and her three children.   Mot. to Dismiss, ECF No. 53 at 2.

### B.     Plaintiff A.P.F.

A.P.F. and his 12-year-old daughter, C.P.R., are citizens of Honduras who fled to the United States after A.P.F. was shot in the shoulder.   Complaint ¶ 67. A.P.F. continued to receive death threats even after he was released from the hospital.   *Id.*   A.P.F. and C.P.R. crossed into the United States in Cameron County, Texas, where A.P.F. approached officials asking for assistance in seeking asylum.   Complaint ¶ 68.   On June 4, 2018, Defendants' employees arrested

A.P.F and his daughter, brought them to a processing center in Brownsville, Texas, and immediately had A.P.F. and C.P.R. sign unknown and unexplained forms.  Complaint ¶ 69-70. That same day, Defendants' employees separated A.P.F. from his daughter.  Complaint ¶ 72.  On June 5 or 6, 2018, A.P.F. pleaded guilty in federal court to violating 8 U.S.C. § 1325(a) and was sentenced to time served.  Complaint ¶ 73.  A.P.F. did not receive any information about his daughter's whereabouts or well-being until July 3, 2018, a full month after their forced separation. Complaint  ¶ 76; Joint Status Report, ECF No. 26 at 3 ¶ 5.b.i.  Plaintiff A.P.F. and his daughter were only reunited on July 17, 2018, approximately one month after filing this lawsuit seeking reunification.  Status Report, ECF No. 45.

### C.   Plaintiff E.F.

E.F. and her 9-year-old son, B.Y.A.F., are citizens of Guatemala who fled their home country after being threatened with violence.  Complaint ¶ 78, 81.  On May 14, 2018, E.F. and her son crossed into the United States near Presidio, Texas, where they sought out immigration officials at a nearby port of entry, asking for protection.  Complaint ¶ 81.  Although E.F. and her son were initially detained together, Defendants' employees forcibly separated them the next day, without providing E.F. with any information about the separation or how long it would last. Complaint ¶ 82-83.  On June 6, 2018, following a record trial, a magistrate pronounced E.F. guilty of violating § 1325(a) and sentenced her to time served.  Complaint ¶ 86.  Following this Court's July 18, 2018, order granting Plaintiffs' motion for a preliminary injunction, *see* ECF No. 46, the Government reunited Plaintiff E.F. and her son on July 20, 2018.  Joint Notice, ECF No. 48.

## III.   The *Ms. L.* Class Action Litigation

On November 1, 2017, Ms. L., a native of the Democratic Republic of Congo, arrived with her 7-year-old daughter at a United States port of entry near San Diego, seeking asylum.  Defendants' employees separated Ms. L. from her daughter, sending the 7-year-old child

to a facility in Chicago.  On February 26, 2018, Ms. L. filed a suit, initially on her own behalf, in the United States District Court for the Southern District of California.  *See Ms. L.* v. *ICE*, No. 18-cv-428, ECF No. 1 (S.D. Cal. 2018).  On June 26, 2018, the *Ms. L.* Court granted a motion for class certification as to the plaintiffs' substantive due process claim, certifying the following class under FED. R. CIV. P. 23(b)(2):

> All adult parents who enter the United States at or between designated ports of entry who (1) have been, are, or will be detained in immigration custody by the DHS, and (2) have a minor child who is or will be separated from them by DHS and detained in ORR custody, ORR foster care, or DHS custody, absent a determination that the parent is unfit or presents a danger to the child.

Order on Mot. for Class Certification, *Ms. L.* ECF No. 82 at 17.

The aforementioned class is subject to important exceptions, notably that "the class does not include migrant parents with criminal history[.]"  *Id.* at n.10.  The same day the *Ms. L.* court certified the class, it also issued a class-wide preliminary injunction that, in relevant part, enjoins the defendants from detaining class members apart from their minor children, continuing to detain the children of released class members, or removing parents from the United States without their children.  Order on Mot. for Prel. Inj., *Ms. L.* ECF No. 83.  Unlike the preliminary injunction issued in this case, the *Ms. L.* injunction does not unequivocally prevent the removal of the class members, but rather prevents their removal without their children unless they consent—a provision that is of significant concern as it remains unclear that Government will actually ensure that the consent obtained from parents is voluntary, knowing, and valid.  *See infra* at 7-8.  Also unlike the preliminary injunction issued by this Court, the *Ms. L* injunction contains a potentially large exception for instances in which the Government makes "a determination that the parent is unfit or presents a danger to the child."  ECF No. 82 at 22-23.  This exception has not been further defined, providing the government with at least some latitude in the future separation of families.

The Government has appealed the *Ms. L.* preliminary injunction, and it has not unequivocally agreed to abide by its mandates.  Notice of Appeal to the Ninth Circuit, *Ms. L.* ECF No. 206.

## IV.     The Government Has Not Renounced Separation

Since the issuance of the preliminary injunctions by this Court and the *Ms. L.* Court, Defendants have continued to impose new and increasingly severe hardships on immigrants and, particularly, immigrants seeking asylum.  These steps include an unwillingness to abide by the spirit, if not also the letter, of these injunctions regarding child separation.[1]

For example, parents have been informed that they would be released and reunited with their children during the pendency of their immigration proceedings, only to be sent back to detention without an explanation and without ever seeing their children.  "Government Reunited Immigrant Families, Then Took the Children Away a Second Time," *Texas Monthly*, August 6, 2018, at Ex. 1.  Other parents have been temporarily reunited with their children, only to be separated again a short time later when they refused to sign a form stating that they wanted to be removed with their children—caught between fear for their children's safety in their home countries and fear of losing their children again, without being given sufficient time to understand the forms they were being asked to sign or the status of their own immigration cases.  *See id.*

This Court confronted these issues with respect to Plaintiff E.F., who had signed a form agreeing to be removed without her child without the government ensuring that she knew or understood what she was signing.  As E.F. herself explained: "[The officer] asked me if I were to

---

[1] *See* Attached Exhibits 1 to 11 concerning the Government's post-Complaint actions and statements.  Plaintiffs respectfully request that the Court take judicial notice of these exhibits. *See* FED. R. EVID. 201(d) ("The court may take judicial notice at any stage of the proceeding."); *Golden* v. *Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n. 2 (D.D.C. 2018) ("A court may consider extrinsic documents not expressly referenced in the complaint without converting the motion to a summary judgment motion if the document is a matter of public record [of] which the court may take judicial notice.") (quoting *Leftish* v. *Gallaudet Univ.*, 878 F. Supp. 2d 81, 93 n.5 (D.D.C. 2012)).

be deported what would I want to do with my son and I said that I wanted him to stay here but that

I didn't know what was happening with my case.  At no point did I understand or did I say to the

officer that I was giving up my rights to have my immigration case heard."  Declaration of E.F.,

ECF. No. 36-3 at 1.  In granting a temporary restraining order preventing Defendants from

removing E.F., this Court expressed significant concerns about the risk that the Government would

deport parents without their children, and without their valid consent.  Memorandum Opinion and

Order, ECF No. 44 at 2.

> What deeply troubles the Court at this stage is the risk that Ms. E.F. will be removed
> from the United States without her young son and without her valid consent to be
> removed without her son, before the Court has an opportunity to rule on her
> preliminary injunction motion seeking immediate reunification with him.  The
> recent representations made by the United States in the class action pending before
> Judge Dana M. Sabraw in federal court in Sane Diego only heighten this concern.
> *See Ms. L.* v. *U.S. Immigration and Customs Enf't*, No. 18-0428, ECF No. 104, at
> 4-5 (S.D. Cal. July 12, 2018) (confirming that twelve immigrant parents have been
> removed without their children thus far).

*Id.*

Other actions taken by the Government since the *Ms. L.* injunction issued include,

but are not limited to, the following, which include both specific actions targeting immigrants and

asylum seekers as well as statements and decisions demonstrating the general environment of

uncertainty and unpredictability that the Government has created with respect to immigration and

asylum policy.

> (1)   On November 1, President Trump stated that large groups of asylum seekers
> heading toward the United States' border "will not be allowed into the
> United States, and they should turn back now, because they're wasting their
> time."  "Remarks by President Trump on the Illegal Immigration Crisis and
> Border Security," issued Nov. 1, 2018, posted on the White House website,
> Ex. 2 at 2.
>
> (2)   On November 7, President Trump fired Attorney General Jeff Sessions,
> creating a leadership shake-up and increasing uncertainty about whether the
> immigration policies of the Justice Department are subject to change in the

near future.  "Attorney General Sessions is Forced Out as Trump Installs Loyalist," *New York Times*, Nov. 7, 2018, Ex. 3 at 1.

(3)    On November 9, President Trump issued a formal proclamation stating, in part: "The entry of any alien into the United States across the international boundary between the United States and Mexico is hereby suspended and limited[.] . . .  [This proclamation] shall not apply to any alien who enters the United States at a port of entry and properly presents for inspection, or to any lawful permanent resident of the United States." "Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States," issued Nov. 9, 2018, posted on the White House website, Ex. 4 at 3.  The proclamation further stated that "[a]liens who enter the United States unlawfully through the southern border in contravention of this proclamation will be ineligible to be granted asylum under the regulation promulgated by the Attorney General and the Secretary of Homeland Security that became effective earlier today." *Id.*  On November 20, the implementation of this proclamation, which illegally limits access to asylum, was blocked by a temporary restraining order issued by The Honorable Judge Jon. S. Tigar of the United States District Court for the Northern District of California.  *East Bay Sanctuary Covenant, et al.* v. *Trump, et al.*, No. 18-cv-6810 (N.D. Cal.), ECF No. 8.

(4)    On November 12, public news reports indicated that President Trump was planning to remove U.S. Department of Homeland Security Secretary Kirstjen Nielsen from office. "Trump is Preparing to Remove Kirstjen Nielsen as Homeland Security Secretary, Aides Say," *Washington Post*, Nov. 12, 2018, Ex. 5 at 1.  Similar to the firing of former Attorney General Sessions, this potential administration shake-up creates additional uncertainty regarding the immediate future of immigration policy and the fates of the plaintiffs challenging the administration's actions.

(5)    On November 15, the nominee for Director of ICE, Ronald Vitiello, testified in front of the U.S. Senate during his confirmation hearing. When questioned about a public news report that the Trump administration was considering reinstating family separations of undocumented immigrants under a new, updated policy, Vitiello refused to deny that the government was considering such a policy.  He stated: "That option and that discussion is underway," and "it is an option."  "Trump's Nominee to Lead ICE Won't Rule Out Separating Migrant Families Again," *Washington Post*, Nov. 15, 2018, Ex. 6 at 1.

(6)    On November 20, the White House issued a memorandum which authorized the U.S. military forces deployed at the U.S.-Mexico border to utilize "a show or use of force (including lethal force, where necessary)."  "Donald Trump Signs Authorization for Border Troops Using Lethal Force as Migrant Caravan Approaches, Document Reveals," *Newsweek*, Nov. 20, 2018, Ex. 7 at 2.

(7)     On November 24, in response to asylum seekers approaching the U.S.-Mexico border, President Trump tweeted the following: "Migrants at the Southern Border will not be allowed into the United States until their claims are individually approved in court. We only will allow those who come into our Country legally. Other than that our very strong policy is Catch and Detain. No 'Releasing' into the U.S. . . . All will stay in Mexico. If for any reason it becomes necessary, we will CLOSE our Sothern Border." "Trumps Tweets Migrants Will Stay in Mexico Until Asylum Claims Approved, Incoming Mexican Official Says No Deal," *The Hill*, Nov. 24, 2018, Ex. 8 at 1.

(8)     On November 25, President Trump ordered the closure of the San Ysidro port of entry into the United States (the same port of entry previously used by Plaintiff M.G.U. to apply for asylum). "Fact Check: What's Happening on the U.S. Mexico Border?", *NPR*, Nov. 27, 2018, Ex. 9 at 2. In the midst of major confusion at the port of entry, President Trump tweeted, in part: "No crossings!" *See* Ex. 8 at 3.

(9)     On November 25, Defendants' employees "fired tear gas into Mexico on Sunday to repel Central American migrants approaching the border after U.S. President Donald Trump vowed the asylum-seekers would not easily enter the country. . . . U.S. Customs and Border Protection officers stopped the migrants with a volley of canisters emitting large clouds of gas as U.S. and Mexican government helicopters clattered overhead." "U.S. Fires Tear Gas Into Mexico to Repel Migrants, Closes Border Gate for Several Hours," *New York Times*, Nov. 25, 2018, Ex. 10 at 1. Those gassed included parents fleeing with their small children. *Id.* at 2.

(10)    On November 26, President Trump tweeted a criticism of a '60 Minutes' news report on the child separations which resulted from Defendants' so-called "zero tolerance" policy. He wrote: "Obama . . . separated children from parents, as did Bush etc., because that is the policy and law." "Trump's False Claim that Obama Had the Same Family Separation Policy," *Washington Post*, Nov. 27, 2018, Ex. 11 at 1. The president's statement indicates that Defendants view the child separation policy as unchanged, just temporarily blocked by orders such as the preliminary injunction issued by this court.

In sum, Defendants continue to act with and express antipathy toward immigrants and asylum seekers, including toward those similarly situated to Plaintiffs, creating new means of barring individuals from legally seeking asylum in the United States and signaling uncertainty about the future of immigration policy. As described above in subparagraphs (5) and (10), Defendants' actions include statements that are specifically directed to the "child separation"

10

policy that is the subject of this Court's preliminary injunction.  These actions and statements demonstrate, at a minimum, that Defendants only halted family separations like the ones suffered by Plaintiffs due to ongoing judicial enforcement of the Constitution.  Defendants' actions and the fear, uncertainty, and chaos they have created demonstrate that this controversy remains live and that Plaintiffs have every reason to pursue these claims to obtain a final judgment protecting their constitutional rights.

## ARGUMENT

### I.      The Complaint is not moot.

Defendants argue that the reunification of Plaintiffs with their minor children renders the complaint in this matter moot.  (Mot. to Dismiss at 4.)  Defendants are wrong.

The mootness doctrine limits federal courts to deciding only "actual, ongoing controversies."  *Honig* v. *Doe*, 484 U.S. 305, 317 (1988).  A federal court should find a case moot if "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future."  *Clarke* v. *United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (quoting *Transwestern Pipeline Co.* v. *FERC*, 897 F.2d 570, 575 (D.C. Cir. 1990)).  Here, although Defendants have temporarily stopped violating Plaintiffs' constitutional rights, their actions have not mooted Plaintiffs' claims, particularly where Defendants' actions demonstrate that the relevant policies are subject to sudden and unpredictable changes and reversals.  As parents, Plaintiffs naturally seek the reassurance that only a final judgment can provide as to the constitutionality of Defendants' actions.  Complaint ¶ 105(c). Hence, additional meaningful relief from worry remains available and necessary for Plaintiffs. Moreover, two exceptions to the mootness doctrine apply here—the "capable of repetition, yet evading review" exception, and the "voluntary cessation" exception.

**A.      This controversy is "capable of repetition, yet evading review."**

The mootness doctrine does not apply when the controversy at issue is "capable of repetition, yet avoiding review."  *United States* v. *Sanchez-Gomez*, 138 S. Ct. 1532, 1536 (2018). This exception is satisfied where (1) the challenged action is too short in duration to be fully litigated prior to its cessation, and (2) there is a reasonable expectation that plaintiffs will be subjected to the same action again.  *See id.* at 1540.

**1.   The family separations at issue inflicted harm for durations sufficiently short to evade review.**

The Supreme Court and D.C. Circuit have repeatedly held that orders of less than two years' duration do not provide sufficient time for a party to fully litigate its claims.  *Burlington N. R. Co.* v. *Surface Transp. Bd.*, 75 F.3d 685, 690 (D.C. Cir. 1996) (citing *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission*, 219 U.S. 498, 514-16 (1911)); *see also Turner* v. *Rogers*, 564 U.S. 431, 440 (2011) (holding that detention of one year's duration satisfies the "evading review" prong).

Plaintiffs' claims satisfy this requirement, as the separations of Plaintiffs from their minor children—which ranged from over one month to over two months in duration—did not last long enough to permit full litigation of their claims that these separations were in violation of their Due Process rights.  (*See supra* at 4-5.)  Any illegal forced separation, regardless of duration, inflicts irreparable harm on children and parents that renders complete redress impossible and necessarily evades review.  Complaint at ¶¶ 24-27.

**2.   There is a reasonable expectation that the challenged actions in this matter will recur**

The second prong of this exception to mootness requires examination of "whether the controversy [is] capable of repetition."  *Honig*, 484 U.S. at 318 n.6.  This test is satisfied when plaintiffs can demonstrate a "reasonable expectation" that they will be subject to the same action

again.  *See id.*  There is no need to establish this reasonable expectation "with mathematical precision."  *Id.*  The Supreme Court has counseled against an overly "stringent" application of this test, stating: "[o]ur concern in these cases, as in all others involving potentially moot claims, was whether the controversy was capable of repetition and not . . . whether the claimant had demonstrated that a recurrence of the dispute was more probable than not."  *Id.*  The test is satisfied by "expectations that, while reasonable, [are] hardly demonstrably probable."  *Id.*

It is well established that the Government's release of immigrants from detention constitutes merely a reprieve from detention, not a full termination thereof.  Accordingly, such a release does not moot a challenge to the government's actions.  For example, in *Clark* v. *Martinez*, the Court considered a challenge by immigrant detainees to ICE's indefinite detention of certain categories of aliens.  543 U.S. 371, 378–79 (2005).  While the case was pending on appeal, one of the plaintiffs was given discretionary parole under a provision similar to 8 U.S.C. § 1226(b) (which governs the apprehension and detention of aliens and provides for revocable parole).  *Id.* at 376 & n.3 (citing 8 C.F.R. § 212.12(h)).  The Court held that the plaintiff's claims nevertheless presented a live controversy because he could be returned to detention at any time.  *Id.* at 376 n.3; *accord Rodriguez* v. *Hayes*, 591 F.3d 1105, 1117-18 (9th Cir. 2010) (similar); *Rosales-Garcia* v. *Holland*, 322 F.3d 386, 395-96 (6th Cir. 2003) (en banc) (holding that discretionary parole does not moot a case because it "does not constitute a termination of detention; it simply constitutes a reprieve from detention").

Similarly, the U.S. District Court for the Western District of Texas rejected the government's argument that plaintiffs' claims challenging the conditions at an immigrant family detention center were moot upon plaintiffs' release from the detention center at issue.  *In re Hutto Family Detention Center*, No. 07-cv-00164-SS (W.D. Tex.), Order filed May 10, 2007, ECF No.

64.  The court reasoned that the Government's continued power to detain the plaintiffs meant that their challenges to conditions of immigrant family detention—essentially Plaintiffs' claims here— were not moot.  *Id.*

In the present case, neither the reunification of Plaintiffs with their children nor the preliminary injunction in *Ms. L.* offer sufficient protection to mitigate the possibility that Plaintiffs will be detained again and separated from their children once more.

First, it is unclear whether M.G.U. is even part of the class protected by the injunction in *Ms. L.* as Defendants have previously alleged that she has a prior criminal history, a fact that would exclude her from membership in the *Ms. L.* class.  Declaration of SDDO Gerardo Aguilar at 1-2, ECF No. 27-1 (stating that MGU was not eligible for family detention because she had previously served 75 days for making false and misleading representations); *cf.* Reply Supporting App. for Prelim. Inj., ECF No. 31 at 7-8 and 23-24 (describing evidence indicating pretextual invocation of criminal history).  And, more generally, the Government continues to dispute the definition of the class in *Ms. L.*, arguing in a November 29, 2018, joint status report that parents whose children were released from custody before June 26, 2018, are not part of the class in *Ms. L.*  Joint Status report, *Ms. L.* ECF No.  329 at 13-14.  In fact, the class certification order in *Ms. L.* contains no such limitation.  *See Ms. L.* ECF No. 82.  Given the Government's continually changing stance on which parents qualify as members of the class in *Ms. L.*— exemplified by its contradictory treatment of M.G.U. and its actions during the course of the *Ms. L.* litigation—it is far from certain that Defendants intend to permanently treat all Plaintiffs as *Ms. L.* class members.

Second, the Government has issued a final order of removal for E.F, *see* Status Report, ECF No. 39 at 1, which continues to exist but is currently superseded by this Court's

preliminary injunction enjoining the removal of Plaintiffs.  Defendants have already attempted to claim that E.F. agreed to be deported without her child.   If the government were to make such an assertion again, whether as to E.F. or the other Plaintiffs, that could lead to removal of Plaintiffs without their child under the preliminary injunction in *Ms. L.*  While the court in *Ms. L.* has required that the parents make such representations affirmatively and knowingly, the facts surrounding E.F. indicate that the Government has attempted to secure waivers that were not knowing.  (*See supra* at 7-8.)

        Finally, Defendants' actions subsequent to the Complaint in this case have been unpredictable and reflective of a disregard for established law.  A recent Presidential Proclamation that would have prevented any person who did not enter at a port of entry from applying for asylum has been enjoined, because it is contrary to federal statutes and treaties.  *See supra* at 9; Ex. 4.  And the government has appealed the preliminary injunction in *Ms. L.,* and has refused to commit to abiding by that court's order indefinitely.  (*See supra* at 6-7.)  The chaos at the border and the disorganization within the relevant agencies, and the statements by Acting Director of ICE Ronald Vitiello, refusing to disavow a child separation policy and indicating that the government may once again separate parents from their children (*see supra* at 9; Ex. 5), make it clear that the challenged actions in this case are capable of repetition.  Particularly in light of the nature of the harm at issue here and the irreparability of that harm, Plaintiffs have a reasonable expectation that the Defendants' unlawful actions will be repeated and that they might once again be again be subject to detention and separation from their minor children.  *See Doe* v. *Annucci*, No. 14-cv-2953, 2015 WL 4393012 at *7 (S.D.N.Y. July 15, 2015) (finding reasonable expectation satisfied by possibility of future separation of parolee from child).

**B.      Defendants cannot moot this case by voluntarily ceasing their unlawful conduct.**

The second exception to the mootness doctrine is voluntary cessation.  A defendant cannot moot a case "simply by ending its unlawful conduct once sued."  *Indian River Cty.* v. *Rogoff*, 254 F. Supp. 3d 15, 19 (D.D.C. 2017) (quoting *Already, LLC* v. *Nike, Inc.*, 568 U.S. 85, 91 (2013)).  Under this standard, the case is moot only if (1) "there is no reasonable expectation that the [alleged] violation will recur" and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *Id.* (quoting *Larsen* v. *U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008).  The Government bears the "heavy" burden of showing that it is "*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Aref* v. *Lynch*, 833 F.3d 242, 251 (D.C. Cir. 2016) (emphasis in original) (quoting *Friends of the Earth* v. *Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000).

Applying these standards, this court has repeatedly expressed suspicion of policy changes that appear to be aimed at temporary expediency.  *See D.L.* v. *D.C.,* 187 F. Supp. 3d 1, 14-15 (D.D.C. 2016) ("[T]here is nothing inherently durable about the changes the [Government] made to its [policies] that would suggest recurrence is unlikely"); *D.C. Prof'l Taxicab Drivers Ass'n* v. *D.C.,* 880 F. Supp. 2d 67, 76 (D.D.C. 2012) ("[T]he government actors voluntarily modified some or all of the challenged conditions after the lawsuits were filed, but [it] did not institute any new policy or procedure that would provide assurance that the voluntary cessation was other than temporary."); *Lake Pilots Ass'n, Inc.* v. *U.S. Coast Guard*, 257 F. Supp. 2d 148, 157 (D.D.C. 2003) ("Although defendant has conceded that they erred in disregarding detention and delay hours, they have only published a temporary rule returning the rates to those set prior to the enactment of the challenged Final Rule.").

To discern whether voluntary cessation moots a claim, courts weigh the extent to which the cessation was the product of deliberation and informed choice, whether it is unequivocally expressed, and whether it is permanent and complete.  *See Flanigan's Enters., Inc., of Ga.* v. *City of Sandy Springs*, 868 F.3d 1248, 1255 (11th Cir. 2017) (en banc).  A defendant "retaining the authority and capacity to repeat an alleged harm," *Wall* v. *Wade*, 741 F.3d 492, 497 (4th Cir. 2014), or a government entity retaining the authority to "reassess . . . at any time," *Pashby* v. *Delia*, 709 F.3d 307, 316 (4th Cir. 2013), are grounds for a defendant to fail to meet its "heavy burden" of proving that wrongful behavior will not recur.  *Porter* v. *Clarke*, 852 F.3d 358, 364-65 (4th Cir. 2017).

Similarly, courts do not find claims moot when a defendant "expressly states that, notwithstanding its abandonment of a challenged policy, it could return to the contested policy in the future," *Porter*, 852 F.3d at 365 (citing *Town of Nags Head* v. *Toloczko*, 728 F.3d 391, 394 n.3 (4th Cir. 2013)) or when a defendant's "reluctant" decision to change a policy reflects "a desire to return to the old ways," *Citizen Center* v. *Gessler*, 770 F.3d 900, 908 (10th Cir. 2014) (quoting *Rio Grande Silvery Minnow* v. *Bureau of Reclamation*, 601 F.3d 1096, 1117 (10th Cir. 2010)).

Plaintiffs have demonstrated a reasonable expectation of recurrence.  Defendants, far from assuring the Court that family separation is a thing of the past, in fact concede that there is a possibility Plaintiffs could be separated from their children again, offering only: "such future separation would have ample opportunity for review, just as was available to Plaintiffs in the instant case."  Mot to Dismiss at 5-6.  In fact, the Acting Director of ICE—and President Trump's nominee for the permanent Director position—has recently stated that reinstating family separations "is an option" and that discussions of such a policy have been "underway" at the White House.  *See supra*, at 9; Ex. 5.  The Government has appealed the preliminary injunction requiring

family reunification in *Ms. L.* and has refused to state unequivocally that it will abide by the order. *See supra*, at 6-7.   Defendants' own statements and actions demonstrate that they have failed to meet their burden here.  The Government's continued defense of its child separation policy and its refusal to admit the illegality of its past conduct weighs against any mootness finding in this case. *See Reeve Aleutian Airways, Inc.* v. *United States*, 889 F.2d 1139, 1143 (D.C. Cir. 1989) (collecting cases).

Plaintiffs, therefore, respectfully request that the Court deny Defendants' motion to dismiss this case as moot.

## II.   The Complaint should not be dismissed or stayed on the basis of comity.

Defendants argue that the doctrine of comity calls for dismissing this case, due to the ongoing litigation in *Ms. L.* v. *ICE*, No. 18-cv-428 (S.D. Cal.) and Defendants' view that all Plaintiffs are members of the newly certified class in that matter.  (Mot. to Dismiss at 7.)  This is not the case.

### A.   Comity does not require dismissal or a stay in the instant case.

The decision of whether to dismiss or stay on the grounds of comity is completely within this Court's discretion.  *See Colorado River Water Conservation District* v. *United States*, 424 U.S. 800, 814 (1976).  "The case law of this circuit makes it clear that 'comity' is rarely employed to justify the dismissal of viable claims that are otherwise properly before the court." *Northwest Forest Resource Council* v. *Dombeck*, 107 F.3d 897, 901 (D.C. Cir. 1997).  "[I]n strictly limited circumstances, [the D.C. Circuit has] held that comity may warrant dismissal of an action where there is a case pending in another jurisdiction involving the same parties, issues, and subject matter."  *Id.* (emphasis omitted).  This case does not present such circumstances.

First, neither the claims nor the plaintiffs of *Ms. L* and this matter wholly overlap. Plaintiffs here bring a claim that is not presented in *Ms. L.*, namely that the government has violated

substantive due process by its punishment of civil detainees.  *Compare* Ms. L. Amended

Complaint, *Ms. L.* ECF No. 32 at 11 *with* M.G.U. Complaint, ECF No. 1 at 16-17 ¶¶ 97-100.

Moreover, it is not clear that M.G.U. is, in fact, a member of the *Ms. L.* class, and, more generally,

the Government continues to change its position on precisely which parents should be considered

part of the Ms. L. class.  *See supra* at 14.

        Second, and crucially, the existing stay in *Ms. L.* is not as protective as the current

stay of removal in this case.  In *Ms. L*, the class-wide preliminary injunction enjoins the defendants

in that matter from detaining class members separate from their minor children, continuing to

detain the children of released class members, or removing parents without their children.

Significant loopholes, however, remain for the Government.  *See Ms. L.* ECF No. 83.  The

government can still do any of the above if it makes "a significant determination" that the parent

is unfit or presents a danger to the child.  *See id.*  Furthermore, the government can do any of the

above without this "significant determination" as long as parents "affirmatively, knowingly, and

voluntarily" decline to be reunited with their children.  *See id.*  (Note that while these loopholes

present an ongoing risk of separation to all Plaintiffs, E.F. is particularly vulnerable, as discussed

*supra* at 15.)

        Here, in contrast to the *Ms. L.* injunction, the Court has explicitly stayed any

removal of these plaintiffs until further order of this Court, with no exceptions.  ECF No. 110.

        As has already been discussed, there are significant concerns about the

government's ability and willingness to commit to the requirements of the *Ms. L.* preliminary

injunction.  *See supra* at 7.   This Court has itself expressed significant concerns about the

Government's refusal to unequivocally commit to complying with the court's directives in *Ms. L.*

*See* ECF No. 44 at 5-6.

Although defendants have repeatedly stated that they will attempt to comply—or more recently, are "committed" to complying, *see Ms. L.* v. *U.S. Immigration and Customs Enf't*, No. 18-0428, ECF No. 109, at 1—with Judge Sabraw's thirty-day timeline for reunification of children age five and above on or before July 26, 2018, defendants have refused to assure this Court that they will not seek to remove Ms. E.F. without her son prior to that date.

*Id.*

The Government has appealed the *Ms. L* order and has not unequivocally agreed to abide by it; Defendants therefore cannot rely on this order as a basis to dismiss or stay the instant action. Given these facts, and given the overall unpredictability of the Government's policies when it comes to these families, it is far from clear that the *Ms. L.* litigation is sufficiently protective of Plaintiffs' rights to justify a dismissal on the basis of comity.

**B.    In the alternative, the court should stay this matter rather than dismiss it, and ensure that the existing stay of removal protecting Plaintiffs remains in place.**

Although Plaintiffs disagree that the *Ms. L* litigation provides a basis for any relief for Defendants, in the event the Court decides the *Ms. L.* litigation should take precedence, the Court should at the very most stay this matter and preserve the existing stay of removal.

Where equitable factors weigh in favor of a stay rather than dismissal, a stay is the proper choice. *See Doe* v. *Hills*, 217 F. Supp. 3d 199, 207 (D.D.C. 2016). Here, the dangers faced by the plaintiffs, the ongoing uncertainty caused by the government's unorganized approach to family detention and separation, and the differences between this case and *Ms. L.* weigh in favor of a stay, not dismissal. "[I]t [is] preferable to stay, rather than dismiss, the action because a stay will effectuate the purposes of a dismissal, but allow the Court to activate the case if warranted by changed circumstances." *Baker Industries, Inc.* v. *Cerberus, Ltd.*, 549 F. Supp. 312, 315 (S.D.N.Y. 1982).

**III.**     **Plaintiffs have stated facts and a cognizable legal theory sufficient to state claims.**

Defendants argue that Plaintiffs have failed to adequately plead a due process right to be detained with their children, as the substantive due process right to family integrity does not apply in the context of undocumented persons facing lawful criminal and immigration enforcement actions.  Mot. to Dismiss at 9.  Defendants misapprehend both the law on this point and the Plaintiffs' burden at the pleading stage.

Courts reviewing a motion to dismiss under Rule 12(b)(6) must accept as true all well-pleaded factual allegations, and "grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Adamski* v. *McHugh*, 304 F. Supp. 3d 227, 233-34 (D.D.C. 2015) (quoting *Sparrow* v. *United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000).  The complaint must contain sufficient factual allegations to "state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

**A.**     **Plaintiffs have sufficiently pleaded a claim for violation of their due process rights to family integrity.**

Plaintiffs have alleged sufficient facts and a cognizable legal theory to state a claim to relief that is plausible on its face.  This Court has already found that Plaintiffs demonstrated a likelihood of success on this claim.  Order on Mot. for Preliminary Injunction, ECF No. 47.

There is a clear due process right to family integrity under the Constitution.  "The Supreme Court has made clear that parents have a fundamental liberty interest in family integrity and in the care, custody, and control of their children." *Jacinto-Castanon de Nolasco* v. *U.S. Immigration & Customs Enf't*, 319 F. Supp. 3d 491, 499 (D.D.C. 2018) (citing *Troxel* v. *Granville*, 530 U.S. 57, 65-66, (2000)).  Due process protects everyone within the territory of the United States, regardless of citizenship status.  *See Zadvydas* v. *Davis*, 533 U.S. 678, 693 (2001).  Plaintiffs were demonstrably separated from their children by Defendants in violation of the

Constitution.  This very Court has held that the lawful detention of plaintiffs in immigration custody "does not eliminate [their] due process right to family integrity."  *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 500.  The actions taken by the government to separate these parents from their children, clearly laid out in the Complaint, "directly and substantially burdened plaintiffs' right to family integrity."  *Id.* at 501; *see* Complaint ¶¶ 44-94, 105.

> **B.      Defendants entirely fail to address one of Plaintiffs' claims.**

Defendants' motion  references only the family integrity due process claim, and fails to address Plaintiffs' claim regarding punishment of civil detainees in violation of substantive due process—the same claim that is distinct to this litigation, as discussed *supra* at 19.  *See* Complaint at ¶¶ 97-100.  This claim therefore survives the instant motion.

In any event, even if the claim had been challenged by the Government, Plaintiffs have stated sufficient facts to satisfy their burden on this claim at the pleading stage.  As a matter of substantive due process, people who are not serving a sentence for crime cannot be subjected to conditions of confinement that "amount to punishment."  *Bell* v. *Wolfish*, 441 U.S 520, 536-37 (1979).  The same is true for civil immigration detainees.  *Edwards* v. *Johnson*, 209 F.3d 772, 778 (5th Cir. 2000).   Defendants forcibly separated Plaintiffs—who were not serving criminal sentences—from their children, and maintained this separation for months without providing meaningful information to parents or children about one another's whereabouts, well-being, and when they could expect to be reunified, and prevented them from reliable and ready access to means of communicating with one another.  Complaint at  ¶¶ 44-94.  Such actions were patently excessive in relation to any legitimate objective.

## CONCLUSION

The Court should deny Defendants' motion to dismiss.

December 7, 2018

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

Steven C. Herzog (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3317
sherzog@paulweiss.com

David J. Ball (DC Bar No. 460055)
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7352
dball@paulweiss.com

Anand Sithian (admitted *pro hac vice*)
Katherine Kelly Fell (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000
asithian@paulweiss.com
kfell@paulweiss.com

TEXAS RIOGRANDE LEGAL AID, INC.

Jerome Wesevich (D.D.C. Bar No. TX0125)
Amanda Chisholm (Texas Bar No. 24040684)
Peter McGraw (Texas Bar No. 24081036)
1331 Texas Avenue
El Paso, Texas 79901
(915) 241-0534
jwesevich@trla.org
achisholm@trla.org
pmcgraw@trla.org

*Counsel for Plaintiffs*

*M.G.U., et al.*, v. *Kirstjen Nielsen, et al.*

18-cv-1458 (PLF)

# EXHIBIT 1

NEWS

# The Government Reunited Some Immigrant Families—Then Took the Children Away a Second Time

As the government contends with 500 children who remain in government facilities, nightmarish tales are emerging of aborted reunifications.

---

BY      **ROBERT MOORE**

DATE     AUG 6, 2018

SHARE

NOTES     3 COMMENTS

---



**Dozens of women, men and their children, many fleeing poverty and violence in Honduras, Guatamala and El Salvador, arrive at a bus station following release from Customs and Border Protection on June 23, 2018 in McAllen, Texas.**

*Spencer Platt/Getty Images*

**T**wo weeks ago, a federal judge praised the Trump administration for its efforts in meeting a court-ordered deadline to reunite the majority of 2,500 children who had been separated from their parents by border agents after they crossed into the United States illegally. But as lawyers with the government and those representing the immigrants sort out what happened to the families of roughly 500 children who remain separated, nightmarish tales are beginning to emerge of parents being reunited with their kids only to have them taken away a second time; or of parents being told that they are about to be reunited with their children, only to wait hours before being returned to holding facilities without seeing their kids—and without any explanation.

*Texas Monthly* had an opportunity to speak with several fathers who are being held in a private prison in the New Mexico desert in Otero County, New Mexico, just outside El Paso. Many of them fear retaliation from their jailers and they also fear reprisal from officials in their native Guatemala. *Texas Monthly* agreed to identify them by pseudonyms.

Pablo and Antonio are two of these men who shared their story via telephone interviews set up by immigration advocates. On July 25, they said, the day before the deadline set for reunifications by U.S. District Judge Dana Sabraw of San Diego, the two men changed out of jail uniforms into civilian clothes at Otero and were put on a bus with other detained parents, headed for the Immigration and Customs Enforcement detention center about fifteen miles away in El Paso. That afternoon, they finally were reunited with their teenage sons after months of separation. Hugs and excited conversations ensued. They were put on a bus with other newly reunified families, and the bus drove out of the ICE detention facility. But the bus soon reversed course.

"Five minutes in, the woman taking care of us received a call and told the driver to go back. We went back to the (El Paso ICE) parking lot, where now there were two other buses," Pablo said. "She told us to move to the bus that said 'Misioneros,'" or Missionaries, he said. Their children stayed with them. "Then we boarded and waited for about an hour and a half. We were wondering what was happening. They made us get off in pairs to ask us about our children, what were their names, ages, names of the parents, etc. Then we boarded again and one person from ICE arrived and asked us to sign a paper."

The paper gave the twenty-five parents on the bus three options, Pablo and Antonio said: "I wish to be deported with my child"; "I wish for my child to stay in the U.S. for his or her own asylum case if I am deported"; "I want to talk to a lawyer." It was a gut-wrenching choice that immigration advocates say was given to hundreds of newly reunited families. Do they stay together as a family if the parent is deported, the likely outcome for most of the parents? Or do the parents leave their children behind with relatives in the United States, hoping their children win their own asylum case so they don't have to return to the poverty and violence that drove them out of their homeland in the first place? According to Pablo and Antonio, as well as other detainees interviewed by lawyers, the English-language forms given to the parents had the first box already pre-checked: Deport me with my child. Pablo, Antonio, and several other parents on the bus objected. They preferred to leave their children in the United States if they are deported.

"I checked the option that I wanted and the officer got mad with us and made us get off the bus," Pablo said. "Then a second and a third officer arrived, a woman and a man, and asked us to sign again. Then a fourth person arrived, also an officer, and told us to board the bus again. 'Don't worry,' he said, 'you are going to a

shelter now.' We sat there hugging our children," Pablo recalled. "They said that if we didn't sign we were going to be separated from our children. They threatened us," Pablo said.

Antonio, who also wanted his teenage son to stay in the United States if he was deported, said, "When we didn't sign, they got very mad and they told us, 'Well, you are not going to see your children ever again.'" The parents who refused to sign were taken off the bus, leaving their children behind.

Six fathers and one mother on the bus refused to sign the document with the pre-checked box saying they wished to be deported with their children, said Taylor Levy, the director of the Annunciation House Legal Project, which has been helping separated parents in El Paso area ICE detention facilities. Pablo said several other parents who initially balked at agreeing to deportation with their children eventually consented. "There were parents who told their children that it would be better to stay here with their relatives. But the children cried and they ended up signing. Lots of parents cried a lot because they couldn't be separated from their children," Pablo said.

It's unclear what happened to the parents who agreed to be deported with their children. One likely possibility is that they were taken to one of two family detention centers in South Texas to await deportation, which could come as early as this week. For the seven parents who refused to agree to deportation with their children, Levy said, their children were taken away from them after spending only a couple of hours back together. The parents returned to ICE detention centers, including the one in Otero; the children stayed on the bus and eventually went back to shelters run by the Office of Refugee Resettlement, the federal agency in charge of caring for unaccompanied minors.

The short-lived July 25 reunion marked the second time that the U.S. government separated the families. The parents were not allowed to board the bus to say goodbye to their children. "It was very painful. I had been separated for so long and then I met him for such a short time," Antonio said. For Pablo, "That was the hardest thing that ever happened to me. These are very difficult things to live through, but God gives us strength." Both men said they have not been able to reach their children by phone since being separated again.

Federal officials rarely discuss individual immigration detainees, and require a full name and alien number before even considering giving a comment. *Texas Monthly* could not provide that information under the ground rules for the interviews. But the Department of Homeland Security provided a statement to Vox about the allegations that children were taken again from parents who refused to have their children deported with them. They did not deny it.

"Asking parents in ICE custody, who are subject to a final order of removal, to make a decision about being removed with or without their children, is part of long-standing policy," the statement said. "For parents who have a final order of removal, and whose children have not received a final order, it is the parent's decision whether to return with or without their children."

Then there were those who were told they were about to be reunited with their children—without it ever happening.

Jorge and Diego also were taken by bus on July 25 from Otero to the El Paso ICE facilities. They were given paperwork that said they were being released from custody to be with their children while their asylum

claims wound their way through immigration court. "We were in the (Otero) cafeteria when they told us to get our things because we were going to be reunited with our children," Jorge said. "We all got excited." He remembers traveling on a bus with about 38 detainees. "They took us to a big room. We stayed there for a full day and our kids never arrived. They then took us back to the prison." Both Jorge and Diego said they were shackled for the return trip and were never told why they were not reunited with their children. "Nobody has given us any explanations. I was supposed to be reunited with my son and then they didn't. Supposedly, they have opened a new case for me," Diego said. Jorge said he's been told his son is back at a shelter in Houston after being brought to El Paso for the aborted reunion; Diego said his son is with a cousin.

Although the Trump administration says it met the court-ordered deadlines for reuniting separated families, more than 500 children remain in government custody, away from their parents. Judge Sabraw was told that more than 400 of them have parents who were deported or otherwise removed from the country without their children. Another group of about 80 have parents who were released from custody in this country, but whom the government has not been able to locate since. Another 30 children have parents who have been deemed by the government to be ineligible for reunification with their children because of "red flags" in their backgrounds. It's possible that Jorge and Diego are in that last group, though they have told attorneys they don't have criminal records.

At a status conference on Friday before Sabraw, American Civil Liberties Union attorney Lee Gelernt said the government hasn't provided much information on what led to the red flags. Some of the information received so far shows that some of the red flags might involve relatively minor charges from a decade ago or longer, Gelernt said. Sabraw on Friday ordered the government to provide more information to the ACLU lawyers about the red flags.

Jorge said 35 fathers who had their children taken from them by border agents are still being detained at Otero. Levy said the Annunciation House Legal Project continues to help more than 50 parents in the El Paso area who still haven't been reunited with their children. Seventeen apparently aren't covered by Sabraw's reunification order because their children had already been placed with other family members in the United States. Several are parents who were separated from their children a second time because they wouldn't agree to have their children deported with them. Others, like Jorge and Diego, haven't been told why they remain apart from their children. Levy says that 70 percent of the parents still detained across the Southwest have children age 14 or older. "It seems very clear to us that there was some sort of a decision to speed up the reunifications of the smaller children and not of the older children," she said.

Levy said dozens of children likely suffered further harm as the deadline neared by being told that they would be reunited with their parents, only to be separated again or never seeing their parents at all. "They flew them across the country, told them they were being reunited. Those (seven) families who refused to sign, they were then ripped away from their parents again," she said. "But even for the other ones who never saw their parents—that was thirty-some, we think—that were physically flown here, to the best of our knowledge. And then, what? What happened? ... It's just awful. It's just horrifically sad."

*Spanish translation assistance for this article was provided by Lourdes Cueva Chacón, a doctoral student in the School of Journalism at the University of Texas at Austin.*

**3**

COMMENTS

SHARE

TAGS: <u>IMMIGRATION</u>, <u>FAMILY SEPARATION</u>, <u>ICE</u>, <u>REUNIFICATION</u>, <u>TRUMP ADMINISTRATION</u>

*M.G.U., et al.*, v. *Kirstjen Nielsen, et al*.

18-cv-1458 (PLF)

# EXHIBIT 2

final

There's a limit to how many people a nation can responsibly absorb into their societies. Every day, above and beyond our existing lawful admission programs, roughly 1,500 to 2,000 people try crossing our borders illegally. We do a very good job considering the laws are so bad. They're not archaic; they're incompetent. It's not that they're old; they're just bad. And we can't get any Democrat votes to change them. It's only the Republicans that are — in unison, they want to change them. They want to make strong borders, want to get rid of any crime because of the borders, of which there's a lot.

And we've done a great job with the laws that we have. We're moving in tremendous numbers of people to get out the MS-13 gangs and others gangs that illegally come into our country. And we're getting them out by the thousands.

But this is a perilous situation, and it threatens to become even more hazardous as our economy gets better and better. A lot of the cause of this problem is the fact that we right now have the hottest economy anywhere in the world. It's doing better than any economy in the world. Jobs, unemployment — you look at any number.

Right now, we have more workers than any time in the history of our country. We have more people working, which is a tremendous statement. More people working than at any time in the history of our country. And people want to come in, and in some cases, they want to take advantage of that, and that's okay. And we want them to come in, but they have to come in through merit. They have to come in legally.

At this very moment, large, well-organized caravans of migrants are marching towards our southern border. Some people call it an "invasion." It's like an invasion. They have violently overrun the Mexican border. You saw that two days ago. These are tough people, in many cases. A lot of young men, strong men. And a lot of men that maybe we don't want in our country. But again, we'll find that out through the legal process.

But they've overrun the Mexican police, and they've overrun and hurt badly Mexican soldiers. So this isn't an innocent group of people. It's a large number of people that are tough. They've injured, they've attacked, and the Mexican police and military has actually suffered. And I appreciate what Mexico is trying to do.

So let me begin by stating that these illegal caravans will not be allowed into the United States, and they should turn back now, because they're wasting their time. They should apply to come into our country. We want them to come into our country very much. We need people to help us, with all of these companies that are coming in. We've never had anything like this. We have car companies coming in. We have Foxconn — so involved with the manufacturing of Apple products — coming in in Wisconsin. We have a lot of companies coming in, but they have to apply, and they have to be wonderful people that are going to love our country and work hard.

And we've already dispatched, for the border, the United States military. And they will do the job. They are setting up right now, and they're preparing. We hope nothing happens. But if it does, we are totally prepared. Greatest military anywhere in the world, and it's going to be, and is now, in great shape. No longer depleted like it was when I took over as the President of the United States.

The government of Mexico has generously offered asylum, jobs, education, and medical care for people within the caravan, but many members of the caravan have refused these offers, which demonstrate that these migrants are not legitimate asylum-seekers. They're not looking for protection. Because if they were, they'd be able to get it from Mexico. Mexico has agreed to take them in and encouraged them to stay. But they don't want to stay; they want to come into the United States. So this is no longer safety, and asylum is about safety.

Asylum is not a program for those living in poverty. There are billions of people in the world living at the poverty level. The United States cannot possibly absorb them all. Asylum is a very special protection intended only for those fleeing government persecution based on race, religion, and other protected status.

These caravans and illegal migrants are drawn to our country by Democrat-backed laws and left-wing judicial rulings. We're getting rulings that are so ridiculous, so bad. They're writing the laws. Can't do that. Collectively known as — as an example, catch-and-release. It's a disgrace that we have to put up with it.

These policies lead to the release of illegal aliens into our communities after they've been apprehended. But we're not releasing anymore. Big change, as of a couple of days ago. We're going to no longer release. We're going to catch; we're not going to release. They're going to stay with us until the deportation hearing or the asylum hearing takes place. So we're not releasing them into the community.

We have millions of people that, over the years, have been released into the community. They never show up for the trials. They never come back. They're never seen again. And those people, they know who they are. And we know a lot of where they are, who they are. And those people will be deported, directly deported.

The biggest loophole drawing illegal aliens to our borders is the use of fraudulent or meritless asylum claims to gain entry into our great country. An alien simply crosses the border illegally, finds a Border Patrol agent, and using well-coached language — by lawyers and others that stand there trying to get fees or whatever they can get — they're given a phrase to read. They never heard of the phrase before. They don't believe in the phrase. But they're given a little legal statement to read, and they read it. And now, all of a sudden, they're supposed to qualify. But that's not the reason they're here.

This merely asserts the need for asylum, and then often released into the United States, and they await a lengthy court process. The court process will takes years sometimes for them to attend. Well, we're not releasing them into our country any longer. They'll wait for long periods of time. We're putting up massive cities of tents. The military is helping us incredibly well.

I want to thank the Army Corps of Engineers. They've been so efficient, so good, so talented. And we have thousands of tents. We have a lot of tents; we have a lot of everything. We're going to hold them right there. We're not letting them into our country. And then they never show up — almost. It's like a level of 3 percent. They never show up for the trial. So by the time their trial comes, they're gone. Nobody knows where they are. But we know where a lot of them are, and they're going to be deported.

There are now nearly 700,000 aliens inside the United States awaiting adjudication of their claims. Most of these people we have no idea how they got there, why they got there. And the number is actually going to be a much larger number as we look at all of the data. So if you look at just at a minimal number, it's the size of Vermont, or bigger. And the overall number could be 10 million people; it could be 12 million people; it could be 20 million people. The record keeping from past administrations has not exactly been very good.

As human smugglers and traffickers have learned how the game is played and how to game the system, we have witnessed a staggering 1,700 [percent] increase in asylum claims since the year 2010. They understand the law better than the lawyers understand the law. You have a lot of professionalism there. You have a lot of professionalism involved with setting up the caravans. You take a look at the way that's happening. Even the countries — you look at Honduras and El Salvador, and you look at what's happening at the different levels and different countries, and what's happening on the streets. There's a lot of professionalism taking place, and there seems to be a lot of money passing. And then, all of a sudden, out of the blue, these big caravans are formed and they start marching up. They got a long way to go.

On average, once released, an asylum case takes three and half years to complete. Think of it. Somebody walks into our country, reads a statement given by a lawyer, and we have a three-and-a-half-year court case for one person, whereas other people tell them, "Out. Get out. Just get out." Other countries — "Get out. We have a border. Get out."

We go through years and years of litigation because of the Democrats and the incompetent, very, very stupid laws that we have. They're the laughingstock all over the world, including the people that are marching up. They understand. But the difference is, we're not allowing them in, and we're not releasing, and we're not doing any of the things that were done for so many years that really are terrible for our country.

The overwhelming majority of claims are rejected by the courts, but by that time, the alien has usually long since disappeared into our country. So they never get to see the judge. They never get to have a ruling. They don't care because they're in the country and nobody knows where they are.

All told, there are approximately 1 million aliens who have received final orders of removal. They've actually got final orders of removal. You don't have to go to court anymore. The courts have already issued the orders of removal, and we've gotten a lot of them. But who remain at large in our country. So we've moving them out.

This endemic abuse of the asylum system makes a mockery of our immigration system, displacing legitimate asylum-seekers — and there are legitimate asylum-seekers — while rewarding those who abuse or defraud our system, which is almost everybody. Everybody is abusing it and just doing things to our system which were unthinkable, I'm sure even by the Democrats who were largely responsible for getting it done.

These individuals disrespect the foundations of American government by voluntarily choosing to break the law as their first act on American soil.

Furthermore, contained within this giant flow of illegal migration to our southwest border is the movement of illicit and deadly narcotics. It's in the southwest, most of it comes in. Nearly 100 percent of heroin in the United States enters through the southern border– think of that: 100 percent, almost, of heroin comes in through the southern border, along with roughly 90 percent of cocaine, and the majority of meth, and a substantial portion of the ultra-lethal fentanyl killing our youth. Fentanyl is killing our youth.

These drugs destroy the lives and kill much more than 70,000 Americans every single year. And the number goes up. It goes up and up and up, because we are so foolish with our laws that we allow this to happen. A death toll equivalent of the size of an entire American city every year.

The current influx, if not halted, threatens to overwhelm our immigration system and our communities, and poses unacceptable dangers to the entire nation. We have to have our borders. Can't let drugs come in. Not just — it's not just people. It's people; it's drugs. It's human traffickers.

Human trafficking is now at the highest level in the world that it's ever been. And that's because of the Internet. Think of it — human trafficking. You think back 200 years, 500 years. Human trafficking — where they steal children; in many cases, women, unfortunately. They steal women. The human traffickers, the lowest scum on Earth. The lowest scum on Earth. And it's at a level that it's never been. Worldwide — never been at a level like this.

If these caravans are allowed into our country, only bigger and more emboldened caravans will follow. And you see that's what's happening now. We have one that's coming up, and it's being somewhat dissipated, as they march. But then other people are joining it. And then it gets bigger. And now, if you look back at Honduras, and if you look at El Salvador, other ones are solving and they're forming. They're forming. You have new ones that are forming. And we call it "caravan number two" is unbelievably rough people. Very, very hard for the military to stop it. Our military will have no problem. But very, very hard. Mexico is having a very, very hard time with it.

Once they arrive, the Democrat Party's vision is to offer them free healthcare, free welfare, free education, and even the right to vote. You and the hardworking taxpayers of our country will be asked to pick up the entire tab. And that's what's happening — medical and, in many cases, they've got some big medical problems before they get here.

No nation can allow itself to be overwhelmed by uncontrolled masses of people rushing their border. That's what's happening. They are rushing our border. They are coming up. And even before you get to the caravan, just on a daily basis, people coming in. And it's a very bad thing for our country. It's sad in many ways, but it's a very bad thing for our country. And again, costs us billions and billions and billions of dollars a year.

And I will therefore take every lawful action at my disposal to address this crisis. And that's what we're doing. The United States military, great people.

My administration is finalizing a plan to end the rampant abuse of our asylum system — it's abused — to halt the dangerous influx, and to establish control over America's sovereign borders. We got borders. And once that control is set and standardized, and made very strong — including the building of the wall, which we've already started. $1.6

billion spent last year; $1.6 billion this year. We have another $1.6 [billion] that will be coming, but we want to build it at one time. All it does is turn people in a different direction if you don't. We want to build it at one time.

Under this plan, the illegal aliens will no longer get a free pass into our country by lodging meritless claims in seeking asylum. Instead, migrants seeking asylum will have to present themselves lawfully at a port of entry. So they're going to have to lawfully present themselves at a port of entry. Those who choose to break our laws and enter illegally will no longer be able to use meritless claims to gain automatic admission into our country. We will hold them — for a long time, if necessary.

The only long-term solution to the crisis, and the only way to ensure the endurance of our nation as a sovereign country, is for Congress to overcome open borders obstruction. That's exactly what it is: It's open border obstruction. No votes. You can come up with the greatest border plan, the greatest immigration plan. You won't get one vote from a Democrat. They have terrible policy. In many cases, they're terrible politicians. But the one thing I give them great credit for: They vote as a bloc. They stick together.

And we will end catch-and-release. We're not releasing any longer. We also must finish the job that we started by being strong at the border. When we're strong at the border, people will turn away and they won't bother. You will see, in a year from now, or in certainly a period of time from now, despite our very good economy, which some of them come for that — I can't blame them for that; you have to do it legally — but you will see that the numbers of people trying to get in will be greatly reduced.

But that can only happen if we're strong at the border. And the southern border is a big problem, and it's a tremendous problem for drugs pouring in and destroying our youth, and, really, destroying the fabric of our country. There's never been a drug problem like we have today. And as I said, much of it comes from the southern border.

So in the meantime, I will fulfill my sacred obligation to protect our country and defend the United States of America. And this is a defense of our country. We have no choice. We have no choice. We will defend our borders, we will defend our country.

Thank you very much.

Q Mr. President, what happens to the children then? If you're ending catch-and-release, what happens to those children? Do they stay in these tent cities? Or what happens?

THE PRESIDENT: We're working on a system where they stay together. But I will say that, by doing that, tremendous numbers — you know, under the Obama plan, you could separate children. They never did anything about that. Nobody talks about that. But under President Obama, they separated children from the parents. We actually put it so that that didn't happen.

But what happens when you do that is you get tremendous numbers of people coming. It's almost like an incentive to — when they hear they're not going to be separated, they come many, many times over. But President Obama

separated the children, the parents. And nobody complained. When we continued the exact same law, this country went crazy.

So we are going to continue and try to continue what we're doing. But it is a tremendous incentive for people to try. But it's going to be very, very hard for people to come into our country. So we think we'll be able to do that.

Q  With the military, do you envision them firing upon any of these people?

THE PRESIDENT: I hope not.

Q  Could you see the military (inaudible)?

THE PRESIDENT: I hope not. It's the military — I hope — I hope there won't be that. But I will tell you this: Anybody throwing stones, rocks — like they did to Mexico and the Mexican military, Mexican police, where they badly hurt police and soldiers of Mexico — we will consider that a firearm. Because there's not much difference, where you get hit in the face with a rock — which, as you know, it was very violent a few days ago — very, very violent — that break-in. It was a break-in of a country. They broke into Mexico.

And you look at what's happening in Guatemala, just to mention Guatemala, along with El Salvador and Honduras. It's disgraceful that those countries aren't able to stop this. Because they should be able to stop it before it starts.

And the United States pays them a fortune, and we're looking at not doing that anymore. Because why should we be doing that when they do nothing for us?

Jeff. Jeff, go ahead.

Q  Mr. President, how is this plan going to be legal, considering the current law?

THE PRESIDENT: Oh, this is totally legal. No. This is legal. We are stopping people at the border. This is an invasion, and nobody is even questioning that.

Q  But in terms of your plans to change asylum, are you going to do this via executive order?

THE PRESIDENT: No, no, you don't have to — you don't have to release. You have — you can hold. The problem is, to hold people, you need massive facilities. It's the most ridiculous thing I've ever heard. Another country says, "Sorry, you can't come in." With us, we take their name, take their phone number, take their everything, and say, "Good luck." Only because we don't have the facilities to hold people. But we're building the facilities now. We're building massive numbers of tents, and we will hold them in tents. But you don't have to release them. They released them only because they didn't have the facilities to hold them.

Q  Mr. President, is there like an executive order that you're going to be releasing today?

THE PRESIDENT: Oh, we will be doing an executive order sometime next week, yes.

Q (Inaudible) executive order dealing with ending catch-and-release and asylum?

THE PRESIDENT: It's going to end — it's going to be talking about everything. It'll be quite comprehensive. Many of the things we've talked about today.

Q Mr. President, so you're — so just to clarify, you are speaking of, in the tents, these family units that would arrive (inaudible) the children?

THE PRESIDENT: Well, we have other facilities also. But what's happened is we are holding so many facilities — so many people that our facilities are being overrun. They're being overrun. And we are putting up temporary facilities. Eventually, people won't be coming here anymore when they realize they can't get through.

Q So they will hold the children in those tents with their parents?

THE PRESIDENT: We will be holding the family and the children together. Remember this: President Obama separated children from families. And all I did was take the same law, and then I softened the law. But by softening the law, many people come up that would not have come up if there was separation.

Q Mr. President, what do you say to the critics who think this is a political thing before the midterms?

THE PRESIDENT: There's nothing political about a caravan of thousands of people, and now others forming, pouring up into our country. We have no idea who they are. All we know is they're pretty tough people when they can blast through the Mexican military and Mexican police. They're pretty tough people. Even Mexico said, "Wow, these are tough people." I don't want them in our country. And women don't want them in our country. Women want security. Men don't want them in our country. But the women do not want them. Women want security. You look at what the women are looking for. They want to have security. They don't want to have these people in our country. And they're not going to be in our country. It's a very big thing.

Yes.

Q Mr. President, when you talk about finalizing a plan to end asylum, is this a plan that would be included in that executive order?

THE PRESIDENT: Oh, no, people are going to have a chance to go for asylum. But if you look at the records, not very many people are allowed to stay once they go to court. But what happens is they'd go into — they were using asylum — first of all, they were told what to say by lawyers and others. "Read this statement." You read the statement, and now you're seeking asylum. The whole thing is ridiculous. And we won't put up with it any longer.

Q President Trump, U.S. law and international law says that people who have valid claims have a right to seek asylum.

THE PRESIDENT: That's right.

Q So why would — why would they be —

THE PRESIDENT: Well, they're going to go to court. They're going to go to court, as crazy as it sounds. They're going to go —

Q But the law say that they don't — they're not —

THE PRESIDENT: Excuse me. Excuse me. Ready? They're going to go to court, and a judge is going to determine. But usually, when they go to court, they're deported. It just seems that most of the people are deported once they go. The problem is they never end up going to court, because when they come in, they're told to come back in a year, for a court case, and they disappear into the United States never to be seen again.

But we're going to be —

Q But the current laws doesn't say about holding people in tent cities.

THE PRESIDENT: And they're given deportation notices. We will be deporting those people.

Q Mr. President, you're saying rocks are — rock-throwing, like happened in Mexico, will be considered —

THE PRESIDENT: We will consider that the maximum that we can consider that, because they're throwing rocks viciously and violently. You saw that three days ago. Really hurting the military. We're not going to put up with that. If they want to throw rocks at our military, our military fights back. We're going to consider — and I told them, consider it a rifle. When they throw rocks like they did at the Mexico military and police, I say, consider it a rifle.

Jeff?

Q A separate topic, sir. Did you offer Heather Nauert the job of U.N. Ambassador?

THE PRESIDENT: Well, she's under very serious consideration. She's excellent. She's been with us a long time. She's been a supporter for a long time. And she's really excellent. So she's under very serious — we'll probably make a decision next week. We have a lot of people that want the job, and there are a lot of really great people. But we'll be talking about that next week sometime.

Q Did you see Oprah Winfrey's comments today?

THE PRESIDENT: I didn't. What did she say?

Q She was campaigning in Georgia at the same time that Vice President Pence was.

THE PRESIDENT: At the same time as who?

Q Excuse me, at the same time Vice President Pence was, encouraging people to vote and —

THE PRESIDENT: Well, that's okay. I mean, I was on Oprah's last week — the last week of her show. Oprah liked me very much. I've always liked Oprah. You know, Oprah is good. But the woman that she's supporting is not qualified to be the governor of Georgia, by any stretch of the imagination.

And I'll be in Georgia the next few days — the next few days — and we have a tremendous — around Macon — we have a tremendous crowd already. Nobody has a crowd like we have because people want to see a great governor of Georgia. And I think Brian is going to be a great governor of Georgia. I think he'll be a fantastic governor. He's totally qualified.

She is not qualified to be the governor of Georgia. She's not qualified. And Georgia is a great state —

Q Why is she not qualified?

THE PRESIDENT: — it's a great, great state. Take a — take a look. Take a look at her past. Take a look at her history. Take a look at what she wants to do and what she has in mind for the state. That state will be in big, big trouble very quickly. And the people of Georgia don't want that.

Question?

Q Mr. President, really quickly, just on election integrity? Can you say for a fact that our elections are secure next week? What can you tell us?

THE PRESIDENT: Yeah, yeah. I just met with — I just met with the FBI, with Chris; and the Justice Department; and with Secretary Nielsen. And they've spent a lot of time and effort and some money on making sure that everything with respect to the election coming up in five days is going to be perfect and safe. There will be hopefully no meddling, no tampering, no nothing. And we spent a lot —

Now President Obama had the chance to do that in September before '16, but he chose not to do that because he thought Hillary Clinton was going to win. And while everybody agrees it didn't affect the vote at all, nevertheless he could have done things that probably would have made it a little more obvious, a little clearer. But he was told by the FBI in September before the election in '16 about potential meddling or potential Russian meddling, and he did nothing about it. He didn't do that because he thought that Hillary Clinton would win.

All right, one more.

Q Are you optimistic that you can still get the continuing resolution through December 7th for Homeland Security funded, even if the Democrats take the House?

THE PRESIDENT: I think if — I think we're going to do very well in the election, I must tell you. If you look at the races, if you look at the Senate, which is very important, obviously. I'm leaving today; I'll be in Missouri. And I'll be touching down at a number of places over the next five days. But I think we're doing very well in the Senate, and I think we're doing very well in the House.

The only problem is, with the House, there's so many people. I'd like to stop for every one of them, but there's so many people. But I think we're doing very well in the House. I think people want to see strong borders. I think they want to see security. They want to see good healthcare. They want to see the things that we're providing. They don't want to have their taxes increased. We're decreasing their taxes.

We just announced yesterday, you probably heard — Kevin Brady put it out — a reduction of tax. We're going for a reduction of middle-income tax or 10 percent. The Democrats want to, I mean, double up your taxes. In some cases, you'll have to pay three times what you're paying right now in order to get bad healthcare.

And so what we're doing is something that I think the people want, and I think we're going to do very well in the election, even though history says that whoever President it — whoever the President may be, it trends the other way. It certainly does seem that way.

But nobody has ever been President that has the greatest economy in the history of our country. This is the greatest economy in the history of our country. These are the greatest unemployment and employment numbers in the history of our country. Nobody has ever had that to campaign with. So I do.

Thank you all very much. I appreciate it. Thank you.

END

4:51 P.M. EDT

*M.G.U., et al.*, v. *Kirstjen Nielsen, et al.*

18-cv-1458 (PLF)

# EXHIBIT 3

# The New York Times

## Jeff Sessions Is Forced Out as Attorney General as Trump Installs Loyalist

**By Peter Baker, Katie Benner and Michael D. Shear**

Nov. 7, 2018

WASHINGTON — President Trump fired Attorney General Jeff Sessions on Wednesday, replacing him with a loyalist who has echoed the president's complaints about the special counsel investigation into Russia's election interference and will now take charge of the inquiry.

Mr. Sessions delivered his resignation letter to the White House at the request of the president, who tapped Matthew G. Whitaker, Mr. Sessions's chief of staff, as acting attorney general, raising questions about the future of the inquiry led by the special counsel, Robert S. Mueller III.

Mr. Whitaker, a former college football tight end and United States attorney in Iowa, and a onetime Senate candidate in that state, has previously questioned the scope of the investigation. In a column for CNN last year, he wrote that Mr. Mueller would be going too far if he examined the Trump family's finances. "This would raise serious concerns that the special counsel's investigation was a mere witch hunt," Mr. Whitaker wrote, echoing the president's derisive description of the investigation. Mr. Mueller has subpoenaed the Trump Organization for documents related to Russia.

Until now, Rod J. Rosenstein, the deputy attorney general, oversaw the investigation because Mr. Sessions recused himself in March 2017, citing his active role in Mr. Trump's 2016 presidential campaign.

Democrats quickly demanded on Wednesday that Mr. Whitaker also remove himself from taking charge of the inquiry, citing potential conflicts of interest, including his criticisms of the Mueller investigation, as well as his connections to a witness in that investigation, Sam Clovis, a former Trump campaign aide. In 2014, Mr. Whitaker was the chairman of Mr. Clovis's unsuccessful campaign to become Iowa state treasurer.

"Given his previous comments advocating defunding and imposing limitations on the Mueller investigation, Mr. Whitaker should recuse himself from its oversight for the duration of his time as acting attorney general," Senator Chuck Schumer of New York, the Democratic leader, said in a statement.

Justice Department ethics advisers may be asked to weigh whether Mr. Whitaker should recuse himself. If he were to agree to do that, Mr. Rosenstein would continue to oversee the special counsel.

*[Read our profile of the acting attorney general, Matthew Whitaker.]*

Mr. Whitaker had no immediate plans to publicly comment about Mr. Mueller or to take actions regarding the Russia inquiry, an administration official said.

"I am committed to leading a fair department with the highest ethical standards that upholds the rule of law and seeks justice for all Americans," Mr. Whitaker said on Wednesday in a statement in which he also called Mr. Sessions "a man of integrity."

But as acting attorney general, Mr. Whitaker would be in a position to impede or undermine the investigation or to block Mr. Mueller from delivering a final report on whether Mr. Trump's campaign advisers conspired with Russia to influence the 2016 campaign, and whether the president tried to cover it up.

Case 1:18-cv-02456-PLF Document 55-1 Filed 12/07/18 Page 21 of 67

Any such step could set off a dramatic clash with the new Democratic majority in the House. Representative Jerrold Nadler, Democrat of New York, who will become the chairman of the House Judiciary Committee, was one of several Democrats to promise investigations once the party takes control in January.

"The American people understand that no person is above the law and have demanded accountability from their government," Mr. Nadler said. "The firing of Jeff Sessions will be investigated and people will be held accountable. This must begin immediately, and if not, then a Democratic Congress will make this a priority in January."

Representative Adam B. Schiff, Democrat of California, who could become the new chairman of the House Intelligence Committee, said that any interference with the Mueller investigation "would cause a constitutional crisis and undermine the rule of law."

But Republicans in Congress appeared less concerned by the president's move. Senator Lindsey Graham, Republican of South Carolina, who said in 2017 that there would be "holy hell to pay" if Mr. Trump fired his attorney general, offered no criticism of the president on Wednesday.



Matthew G. Whitaker, Mr. Sessions's chief of staff, will take over as acting attorney general.
Chip Somodevilla/Getty Images

"I look forward to working with President Trump to find a confirmable, worthy successor so that we can start a new chapter at the Department of Justice," Mr. Graham said. He had in recent months begun to ease off his stance of last year, saying in August that it had become clear that Mr. Sessions had lost the president's confidence.

The firing of Mr. Sessions came a day after midterm elections that handed control of the House to Democrats, dealing a major blow to Mr. Trump for the final two years of his term. Republicans preserved their hold on the Senate and increased their majority slightly, making it likelier that Mr. Trump would be able to confirm a replacement.

But House Democrats have made clear that they plan to use the subpoena power that will come with their majority to reopen the lower chamber's own investigation into the Russia matter.

The abrupt ouster of Mr. Sessions resembled in some ways the decision by President George W. Bush to oust Defense Secretary Donald H. Rumsfeld in 2006 the day after a similar electoral defeat in midterm elections. In that case, Mr. Bush was attempting to mollify his critics. Mr. Trump's decision to fire Mr. Sessions appeared likely to inflame his adversaries on Capitol Hill.

John F. Kelly, the White House chief of staff, called Mr. Sessions before the president's postelection news conference on Wednesday to tell the attorney general that Mr. Trump wanted him to step down, the administration official said. Mr. Trump, who did not speak with Mr. Sessions himself, then ducked questions about Mr. Sessions's fate at the news conference.

Mr. Sessions then had his letter, which was undated, delivered to the White House. "Dear Mr. President, at your request I am submitting my resignation," he wrote. He added, "Most importantly, in my time as attorney general we have restored and upheld the rule of law," and thanked the president.

Mr. Trump announced the resignation and Mr. Whitaker's assignment on Twitter. "We thank Attorney General Jeff Sessions for his service, and wish him well!" he wrote. "A permanent replacement will be nominated at a later date."

Though Mr. Trump has said for months that he wished to replace Mr. Sessions, lawmakers and administration officials believed that firing the attorney general before the midterm elections would have had negative consequences for Republicans in tight races. So it came as little surprise when Mr. Sessions was asked to resign the day after the midterms were over.

The president's decision ended a partnership that soured almost from the start of the administration and degenerated into one of the most acrimonious public standoffs between a commander in chief and a senior cabinet member in modern American history.

Only weeks after he was confirmed as the United States' top law enforcement officer, Mr. Sessions recused himself from overseeing the Justice Department investigation in March 2017, after revelations that he had failed to report encounters with Ambassador Sergey I. Kislyak of Russia during the 2016 campaign.

At the time, Mr. Sessions said there was nothing nefarious about those meetings, though he acknowledged that he "should have slowed down" and been more thoughtful in denying any contacts with Russian officials during his Senate confirmation process. His recusal was one of his first public acts as attorney general.

Mr. Trump never forgave him. At various points, he called Mr. Sessions "beleaguered," "VERY weak" and "DISGRACEFUL." In private, he referred to him derisively as "Mr. Magoo," after the befuddled cartoon character.

In an interview with The New York Times in July of 2017, Mr. Trump first publicly revealed his anger with Mr. Sessions, kicking off 16 months of public fury toward his attorney general by saying he would not have hired Mr. Sessions had he known he would hand off oversight of the Russia inquiry.

"How do you take a job and then recuse yourself?" Mr. Trump said in the Oval Office interview. "If he would have recused himself before the job, I would have said, 'Thanks, Jeff, but I can't, you know, I'm not going to take you.' It's extremely unfair, and that's a mild word, to the president."

Mr. Trump also publicly badgered Mr. Sessions to open investigations into his defeated rival, Hillary Clinton, and other Democrats. Critics from both parties said the president was shredding the traditional independence of the law enforcement agencies in seeking what appeared to be politically motivated prosecutions.

For the most part, Mr. Sessions made no public retort. But after the president chided him in February for leaving an inquiry into the F.B.I.'s handling of the Russia investigation to an inspector general rather than conducting his own review, Mr. Sessions pushed back. "As long as I am the attorney general," he said, "I will continue to discharge

my duties with integrity and honor."

When Mr. Trump said in August that Mr. Sessions "never took control of the Justice Department," Mr. Sessions fired back, saying in a rare public rebuke that "the Department of Justice will not be improperly influenced by political considerations."

Mr. Sessions tried to quit at least twice. In June 2017, shortly after his recusal, Mr. Trump berated Mr. Sessions during a private meeting in the Oval Office and accused him of "disloyalty." Mr. Sessions grew emotional and agreed to resign. Reince Priebus, then the White House chief of staff, later said he ran out of the building to find the attorney general in the parking lot and stop him from leaving.



**Listen to 'The Daily': Why Trump Is Firing Sessions Now**
We look at the story behind the decision and the implications for the Russia investigation.

▶      10   Listen   24:01

The deputy attorney general, now Mr. Rosenstein, would normally be in line to become the acting attorney general, but Mr. Trump has complained publicly about Mr. Rosenstein, too.

Installing Mr. Whitaker could clear the way for Mr. Trump to force out Mr. Mueller. To dismiss a special counsel, the president has to order the attorney general or, in the case of a recusal, the deputy attorney general, to carry it out. Mr. Rosenstein has said that he sees no justification to dismiss Mr. Mueller. Mr. Trump fired James B. Comey, the F.B.I. director originally overseeing the investigation.

During his new conference on Wednesday, Mr. Trump again insisted that he had the right to order an end to the investigation. "I could've ended it anytime I wanted," he said. "I didn't. There was no collusion. There was no anything." But he did not rule it out. "It should end because it's very bad for our country," he said.

Mr. Whitaker's ascendance to the top of the Justice Department shows how much loyalty means to Mr. Trump. The president has long regarded Mr. Whitaker as his eyes and ears inside a department that he considers an enemy institution.

Mr. Whitaker has been a frequent White House visitor and served as what one White House aide called a "balm" on the relationship between the president and the Justice Department.

In pushing out his attorney general, the president cast aside one of his earliest and strongest supporters.

In February 2016, Mr. Sessions became the first sitting senator to endorse Mr. Trump's presidential campaign, and in the months leading up to the election, he became one of the candidate's closest national security advisers and a key architect of the president's hard-line immigration agenda.

As attorney general, Mr. Sessions has been instrumental in putting that agenda into practice, leading the assault on protections for young immigrants, ordering a "zero tolerance" crackdown on migrant families at the border, and helping to orchestrate changes aimed at severely reducing legal and illegal immigration.

Working with Stephen Miller, the president's top domestic policy adviser, Mr. Sessions helped shape the president's dark immigration message during the midterm elections, pushing for new efforts to separate families at the border, elimination of birthright citizenship, and more aggressive efforts to counter a caravan of migrants heading toward the United States from Central America.

He also fought for tougher sentencing for criminals, challenged so-called sanctuary cities and pursued the MS-13 gang.

But despite arguably being the most effective of Mr. Trump's cabinet members on issues that the president deeply cared about, Mr. Sessions never recovered from Mr. Trump's anger over his recusal in the Russia investigation.

Mr. Sessions, 71, got his start in politics as a United States attorney in Alabama, but his nomination for a federal judgeship was blocked by the Senate amid charges of racial insensitivity. He mounted a comeback by winning election as the state attorney general and then, in 1996, to the Senate.

Rebecca R. Ruiz contributed reporting.

A version of this article appears in print on Nov. 8, 2018, on Page A1 of the New York edition with the headline: Trump Replaces Sessions With a Loyalist; Vows 'Warlike' Stance on House Inquiries

READ 1746 COMMENTS

*M.G.U., et al.*, v. *Kirstjen Nielsen, et al.*

18-cv-1458 (PLF)

# EXHIBIT 4

12/5/2018
Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States | The White House

Case 1:18-cv-01458-PLF   Document 55-1   Filed 12/07/18   Page 26 of 67



# Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States

IMMIGRATION

Issued on: **November 9, 2018**

★ ★ ★

The United States expects the arrival at the border between the United States and Mexico (southern border) of a substantial number of aliens primarily from Central America who appear to have no lawful basis for admission into our country.  They are traveling in large, organized groups through Mexico and reportedly intend to enter the United States unlawfully or without proper documentation and to seek asylum, despite the fact that, based on past experience, a significant majority will not be eligible for or be granted that benefit.  Many entered Mexico unlawfully — some with violence — and have rejected opportunities to apply for asylum and benefits in Mexico.  The arrival of large numbers of aliens will contribute to the overloading of our immigration and asylum system and to the release of thousands of aliens into the interior of the United States.  The continuing and threatened mass migration of aliens with no basis for admission into the United States through our southern border has precipitated a crisis and undermines the integrity of our borders.  I therefore must take immediate action to protect the national interest, and to maintain the effectiveness of the asylum system for legitimate asylum seekers who demonstrate that they have fled persecution and warrant the many special benefits associated with asylum.

In recent weeks, an average of approximately 2,000 inadmissible aliens have entered each day at our southern border. In Fiscal Year 2018 overall, 124,511 aliens were found inadmissible at ports of entry on the southern border, while 396,579 aliens were apprehended entering the United States unlawfully between such ports of entry.  The great number of aliens who cross unlawfully into the United States through the southern border consumes tremendous resources as the Government seeks to surveil, apprehend, screen, process, and detain them.

Aliens who enter the United States unlawfully or without proper documentation and are subject to expedited removal may avoid being promptly removed by demonstrating, during an initial screening process, a credible fear of persecution or torture.  Approximately 2 decades ago, most aliens deemed inadmissible at a port of entry or apprehended after unlawfully entering the United States through the southern border were single adults who were promptly returned to Mexico, and very few asserted a fear of return.  Since then, however, there has been a massive increase in fear-of-persecution or torture claims by aliens who enter the United States through the southern border. The vast majority of such aliens are found to satisfy the credible-fear threshold, although only a fraction of the claimants whose claims are adjudicated ultimately qualify for asylum or other protection.  Aliens found to have a

credible fear are often released into the interior of the United States, as a result of a lack of detention space and a variety of other legal and practical difficulties, pending adjudication of their claims in a full removal proceeding in immigration court.  The immigration adjudication process often takes years to complete because of the growing volume of claims and because of the need to expedite proceedings for detained aliens.  During that time, many released aliens fail to appear for hearings, do not comply with subsequent orders of removal, or are difficult to locate and remove.

Members of family units pose particular challenges.  The Federal Government lacks sufficient facilities to house families together.  Virtually all members of family units who enter the United States through the southern border, unlawfully or without proper documentation, and that are found to have a credible fear of persecution, are thus released into the United States.  Against this backdrop of near-assurance of release, the number of such aliens traveling as family units who enter through the southern border and claim a credible fear of persecution has greatly increased.  And large numbers of family units decide to make the dangerous and unlawful border crossing with their children.

The United States has a long and proud history of offering protection to aliens who are fleeing persecution and torture and who qualify under the standards articulated in our immigration laws, including through our asylum system and the Refugee Admissions Program.  But our system is being overwhelmed by migration through our southern border. Crossing the border to avoid detection and then, if apprehended, claiming a fear of persecution is in too many instances an avenue to near-automatic release into the interior of the United States.  Once released, such aliens are very difficult to remove.  An additional influx of large groups of aliens arriving at once through the southern border would add tremendous strain to an already taxed system, especially if they avoid orderly processing by unlawfully crossing the southern border.

The entry of large numbers of aliens into the United States unlawfully between ports of entry on the southern border is contrary to the national interest, and our law has long recognized that aliens who seek to lawfully enter the United States must do so at ports of entry.  Unlawful entry puts lives of both law enforcement and aliens at risk.  By contrast, entry at ports of entry at the southern border allows for orderly processing, which enables the efficient deployment of law enforcement resources across our vast southern border.

Failing to take immediate action to stem the mass migration the United States is currently experiencing and anticipating would only encourage additional mass unlawful migration and further overwhelming of the system.

Other presidents have taken strong action to prevent mass migration.  In Proclamation 4865 of September 29, 1981 (High Seas Interdiction of Illegal Aliens), in response to an influx of Haitian nationals traveling to the United States by sea, President Reagan suspended the entry of undocumented aliens from the high seas and ordered the Coast Guard to intercept such aliens before they reached United States shores and to return them to their point of origin.  In Executive Order 12807 of May 24, 1992 (Interdiction of Illegal Aliens), in response to a dramatic increase in the unlawful mass migration of Haitian nationals to the United States, President Bush ordered additional measures to interdict such Haitian nationals and return them to their home country.  The Supreme Court upheld the legality of those measures in *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993).

12/5/2018    Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States | The White House

Case 1:18-cv-01458-PLF   Document 55-1   Filed 12/07/18   Page 28 of 67

I am similarly acting to suspend, for a limited period, the entry of certain aliens in order to address the problem of large numbers of aliens traveling through Mexico to enter our country unlawfully or without proper documentation.  I am tailoring the suspension to channel these aliens to ports of entry, so that, if they enter the United States, they do so in an orderly and controlled manner instead of unlawfully.  Under this suspension, aliens entering through the southern border, even those without proper documentation, may, consistent with this proclamation, avail themselves of our asylum system, provided that they properly present themselves for inspection at a port of entry.  In anticipation of a large group of aliens arriving in the coming weeks, I am directing the Secretary of Homeland Security to commit additional resources to support our ports of entry at the southern border to assist in processing those aliens — and all others arriving at our ports of entry — as efficiently as possible.

But aliens who enter the United States unlawfully through the southern border in contravention of this proclamation will be ineligible to be granted asylum under the regulation promulgated by the Attorney General and the Secretary of Homeland Security that became effective earlier today.  Those aliens may, however, still seek other forms of protection from persecution or torture.  In addition, this limited suspension will facilitate ongoing negotiations with Mexico and other countries regarding appropriate cooperative arrangements to prevent unlawful mass migration to the United States through the southern border.  Thus, this proclamation is also necessary to manage and conduct the foreign affairs of the United States effectively.

NOW, THEREFORE, I, DONALD J. TRUMP, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(f) and 1185(a), respectively) hereby find that, absent the measures set forth in this proclamation, the entry into the United States of persons described in section 1 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions.  I therefore hereby proclaim the following:

Section 1.  Suspension and Limitation on Entry.  The entry of any alien into the United States across the international boundary between the United States and Mexico is hereby suspended and limited, subject to section 2 of this proclamation.  That suspension and limitation shall expire 90 days after the date of this proclamation or the date on which an agreement permits the United States to remove aliens to Mexico in compliance with the terms of section 208(a)(2)(A) of the INA (8 U.S.C. 1158(a)(2)(A)), whichever is earlier.

Sec. 2.  Scope and Implementation of Suspension and Limitation on Entry.  (a)  The suspension and limitation on entry pursuant to section 1 of this proclamation shall apply only to aliens who enter the United States after the date of this proclamation.

(b)  The suspension and limitation on entry pursuant to section 1 of this proclamation shall not apply to any alien who enters the United States at a port of entry and properly presents for inspection, or to any lawful permanent resident of the United States.

(c)  Nothing in this proclamation shall limit an alien entering the United States from being considered for withholding of removal under section 241(b)(3) of the INA (8 U.S.C. 1231(b)(3)) or protection pursuant to the regulations

12/5/2018                    Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States | The White House

Case 1:18-cv-01458-PLF  Document 55-1  Filed 12/07/18  Page 29 of 67

promulgated under the authority of the implementing legislation regarding the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, or limit the statutory processes afforded to unaccompanied alien children upon entering the United States under section 279 of title 6, United States Code, and section 1232 of title 8, United States Code.

(d)  No later than 90 days after the date of this proclamation, the Secretary of State, the Attorney General, and the Secretary of Homeland Security shall jointly submit to the President, through the Assistant to the President for National Security Affairs, a recommendation on whether an extension or renewal of the suspension or limitation on entry in section 1 of this proclamation is in the interests of the United States.

Sec. 3.  Interdiction.  The Secretary of State and the Secretary of Homeland Security shall consult with the Government of Mexico regarding appropriate steps — consistent with applicable law and the foreign policy, national security, and public-safety interests of the United States — to address the approach of large groups of aliens traveling through Mexico with the intent of entering the United States unlawfully, including efforts to deter, dissuade, and return such aliens before they physically enter United States territory through the southern border.

Sec. 4.  Severability.  It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States.  Accordingly:

(a)  if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b)  if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

Sec. 5.  General Provisions.  (a)  Nothing in this proclamation shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

12/5/2018 Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States | The White House

Case 1:18-cv-01458-PLF Document 55-1 Filed 12/07/18 Page 58 of 67

IN WITNESS WHEREOF, I have hereunto set my hand this

ninth day of November, in the year of our Lord two thousand eighteen, and of the Independence of the United States of America the two hundred and forty-third.

DONALD J. TRUMP

*M.G.U., et al.*, v. *Kirstjen Nielsen, et al*.

18-cv-1458 (PLF)

# EXHIBIT 5

The Washington Post

**National Security**

# Trump is preparing to remove Kirstjen Nielsen as Homeland Security secretary, aides say

By Nick Miroff ,
Josh Dawsey and
Philip Rucker
November 12

President Trump has told advisers he has decided to remove Homeland Security Secretary Kirstjen Nielsen, and her departure from the administration is likely to occur in the coming weeks, if not sooner, according to five current and former White House officials.

Trump canceled a planned trip with Nielsen this week to visit U.S. troops at the border in South Texas and told aides over the weekend that he wants her out as soon as possible, these officials said. The president has grumbled for months about what he views as Nielsen's lackluster performance on immigration enforcement and is believed to be looking for a replacement who will implement his policy ideas with more alacrity.

The announcement could come as soon as this week, three of these officials said.

Trump has changed his mind on key personnel decisions before, and Chief of Staff John F. Kelly is fighting Nielsen's pending dismissal and attempting to postpone it, aides say. But Kelly's future in the administration also is shaky, according to three White House officials.

DHS officials who work with Nielsen declined to address her potential departure Monday. "The Secretary is honored to lead the men and women of DHS and is committed to implementing the President's security-focused agenda to protect Americans from all threats and will continue to do so," spokesman Tyler Q. Houlton said in a statement.

Nielsen has been reluctant to leave the administration before reaching the one-year mark as secretary on Dec. 6, but she has been unhappy in the job for several months, according to colleagues. Trump has berated her during Cabinet meetings, belittled her to other White House staff and tagged her months ago as a "Bushie," a reference to her previous service under President George W. Bush and meant to cast suspicion on her loyalty.

When Nielsen has tried to explain the laws and regulations that prevent the government from drastically curtailing immigration or closing the border with Mexico, as Trump has suggested, the president has grown impatient and frustrated, aides said.

Nielsen's departure would leave a leadership void at the government's third-largest agency, which has 240,000 employees and a $60 billion budget. The deputy secretary job at DHS has been vacant since April, and the White House has not submitted to Congress a nomination for that post.

Unless Trump were to name another official to lead DHS in an acting capacity, the day-to-day task of running the agency would fall to Claire M. Grady, the undersecretary for management.

Trump has told White House officials that he has begun contemplating replacements for Nielsen. He could name one of the agency's other Senate-confirmed principals, such as Kevin McAleenan, the commissioner of U.S. Customs and Border Protection, or David P. Pekoske, administrator of the Transportation Security Administration and a former vice commandant of the Coast Guard.

"If I were advising the White House, I'd encourage them to nominate someone with executive branch experience," said one senior DHS official who spoke on the condition of anonymity to share candid views about his agency's leadership. "This will be our fourth secretary in two years. The last thing we want is someone who needs hand-holding."

Kris Kobach's loss in the Kansas governor's race has generated speculation that Trump could attempt to nominate him as a replacement for Nielsen, but Kobach, Kansas's secretary of state, remains a polarizing figure whose hard-line views — especially on immigration — are considered by many observers to be too extreme to win Senate confirmation.

Colleagues who've worked closely with Nielsen and defend her performance at DHS say working for Trump on immigration  issues is miserable because the president has an unrealistic view of border security and little patience for the intricacies of U.S. immigration law.

Nielsen was selected for the DHS job by Kelly, and her imminent departure is another indication that his influence over personnel decisions has waned. Kelly has defended her repeatedly, and aides have grown annoyed at their close relationship — he often praises her impromptu in senior staff meetings while not praising other Cabinet members.

Former colleagues who worked with Nielsen were astonished when Kelly pushed to install her at DHS because she had never led a large organization, let alone one with so many responsibilities. Nielsen worked on disaster-management response in the Bush White House, then in the private sector and academia as a cybersecurity expert before returning to DHS to work as chief of staff under Kelly when he was homeland security secretary during Trump's first six months in office.

But it was immigration enforcement that became one of Trump's biggest frustrations, and the president has blamed her for a rebound this year in the number of people arrested along the Mexican border.

At the peak of controversy over the Trump administration's "zero tolerance" family-separation initiative, Nielsen nonetheless stood at the White House lectern and delivered a vigorous defense of the measures. The president loved her performance — especially when she said there was no administration policy on separations. Days later, under withering criticism, the president changed his mind and ordered an end to the separations.



**Nick Miroff**
Nick Miroff covers immigration enforcement, drug trafficking and the Department of Homeland Security on The Washington Post's National Security desk. He was a Post foreign correspondent in Latin America from 2010 to 2017, and has been a staff writer since 2006. Follow 🐦



**Josh Dawsey**
Josh Dawsey is a White House reporter for The Washington Post. He joined the paper in 2017. He previously covered the White House for Politico, and New York City Hall and New Jersey Gov. Chris Christie for the Wall Street Journal. Follow 🐦



**Philip Rucker**
Philip Rucker is the White House Bureau Chief for The Washington Post. He previously has covered Congress, the Obama White House, and the 2012 and 2016 presidential campaigns. Rucker also is a Political Analyst for NBC News and MSNBC. He joined The Post in 2005 as a local news reporter. Follow 🐦

## The Washington Post

# Help us tell the story.

Your subscription supports foreign correspondents based in 17 countries.

Try 1 month for $1



**Podcasts**

## Democrats set the stage (literally) for 2020

The Democratic National Committee struggles to find a big-enough stage for likely presidential candidates. Plus, the second and final installment of our series "An Affair. The Mob. A Murder."

▶ **Listen**  22:53

19 hours ago



Our journalism keeps watch on Washington and the world.

Try 1 month for $10 $1

Send me this offer

*M.G.U., et al.*, v. *Kirstjen Nielsen, et al.*

18-cv-1458 (PLF)

# EXHIBIT 6

 The Washington Post

**Immigration**

# Trump's nominee to lead ICE won't rule out separating migrant families again

By Maria Sacchetti

November 15

Ronald D. Vitiello, a veteran law enforcement official tapped by President Trump to run U.S. Immigration and Customs Enforcement, faced criticism at his Senate confirmation hearing Thursday for refusing to rule out the possibility that the Trump administration could resort again to separating migrant parents and children at the U.S.-Mexico border.

The White House is discussing plans to detain asylum-seeking families for up to 20 days and then give parents a choice: Stay in jail with their child pending a deportation hearing, or allow children to be taken to a government shelter so other relatives or guardians can seek custody of them.

"That option and that discussion is underway," Vitiello told the Homeland Security and Governmental Affairs Committee. He would not address lawmakers' questions seeking clarity on how long he believed migrant children should be detained or whether the separation from their families caused them psychological harm. "We'll get less people bringing their children," he added. "It is an option."

Vitiello said that, for now, the president has ordered U.S. immigration officials to keep families together, but he said that detaining them all — or giving them the option to split up — could deter rising numbers of families seeking refuge at the Mexican border, including a caravan of mostly Hondurans that has infuriated the president.

The Trump administration has claimed that migrant families are filing false asylum claims to win release in the United States because the backlogged system does not have enough jail space or immigration judges to complete their cases quickly. Under current rules, officials cannot jail children with their parents for more than 20 days, which often forces the government to release the entire family into the United States.

Committee Democrats questioned Vitiello's role in the administration's widely criticized effort earlier this year to prosecute all parents who illegally crossed the border with their children. The policy split more than 2,500 children from their parents without a plan to reunite them before Trump stopped it in June. A federal court is still overseeing efforts to put all the families back together.

"We have the capacity in the United States of America to control our borders without harming children," Sen. Maggie Hassan (D-N.H.) told Vitiello. "That is something that I am quite confident that we can do."

Vitiello acknowledged during the hearing that the administration failed to be "ready for the public outcry that occurred."

"We never contemplated on having the systems work backwards," he said. "Nobody in the discussions that I was involved in were contemplating that these people would be separated forever.

"We'd like to be in a place where no one got separated," Vitiello told Sen. Gary Peters (D-Mich.), but added, "We'd like to be in a place where lots of people didn't bring their kids to the border and try to cross illegally, but that's the situation we're faced with now."

Sen. Ron Johnson (R-Wis.), the committee's chairman, dismissed criticism of Vitiello and other immigration agencies, saying they were merely enforcing the laws that Congress wrote.

"This is where Congress bears responsibility," Johnson said. ". . . Right now, the law is broken."

Vitiello presented himself as a career law-enforcement official who possesses the skills and political savvy to reach out to Democrats and Republicans alike, and to address rising concerns about the agency's budget, detention conditions and polarizing reputation.

ICE is the Department of Homeland Security agency that detains and deports hundreds of thousands of immigrants a year for civil violations of immigration law. The agency also includes Homeland Security Investigations, a division that targets drug traffickers, gang members and other crime.

Since Trump took office, the agency has targeted people often treated more leniently under the Obama administration, including parents of American citizens and those without criminal records.

But Trump has also deported fewer immigrants each year than the Obama administration at its peak, partly because "sanctuary cities" are increasingly refusing to detain immigrants with little or no criminal history.

Vitiello insisted that the agency's priority is deporting criminals and said he'd defend the agency against calls to abolish it.

"If confirmed, one of my highest priorities will be to better demonstrate to the public, Congress, and the media the importance and criticality of the mission to protect the homeland and improve public safety — and why our agency's existence should not be up for debate," he said.

Vitiello also acknowledged having made personal missteps, including a three-year-old tweet that compared Democrats to the Ku Klux Klan. In 2015, he tweeted from his personal account that the Democratic Party should be renamed the "Liberalcratic party or the NeoKlanist party," according to the Gizmodo news site.

"It was a mistake," he said. "It was a momentary lapse of judgment, and I apologize. It was meant as a joke."

In another tweet from 2016, Vitiello compared Trump to the cartoon character Dennis the Menace.

Vitiello, a 30-year Border Patrol veteran, is ICE's acting director. Trump tapped him in August to replace Thomas D. Homan, the acting director whose nomination languished for months despite Republican control of the Senate.

Homeland Security Secretary Kirstjen Nielsen, whose tenure in the administration may be nearing its end, named Vitiello acting director in June, calling him "an experienced and well-respected career law enforcement officer who will be a strong advocate for the agency's workforce."

Vitiello has kept a lower profile than Homan, a lightning rod who praised Trump for taking the "handcuffs" off ICE and for rescinding policies that let millions of immigrants skirt deportation.

He also submitted multiple letters of support, including from R. Gil Kerlikowske, the U.S. Customs and Border Protection commissioner under President Barack Obama.

In his letter, Kerlikowske called Vitiello "an extremely effective, honest, and dedicated public servant" who led the Border Patrol's effort to reduce uses of force in apprehending immigrants and introduced an internal affairs division to monitor the agency, whose secrecy has come under scrutiny.

"This would not have been possible without Mr. Vitiello's leadership," Kerlikowske wrote.

Vitiello, 55, is a Chicago native. He began his career with the Border Patrol in 1985 in Laredo, Tex., and has worked in leadership positions at Customs and Border Protection headquarters since 2010. Before joining ICE, he served as CBP's acting deputy commissioner, helping the commissioner oversee 60,000 employees and a $13 billion budget.



**Maria Sacchetti**
Maria Sacchetti covers immigration for the Washington Post, including U.S. Immigration and Customs Enforcement and the court system. She previously reported for the Boston Globe, where her work led to the release of several immigrants from jail. She lived for several years in Latin America and is fluent in Spanish.  Follow 🐦

---

*The Washington Post*

## The story must be told.

Your subscription supports journalism that matters.

Try 1 month for $1

## Podcasts

### Democrats set the stage (literally) for 2020

The Democratic National Committee struggles to find a big-enough stage for likely presidential candidates. Plus, the second and final installment of our series "An Affair. The Mob. A Murder."

▶ **Listen**  22:53

19 hours ago



## Be the first to know.

Our award-winning journalists are there when the news breaks.

Try 1 month for ~~$10~~ $1

**Send me this offer**

*M.G.U., et al.*, v. *Kirstjen Nielsen, et al.*

18-cv-1458 (PLF)

# EXHIBIT 7

SIGN IN    SUBSCRIBE    ☰

U.S.

# DONALD TRUMP SIGNS AUTHORIZATION FOR BORDER TROOPS USING LETHAL FORCE AS MIGRANT CARAVAN APPROACHES, DOCUMENT REVEALS

BY **JAMES LAPORTA** ON 11/21/18 AT 3:24 PM



SHARE    

U.S.        DONALD TRUMP



400 military police officers from the U.S. Army redeployed to San Diego, the Trump administration approved the use of troops for law enforcement tasks at the southern border, stating that they are permitted to employ lethal force, according to a White House memo obtained by *Newsweek*.

The "decision memorandum" was signed by President Donald Trump on Tuesday and ran through Derek S. Lyons, a Harvard-educated lawyer and White House staff secretary to John Kelly, the White House chief of staff and former U.S. Marine general. The documents were obtained from a Defense Department source.

Kelly signed the memo late Tuesday authorizing U.S. service members to perform "military protective activities," allowing service members to use "a show or use of force (including lethal force, where necessary), crowd control, temporary detention, and cursory search," as determined by Defense Secretary James Mattis to protect agents with Customs and Border Protection (CPB).

The news of the memo was first reported by The Military Times on Wednesday morning but said the president did not sign off on the White House directive. The memo obtained by *Newsweek* shows Trump signed off on the order to Mattis. (You can read the full memo at the bottom of this article.*)*

The White House issued the memo on the same day *Newsweek* reported that U.S. Army North will shift roughly 400 military police officers from the port of entry in Brownsville, Texas, to the San Ysidro Land Port of Entry in San Diego over the next three days, according to a Defense Department source with knowledge of the southern border mission.

The military police officers will support Border Patrol agents as the initial wave of migrants reaches the California-Mexico border.

President Donald Trump walks off Marine One on the South Lawn of the White House after returning from viewing the damage from the California wildfires, on November 18. Trump signed off on November 20 on the use of deadly force and law enforcement roles for U.S. forces stationed at the southern border.

TASOS KATOPODIS-POOL/GETTY IMAGES

A spokesman for U.S. Army North told *Newsweek* Wednesday morning that they had not received any guidance about the White House memo as the Defense Department would be ironing out the operational particulars of the directive.

Mattis told reporters in a press gaggle at the Pentagon Wednesday that U.S. forces would not violate the Posse Comitatus Act, the 1878 federal statute that restricts the government's ability to use the U.S. military as a police force. However, Mattis did indicate that the new authorities give U.S. forces an expanded law enforcement role to protect Border agents.

"I now have the authority to do more. Now we'll see what she asks me to do," Mattis said Wednesday, referring to Homeland Security Secretary Kirstjen Nielsen.

Earlier this month, Trump suggested he wanted to change the rules of engagement for U.S. troops and Border Patrol Agents when he spoke to reporters in the Roosevelt Room at the White House.

"Anybody throwing stones, rocks, like they did to Mexico and the Mexican military, Mexican police, where they badly hurt police and soldiers of Mexico, we will consider that a firearm," Trump said. "We're

not going to put up with that. They want to throw rocks at our military, our military fights back. I told them to consider it a rifle."

Defense Department sources speaking to *Newsweek* moments after Trump concluded his comments said that service members at the southern border had not received intelligence about "bad actors" contrary to the president's remarks and there had not been a change to the use of force rules that would permit service members to treat rocks as firearms.

Under federal law, U.S. troops are allowed to use deadly force in self-defense and to defend other people and property.

However, the rules governing the use of deadly force state it can be used only when "all lesser means have failed or cannot reasonably be employed," according to a 2012 Defense Security Cooperation Agency handbook published by Public Intelligence, an online collaborative research project that publishes government documents.

"They are pushing DoD's authority right up to the line of what is permitted without violating the restrictions of Posse Comitatus. Active duty personnel can respond in self-defense of border officials, but the perfect world does not exist in factual reality in which this subjective concept can be neatly applied to the environment of border enforcement," said Brad Moss, a Washington, D.C. based attorney specializing in national security.

The Military Times reported that Defense officials said the language in the White House directive was carefully crafted to stay within the legal limits established under Posse Comitatus.

However, the areas most vulnerable to Posse Comitatus violations, according to Moss, are U.S. service members participating in crowd control and the detention of migrants.

"That becomes the undefined gray line between emergency circumstances and routine border enforcement," Moss said. "The fine print of when either such behavior is permissible needs to be fleshed out by the government in far more detail."

"It is virtually guaranteed that the presumed good faith efforts of active duty personnel notwithstanding, there will be several repeated violations of the Posse Comitatus restrictions," Moss added.

When asked how the U.S. military would prevent a repeat of a May 1997 incident when Marines on the border mistakenly shot and killed a teenager, Mattis said, "They're not even carrying guns, for Christ's sake," according to Politico.

Mattis went on to indicate that if troops are used as an additional protective force for Border Patrol agents, military police officers will be "unarmed MPs with shields, batons, and no firearms," and that service members might detain migrants if they were "beating on a Border Patrolman and we're in a position to stop them."

Kelly's signed directive said the additional authorities granted to the Defense Department were driven by "credible evidence and intelligence" indicating thousands of migrants arriving at the port of entry near Tijuana, Mexico, "may prompt incidents of violence and disorder" that could threaten border officials.

Since the announcement of troop deployments to the U.S. southern border, reports have questioned the credibility of intelligence touted by the Department of Homeland Security and the White House.

On Tuesday, *Newsweek* confirmed DHS was actively spying on migrants traveling to the U.S. southern border through paid undercover informants and infiltrated WhatsApp text messaging groups the caravan uses to coordinate.

The information gathered from the informants and text messages is combined with reports from DHS personnel working with the Mexican government, according to NBC News, who first reported the news.

NBC News additionally reported that over the weekend, DHS intelligence assessments indicated that a group of migrants wanted to run through the car lanes of a border crossing near San Diego, prompting CBP to shut down all northbound lanes from 3 a.m. to 6 a.m. The border breakthrough by migrants never occurred.

Earlier this month, *Newsweek* reported that the Pentagon had not been briefed on whether there were hundreds of criminal suspects allegedly traveling with the migrant caravan.

*Newsweek* has been unable to determine how DHS preemptively identified at least 270 migrants with criminal backgrounds in the convoy and concluding they are ineligible to request asylum.

On the eve of Thanksgiving, roughly 5,900 active-duty troops and 2,100 National Guard forces are deployed to the U.S.-Mexico border waiting for what the president has called "an invasion."

*This article has been updated with comments from Defense Secretary James Mattis and past quotes from President Donald Trump on wanting U.S. troops to treat rocks as firearms.*

REQUEST REPRINT OR SUBMIT CORRECTION

**Promoted Links**

Ads by Revcontent

**She Was a Huge Star Before Her Plastic Surgery, Guess Who She Is!**

90s Kids Only

**32 Embarrassing Photos That, You Need To Look At Now!**

90s Kids Only

**German Hearing Aids Will Change Your Life**

hear.com

*M.G.U., et al.*, v. *Kirstjen Nielsen, et al.*

18-cv-1458 (PLF)

# EXHIBIT 8

12/5/2018
Trump tweets migrants will stay in Mexico until asylum claims approved; incoming Mexican official says no deal | TheHill

Case 1:18-cv-01458-PLF Document 55-1 Filed 12/07/18 Page 46 of 67



# Trump tweets migrants will stay in Mexico until asylum claims approved; incoming Mexican official says no deal

BY **BRETT SAMUELS** - 11/25/18 08:41 AM EST

**1,261** SHARES                        SHARE        TWEET

Michelle Obama on 'leaning in:' 'That s--t doesn't work all the time'
TheHill.com

Autoplay: **On** | Off

President Trump asserted Saturday night that migrants seeking asylum in the U.S. will be forced to stay in Mexico while their claims are individually processed, though an incoming Mexican government official claimed his country had not agreed to such a policy.

"Migrants at the Southern Border will not be allowed into the United States until their claims are individually approved in court. We only will allow those who come into our Country legally," Trump wrote on Twitter.

"Other than that our very strong policy is Catch and Detain. No 'Releasing' into the U.S. All will stay in Mexico," he continued. "If for any reason it becomes necessary, we will CLOSE our Southern Border."

**Donald J. Trump**
@realDonaldTrump

Migrants at the Southern Border will not be allowed into the United States until their claims are individually approved in court. We only will allow those who come into our Country legally. Other than that our very strong policy is Catch and Detain. No "Releasing" into the U.S...

166K   6:49 PM - Nov 24, 2018

57.6K people are talking about this

**Donald J. Trump**
@realDonaldTrump

....All will stay in Mexico. If for any reason it becomes necessary, we will CLOSE our Southern Border. There is no way that the United States will, after decades of abuse, put up with this costly and dangerous situation anymore!

145K   6:56 PM - Nov 24, 2018

56.2K people are talking about this

## Just In...

**Russian romancing, Saudi intrigue precede OPEC meeting**
OPINION — 14M 50S AGO

**Boundless: 5G and Smart Manufacturing**
BOUNDLESS — 19M 32S AGO

**Mexico's new president says relationship with Trump is 'good,' expects immigration talks soon**
LATINO — 20M 38S AGO

**What America's Thinking: December 5, 2018**
WHAT AMERICA'S THINKING — 21M 3S AGO

**George W. Bush chokes back tears in eulogy for father**
ADMINISTRATION — 26M 1S AGO

**Alan Simpson on George HW Bush: 'He could never, ever remember a punchline'**
IN THE KNOW — 29M 59S AGO

**The Hill's 12:30 Report — Presented by The Embassy of the United Arab Emirates — George H.W. Bush honored with state funeral | Sights and sounds | Trump seated next to Obamas**

**World's largest shipping company pledges to bring carbon emissions to zero by 2050**
INTERNATIONAL — 37M 48S AGO

VIEW ALL

12/5/2018    Trump pushes on Trump claim that asylum seekers will wait in Mexico until claims filed as Mexican official says no deal | TheHill

Case 1:18-cv-01458-PLF   Document 55-1   Filed 12/07/18   Page 47 of 67

## Related News    by    |



Laura Bush thanks
Melania Trump for a...



New book about White
House stirs controversy



[Pics] Chip and Joanna's
Let Cameras Inside...
Sponsored | Livestly



Ex-doorman makes
unverified claim that...

Mexico's soon-to-be interior minister said, however, on Saturday there was
no agreement between the two countries to keep asylum seekers in
Mexico.

"There is no agreement of any sort between the incoming Mexican
government and the U.S. government," Olga Sanchez told The Associated
Press in a statement.

Sanchez, who will take office with Andres Manuel Lopez Obrador's
administration on Dec. 1, contradicted an earlier statement given to The
Washington Post that said the U.S. and Mexico had agreed to such a policy
as a "short-term" solution.

Her statement to the AP did not address the discrepancy between her two
comments.

The president's tweets on Saturday served as confirmation of a report
that his administration was considering a policy termed "Remain in
Mexico" that would force migrants seeking asylum in the U.S. to wait in
Mexico, breaking with current policy.

Under the policy, asylum seekers would have to establish a "reasonable
fear" of persecution in Mexico to be allowed into the U.S. while their
claims are processed, according to memos obtained by the Post.

The measure is the latest effort from the Trump administration to crack
down on immigration, particularly in response to a so-called "caravan" of
Honduran, Guatemalan and El Salvadoran migrants making its way
toward the U.S. border from Central America.

The president has in recent weeks painted the group as an imminent
national security threat, deployed troops to the border and signed a
proclamation preventing certain immigrants from declaring asylum. The
latter measure was halted by a federal judge last week.



### An Insane Credit Card
### Offering 0% Interest
### Until 2020

SPONSORED CONTENT    SPONSORED BY NEXTADVISOR

Trump added on Sunday morning that Mexico should stop migrant groups
"long before they get to our Southern Border," and that the countries the
migrants are fleeing should prevent the groups from forming in the first
place.

 **Donald J. Trump**
@realDonaldTrump

Would be very SMART if Mexico would stop the Caravans long
before they get to our Southern Border, or if originating countries
would not let them form (it is a way they get certain people out of
their country and dump in U.S. No longer). Dems created this
problem. No crossings!

129K   8:28 AM - Nov 25, 2018

55.9K people are talking about this

Experts have noted that human rights laws prevent governments from
prohibiting its citizens from leaving.

TAGS   DONALD TRUMP

SHARE          TWEET



THE HILL 1625 K STREET, NW SUITE 900 WASHINGTON DC 20006 | 202-628-8500 TEL | 202-628-8503 FAX
THE CONTENTS OF THIS SITE ARE ©2018 CAPITOL HILL PUBLISHING CORP., A SUBSIDIARY OF NEWS COMMUNICATIONS, INC.

*M.G.U., et al.*, v. *Kirstjen Nielsen, et al*.

18-cv-1458 (PLF)

# EXHIBIT 9



**Pick Your NPR Station**
There are at least two stations nearby



| NEWSCAST DONATE | LIVE RADIO | SHOWS |

NATIONAL

# FACT CHECK: What's Happening On The U.S.-Mexico Border?

November 27, 2018 · 5:24 AM ET

CAMILA DOMONOSKE     RICHARD GONZALES



Tear gas thrown by U.S. border agents is seen near the border crossing in Tijuana, Mexico, on Sunday.

*Guillermo Arias/AFP/Getty Images*

**Updated at 2:15 p.m. ET**

The situation at the San Ysidro Land Port of Entry has been chaotic and confusing in recent days. And reactions from the American public suggest that photos and footage from the scene serve as a sort of Rorschach test.

On Sunday, for instance, U.S. agents closed a major border crossing and fired tear gas at migrants attempting to cross into the U.S. from Tijuana, Mexico. The migrants, many of whom had been part of a caravan of Central American asylum-seekers, were protesting the slow pace with which the U.S. has been processing asylum claims.

For supporters of President Trump who advocate a crackdown on immigration, the events of Sunday showed migrants storming a protected border, confirming fears of an "invasion" of migrants defying U.S. laws.

For Trump's critics and pro-immigration activists, the scene showed American patrol agents firing tear gas at an unarmed crowd including children, reinforcing horror over the way the U.S. is treating immigrants.

Here's what we know about what's happening on the border.

---

Article continues below

# Sign Up For The NPR Daily Newsletter

Catch up on the latest headlines and unique NPR stories, sent every weekday.

| What's your email? | SUBSCRIBE |

By subscribing, you agree to NPR's terms of use and privacy policy.

**Is the U.S.-Mexico border currently closed?**

No. The border has not been shut down. One port of entry was closed for a few hours on Sunday but has since reopened.

The port of entry in question — San Ysidro — is a big one. It's the busiest land border crossing in the Western Hemisphere. An average of 90,000 people pass north through the crossing each day, 70,000 in cars and 20,000 by foot.

**Could President Trump seal the border if he wished?**

Yes. It is difficult to completely secure a border more than 1,900 miles long, but ports of entry could be shut down, as USA Today explains. There is some precedent for such an action, although it's extreme.

And as Quartz notes, that would only delay — not eliminate — the United States' legal responsibility to hear asylum claims.



A group of Central American migrants climb a metal barrier on the Mexico-U.S. border in Tijuana on Sunday.
*Pedro Pardo/AFP/Getty Images*

### How many people are waiting in Mexico, hoping to cross into the U.S.?

More than 5,000 migrants from Central America have reached the border town of Tijuana, as part of the caravan that traveled some 3,000 miles. Most are from Honduras, where gang violence is widespread and a 2009 coup triggered an ongoing political crisis. The U.S. has long played a key role in Honduran politics.



YOUTH
PHOTOS: It's Hard To Grow Up — And Grow Old — In Honduras

All told, more than 7,000 migrants with the caravan have reached the state of Baja California, where Tijuana is located, according to the Mexican government.

And there were other migrants waiting in Tijuana even before the caravan members began to arrive, reporter James Fredrick notes.

Several hundred migrants were involved in the confrontation on Sunday.

### Why were the migrants protesting over the weekend?

Many of the migrants say they want to seek asylum in the U.S., which is not illegal —
in fact, the right to seek asylum is protected by both U.S. and international law.

---

**What is asylum?**

Seeking asylum means asking the U.S. to accept you — legally — because of persecution you are facing in your home country.

Crossing the border illegally is a misdemeanor; for a person who has already been deported once, it's a felony.

Seeking asylum *at a port of entry*, however, is not a crime at all.

However, authorities at legal border crossings have been limiting the number of
people who can request asylum. Only 40 to 100 people are allowed each day, Fredrick
says.

"People in the caravan who want to request asylum, they're looking at months to even
be heard first by U.S. authorities, and then for that claim to be processed can take
months or even years," Fredrick tells NPR.

Migrants were protesting that delay.

A spokesman for CBP told NPR's Joel Rose that San Ysidro is limited by its facilities,
which can hold up to 300 people, and that the port of entry can process about 100
people per day under ideal conditions.

The federal government is aware that asylum-seekers face a backlog. A report from the
Department of Homeland Security's Office of Inspector General published in
September described the issue.

The U.S. government has encouraged all asylum-seekers to go to ports of entry, rather
than along the rest of the border. At the same time, authorities are limiting the volume
of asylum-seekers allowed at ports of entry. The "competing directives" have created a
backlog, OIG found, likely causing more migrants to enter the country illegally.

Earlier this month the Trump administration announced new measures aimed at
denying asylum to migrants who enter the country illegally. A federal court later
blocked that effort.



Central American migrants run along the shallow concrete waterway of the Tijuana River.

*Guillermo Arias/AFP/Getty Images*

## What happened on Sunday?

It was a peaceful protest at first, says Fredrick, who witnessed the events in Tijuana. Mexican federal police attempted to contain the crowd, but some migrants were able to pass the Mexican police.

"They went down into this kind of riverbank, where there is not that giant steel fence that divides the U.S. and Mexico," he says. "It's a chain-link fence and barbed wire. A group of them started pushing up against that fence."

At that point, U.S. agents began firing tear gas into the crowd for the first time. Tear gas was used again several times.

It was a windy day, and the tear gas drifted at least half a mile, Fredrick reported Sunday. Families with children, including some far from the altercation at the fence, felt its effects.

Ninety-eight migrants were arrested by Mexican authorities south of the border.

Rodney Scott, chief patrol agent of the San Diego Sector Border Patrol, told CNN on Monday that about 42 people were arrested on the U.S. side of the border, including eight women and "a few children."

Some of the migrants threw rocks, and Border Patrol agents "deployed tear gas to protect themselves and to protect the border," Scott said.

He said several agents were struck by rocks but were not injured because they were wearing tactical gear, including helmets and bulletproof vests.

**What's the role of the military along the border?**

President Trump has sent nearly 6,000 U.S. troops, including military engineers and military police, to the U.S.-Mexico border to support Customs and Border Protection. The military police are not supposed to carry out law enforcement duties, but they can protect CBP officials.

While local police and CBP agents have firepower, military leaders and spokesmen have repeatedly said that the military police at the border are unarmed. Secretary of Defense James Mattis said Wednesday that military police would carry shields and batons, not firearms.

Armed Border Patrol tactical units are deployed at the border to protect Border Patrol agents. Backing up these tactical units are unarmed military police with protective shields and batons. The military police are not supposed to engage migrants but are there in a support role to back up the Border Patrol.



**NATIONAL SECURITY**

Marines Deployed To U.S.-Mexico Border As Central American Migrants Continue North

A total of 1,800 troops are in California as of Monday, an increase compared with recent weeks. Some of the military police — it's not clear how many — participated in the border action over the weekend.

U.S. Northern Command tells Walsh the military provided nonlethal assistance, did not have contact with migrants and were not involved in deploying tear gas.

It's not yet clear what their role was.

**Does the military have authorization to use lethal force?**

President Trump has said that he's "given the OK" for U.S. forces to "use lethal force" against the migrant caravan.

But according to a White House memo from last week, which was acquired by multiple media outlets, the decision to use lethal force is limited to protecting federal agents —

and at the discretion of the secretary of defense.

And Mattis, in a briefing last week, said that the Department of Homeland Security has issued no call for lethal force. On Monday, CBP described the military's role as helping put up barriers along the border — with no mention of force.

The memo expanding the military's powers was signed by White House chief of staff John Kelly, which is unusual. It was reportedly opposed by both Mattis and Secretary of Homeland Security Kirstjen Nielsen.

U.S. troops have always had the right to act in their own self-defense.



U.S. military personnel and Border Patrol agents secure the border at the San Ysidro crossing point.
*Sandy Huffaker/AFP/Getty Images*

### Are the number of border crossings increasing or at a historic high?

No. As Rose reported this month, the total number of migrants apprehended at the border is actually down slightly, to about 521,000, and remains far below the numbers that were routine in the 1990s and 2000s.

The difference, according to the Trump administration, is the kind of migrants turning up at the border. In the past, migrants were largely single adults who could be deported quickly. Today's migrants are more likely from Central America and part of family units. That means they have greater protections under U.S. law, and it may take

months or years to deport them. In the meantime, hundreds of thousands have been released into this country, awaiting their day in court.

**Has the U.S. made a deal with Mexico that would keep asylum-seekers south of the border as their claims are processed?**

It appears that the initial reports of a deal between the U.S. and Mexico to keep asylum-seekers in Mexico were premature, but not inaccurate.

*The Washington Post* first reported on Saturday that a tentative deal with Mexico had been reached, adding that "no formal agreement has been signed."

*The Post* offered these details:

> "According to outlines of the plan, known as Remain in Mexico, asylum applicants at the border will have to stay in Mexico while their cases are processed, potentially ending the system, which Trump decries as 'catch and release,'" that has generally allowed those seeking refuge to wait on safer U.S. soil.

> "For now, we have agreed to this policy of Remain in Mexico," said Olga Sánchez Cordero, Mexico's incoming interior minister, the top domestic policy official for López Obrador, who takes office Dec. 1. In an interview with The Washington Post, she called it a 'short-term solution.'"

> "The medium- and long-term solution is that people don't migrate," Sánchez Cordero said. 'Mexico has open arms and everything, but imagine one caravan after another after another. That would also be a problem for us.'"

Within hours, the incoming Mexican government appeared to pull back from the deal. In a statement, Sánchez Cordero declared that "there is no agreement of any kind" between the U.S. and Mexican governments, "since the next president, Andrés Manuel López Obrador, will take office on December 1."

However, the statement doesn't really deny that there have been some negotiations between the two countries on how to handle the migrant caravan. It also implies that López Obrador's incoming government cannot yet announce any deal, if there is one, because he has not taken authority.

The statement does say that Mexico won't become a "safe third country" for the asylum-seekers. That refers to a specific arrangement sought by American officials under which the Central American migrants would be required to seek asylum in Mexico rather than in the U.S. As *The Post* reported in July, the Mexican government never warmed up to that idea.

12/5/2018

Under the so-called "Remain in Mexico" policy, *The Post* reports asylum-seekers would be screened in interviews allowing them to claim a "credible fear" of persecution in their homeland if they return there. They also would have to establish a "reasonable fear" of persecution in Mexico if they remain there. Only those determined to have a "reasonable fear" of staying in Mexico would be allowed into the U.S. to await an asylum hearing. All others would have to wait in Mexico to apply for asylum.

---



NATIONAL

What We Know: Family Separation And 'Zero Tolerance' At The Border

Immigrant advocates say they are monitoring the reports of negotiations between the two governments.

"We are going to wait to see precisely what the president proposes," said Lee Gelernt, an attorney with the American Civil Liberties Union (ACLU) in an interview with NPR.

"But one thing we know right off the bat is that it cannot be legal unless they can assure all the asylum seekers who will be stranded in Mexico ... will be safe — not only from persecution by state actors in Mexico, but by criminal gangs. And from what we know about what's going on, we see no likelihood that that is going to be true. And so because that's part of the legal analysis, whether the asylum seekers will be safe in Mexico, we can't imagine any proposal will be legal."

migrant caravan     u.s. customs and border protection     asylum seekers     u.s.-mexico

immigration     border patrol

# More Stories From NPR

*M.G.U., et al.*, v. *Kirstjen Nielsen, et al.*

18-cv-1458 (PLF)

# EXHIBIT 10

# The New York Times

# *U.S. Fires Tear Gas Into Mexico to Repel Migrants, Closes Border Gate for Several Hours*

**By Reuters**

Nov. 25, 2018

TIJUANA, Mexico — U.S. authorities shut the country's busiest border crossing and fired tear gas into Mexico on Sunday to repel Central American migrants approaching the border after U.S. President Donald Trump vowed the asylum-seekers would not easily enter the country.

Traffic in both directions was suspended for several hours at the San Ysidro port of entry between San Diego and Tijuana, U.S. officials said, disrupting trade at the most heavily trafficked land border in the Western Hemisphere. Pedestrian crossings and vehicle traffic later resumed, officials said.

Tensions on the border had been rising in recent days, with thousands of Central American migrants who arrived in a caravan camped out in a sports stadium in Tijuana. On Sunday, Mexican police broke up the latest in a series of daily protests, triggering a rush toward the U.S. border.

U.S. Customs and Border Protection officers stopped the migrants with a volley of canisters emitting large clouds of gas as U.S. and Mexican government helicopters clattered overhead.

The Mexican government said it had retaken control of the border crossing after nearly 500 migrants tried to cross the U.S. border "in a violent manner," and vowed to immediately deport Central Americans who attempt to enter the United States illegally.

Trump has raised alarm for weeks about the caravan of Central American migrants as it approached the United States, with its members planning to apply for asylum on reaching the country.

---

**Breaking big stories requires support.**
**Subscribe to The Times**

The mostly Honduran migrants are fleeing poverty and violence and have said they would wait in Tijuana until they could request asylum in the United States, despite growing U.S. measures to tighten the border.

Hundreds of caravan members including women and children protested peacefully on Sunday with chants of "We aren't criminals! We are hard workers." As they neared the U.S. border, they were stopped by Mexican authorities, who told them to wait for permission.

As the morning wore on, and it became clear they would not get permission, people started to express frustration.

MILITARY POLICE DEPLOYED

Groups of migrants, some of them bearing the Honduran flag, broke off and headed toward the border fence, where U.S. Customs and Border Protection officers gathered on the other side, backed by U.S. military police, San Diego police and the California Highway Patrol.

The Americans responded with tear gas after the migrants hit them with projectiles, U.S. Customs and Border Protection said on Twitter.

"Border Patrol agents deployed tear gas to dispel the group because of the risk to agents' safety," the statement said.

Protesters were caught between the Mexican and U.S. authorities. A young woman fell to the ground unconscious, and two babies cried, tears streaming from the gas, a Reuters witness said.

"They want us to wait in Mexico but I for one am desperate. My little girl is sick and I don't even have money for milk," said Joseph Garcia, 32, of Honduras. "I can't stand it anymore."

Trump has deployed military forces to the border to support the Border Patrol and threatened on Saturday to close the entire southern border.

Military police were sent to the border crossing and military engineers moved barricades as part of the enforcement, the U.S. Northern Command said in a statement on Sunday.

"Department of Defense military personnel will not be conducting law enforcement functions, but are authorized to provide force protection for Customs and Border Protection personnel," the statement said.

An average of 70,000 vehicles and 20,000 pedestrians cross from Mexico to the United States at San Ysidro each day, according to the U.S. General Services Administration.

Duncan Wood, director of the Mexico Institute at the Wilson Center research group in Washington, called the closure a "drastic response" and said it would cost "many millions of dollars."

U.S. and Mexican negotiators met on Sunday to discuss a plan to keep the Central Americans in Mexico while their asylum claims are heard. Normally, asylum-seekers announce their intention on arriving at U.S. ports of entry or after crossing the border illegally.

Trump has been pushing for a U.S.-Mexico border wall and warned on Thursday there could be a government shutdown next month if the U.S. Congress failed to provide funding. Sunday's events took place at one of the stretches where there is a physical border barrier.

(Reporting by Lizbeth Diaz in Tijuana; Additional reporting by Lucia Mutikani, Doina Chiacu and Julia Harte in Washington; Writing by Daniel Trotta; Editing by Peter Cooney)

*M.G.U., et al.*, v. *Kirstjen Nielsen, et al*.

18-cv-1458 (PLF)

# EXHIBIT 11

The Washington Post

Fact Checker Analysis

# Trump's false claim that Obama had the same family separation policy

By Salvador Rizzo

*"Obama separated . . . . . . . . children from parents, as did Bush etc., because that is the policy and law. I tried to keep them together but the problem is, when you do that, vast numbers of additional people storm the Border. So with Obama seperation is fine, but with Trump it's not. Fake 60 Minutes!"*

**— President Trump, in a pair of tweets, Nov. 25, 2018**

*"Mexico should move the flag waving Migrants, many of whom are stone cold criminals, back to their countries."*

**— Trump, in a tweet, Nov. 26, 2018**

*"They had to use [tear gas on migrants at the border] because they were being rushed by some very tough people. And they used tear gas."*

**— Trump, remarks at the White House, Nov. 26, 2018**

It's not the first time Trump tries to minimize the scope of his family separations at the border by claiming that President Barack Obama had the same policy. This claim and its variations have been roundly debunked. We gave them Four Pinocchios in June. But they're back now, and so are we.

Trump also claimed without evidence again that "criminals" are part of the migrant caravans traveling from Central America to the U.S.-Mexico border. The administration over the past month has tried to cobble together proof of Trump's claim. It has almost nothing but supposition to show the public. Many of the caravan members are women and children fleeing violence in their home countries or seeking economic opportunity in the United States. They hardly fit Trump's description of "very tough people" rushing the border.

The Facts

There is simply no comparison between Trump's family separation policy and the border enforcement actions taken by the Obama and George W. Bush administrations. (After a public outcry, Trump in late June signed an executive order to end family separations.)

Obama had guidelines that prioritized the deportation of gang members, national security risks and felons. Once he took office, Trump issued an executive order rolling back much of that framework and scrapping the priority list. Trump's January 2017 order refers only to "criminal offenses," which is broad enough to encompass serious felonies and misdemeanors.

But the key difference here is that in April, the Justice Department rolled out a "zero tolerance" policy of prosecuting all adults caught crossing the border illegally. As a result of this and the Department of Homeland Security's decision in May to refer all illegal-crossing cases to federal prosecutors, families apprehended at the border were systematically separated. The reason is simple: Children can't be prosecuted with their parents.

This is worlds apart from the Obama- and Bush-era policy of separating children from adults at the border only in limited circumstances, such as when officials suspected human trafficking or another kind of danger to the child, or when false

claims of parentage were made.

"The biggest difference really is the difference between a policy that is targeted and tailored to protect a child and a policy which essentially uses children as a way to punish the parents or to deter them from doing the thing that we don't want them to do," said Cecilia Muñoz, who oversaw immigration as director of Obama's domestic policy council. "The scale as a result is very different and the impact is very different."

When DHS presented family separations as one of several options to the Obama administration, it was immediately rejected as "immoral," she added. Morality questions aside, the proposal would have been a costly "logistical nightmare" for DHS and the Department of Health and Human Services, which is tasked with resettling separated or unaccompanied children at the border, Muñoz said.

Responding to questions for a previous fact check, a DHS spokeswoman sent figures from fiscal 2010 through 2016 showing that, of 2,362,966 adults apprehended at the southern border, 492,970, or 21 percent, were referred for prosecution. These figures include all adults, not just those who crossed with minor children, so they're not a measure of how many families were separated under Obama.

For this fact check, we asked the White House whether it had a breakdown of these numbers that supports the Obama-Trump comparison on family separations. We didn't get a response. No government agency or outside group appears to have data on family separations under Bush or Obama.

"During the Obama administration, there was no policy in place that resulted in the systematic separation of families at the border, like we are now seeing under the Trump administration," Sarah Pierce, a policy analyst at the Migration Policy Institute, told us in June. "Our understanding is that generally parents were not prosecuted for illegal entry under President Obama. There may have been some separation if there was suspicion that the children being trafficked or a claimed parent-child relationship did not actually exist. But nothing like the levels we are seeing today."

We don't know which parts of "60 Minutes" got Trump tweeting. The program's reporting about the workings of the "zero tolerance" policy matches our own at The Fact Checker. (See here and here.)

The news program also reported on an uncensored DHS document it obtained: The "document reveals that child separation began nine months earlier than the administration acknowledged. There was a pilot program in the busy 'El Paso sector' from 'July to November 2017.' We don't know how many children were taken in those five months." But this is unrelated to Trump's assertion that the Obama and Bush administrations separated families.

As for Trump's claim about "the flag waving Migrants, many of whom are stone cold criminals," we've looked into it repeatedly (see here, here and here). The Trump administration has offered no proof of criminals traveling with the caravan. The most that can be said is that any crowd of 7,000 people is going to have some bad apples and that the Trump administration's estimates of 270 to 470 criminals in the caravan comport with the ratio seen during a 2014 immigration surge.

But it's important to keep in mind that the Mexican government deports many criminals before they reach the United States and has named only two individuals in this case.

Asked about U.S. Customs and Border Protection agents lobbing tear gas at children near the San Ysidro border crossing between San Diego and Tijuana over the weekend, Trump said it was necessary because they were being rushed by "very tough people." He dismissed reports that children were among those subjected to tear gas. Photos and video taken on site show that these children were with their mothers, not hardened criminals. Men were also part of the group.

"A lot of young children fainted. My daughter also got hit," one mother told The Washington Post. "There were pregnant women there and a lot of older men, too."

"I felt that my face was burning, and my baby fainted. I ran for my life and that of my children," Cindy Milla, a Honduran migrant with two children, told the Wall Street Journal.

The Pinocchio Test

Time keeps passing by and the president is still shifting blame, refusing to acknowledge the scope of his family separations, defending them with falsehoods and peddling unsubstantiated claims about criminals in the migrant caravan. The administration has had ample time to find something, anything, to support these claims. But the tank remains empty, and Trump earns another Four Pinocchios.

Four Pinocchios

(About our rating scale)

**Send us facts to check by filling out this form**

**Sign up for The Fact Checker weekly newsletter**

**The Fact Checker is a verified signatory to the International Fact-Checking Network code of principles**



**Salvador Rizzo**
Salvador Rizzo is a reporter for The Fact Checker. He previously covered New Jersey politics, courts, state finances and Gov. Chris Christie, with stints at the Star-Ledger, the Bergen Record and the Observer. Follow 🐦

---

# The Washington Post

## The story must be told.

Your subscription supports journalism that matters.

Try 1 month for $1

---

**Podcasts**

## Democrats set the stage (literally) for 2020

The Democratic National Committee struggles to find a big-enough stage for likely presidential candidates. Plus, the second and final installment of our series "An Affair. The Mob. A Murder."

▶ **Listen**   22:53

19 hours ago



# Be the first to know.

Our award-winning journalists are there when the news breaks.

Try 1 month for ~~$10~~ $1

**Send me this offer**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| M.G.U., *et al.*, |
| Plaintiff, |
| v. |
| KIRSTJEN NIELSEN, *et al.*, |
| Defendants. |

Civil Action No. 1:18-cv-1458 (PLF)

**[PROPOSED] ORDER**

UPON CONSIDERATION of Defendants' Motion to Dismiss (ECF No. 53) and Plaintiffs' Memorandum in Opposition to Motion to Dismiss, it is by the Court this ___ day of _____, 2018

ORDERED that Defendants' Motion is DENIED.

_____
The Honorable Paul L. Friedman
United States District Judge