# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| M.G.U., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | No. 18-cv-1458-PLF |
| v. | § | |
| | § | Civil Action |
| Kirstjen Nielsen, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## EMERGENCY APPLICATION FOR A TEMPORARY RESTRAINING ORDER

Plaintiffs P.M.B. and C.O.M. a mother and her daughter, are currently detained together near Dilley, Texas.  Plaintiff C.O.M. is pursuing an asylum claim and is awaiting her next Master Calendar Hearing.  Defendants are threatening to separate P.M.B. from C.O.M. imminently—during the pendency of C.O.M.'s asylum proceedings—and perhaps permanently. Plaintiffs seek a Temporary Restraining Order preserving the *status quo*—detention of P.M.B. together with C.O.M.—while the parties can brief and argue whether Defendants can lawfully extend their child separation policy to separate this family.  The Court has jurisdiction to enjoin unconstitutional actions by the Defendants, and has already found in this action that another application of the child separation "policy" likely violates the Fifth Amendment.  Plaintiffs respectfully request that the Court grant this application to prevent this mother and daughter from being separated while it considers whether the extension of that policy to these Plaintiffs is also unconstitutional.

## FACTS

Plaintiff C.O.M. has a pending asylum claim, while her mother P.M.B. does not.  P.M.B. is presently subject to a final order of deportation which, if executed, will separate her from her

daughter C.O.M.  Prior to the family separation crisis that began in 2018, separation of children with asylum claims from parents without claims was unheard of.  Attached Exhibit 1 (Declaration of Denise Gilman at ¶ 5).  The Government's practice in such situations has been to allow the parent to remain in the country while the child's case remains pending or where the child is granted relief.  (*See id.*).  In related family separation litigation during 2018, Defendants agreed that in similar circumstances, they would not separate families.  Attached Exhibit 2 (*Ms. L.* ECF No. 321, approving Settlement Agreement in ECF No. 220-1 at 5 ¶ 6).  Here, however, Defendants claim that they can separate C.O.M. from P.M.B. simply because this family has not previously been forcibly separated.  Attached Exhibit 3 (Government's Opposition to P.M.B.'s Motion to Reopen at 4 ¶ 5).  Separation is imminent and will harm P.M.B. and C.O.M. by traumatizing them and impeding C.O.M. from pursing her asylum claim.  Attached Exhibit 4 (Young Center Declaration), Exhibit 5 (Fluharty Declaration), and Exhibit 6 (P.M.B. Declaration).

## ARGUMENT

All factors weigh in favor of preserving the status quo—keeping P.M.B. together with her daughter—while the parties brief and argue whether Defendants can lawfully separate them.

### I.     Separation Causes Immediate, Ongoing, Irreparable Harm

"[L]oss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.  *Mills* v. *Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (citations omitted).  As a result, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." 11A WRIGHT & MILLER, FED. PRAC. & PROC. § 2948.1 (2d ed. 2004).

The threat of separation and any actual separation causes immediate, ongoing, severe trauma to Plaintiffs, as would any period of forced separation, for which no remedy at law is available.  Attached Exhibits 4 to 6; *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 121-23 (D.D.C. 2018).

The threat of separation and any actual separation will also impede C.O.M.'s capacity to pursue her asylum claim.  *See Ms. L.* v. *U.S Immigration & Customs Enf't*, 302 F. Supp. 3d 1149, 1164 (S.D. Cal. 2018) (importance of asylum figures in Due Process enforcement); *U.S.* v. *Dominguez-Portillo*, No. EP-17-MJ-4409, 2018 WL 315759 at *1-2 and *14 (W.D. Tex. January 5, 2018) (separation impedes pursuit of asylum).

## II.    Plaintiffs Are Likely to Succeed on the Merits of their Fifth Amendment Claim

Plaintiff C.O.M. has a due process right to pursue her pending asylum claim, and Plaintiffs have a due process right to remain together while this claim is pending.

First, as has been well-established in this Circuit, Plaintiff C.O.M. "has a Fifth Amendment procedural due process right" to petition the government for asylum.  *Gutierrez-Rogue* v. *I.N.S.*, 954 F.2d 769, 773 (D.C. Cir. 1992) (citing *Maldonado-Perez* v. *INS,* 865 F.2d 328, 332-33 (D.C. Cir. 1989) (citation omitted).  C.O.M. has already passed her credible fear determination, and is now awaiting her next master calendar hearing.  She has the right to continue her pursuit of asylum through these proceedings.   Second, Plaintiffs have an undisputed substantive due process right to family integrity.  Substantive due process protects parents' interest in "family integrity, and the care custody, and control of their children." *M.G.U.*, 325 F. Supp. 3d at 119.  It also protects children's liberty interest in family association and integrity.  *See M.M.M.* v. *Sessions*, No. 18-cv-1832, Order Granting Plaintiffs' Motion for Temporary Restraining Order (S.D. Cal., August 16, 2018) ("[T]here is a public interest in

ensuring that [the child plaintiffs'] constitutional right to family association and integrity is upheld."); *see, e.g., Wooley* v. *City of Baton Rouge*, 211 F.3d 913, 923 (5th Cir. 2000) ("a child's right to family integrity is concomitant to that of a parent").

This Court has already recognized that this Fifth Amendment right extends to migrant families who came to the United States together to seek asylum.  *M.G.U.*, 325 F. Supp. 3d at 119 (separation of migrant parent from their child "implicate a fundamental liberty interest that has been infringed").  The Court did so in the context of rectifying a separation that had already occurred; in that context, the relief ordered was reunification.  The constitutional interest here, where separation is imminent, is the same.  *See also Ms. L. v. U.S Immigration & Customs Enf't*, 310 F. Supp. 3d 1133, 1142-46 (S.D. Cal. 2018) (holding that migrant asylum seeking families have substantive due process rights, ordering reunification, and prohibiting separation of families apprehended together at the border absent a finding that the parent poses a danger to the child); *MMM v. Sessions*, Stay Decision, at 4 n.3 (recognizing general practice of allowing families placed in expedited removal to seek asylum together as a unit, and be treated as a unit through the process).

In the context of the *Ms. L.* case, pursuant to a settlement agreement, Defendants agreed to allow parents with final orders of removal whose children still seek asylum to remain with their children through the proceedings.  (Attached Exhibit 2 at *Ms. L* ECF No. 220-1 at 5 ¶ 6). Defendants have written that P.M.B. and C.O.M. are not entitled to benefit from the settlement agreement in *Ms. L*  and *M.M.M.* (*see* Attached Exhibit 3 at 4 ¶ 5) because they have never before been separated.  This factual distinction is immaterial to Plaintiffs' right to family integrity.  Regardless of whether separation and reunification have occurred in the past, families who arrived in the United States together as a family unit to seek asylum have a right to remain

together while pursuing asylum, so as to avoid the trauma of separation and to ensure that each family member pursuing asylum has a fair opportunity to do so.

### III.     The Balance of Harms and Public Interest Favor a Temporary Restraining Order

If the Court grants this TRO, the only harm the Government will incur is the inability to immediately remove P.M.B. from the country while her daughter's asylum claim is pending—an plan that is already out of step with the government's actions in the past with respect to similar situations.  (*See* Attached Exhibit 1, Gilman Decl. at ¶ 5.)

Without this TRO, P.M.B. will be removed from the country while her daughter's asylum claim is pending, a significant intrusion on both the right to pursue asylum proceedings and the right to family integrity.  The Government's interest in the immediate execution of removal orders does not outweigh the significant risks that its actions pose to the due process rights of both Plaintiffs.  *See M.M.M.* v. *Sessions*, 18-cv-1832, Order Granting Plaintiffs' Motion for Temporary Restraining Order (S.D. Cal. August 16, 2018) (holding that the Government's interest in executing removal orders "must not and surely need not be solved by depriving people of their rights").  The court in *M.M.M.* has already recognized that both family integrity and the right to pursue asylum proceedings are significant public interests which outweigh the government's interest in swift removal.  *See id.*

Furthermore, Defendants themselves have an important interest in promoting family integrity:

> the state also shares the interest of the parent and child in their family's integrity, *see Santosky v. Kramer*, 455 U.S. 745, 766-67 (1982)] ("the *parens patriae* interest favors preservation, not severance of natural familial bonds"), because the welfare of the state depends in large part on the strength of the family.

*Jordan by Jordan v. Jackson*, 15 F.3d 333, 346 (4th Cir. 1994); *see also id.* ("The forced separation of parent from child, even for a short time, represents a serious impairment on

[parental] rights.").  This basic commitment to family values is enshrined in our Constitution.

*See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a

substantial public interest 'in having governmental agencies abide by the federal laws that

govern their existence and operations.'") (citation omitted).  Defendants will suffer no harm if

the Court enters a temporary restraining order that merely preserves the *status quo* while the

parties brief and argue whether Defendants have any lawful basis for separating P.M.B. from

C.O.M.

Finally, Plaintiffs respectfully note that the current shutdown of the federal government

further weighs in favor of preserving the status quo.  Plaintiffs' attorneys have been unable to

contact the attorneys for the Government in this matter, whom Plaintiffs understand to be

furloughed as a result of the shutdown.  (*See* Certificate of TRO Notice, *infra* at p.9).  The ability

of Plaintiffs' attorneys to communicate with Defendants is crucial, both in terms of obtaining the

most up-to-date information as to the timing of removal proceedings and the ability of the parties

to resolve this matter on their own.  A temporary restraining order would preserve the status quo

until the government is fully operational again and both sides can efficiently communicate to

either resolve this matter on their own or provide the Court with appropriate briefing.

**CONCLUSION**

Plaintiffs have filed a proposed Temporary Restraining Order with this Application containing all information required by Rule 65(b)(2), and they urge the Court to enter it at the soonest possible time.  Plaintiffs are willing to post a bond in an amount set by the Court.

December 23, 2018

Respectfully submitted,
TEXAS RIOGRANDE LEGAL AID, INC.

Jerome Wesevich (D.D.C. Bar No. TX0125)
Peter McGraw (admitted pro hac vice)
Amanda Chisholm (admitted pro hac vice)
1331 Texas Avenue
El Paso, Texas 79901
(915) 585-5120
jwesevich@trla.org


PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

Steven C. Herzog (admitted pro hac vice)
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3317
sherzog@paulweiss.com

David J. Ball (DC Bar No. 460055)
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7352
dball@paulweiss.com

Anand Sithian (admitted pro hac vice)
Katherine Kelly Fell (admitted pro hac vice)
1285 Avenue of the Americas
New York, NY 10019-6064

(212) 373-3000
asithian@paulweiss.com
kfell@paulweiss.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| M.G.U., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | No. 18-cv-1458-PLM |
| v. | § | |
| | § | Civil Action |
| U.S. DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**CERTIFICATE OF COMPLIANCE**
**WITH EMERGENCY NOTICE REQUIREMENTS OF LOCAL RULE 65.1(a)-(b)**

I, Jerome Wesevich, counsel for Plaintiffs, certify that I secured compliance with Local Rules 65.1(a)-(b) in conjunction with filing an Emergency Application for Temporary Restraining Order, ECF No. 59 in the above-styled case, as follows:

(a) On Friday, December 21, 2018 at 3:44 p.m. EST, the clerk for the Immigration Judge first revealed the order that precipitated these TRO proceedings. This was the first notice that Plaintiffs had of the need for action. Plaintiffs could not read the order and confer with counsel as to the proper response prior to closure of the office of the U.S. District Clerk for the District of Columbia at 5:00 p.m. that day. Notice of the TRO application during business hours was thus impossible.

Plaintiffs' counsel attempted to resolve the TRO dispute by agreement with defense counsel prior to seeking emergency judicial action. At 10:22 p.m. on December 21, 2018, Plaintiffs' counsel caused an email to be sent to defense counsel urging agreement to a brief withholding of removal of two specific persons (identified by Alien Number and full name) to avoid the need for judicial action. Plaintiffs' counsel also attempted to reach defense counsel Sarah Fabian by telephoning her at about 4:00 p.m. on December 23, 2018, and leaving her a message on her cell phone advising that this is an urgent matter on which Plaintiffs' counsel might seek TRO relief. Perhaps due to the government shutdown, Plaintiffs' counsel has not received a response to their email or phone messages.

(b) Actual notice of the time of making the application for temporary restraining order, and copies of all pleadings and papers filed in the action to date, have been provided to counsel for all Defendants in this action immediately upon filing by CM/ECF and email to sarah.b.fabian@usdoj.gov daniel.vanhorn@usdoj.gov Nicole.Murley@usdoj.gov jeremy.simon@usdoj.gov and Scott.G.Stewart@usdoj.gov.

/s/ Jerome Wesevich
Counsel for Plaintiffs

9

**EXHIBIT LIST
FOR ECF NO. 59—APPLICATION FOR TRO BY P.M.B. AND C.O.M.**

**Exhibit
ECF No.**

59-1    Declaration of Prof. Denise Gilman, Univ. of Texas School of Law
(December 23, 2018)

59-2    Settlement Agreement Approved in *Ms. L v. ICE*
(November 15, 2018)

59-3    Government's Argument as to *Ms. L* Inapplicability in Opposition to
Plaintiff's Motion to Reopen Asylum Proceedings
(December 6, 2018)

59-4    Declaration of Young Center Director Jennifer Nagda
(December 23, 2018)

59-5    Declaration of Dilley Pro Bono Project Director Shayln Fluharty
(December 23, 2018)

59-6    Declaration of Plaintiff P.M.B.
(December 23, 2018)

## DECLARATION OF DENISE GILMAN

I, Denise Gilman, hereby declare:

1.      I make this declaration based on my own personal knowledge and, if called to testify, I could and would do so competently as follows:

Background

2.      I have been a licensed attorney in Texas since 1994. I direct the Immigration Clinic at the University of Texas School of Law. I teach immigration law and refugee law.  I supervise students as they handle immigration matters before the Immigration Courts and the immigration agencies.  In my capacity as director of the Immigration Clinic, I directly represent clients as well.  I am an active member in the American Immigration Lawyers Association (AILA).  I have represented, with my students or independently, many asylum seekers and other migrants in removal proceedings.  I have taught numerous continuing legal education sessions and other trainings and classes on detention, immigration removal proceedings and asylum and refugee law. I mentor other attorneys in these areas of immigration practice as well.

3.      I have represented families in immigration detention in Texas since 2007.  When the Karnes family immigration detention center opened in August 2014, I worked with a group of attorneys to set up a pro bono assistance project at the facility.  During 2014 and 2015, the Immigration Clinic represented more than a dozen families held at the Karnes family detention center.  I also visited the Dilley family detention center during that same time period.  Since 2015, I have remained involved in providing legal advice and representation to families detained at the Karnes and Dilley family detention centers.  Several times a semester, I take a group of student volunteers to the Karnes facility to provide advice and counseling to detained families.  In addition, through the clinic, we have represented a number of families who were detained at the Karnes and Dilley facilities and then settled in the Austin, Texas area during their ongoing Immigration Court proceedings.

4.      Based on this experience, I am very familiar with detention and the processing of families at the Karnes and Dilley detention centers.  Since 2014, I have had contact with a number of detained families where the parent has a removal order and the child(ren) does not.  This situation can arise in a number of ways:  1) the parent is given an expedited removal order at the border after apprehension and does not pass a credible fear interview so that the removal order remains in place, while the child passes a credible fear interview and is placed into removal proceedings to seek asylum; 2) the parent was previously removed from the United States and the prior removal order is reinstated upon the parent's return to the United States and then the parent does not claim fear or does not pass a reasonable fear interview while the child passes a credible fear interview and is placed into removal proceedings to seek asylum; 3) the parent and child received removal orders after Immigration Court proceedings and the child's removal order has been reopened or rescinded while the parent's order has not.

5.      In these situations where the parent has a final removal order and the child does not, the practice has been to allow the parent to remain in the United States with the child while the

child's case remains pending or where the child is granted relief.  I am not aware of any case where the parent is deported and the child remains in the United States.  In most cases, both parent and child are released from detention to allow the child to complete the Immigration Court proceedings or upon a grant of asylum or other relief to the child.  In many cases, once the child is placed in removal proceedings, the parent's removal order is also vacated or reopened and the parent is also placed into removal proceedings to seek asylum or related relief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of December, 2018 at Austin, Texas.

_____
Denise Gilman

1   MICHAEL M. MADDIGAN (SBN 163450)
2   HOGAN LOVELLS US LLP
    1999 Avenue of the Stars, Suite 1400
3   Los Angeles, CA 90067
    Telephone: (310) 785-4727
4   Facsimile: (310) 785-4601
    Email: michael.maddigan@hoganlovells.com

5   Attorney for *M.M.M.* Plaintiffs

6

7

8

9              **UNITED STATES DISTRICT COURT**

10            **SOUTHERN DISTRICT OF CALIFORNIA**

11                   **SAN DIEGO DIVISION**

12

| | |
|---|---|
| 13 M.M.M., on behalf of his minor child, J.M.A., et al., | Case No. 3:18-cv-1832-DMS |
| 14 | JUDGE: Hon. Dana M. Sabraw |
| 15          Plaintiffs, | DATE: November 15, 2018 |
| 16 v. | TIME: 10:30 AM COURTROOM: 13A |
| 17 Jefferson Beauregard Sessions, III, Attorney General of the United States, | |
| 18 et al., | |
| 19          Defendants. | |
| 20 | |
| 21 Ms. L, et al., | Case No. 3:18-cv-428-DMS |
| 22 | JUDGE: Hon. Dana M. Sabraw |
| 23          Plaintiffs, | DATE: November 15, 2018 TIME: 10:30 AM |
| 24 v. | COURTROOM: 13A |
| 25 U.S. Immigration and Customs Enforcement, et al., | **ORDER CERTIFYING THE SETTLEMENT CLASSES AND GRANTING FINAL APPROVAL OF CLASS ACTION** |
| 26 | |
| 27          Defendants. | **SETTLEMENT** |

HOGAN LOVELLS US LLP
ATTORNEYS AT LAW
LOS ANGELES

ORDER CERTIFYING SETTLEMENT CLASSES
AND GRANTING FINAL APPROVAL OF CLASS
ACTION SETTLEMENT

Upon consideration of the Plaintiffs' Motion for Final Approval of Class Action Settlement and Certification of Settlement Classes;

WHEREAS, the *M.M.M.*, *Ms. L*, and *Dora* named Plaintiffs allege that they and members of the Settlement Classes were injured as a result of Defendants' actions;

WHEREAS, the Court granted the *M.M.M.* Plaintiffs' request for a Temporary Restraining Order temporarily restraining Defendants "from removing [specified persons] from the United States, until the merits of Plaintiffs' motion for a preliminary injunction is resolved," *M.M.M. v. Sessions*, Case No. 3:18-cv-1832-DMS (S.D. Cal.) (Aug. 16, 2018), Dkt No. 55 at 15;

WHEREAS the Court ordered the parties to consider "how they wish to proceed on the issues of class certification and Plaintiffs' entitlement to asylum proceedings" and to "meet and confer and propose a solution—one which follows the law, and is equitable and reflective of ordered governance," *id.* at 16;

WHEREAS, the parties reached a settlement agreement that was filed with the Court on September 12, 2018 ("Agreement" or "Settlement");

WHEREAS, on October 9, 2018, the Court granted preliminary approval of the Agreement, approved the proposed notice plan, and provisionally certified the Settlement Classes; and

WHEREAS, the Court has considered the Agreement, the filed objections to the agreement, arguments presented at the fairness hearing held on November 15, 2018, and all other submissions in connection with the parties' request for final approval of the Agreement and certification of the Settlement Classes set forth in the Agreement for the purposes of settlement only, and good cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

1.     The Motion is **GRANTED**.

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
LOS ANGELES

- 2 -

ORDER CERTIFYING SETTLEMENT CLASSES
AND GRANTING FINAL APPROVAL OF CLASS
ACTION SETTLEMENT

**Final Approval of the Settlement**

2.     The form and method by which notice was given to the Settlement Classes met the requirements of due process, Rules 23(c)(2) and 23(e) of the Federal Rules of Civil Procedure, constituted the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons entitled thereto.

3.     The Court finds that: (a) the Settlement is fair, reasonable, and adequate in accordance with Fed. R. Civ. P. 23(e)(2); (b) the Agreement was negotiated at arm's length by experienced counsel acting in good faith; and (c) there has been adequate opportunity for experienced counsel to evaluate the claims and risks at this stage of the litigation.

4.     The Court has reviewed the six objections filed regarding the Settlement and carefully considered each of the issues raised by those filings, and finds that the objections do not impact the conclusion that the Settlement is fair, reasonable, and adequate.

5.     The Court therefore finds that final approval is appropriate and hereby grants final approval of the Settlement.  The parties are directed to consummate the Agreement according to its terms.  The Agreement and every term thereof shall be deemed incorporated herein as if explicitly set forth and shall have the full force of an Order of the Court.

**Certification of the Settlement Classes, Appointment of Settlement Class Representatives, and Appointment of Co-Lead Counsel**

6.     For purposes of the Settlement, and only for that purpose, and without an adjudication on the merits, pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, the Court finds that the requirements for a class action are met, and hereby defines the following classes.

The class of parents is defined as follows:

Hogan Lovells US LLP
Attorneys At Law
Los Angeles

- 3 -

ORDER CERTIFYING SETTLEMENT CLASSES
AND GRANTING FINAL APPROVAL OF CLASS
ACTION SETTLEMENT

All adult alien parents who entered the United States at or between designated ports of entry with their child(ren), and who, on or before the effective date of this agreement: (1) were detained in immigration custody by the DHS; (2) have a child who was or is separated from them by DHS and, on or after June 26, 2018, was housed in ORR custody, ORR foster care, or DHS custody, absent a determination that the parent is unfit or presents a danger to the child; and (3) have been (and whose child(ren) have been) continuously physically present within the United States since June 26, 2018, whether in detention or released. The class does not include alien parents with criminal histories or a communicable disease, or those encountered in the interior of the United States.[1]

The class of children is defined as follows:

All alien children who are under the age of 18 on the effective date of this agreement who: (1) entered the United States at or between designated ports of entry with an alien parent, and who were separated from their parents, on or before the effective date of this settlement agreement; (2) have been or will be reunified with that parent pursuant to the preliminary injunction issued by the Court in *Ms. L v. U.S. Immigration and Customs Enforcement*, No. 18-428 (S.D. Cal. June 26, 2018); and (3) have been continuously physically present in the United States since June 26, 2018.

The Settlement Classes are certified for settlement purposes.

7.     The Court finds that certification of the Settlement Classes is warranted in light of the Settlement under the prerequisites of Federal Rule of Civil Procedure 23(a) because: (1) the members of the Settlement Classes are so numerous that joinder is impracticable; (2) there are issues of law and fact common to the Settlement Classes; (3) the claims of the named Plaintiffs in *M.M.M.*, *Ms. L*, and *Dora* are typical of the claims of the Settlement Class Members; and (4) Plaintiffs and Class Counsel will fairly and adequately represent the interests of the Settlement Class Members.

8.     The Court also finds that certification of the Settlement Classes is warranted in light of the Settlement under the requirements of Federal Rule of Civil Procedure 23(b)(2) because Defendants are alleged to have acted or refused to act

---

[1]     References to a "class" or "class member" in the Agreement refer to the classes described in the text, as well as alien parents who are not part of the *Ms. L* class due to criminal history or communicable disease, but who the Court has ordered must be reunified. The Agreement also addresses parents who are covered by the above description, but who have been removed from the United States.

Hogan Lovells US LLP
Attorneys At Law
Los Angeles

- 4 -

ORDER CERTIFYING SETTLEMENT CLASSES
AND GRANTING FINAL APPROVAL OF CLASS
ACTION SETTLEMENT

on grounds that apply generally to the Settlement Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Settlement Classes as a whole.

9.     The Court hereby appoints the named Plaintiffs in *M.M.M.* and *Ms. L.* (as recently amended) as Settlement Class Representatives. The Court finds that the Settlement Class Representatives will fairly and adequately protect the interests of the Settlement Classes because: (1) the interests of the Settlement Class Representatives are consistent with those of Settlement Class Members; (2) there appear to be no conflicts between or among the Settlement Class Representatives and the other Settlement Class Members; (3) the Settlement Class Representatives have been and appear to be capable of continuing to be active participants in both the prosecution and the settlement of this litigation; and (4) the Settlement Class Representatives and Settlement Class Members are represented by qualified, reputable counsel who are experienced in preparing and prosecuting large, complicated class action cases, including those concerning alleged violations of the relevant laws.

10.    The requirements of Rule 23(g) of the Federal Rules of Civil Procedure are met, and the Court hereby confirms the appointment of the law firm Eversheds Sutherland, Muslim Advocates, and the Legal Aid Justice Center as counsel for the parent class for parents continuously physically present in the United States since June 26, 2018, the ACLU as counsel for parents who have been removed, and Hogan Lovells US LLP as counsel for the child class.

**Other Provisions**

11.    Neither the Agreement, nor any of its terms or provisions, nor any of the negotiations or proceedings in connection with it, shall be construed as an admission or concession by Defendants of the truth of any allegations in the litigation, or of any fault or wrongdoing of any kind, or of a lack of merit of Plaintiffs' allegations.

HOGAN LOVELLS US
LLP
ATTORNEYS AT LAW
LOS ANGELES

- 5 -

ORDER CERTIFYING SETTLEMENT CLASSES
AND GRANTING FINAL APPROVAL OF CLASS
ACTION SETTLEMENT

**IT IS SO ORDERED**.

Dated:  November 15, 2018

_____
Hon. Dana M. Sabraw
United States District Judge

Hogan Lovells US LLP
Attorneys At Law
Los Angeles

**Plan to address the asylum claims of class-member parents and children who are physically present in the United States**

The government is willing to agree to the following procedures for addressing the asylum claims of *M.M.M.* agreed class members and the claims of *Ms. L* class members (and *Dora* plaintiffs), other than those class members who agree to waive these procedures (and thus to waive any further claims or relief). [1] (In this document, references to *Ms. L* class members encompass *Dora* plaintiffs.) Class counsel are responsible for determining a class member's intentions related to waiver of the procedures set forth below. Upon approval of this agreed-upon plan by the U.S. District Court for the Southern District of California, *M.M.M.* agreed class members agree to dismiss their pending litigation in the U.S. District Court for the District of Columbia, and to refrain from seeking preliminary injunctive relief in their litigation pending in the U.S. District Court for the Southern District of California; *Dora* plaintiffs agree to dismiss their pending litigation in the U.S. District Court for the District of Columbia; and *M.M.M.* agreed class members and *Ms. L* class members agree to refrain from additional litigation seeking immigration- or asylum-related injunctive, declaratory, or equitable relief that arises from the facts and circumstances set forth in the *Ms. L*, *M.M.M.*, and *Dora* complaints relating to those parents and children covered by this plan, including statutory claims. This plan applies only to *Ms. L* class members and *M.M.M.* agreed class members who have been continuously physically present in the United States since June 26, 2018, and does not set any precedent for any additional group of aliens, and any exercise of legal authority or discretion taken pursuant to this plan is exercised only to effectuate the implementation of this plan in relation to this group of individuals. The Court's approval of this agreement will resolve the pending preliminary-injunction motion in *M.M.M.* and will also lift the TRO issued in that matter. The Court will retain jurisdiction to enforce the provisions of this plan, which represents the substantive terms for the implementation of a settlement agreement and supersedes the prior written or oral communications between the parties regarding this plan.

1. **a.** *Ms. L* class members and *M.M.M.* agreed class members who are not currently detained in DHS custody (and are not currently in HHS custody) and who have been issued Notices to

---

[1] The classes of individuals to whom this plan relates include:

**<u>*Ms. L* Class Members and *Dora* Plaintiffs</u>**: All adult alien parents who entered the United States at or between designated ports of entry with their child(ren), and who, on or before the effective date of this agreement: (1) were detained in immigration custody by the DHS; (2) have a child who was or is separated from them by DHS and, on or after June 26, 2018, was housed in ORR custody, ORR foster care, or DHS custody, absent a determination that the parent is unfit or presents a danger to the child; and (3) have been (and whose child(ren) have been) continuously physically present within the United States since June 26, 2018, whether in detention or released. The class does not include alien parents with criminal histories or a communicable disease, or those encountered in the interior of the United States.

**<u>*M.M.M.* Agreed Class Members</u>**: All alien children who are under the age of 18 on the effective date of this agreement who: (1) entered the United States at or between designated ports of entry with an alien parent, and who were separated from their parents, on or before the effective date of this settlement agreement; (2) have been or will be reunified with that parent pursuant to the preliminary injunction issued by the Court in *Ms. L v. U.S. Immigration and Customs Enforcement*, No. 18-428 (S.D. Cal. June 26, 2018); and (3) have been continuously physically present in the United States since June 26, 2018.

All references to a "class" or "class member" in this document refer to the classes described above, as well as alien parents who are not part of the *Ms. L* class due to criminal history or communicable disease, but who the Court has ordered must be reunified.

Appear (NTAs) will not be removed by DHS prior to issuance of a final removal order in their resulting removal proceedings conducted under Section 240 of the Immigration and Nationality Act (INA). If a *Ms. L* class member or *M.M.M.* agreed class member was released from DHS or ORR custody, is not currently in Section 240 removal proceedings, and is not subject to a final removal order, that individual can affirmatively apply for asylum before U.S. Citizenship and Immigration Services (USCIS), USCIS will adjudicate such an application regardless of whether an unfiled NTA exists, and USCIS will follow its established procedures concerning a parent's involvement in his or her minor child's asylum application process. If an *M.M.M.* agreed class member (whether currently detained or released) received a final removal order in Section 240 removal proceedings prior to reunification, DHS and HHS will work in good faith with *M.M.M.* counsel to identify such children within 15 days of approval of this agreement, and DHS will join in a motion to reopen those proceedings if requested by the *M.M.M.* agreed class member no later than 45 days from approval of this agreement. *M.M.M.* agreed class members who have not been reunified with their parent(s) as of the effective date of this agreement will be afforded existing procedures for unaccompanied alien children pursuant to governing statutes and regulations, including but not limited to Section 240 removal proceedings, unless and until they are reunified with a parent, in which case the procedures described below will apply.

**b.** If a detained, reunited *M.M.M.* agreed class member child has been served with an NTA, but the NTA has not been filed with an immigration court, DHS will exercise its discretion under 8 C.F.R. § 239.2(a) to cancel the NTA within 15 days of the Court's approval of this agreement. For such a child who either had an NTA cancelled in this way, or who has never been served with an NTA, if the child is an arriving alien or was initially encountered by DHS within 14 days of entry and 100 miles of the border, ICE will then initiate expedited removal (ER) proceedings under Section 235 of the INA against the child. Where such a class member child asserts, or has already asserted, an intention to apply for asylum or a fear of persecution or torture, either directly or through counsel, they shall be referred to USCIS for a credible fear determination.

**c.** If a detained, reunited *M.M.M.* agreed class member child has been issued an NTA that has been filed with an immigration court and the child is an arriving alien or was initially encountered by DHS within 14 days of entry and 100 miles of the border, DHS will file a motion to dismiss the pending Section 240 proceeding, seeking to do so jointly with the child's immigration attorney of record, as practicable. Such a motion shall be filed within 30 days of the Court's approval of this agreement and shall request expedited consideration by the immigration court. Upon dismissal of the Section 240 proceeding, ICE will initiate expedited removal proceedings under Section 235 of the INA against the child. Where such a class member child asserts, or has already asserted, an intention to apply for asylum or a fear of persecution or torture, either directly or through counsel, they shall be referred to USCIS for a credible fear determination.

**d.** For *Ms. L* class members who have not been issued an NTA and have final ER orders that have not been cancelled by DHS, USCIS will exercise its discretionary authority to sua sponte conduct in good faith a de novo review of the credible fear finding of the parent to determine if reconsideration of the negative determination is warranted. During that review process for *Ms. L* class members, USCIS will review the parent's case and the information provided and determine whether the individual has a credible fear of persecution or torture.

2

For the limited purpose of this settlement agreement, USCIS will speak with the individual again for additional fact-gathering and the individual may present new or additional information at this time, with the assistance of the individual's counsel in-person unless ICE determines in good faith that in-person participation would adversely impact facility security or operations due to facility staffing, configuration, or access policies, in which case counsel will be permitted to participate telephonically, provided that counsel's attendance is at no expense to the government and does not unreasonably delay the process. In determining whether any factual inconsistencies between the original interview and the subsequent fact-gathering impact the credibility of the parent, due consideration will be given to the psychological state of the parent at the time of the initial interview. If the parent establishes that he or she can meet the credible fear standard, as it is described at Section 235(b)(1)(B)(v) of the INA and 8 C.F.R. § 208.30(e)(2) and (3), then DHS will issue and subsequently file an NTA. The children will be treated as the parent's dependents under 8 C.F.R. § 208.30(b). If the parent's credible fear determination remains negative, USCIS will screen the child individually for credible fear. The parent will be permitted to participate in the child(ren)'s credible fear interview and provide testimony on behalf of the child(ren), in addition to any testimony from the child(ren). Counsel for the child will be permitted to attend the interview in person unless ICE determines in good faith that in-person participation would adversely impact facility security or operations due to facility staffing, configuration, or access policies, in which case counsel will be permitted to participate telephonically, so long as it does not unreasonably delay the process and any attorney assistance is at no expense to the government.

e.  For *Ms. L* class members who are currently detained[2] with their *M.M.M.* agreed class member child(ren) at an ICE FRC and are subject to reinstated orders of removal, ICE will initiate ER proceedings under Section 235 against the minor child(ren), upon a determination that the child was initially encountered within 14 days of entry and 100 miles of the border. During those proceedings, the child(ren) will be referred for a credible fear determination if the child(ren) asserts, or has already asserted, a fear of return, either directly or through counsel. The credible fear claim will then be considered under the standards of 8 C.F.R. § 208.30, as described above. USCIS will conduct the credible fear interview of the child(ren) in coordination with a sua sponte review of the reasonable fear determination for the parents to determine whether reconsideration of the negative reasonable fear determination is warranted.

USCIS will review the parent's case and the information provided and determine whether the individual has a reasonable fear of persecution or torture. For the limited purpose of this settlement agreement, USCIS will speak with the individual again for additional fact-gathering and the individual may present new or additional information at this time, with the assistance of the individual's counsel in-person unless ICE determines in good faith that in-person participation is impracticable or would adversely impact facility security or operations due to facility staffing, configuration, or access policies, in which case counsel will be permitted to participate telephonically, provided that counsel's attendance is at no expense to the government and does not unreasonably delay the process. In determining whether any factual inconsistencies between the original interview and the subsequent fact-

---

[2] This agreement does not impact the ability of *Ms. L* class members with reinstated orders of removal who are not detained to pursue any available appeal of such an order under existing law and subject to statutory time periods.

gathering impact the credibility of the parent, due consideration will be given to the psychological state of the parent at the time of the initial interview. If the parent establishes that he or she can meet the reasonable fear standard, as it is described at 8 C.F.R. § 208.31(c), then DHS will place the parent in withholding-only proceedings. The parent will be permitted to participate in the child(ren)'s credible fear interview and provide testimony on behalf of the child(ren), in addition to any testimony from the child(ren). Counsel for the child will be permitted to attend the interview in person unless ICE determines in good faith that in-person participation is impracticable or would adversely impact facility security or operations due to facility staffing, configuration, or access, in which case counsel will be permitted to participate telephonically, so long as it does not unreasonably delay the process and any attorney assistance is at no expense to the government.

f. If the parent's credible fear or reasonable fear finding remains negative upon review, USCIS will notify the parent in writing that USCIS declines to reconsider the existing negative credible fear or reasonable fear determination. If the child receives a separate negative credible fear determination, the child may seek review by an immigration judge.

g. For purposes of the reviews and interviews of detained parents and/or children described in this proposal, the government shall provide the parent and/or child with the orientation that is normally provided for credible fear interviews, and shall provide at least 5 days' notice of such orientation. Notice of the orientation shall be provided no later than 3 days following the parent and/or child's execution of a document reflecting his or her decision pursuant to paragraph 8 of this agreement, and the notice shall state the purpose of the notice (orientation for an interview or review) and the date, time, and location of the orientation. Such reviews and interviews will be conducted at least 48 hours after the orientation, with due consideration given to any reasonable requests to continue the interview. The notice and time periods described in this paragraph will not apply if a parent affirmatively requests, in writing, that the review or interview take place on an expedited basis.

2. In the case of a parent and child(ren) both in ER proceedings under the process described above, if either the parent or the child establishes a credible fear of persecution or torture, USCIS will issue NTAs to both parent and child and place the family in Section 240 removal proceedings. *See* 8 C.F.R. §§ 208.30(f) (positive credible fear finding made by USCIS), 1208.30(g)(2)(iv)(B) (positive credible fear finding made by immigration judge).

3. In the case of a parent and child(ren) both in ER proceedings under the process described above, if none of the family members establish credible fear of persecution or torture (and in the case of a child who seeks review of the credible fear finding by an immigration judge, such finding is upheld by an immigration judge), the ER orders may immediately be executed.

4. In the case of a parent who is subject to a reinstated order of removal, if the child(ren) establishes credible fear and the parent does not establish a reasonable fear, the child(ren) would be placed in Section 240 removal proceedings and the parent would at that time be subject to continued detention or release, in DHS's discretion, consistent with paragraph 7 below. DHS will not remove a *Ms. L* class member who received a negative reasonable fear finding while his or her *M.M.M.* agreed class member child goes through the credible

fear process and, if applicable, Section 240 removal proceedings. Plaintiffs concede, however, that removal of any *Ms. L* class member with a reinstated removal order under this agreement is significantly likely to occur in the reasonably foreseeable future and that, if a parent initiates legal proceedings challenging their continued detention, DHS may immediately proceed with that *Ms. L* class member's removal, regardless of any injunctive orders issued in *Ms. L* and *M.M.M.*, provided that DHS gives the parent at least 7 days' advance notice to the parent that he or she will be removed.

5. In the case of a parent who is subject to a reinstated order of removal, if the child(ren) establish credible fear and the parent establishes a reasonable fear, the child(ren) would be issued NTAs and placed in Section 240 removal proceedings, and the parent would be referred for withholding-only proceedings pursuant to 8 C.F.R. §§ 1208.2(c)(2) and 1208.31(e).

6. If a *Ms. L.* class member who is currently detained[3] in an ICE FRC with his or her *M.M.M.* agreed class member child is subject to a final removal order issued in proceedings conducted under Section 240 (other than a reinstated order) and the child is an arriving alien or was initially encountered by DHS within 14 days of entry and 100 miles of the border, ICE would initiate ER proceedings under Section 235 against the child within 7 days of the Court's approval of this agreement, and refer the child for a credible fear interview. While the final order parent would not be a party to the child's credible fear adjudication, the parent would be available to consult with and assist the child in the course of that process. The parent would be permitted to participate in the child(ren)'s credible fear interview and provide testimony on behalf of the child(ren), in addition to any testimony from the child(ren). Counsel for the child will be permitted to attend the interview in person, so long as it does not unreasonably delay the process and any attorney assistance is at no expense to the government, and the timing of the interview will be in accordance with Paragraph 1.g. above. If the child establishes a credible fear of persecution or torture, USCIS will place the child in Section 240 removal proceedings, and ICE will move for reopening of the parent's prior removal proceedings and consolidation of the parent's case with the child's before the immigration court. If the child does not establish credible fear of persecution or torture, the removal orders may immediately be executed.

7. Detention and custody decisions for aliens covered by this plan will be made consistent with DHS's authorities under Sections 235, 236, and 241, and the Order Granting Joint Motion Regarding Scope Of The Court's Preliminary Injunction in *Ms. L. v. ICE*, No. 18-428 (S.D. Cal.) (Aug. 16, 2018) (ECF 192) (recognizing that class members may be required to choose whether to waive their own right not to be separated from their minor child(ren) or to waive their child(ren)'s right under the Flores Settlement Agreement to be released, including the rights with regard to placement in the least restrictive setting appropriate to the minor's age and special needs, and the right to release or placement in a "licensed program.").

8. *Ms. L* counsel, *M.M.M.* counsel, or *Dora* counsel may identify class members who wish to waive the procedures described herein and be promptly removed to their country of origin.

---

[3] This agreement does not impact the ability of *Ms. L* class members with final removal orders issued in Section 240 removal proceedings, other than a reinstated order of removal, and who are not detained, to pursue individual appeals of such orders under existing law and subject to statutory time periods for challenging any such order.

*Ms. L* counsel, *M.M.M.* counsel, and *Dora* counsel will promptly develop a process for obtaining and documenting such a choice through a knowing and voluntary waiver. Defendants will not engage with class members on such matters, but will seek to effectuate such waiver decisions when communicated and documented by *Ms. L* counsel, *M.M.M.* counsel, or *Dora* counsel. Class members may either pursue the relief described in this agreement or elect prompt removal, but may not pursue any other immigration- or asylum-related injunctive, declaratory, or equitable relief based on the allegations or claims made in any of the *Ms. L*, *M.M.M.*, or *Dora* complaints filed in any court accruing as of the date this plan is approved by the Court, including statutory claims. This agreement does not affect the right of *Ms. L* class members to seek reunification under the June 26, 2018 preliminary injunction in *Ms. L.*

### The return of removed parents to the United States[4]

The government does not intend to, nor does it agree to, return any removed parent to the United States or to facilitate any return of such removed parents. The classes agree not to pursue any right or claim of removed parents to return to the United States other than as specifically set forth in this paragraph. Plaintiffs' counsel may raise with the government individual cases in which plaintiffs' counsel believes the return of a particular removed *Ms. L* class member may be warranted. Plaintiffs' counsel represent that they believe that such individual cases will be rare and unusual and that they have no basis for believing that such individual cases will be other than rare and unusual. Plaintiffs' counsel agree to present any such cases, including all evidence they would like considered by the government within 30 days of the approval of this agreement. In light of plaintiffs' counsel's representation that such cases will be rare and unusual, Defendants agree to provide a reply to any case presented by Plaintiffs within 30 days of receiving Plaintiffs' request to consider the case. Except as specifically set forth herein, the classes agree that existing law, existing procedures, and the Court-approved reunification plan address all interests that such parents or their children may have.

With respect to *M.M.M.* agreed class members who seek asylum and who have removed parents, the government agrees not to oppose requests that the removed parent provide testimony or evidence telephonically or in writing in the child's asylum or removal proceedings and that ICE attorneys appearing in immigration court (1) will not object to the admission of documentary evidence (such as photocopied, scanned, or faxed documents) provided by the removed parent on the grounds that such documentary evidence does not bear an original signature or is not an original copy (ICE reserves the right to object based on other grounds), and (2) will not object to telephonic participation by the parent in the *M.M.M.* agreed class member's Section 240 removal proceedings provided that the alien (and his or her legal representative, if applicable) make appropriate motions to the immigration judge to permit telephonic testimony in advance of any merits hearing, that the alien is responsible for providing accurate contact information to permit the immigration judge to make contact with the parent, and that the parent's unavailability and faulty connections or other technological impediments may not serve as the basis for delaying scheduled hearings. Class

---

[4] For this section of this agreement, the classes are the same as in footnote 1 above except that the requirements of continuous physical presence in the United States do not apply to this section of the agreement, since this section addresses removed parents.

6

members, however, recognize that ICE has no control over the technology or logistics of the Executive Office for Immigration Review.

Jo Ann McLane                                              **DETAINED**
Chief Counsel
Susan Aikman
Deputy Chief Counsel
Veronica M. Segovia
Assistant Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
300 El Rancho Way
Dilley, Texas 78017

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**PEARSALL, TEXAS**

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| M█████-B█████, P███ ) | A Number: █████ |
| ) | |
| In removal proceedings ) | |
| ) | |
| ) | |
| ) | |

Parent's Immigration Judge:  Hon. Yvonne Gonzalez      Next Hearing: TBD

**DEPARTMENT OF HOMELAND SECURITY'S**
**OPPOSITION TO RESPONDENT'S MOTION**
**TO REOPEN SUA SPONTE**

## DEPARTMENT OF HOMELAND SECURITY
## OPPOSITION TO RESPONDENT'S MOTION
## TO REOPEN SUA SPONTE

The Department of Homeland Security (DHS), by and through the undersigned representative, Opposes Respondent's Motion to Reopen sua sponte. In support of our position, the DHS states the following:

1. The respondent is a native and citizen of Honduras who entered the United States without inspection on April 14, 2016, near Hidalgo, Texas. She was accompanied by her child, C███ C███ M████. They were both apprehended by the U.S. Border Patrol. On April 27, 2016, an asylum officer interviewed the respondent and did not find that the respondent expressed a credible fear of returning to Honduras. However, her child was found to have a credible fear of returning to Honduras. Subsequently, NTA's were issued and the Respondent was released with her child on her own recognizance on April 28, 2018.

2. Generally, "[a]n Immigration Judge may upon his or her motion at any time, or upon the motion of the Service or the alien, reopen or reconsider any case in which he or she has made a decision, unless jurisdiction is vested with the Board of Immigration Appeals. Furthermore, a party may file only one motion to reconsider and one motion to reopen proceedings. A motion to reopen must be filed within 90 days of the date of entry of a final administrative order of removal...subject to the exception in this paragraph and paragraph (b)(4). The regulations provide for three exceptions to the rule: (1) the motion to reopen alleges lack of notice and the order of removal was entered in absentia; (2) the respondent is applying for asylum, withholding or withholding of removal under the Convention Against Torture and is based on change country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence was material and was not available and could not have been discovered or presented at the previous proceeding; (3) the motion to reopen is filed jointly.

See 8 C.F.R. §1003.2(b)(4). In this case, Respondent's motion to reopen was filed more than ninety-days after she was ordered removed on June 5, 2018. Moreover, Respondent's motion does not meet any of the above-noted exceptions to the ninety-day rule.

Sua sponte reopening of this case would permit the respondent to circumvent the regulations by eliminating the regulatory time on motions to reopen. The regulations clearly provide that a respondent may file one motion to reopen "no later than 90 days after the date on which the final administrative decision was rendered. 8 C.F.R. §103.2(c)(2). Respondent already filed one Motion to Reopen and Reconsideration on July 20, 2018. The immigration judge denied that Motion to Reopen on September 10, 2018. The regulation prevents her from filing a second Motion to Reopen. There is no evidence that the country conditions have changed to Respondent's detriment. On the contrary, there have been moves by the Honduran government to alleviate the violence perpetuated by the gangs, which would make it safer for Respondent to return. This evidence was available at the time that Respondent chose to give up her I-589 claims for relief to pursue Voluntary Departure. As such, Respondent is not entitled to have her case reopened under the regulation. DHS did not jointly file the request for a Motion to Reopen. Respondent's request should be denied.

Respondent has utilized the full extent of legal remedies available to her. She has gone through every process from the credible fear interview to the Motion to Reopen. She has been denied at every step throughout this procedure.

3. To the extent that the Respondent requests the Court to exercise its sua sponte authority to reopen this matter, the Respondent has not provided sufficient evidence of an exceptional situation meriting relief. *See Matter of J-J-*, 21 I&N Dec. 976 (BIA1997). Aliens seeking reopening bear a "heavy burden" and must establish prima facie eligibility for relief sought. INS v. Abudu, 485 U.S. 94 (1988). Motions to reopen are disfavored, especially as "every delay works to the advantage of the deportable alien who

3

wishes to remain in the United States." *INS v. Douherty*, 502 U.S. 314, 323 (1992). The Respondent should be denied, as her case does not present exceptional circumstances.

4. In the motion provided by Respondent's Counsel, in support of Respondent's Motion to Reopen, there are statements made by Respondent's Counsel based on her personal experience. DHS objects and asks the brief be stricken. Respondent' counsel's statement are personal observations and should only be permitted as testimony. This is an inherent conflict between the role of a legal advocate and of a witness. Respondent's Counsel has placed herself in the role of being a witness and providing evidence/testimony through her written statements in the brief. As such, DHS objects to any statements made by Respondent's counsel and ask that they not be taken into consideration in determining the outcome of Respondent's requested relief. If counsel wishes to testify, she should recuse herself and have subsequent counsel submit a witness list with her listed as a witness.

5. Respondent is not a member of the Ms. L or MMM class.

> Class members are defined as: "All adult alien parents who entered the United States at or between designated ports of entry with their child(ren), and who, on or before the effective date of this agreement: (1) were detained in immigration custody by the DHS; (2) have a child who was or is separated from them by DHS and, on or after June26, 2018, was housed in ORR custody, ORR foster care, or DHS custody absent a determination that the parent is unfit or presents a danger to the child; and (3)have been continuously physically present within the United States since June 26, 2018, whether in detention or released."

Respondent does not meet the criteria to be a class member as she was not ever separated from her child. Both Respondents entered the U.S. illegally on April 4, 2016. Both were placed at Karnes County Residential Center on April 17, 2018 and released together on April 28, 2018. They were again detained together on June 29, 2018 and placed at South Texas Family Residential Center on the same date together. Hence, Respondents are not a Ms.L or MMM class member. All submissions made by Respondent under Tabs A, B and C are irrelevant to this case and are not dispositive of any relevant facts. DHS objects to this presented documentation and ask that it be stricken and not be taken into consideration in determining the outcome of Respondent's requested relief. Merely wishing respondent is part of a class action does not make it so.

6.  INA§235(b)(1)(B)(iii)(III) it states, "The Attorney General shall provide…upon the alien's request for prompt review by an immigration judge of a determination…that the alien does not have a credible fear of persecution" According to 8 C.F.R.§1208.30(g)(2)(iv)(B), "If the immigration judge finds that the alien…possesses a credible fear of persecution or torture, the immigration judge shall vacate the order of the asylum officer…and the service may commence removal proceedings…" The regulations do not, at any point, grant Immigration Judges the authority to vacate negative credible fear findings for humanitarian reasons or to preserve family unity. Bad law should not be perpetuated. Decisions submitted as evidence counsel to show Immigration Judges decisions on credible fear reviews are not precedential and therefore not binding on the courts. There is no need to repeat the unsupported decisions made by Immigration Judges on these cases.

7.  Respondent would have the court believe that the court has discretion to release her so that her child can be released, as well. This is faulty legal reasoning. Respondent has a final order of removal. She was found to be preparing to flee from law enforcement when she was loading her luggage into a pickup truck on June 29, 2018, after failing to turn herself in to ICE. This evidence supports a finding that Respondent is a high flight risk. She has no legal remedies available to her and was already found to be preparing to leave with the child. As such, respondent falls under mandatory detention and cannot be released until she is removed from the U.S.

Furthermore, the Court was willing to release Respondent child to any other family members or friends at the court hearing on November 29, 2018. No one was willing to take the child. DHS was willing to have the child released from detention into ORR custody but Respondent refused to allow the child to be released. On two separate occasions, ICE attempted to execute the final order of removal, which would have taken the child out of detention. Both times Respondent refused to board the plane and placed herself and her child back in detention. Denying Respondent's Motion to Reopen does not deny the Respondent Child to move forward with her case. DHS is concerned respondent and respondent's counsel are placing their agenda before the best interest of the child.

8.  Respondent asks that equitable tolling be invoked so that her Motion to Reopen be granted. DHS does not believe that equitable tolling applies in this case. For equitable tolling apply, Respondent would have to demonstrate that the applicant exercised due diligence in determining the attorney's misconduct and there was prompt filing of the motion to reopen. Respondent would have to meet a two-part test for equitable tolling to apply: 1) Respondent must show that her counsel performance was so ineffective...that it impinged upon the fundamental fairness of the hearing in violation of the fifth amendment due process clause and 2) Respondent must demonstrate that she has exercised due diligence in pursuing the claim. *Rashid v. Mukasey*, 533 F.3d 127 (2nd Cir.2008). In the instant case, DHS argues that Respondent's previous counsel's actions were not ineffective and did not impinge on the fundamental fairness of the hearing. In the merits hearing on February 5, 2018, Respondent's counsel informed the immigration judge that after talking with Respondent and her daughter, that they wanted to waive all claims of relief to pursue Voluntary Departure. Respondent acknowledged that this was what she wanted to do for herself and her child. All of this was made evident can be referenced in the Digital Audio Recording (DAR) of the that day's hearing. In pursuing Voluntary Departure, Respondent's previous counsel created the possibility for more avenues for Respondent to pursue legal status in the U.S. If Voluntary Departure did not afford respondent and her child to obtain the U-Visa, they could have always attempted to seek asylum or other relief at another time. Former respondent's counsel did not impinge on the fundamental fairness of the hearing but instead, afforded Respondent and her child to have "multiple bites at the apple". Respondent created the current situation for her failure to comply with her agreement to Voluntarily Depart the U.S.

Respondent did not exercise due diligence in pursuing her claim of ineffective assistance of counsel. The final order in this case was signed on February 5, 2018. Respondent waited seven and a half months before pursuing the ineffective assistance of counsel claim.

Respondent did not pursue it after the order was signed nor during the time the immigration judge gave her to get her affairs in order.  She did not even pursue it in June 2018, when she was picked up by ICE for failing to comply with her voluntary departure order.  It was not until last September 2018, that she decided to make the claim of ineffective assistance of counsel.  This is not due diligence in pursuing the claim on respondent's part.  Respondent did not meet the two-prong requirement for equitable tolling and should not be granted her motion to reopen.

9. Respondent's motion was to be accompanied by a brief explaining why the Immigration Judge had jurisdiction over this Respondent.  DHS has not received any such brief.

For the above reason, DHS requests that Respondent's Motion to Reopen Sua Sponte be DENIED.

Respectfully submitted,

Veronica M. Segovia
Assistant Chief Counsel
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# Table of Exhibits

| Tab | | Pages |
|---|---|---|
| A | Articles from the Honduran Government website | 1 – 104 |
| B | Translation of Articles from the Honduran website | 105-163 |
| C | Article: *Honduras will improve citizen security with USD 60 mln loan from IDB*, April 28, 2018, available at http://www.devdiscourse.com?Article/5429-honduras-will-improve-Citizen-security-with-USD-60-mln-loan-from-IDB | 164-170 |
| D | Hernandez Beltran, Ruth, *Honduran president seeks to create jobs to deal with gangs,* AGENIA EFE, SPANISH INTERNATIONAL NEWS AGENCY, Sep. 21, 2016, available at https://www.efe.com/efe/english/world/honduran-president-seeks-to-create-jobs-deal-with-gangs/50000262-3046759 | 171 |
| E | PR Newswire, *Honduran Government Receives Praise from U.S. State department for Reducing Crime and Corruption Rates*, May 2, 2017, available at http://www.prnewswire.com/news-release/honduran-government-receives-praise-from -us-state-department-for-reducing-crime-and-corruption-rates-300432113.html?src=ilaw# | 172-173 |
| F | PR Newswire, *Honduran Government announces 30 Perscent Decline in Homicides*, Mar. 30, 2017, available at http://www.prnewswire.com/news-releases/Honduran-government-announces-30-percent-decline-in-homicides-300449349.html#. | 174-175 |
| G | Renteria, Nelson, *El Salvador, Honduras and Guatemala launch force to Confront gangs*, REUTERS, Aug 24, 2016, available at http://in.reuters.com/ article/centralamerica-violence-idINKCN10Z02V. | 176 |
| H | U.S. Dep't of State, 2017 International Narcotics Control Strategy Report (INCSR) (Mar 2, 2016) available at https://www.state.gov/documents/ organization/268025.pdf | 177-192 |
| I | Alonso, Luis Fernando, *400 Arrests this Year as Honduras Cracks Down on Extortion*, INSIGHT CRIME, Aug 18, 2016, available at https://www. insightcrime.org/news-briefs/400-arrests-this-year-honduras-cracks-down-on extortion. | 193 |
| J | Nozario, Sonia, *How the Most Dangerous Place on Earth Got Safer*, N.Y. Times, Aug 11, 2016. | 194-197 |
| K | *Honduras police arrest US woman accused of being gang leader*, THE GUARDIAN, Mar. 23, 2016, available at https://www.theguardian.com/ world/2016/mar/23/Honduras-police-arrest-american-woman-accused-gang-leader. | 198 |

L    Lasusa, Mike, *Military Police Occupy Honduras Neighborhood After Gang Threat,* INSIGHT CRIME, Mar 23, 2016, available at http://www.insightcrime. org/news/briefs/military-police-occupy-honduras-neighborhood-after-gang-threat .        199-204

M    Reuters, *Honduras murder rate fell by more than 25 percent in 2017,* REUTERS, Jan. 2, 2018.        205-206

N    Log of Contacts between ERO and Respondent        207-225

O    Certificate of Service

## CERTIFICATE OF SERVICE

I certify that I caused a true and correct copy of the document(s) listed below which relate(s) to the following case:

Respondent/Alien Name:   M/
Alien Number:   A2(
Document(s):   **DHS OPPOSITION TO MOTION TO REOPEN SUA SPONTE**
with Attachments – Tabs A-O

to be served on Respondent by the following means:

☒ Personally served on Respondent

☒ Personally served on Respondent's Attorney

☐ Mailed via 1st Class Mail to Respondent at the following address:

☐ Mailed via 1st Class Mail to Respondent's attorney at the following address:

On the following date:  December 6, 2018.

Veronica M. Segovia
Assistant Chief Counsel

10

## DECLARATION OF JENNIFER NAGDA, YOUNG CENTER FOR IMMIGRANT CHILDREN'S RIGHTS AT THE UNIVERSITY OF CHICAGO

I, Jennifer Nagda, pursuant to 28 U.S.C. § 1746, swear under penalty of perjury that the following statement is true and correct to the best of my knowledge.

1.  My name is Jennifer Nagda and I am the Policy Director at the Young Center for Immigrant Children's Rights (hereinafter "Young Center"). I have been employed by the Young Center since November 2008.

2.  The Young Center is a registered 501(c)(3) organization headquartered at the University of Chicago Law School with programs in seven additional locations including: Harlingen, Texas; Houston, Texas; San Antonio, Texas; Phoenix, Arizona; Los Angeles, California; Washington, D.C.; and New York, New York.

3.  The Young Center was created in 2004 as a pilot project of the federal Department of Health and Human Services' Office of Refugee Resettlement (hereinafter "ORR") to create a program to provide guardians *ad litem* (Child Advocates) for trafficking victims and other vulnerable unaccompanied children. The role of the Child Advocate is to advocate for the best interests of the child.

4.  Beginning in 2004, ORR appointed Young Center staff and volunteers as Child Advocates for unaccompanied children in ORR custody.

5.  In 2008, Congress passed and President George W. Bush signed into law the Trafficking Victims Protection Reauthorization Act ("TVPRA") which authorizes the Secretary of Health and Human Services to appoint "independent child advocates" to identify and advocate for the best interests of vulnerable unaccompanied children.[1] In 2013, Congress expanded the Child Advocate program from the original two programs in Chicago and Harlingen to a total of eight locations.

6.  Since its founding, the Young Center has served as independent Child Advocate for more than 2,500 children in government custody. We are the only organization authorized by ORR to serve in that capacity.

7.  The Young Center is appointed as Child Advocate for only certain children in ORR custody—specifically, those determined to be "vulnerable" as specified in the 2008 TVPRA.[2] Among the categories of children that ORR has designated as particularly vulnerable that are relevant to the case at hand are children who are in government custody for more than 120 days and children who have been a victim of a crime.[3] Children facing more than 120 days in ORR custody are more likely to experience the negative physical and mental health effects of prolonged detention both because of the

---

[1] 8 U.S.C. § 1232(c)(6) (2013).

[2] *Id.*

[3] OFFICE OF REFUGEE RESETTLEMENT, U.S. DEP'T OF HEALTH & HUMAN SERV., ORR UAC/C-2, CHILD ADVOCATE RECOMMENDATION & APPOINTMENT FORM (2011).

conditions of detention but also because of their separation from family, home, and community. Similarly, child crime victims have already experienced a trauma before arriving in government custody and may be less likely to receive the mental health services they need or may have more difficulty accessing benefits available to them as crime victims.

8.  As Child Advocate, we submit best interests recommendations on behalf of unaccompanied children in government custody—including those facing prolonged detention, separation from family, and those who are crime victims—to federal agencies including the Executive Office for Immigration Review of the Department of Justice, Immigration and Customs Enforcement of the Department of Homeland Security, and ORR.

9.  Young Center best interests recommendations address issues including but not limited to: the child's placement while in government custody; the child's release from government custody; the child's claims for relief from removal; and the ability of the child to be repatriated safely.

10. Each best interests recommendation is reached by applying relevant best interests law and best interests principles to the specific facts of each child's case. Sources of best interests law include the 2008 TVPRA, federal and state child welfare laws governing the separation of children from their families, and international law and standards.

11. In 2016, the Young Center Child Advocate program was evaluated by the non-partisan General Accounting Office ("GAO").[4] The GAO found that government agencies including DHS, DOJ, and ORR consider the Child Advocate best interests recommendations and follow more than 70% of those recommendations.[5]

12. Between 2012 and 2015, the Young Center facilitated the work of the Interagency Working Group on Unaccompanied and Separated Children's Subcommittee on Best Interests in creating the *Framework for Considering the Best Interests of Unaccompanied Children* (hereinafter "Framework").[6] The Framework was a collaborative effort by EOIR, DHS, and ORR along with non-governmental organizations, immigration practitioners and scholars, to articulate how federal agencies including DOJ-EOIR and DHS-ICE can consider the best interests of children in all decisions about the care, custody, release, adjudication of relief and repatriation of children, consistent with existing immigration law as set forth in the Immigration & Nationality Act.

13. In November 2015, I was appointed by then DHS Secretary Jeh Johnson to serve on the Federal Advisory Committee for Family Residential Centers. In October 2016, our

---

[4] U.S. GOV'T ACCOUNTABILITY OFF., GAO-16-367, UNACCOMPANIED CHILDREN: HHS SHOULD IMPROVE MONITORING AND INFORMATION SHARING POLICIES TO ENHANCE CHILD ADVOCATE PROGRAM EFFECTIVENESS (2016).

[5] *Id.* at 29.

[6] *Framework for Considering the Best Interests of Unaccompanied Children*, GEORGETOWN LAW HUM. RTS. INST., Jan. 2017, at 1 [hereinafter *Framework*].

Committee released a report recommending significant and immediate changes to services provided to families detained at facilities including the South Texas Family Residential Center ("Dilley"), where the family at issue is currently detained. In addition to the specific recommendations regarding legal, medical, educational, languages and other services, our Committee found that family detention should be discontinued, "reserving it for rare cases when necessary following an individualized assessment of the need to detain because of the danger or flight risk that cannot be mitigated by conditions of release."[7]

14. Since 2017, the Young Center has been appointed by HHS to advocate on behalf of children forcibly separated from parents by the Department of Homeland Security ("DHS") at each of our eight program sites. We have seen firsthand the negative changes in children's physical and mental health upon separation from their parents, from children who experienced developmental regression (loss of speech, bed-wetting) to children whose relationships with their parents were permanently scarred in cases where children were falsely led to believe that their parents permitted the separation.

**Established Legal Presumption: It is in a Child's Best Interests to be in the Care, Custody and Protection of her Parent**

15. A child's right to be raised and nurtured by her parent flows naturally from the parent's constitutional right to the care and custody of her child.[8]

16. The Due Process clause demands "clear and convincing evidence" before a parent's rights can be terminated.[9]

17. For more than three decades, the Supreme Court has recognized that the rights under the due process clause extend to all "persons," which includes all immigrants and those who lack lawful status.[10]

18. State laws provide both substantive and procedural protection of the rights of parents to care for their children, and of children to be with their parents, such that children may only be separated from their parents as a matter of last resort.

---

[7] Dep't of Homeland Sec., Report of the DHS Advisory Committee on Family Residential Centers 2 (2016).

[8] *See Santosky v. Kramer*, 455 U.S. 745, 753-54 & n.7 (1982) (recognizing not just the "fundamental liberty interest of natural parents in the care, custody and management of their child" but also "the important liberty interests of the child"); *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected.") (citations omitted). *See also Troxel v. Granville*, 530 U.S. 57, 65 (2000) (quoting U.S. Const. amend. XIV) (the right to parent one's child is "perhaps the oldest of the fundamental liberty interests.").

[9] *Santosky*, 455 U.S. at 748, 768-70.

[10] *Plyler v. Doe*, 457 U.S. 202, 210-215 (1982).

19. The public policy of the Texas Family Code is "to assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child," as such contact would "optimize the development of a close and continuing relationship between . . . parent and child."[11]

20. Texas limits the situations in which the government may terminate the parent-child relationship. For example, the state must establish, by clear and convincing evidence, the parent's inability to provide proper care and control, defined as allowing the child to remain in conditions or surroundings that endanger their physical or emotional well-being; or that the parent has abandoned the child.[12]

21. Even when the government steps into the relationship between a parent and child, the child's continued placement with, or reunification with, the parent must be the first goal. Once a family has contact with the child welfare system, every one of the 50 states (as well as the District of Columbia, Puerto Rico and other U.S. territories) is required to make reasonable efforts to reunify the parent and child.[13] These reasonable efforts "consist of accessible, available, and culturally appropriate services that are designed to improve the capacity of families to provide safe and stable homes for their children."[14]

22. Whether any other placement is in a child's best interests is considered only <u>after</u> a determination that the parent is unfit to care for the child.

23. Consistent with this state law focus on maintaining a parent's custody of her child, federal law makes federal funding for state child welfare agencies contingent upon reasonable efforts to <u>prevent</u> the separation of parents and children or to reunify children with parents as soon as possible in cases where they have been separated.[15]

24. State law also gives weight to the child's stated desires when making placement decisions. In Texas, the law states that the court "shall" interview a child that is 12 years of age or older to determine her wishes about placement.[16] Similarly, in a hearing regarding termination of parental rights, the court may consider some factors when determining the best interests of the child, the first of which is the desires of the child.[17]

---

[11] TEX. FAM. CODE ANN. §153.001, 153.251(b) (2005).

[12] TEX. FAM. CODE ANN. § 161.001(a) (2005) (remaining criteria include parents who: fail to enroll the child in school, have been convicted or placed on community supervision, has failed to comply with a court order regarding maintenance of child custody, used a controlled substance, knowingly engaged in criminal conduct resulting in inability to take care of the child, or having been placed on community supervision for sexual assault).

[13] CHILDREN'S BUREAU, ADMIN. ON CHILDREN, YOUTH & FAMILIES, ADMIN. FOR CHILDREN & FAMILIES, U.S. DEP'T OF HEALTH AND HUM. SERV., REASONABLE EFFORTS TO PRESERVE OR REUNIFY FAMILIES AND ACHIEVE PERMANENCY FOR CHILDREN 1 (2016).

[14] *Id.*

[15] *Id.* at 2 (citing the Adoption Assistance and Child Welfare Act of 1980, Pub. L. No. 96-272, 42 U.S.C. § 671 (a)(15)).

[16] TEX. FAM. CODE ANN. § 153.009 (2005).

[17] *Holly v. Adams*, 544 S.W. 2d 367, 371-72 (Tex. 1976).

25. Setting aside recent changes in federal immigration enforcement policies, U.S. immigration policy has historically valued family unity and supported the parent-child relationship.

26. The *Flores* settlement agreement requires the federal government to place children in custody in the least restrictive setting that that will be appropriate for the child's age and needs and to preference parents—without regard to the parents' immigration status— above all other options for release.[18]

27. In an October 2016 report released by the Federal Advisory Committee on the family detention facilities operated by DHS, the very first and over-arching recommendation of the Committee recognized the importance of family unity during immigration enforcement:

> Recommendation 1-1: DHS's immigration enforcement practices should operationalize the presumption that detention is generally neither appropriate nor necessary for families – and that detention or the separation of families for purposes of immigration enforcement or management, or detention is never in the best interests of children. . . . If [] an assessment determines that continued custody is absolutely necessary, families should be detained for the shortest amount of time and in the least restrictive setting possible; all detention facilities should be licensed, non-secure and family-friendly. If necessary to mitigate individualized flight risk or danger, every effort should be made to place families in community-based case-management programs that offer medical, mental health, legal, social, and other services and supports, so that families may live together within a community.[19]

28. Similarly, the *Framework* created by the Interagency Working Group on Unaccompanied and Separated Children identifies "family integrity" as one of several widely-accepted factors in any best interests analysis.[20] The Framework also recognizes a child's right to liberty as a key factor in evaluating the best interests of that child.[21]

29. ORR also prioritizes the release of unaccompanied children to their parents, notwithstanding the parents' immigration status, to maintain the parent-child relationship.

   a. Parents are considered "Category 1" sponsors—the highest of four levels of sponsorship.[22]

---

[18] *Flores v. Reno*, No. CV 85-4544-RJK (Px) (C.D. Cal. Ja. 17, 1997).
[19] DEP'T OF HOMELAND SEC., REPORT OF THE DHS ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS 2 (2016) (emphasis added).
[20] *Framework*, *supra* note 6.
[21] *Id.*
[22] ADMIN. FOR CHILDREN & FAMILIES, U.S. DEP'T OF HEALTH AND HUM. SERV., CHILDREN ENTERING THE UNITED STATES UNACCOMPANIED, § 2.2.1, https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2.

b. ORR "gives preference to a parent or legal guardian when determining release plans" unless there has been a "court ordered termination of parental rights" or "substantial evidence that the child would be at risk of harm if released to the parent."[23]

c. ORR also considers the child's express wishes. If a child does not want to be reunified with his or her parent, ORR takes that into consideration. In some cases, ORR provides counseling to determine whether reunification is appropriate or to facilitate the child's reunification with a parent.

d. In further recognition of the importance of the parent-child bond, particularly for very young children, ORR will release an unaccompanied child, who enters with her own biological child, with the same sponsor because "it is in the best interest of the unaccompanied alien child <u>and</u> her biological child."[24]

**The Law's Emphasis on Maintaining the Parent-Child Relationship Reflects Decades of Scientific Research Demonstrating the Importance of that Relationship to a Child's Health—Particularly for Teens with Histories of Trauma**

30. There is consensus within the medical community of the importance of healthy parent-child attachments.

31. It is the policy of the American Academy of Pediatrics (AAP) that "children in the custody of their parents should never be detained, nor should they be separated from a parent, unless a competent family court makes that determination."[25]

32. The AAP also advises that "Pediatricians work to keep families together in times of strife because we know that in any time of anxiety and stress, children need to be with their parents . . .".[26]

33. Child development research also shows that separating an adolescent child from her parent is harmful to the child's health and well-being.

34. Children separated from their parents due to immigration raids experienced psychological distress and behavioral problems due to the severe disruption caused by the raids.[27] The

---

[23] *Id.*

[24] *Id.* (emphasis added).

[25] JULIE M. LINTON ET AL., AM. ACAD. OF PEDIATRICS, DETENTION OF IMMIGRANT CHILDREN 7 (2017). http://pediatrics.aappublications.org/content/pediatrics/139/5/e20170483.full.pdf.

[26] Statement from the Am. Acad. of Pediatrics Opposing Separation of Mothers and Children at the Border (Mar. 4, 2017), https://www.aap.org/en-us/about-the-aap/aap-press-room/pages/immigrantmotherschildrenseparation.aspx.

[27] RANDY CAPPS, ET AL., THE URBAN INSTITUTE, PAYING THE PRICE: THE IMPACT OF IMMIGRATION RAIDS ON AMERICA'S CHILDREN 50 (2007), https://www.urban.org/sites/default/files/publication/46811/411566-Paying-the-Price-The-Impact-of-Immigration-Raids-on-America-s-Children.PDF.

longer children are separated from parents, the greater the trauma they suffer.[28] Negative impacts to children's mental health include separation anxiety, attachment disorder, and post-traumatic stress disorder.[29] The trauma of separation also manifests in physical symptoms: children suffer from loss of appetite, weight loss, and difficulty sleeping.[30]

35. Children between the ages of 12 to 17 exhibit distinct, negative behavioral changes in response to separation from a parent—particularly, withdrawal.[31] When the stress an adolescent child faces becomes prolonged, the adolescent's exposure to chronic stress has various negative effects on neurobehavioral outcomes, particularly in regard to emotional expression.[32]

36. Moreover, when a child faces cumulative adversity, including intrafamilial adversity such as domestic violence and separation from a parent, the effects can be lifelong.[33] These effects manifest as both psychological and physical health problems, such as difficulty managing emotions, dissociation, risky behaviors, and chronic physical conditions.[34]

37. Fostering the parent-child relationship can help a child overcome the impact of trauma. A child's strong relationship with her parent can promote her, protect her from developing the adverse effects of trauma, and teach her how to regulate her emotions and interact with the world.[35] As the Harvard University Center on the Developing Child points out, "the single most common factor for children and teens who develop the capacity to overcome serious hardship is having at least one stable and committed relationship with a

---

[28] *Id.*

[29] *Id.* at 51.

[30] *Id.*

[31] AJAY CHAUDRY ET AL, THE URBAN INSTITUTE, FACING OUR FUTURE: CHILDREN IN THE AFTERMATH OF IMMIGRATION ENFORCEMENT 42 (2010), https://www.urban.org/sites/default/files/publication/28331/412020-Facing-Our-Future.PDF.

[32] RUSSELL D. ROMEO, BRAIN RESEARCH, THE IMPACT OF STRESS ON THE STRUCTURE OF THE ADOLESCENT BRAIN: IMPLICATIONS FOR ADOLESCENT MENTAL HEALTH 186 (2017), https://reader.elsevier.com/reader/sd/pii/S0006899316301482?token=D5492A5BA7D8E621E85A36E801A485CEDD13DEF8ABDFD082B6E7F99528277285B354981B22F0C91796702F6C8FA6E904.

[33] MOIRA SZILAGYI & NEAL HALFON, ACADEMIC PEDIATRICS, PEDIATRIC ADVERSE CHILDHOOD EXPERIENCES: IMPLICATIONS FOR LIFE COURT HEALTH TRAJECTORIES 467 (2015), https://ac.els-cdn.com/S1876285915002259/1-s2.0-S1876285915002259-main.pdf?_tid=1687d7d3-35a4-4bdd-845a-70070ceada19&acdnat=1545161260_0b4d2778920a20a357dab692789718c5. FERNANDO S. MENDOZA ET AL., ACADEMIC PEDIATRICS, IMMIGRATION POLICY: VALUING CHILDREN 723 (2018), https://www.academicpedsjnl.net/article/S1876-2859(18)30415-7/pdf.

[34] *Effects: Complex Trauma*, THE NAT'L CHILD TRAUMA STRESS NETWORK, https://www.nctsn.org/what-is-child-trauma/trauma-types/complex-trauma/effects (last accessed December 18, 2018).

[35] STEVEN D. COHEN ET AL., HARVARD UNIV. CTR. ON THE DEVELOPING CHILD, 3 PRINCIPLES TO IMPROVE OUTCOMES FOR CHILDREN AND FAMILIES 3 (2017), https://46y5eh11fhgw3ve3ytpwxt9r-wpengine.netdna-ssl.com/wp-content/uploads/2017/10/HCDC_3PrinciplesPolicyPractice.pdf. *Effects: Complex Trauma*, THE NAT'L CHILD TRAUMA STRESS NETWORK, https://www.nctsn.org/what-is-child-trauma/trauma-types/complex-trauma/effects (last accessed December 18, 2018).

supportive parent . . .".[36] In sum, in the face of severe and chronic trauma, close family relationships are essential to improving a child's health and development.

**Prolonged Detention is Detrimental to the Health and Well-being of Children—Including Teenagers with Histories of Trauma**

38.  Detention can "have a serious, long-lasting impact on children's psychological well-being. The persistent stress, despair, and uncertainty of detention—even when it's just for a few weeks—compromises young children's intellectual, cognitive, emotional, and social development" and "raises the risk of recurrent and distressing memories, nightmares, dissociative reactions, prolonged psychological distress, and negative alterations in cognition."[37]

39. When older children are detained, they "may experience a sense of hopelessness and futility and can have trouble sleeping or concentrating. As a response to their hopelessness and anger, some young people harm themselves."[38]

40. For young people who have fled their countries due to threats and violence, "detention may service to continue their experience of being treated unfairly or unjustly, as well as their perception that life is unsafe, uncertain, unstable, and unpredictable."[39] Detention essentially returns an asylum-seeking child "to the state of existential panic that [she] experienced when subjected to the human rights violations or persecution which led [her] to flee [her] country of origin."[40]

**In this Case, Separating ▮▮▮▮▮▮ from Her Mother or Subjecting them to Continued Detention would be Severely Detrimental to ▮▮▮▮▮▮'s Physical and Mental Health**

41. Based on the record the Young Center has examined, ▮▮▮▮▮▮ has suffered a history of repeated trauma.

42. While in Honduras, ▮▮▮▮▮▮ witnessed her mother being extorted by the Barrio 18 gang and was herself threatened and assaulted by the gang. Specifically, ▮▮▮▮▮▮ was followed by the gang when she went to school and was approached by gang members, warning her that her mother must pay the Barrio 18. When ▮▮▮▮▮▮'s mother was later unable to pay the gang, members forced their way into her mother's home, pointed a guy to ▮▮▮▮▮▮'s head, and sexually assaulted her.

43. After this experience, ▮▮▮▮▮▮ and her mother fled to the United States.

---

[36] *Id.*

[37] LUIS H. ZAYAS, IMMIGRATION ENFORCEMENT PRACTICES HARM CHILDREN AND CITIZEN CHILDREN, 38 Zero to Three, 22 (2018).

[38] *Captured Childhood*, INT'L DETENTION COALITION 53 (2012), https://idcoalition.org/wp-content/uploads/2016/01/Captured-Childhood.pdf.

[39] *Id.* at 50.

[40] *Id.* at 54.

44. ████████ faced further trauma here in the United States. ████████ and her mother moved to Alabama, where her mother began a relationship with Mr. ████████. ████████ witnessed Mr. ███ physically, psychologically, and sexually abuse her mother. Mr. ███ also abused ████████. He beat her and repeatedly attempted to walk in on her naked. After Mr. ████ assaulted ████████'s mother so severely that she was hospitalized, she ended the relationship. When Mr. ████ refused to leave them alone and threatened to harm them if they called the police, ████████ and her mother fled to San Antonio, Texas.

45. After ████████ and her mother escaped Mr. ████'s abuse, ████████ began to stabilize and move closer to a normal childhood. She developed ties in her new community through her school, where she has close friendships and where she established mentorship relationships with some of her teachers. ████████ also developed deep ties with family friends and fellow church members. ████████'s peers, teachers, and church members describe ████████ as a friendly, considerate, and respectful young woman. ████████'s teacher describes her as taking initiative for her own learning.

46. Since her arrest and detention by DHS officials, ████████'s health and well-being have deteriorated markedly.

    a. When faced with the prospect of going back to Honduras, where ████████ was sexually assaulted by the Barrio 18 gang, and where her abuser Mr. ████ now lives, ████████ suffered a panic attack.

    b. A licensed clinical social worker evaluated ████████ and found that she is experiencing helplessness, loss of hope, traumatic recollections, and intrusive thoughts and flashbacks. The social worker also found that ████████ has decreased appetite and sleep disturbance, as well as a history of self-harm and suicidal ideation.

    c. The social worker concluded that ████████'s symptoms are "consistent with a diagnosis of Post-Traumatic Stress Disorder and [that she] requires consistent clinical intervention as well as removal of situational triggers to help her process her experiences, feel safe and improve adaptive functioning."

    d. ████████'s symptoms echo those of children who have suffered chronic trauma, as explained above. These diagnoses could last for ████████'s lifetime without immediate intervention.

**Steps Necessary to Protect ██████'s Best Interests—Her Safety and Well-Being**

47. In light of the trauma ██████ and her mother faced in Honduras and here in the United States, ██████'s deteriorating health, and the importance of healthy family attachments at this critical time, the Young Center believes that it is in ██████'s best interests to be immediately released from detention with her mother.

48. In ██████'s case, separation from her mother would compound trauma upon trauma and threaten her ability to overcome the adverse impacts of her experiences to this point.

49. Moreover, continued detention of both ██████ and her mother is contrary to the specific recommendations of the DHS Secretary's appointed Advisory Committee on Family Residential Centers, which recommends against family detention unless the mother and daughter present a danger or flight risk that cannot be mitigated by the conditions of release. In this case, ██████ and her mother are pursuing legal relief and are represented by counsel. ██████ and her mother are profoundly afraid to return to Honduras, so much so that ██████ suffered a panic attack when brought to the airport awaiting return to Honduras. She and her mother have every reason to continue to participate in their immigration case upon release from Dilley. Continued detention is neither necessary nor appropriate for ██████ and her mother.

50. ██████'s deteriorating condition reflects the symptoms that children her age exhibit when they languish in detention. Because of her condition, ██████ needs the support of a loving home with the parent she trusts, and the stability and services that come with attending school and being part of a community where she has developed close ties.

**Conclusion**

51. This declaration is submitted on behalf of a child who has been detained with her mother for a prolonged time at the South Texas Family Residential Center and who faces the unacceptable risks of continued detention or possible separation from her parent.

52. For all of the reasons identified above, <u>it is our opinion that the only appropriate placement for ██████ is release in the custody of her accompanying parent—her mother</u>.

53. Releasing ██████ and her mother together will maintain the parent-child relationship, foster ██████'s safe and healthy development, and protect her physical and mental health, and is therefore unequivocally in her best interests.

December 23, 2018

I, Shalyn Fluharty, submit the following declaration in support of Plaintiffs' Motion for a Temporary Restraining Order in the above case:

1.      I am an attorney and have been licensed to practice law in the State of California since 2010.  My practice has focused on representing detained immigrant families before the Executive Office of Immigration Review and the Department of Homeland Security. I serve as the Managing Attorney of the Dilley Pro Bono Project, a volunteer-based legal services program that provides free representation to asylum-seeking woman and children who are detained at the South Texas Family Residential Center ("STFRC"). I am above the age of 18 years and not a party to this action.  I make this declaration of my own personal knowledge.  I could and would competently testify to the matters contained herein if called upon to do so.

2.      I am the attorney of record for P.M.B., and her minor child, C.O.M., both of whom are currently detained together at STFRC. I can attest to the procedural posture of this family's immigration case.   An asylum officer found that C.O.M. has a credible fear of persecution and is permitted to seek asylum before an Immigration Judge.  Currently, C.O.M. is awaiting her next master calendar hearing before the Immigration Judge in removal proceedings under Section 240 of the Immigration and Naturalization Act.

3.      C.O.M.'s mother, P.M.B., has a final order of removal. On behalf of P.M.B. I filed a Motion to Reopen her Section 240 removal proceeding and rescind her order of removal with the Immigration Court. The Immigration Judge denied this motion on December 21, 2018, which subjects P.M.B. to an immediate threat of removal from the United States.

4.      I have reason to believe that P.M.B.'s removal, and permanent separation from C.O.M., is imminent.   ICE has repeatedly stated P.M.B. can and will be removed from the United States. I have spoken on numerous occasions with Ms. Susan Aikman, the Pearsall

Deputy Chief Counsel with ICE's Office of Chief Counsel about P.M.B.'s case. Ms. Aikman has informed me in-person, by telephone, and in writing that P.M.B. can be separated from her daughter because she is not a class member under *Ms. L v. ICE*, and should be removed from the United States.

5.      In August, 2017 I represented a family detained at STFRC in a similar procedural posture. In that case I represented a mother who had three children. The mother and two of her children had final orders of removal that were pending appeal before the Board of Immigration Appeals. The mother's third and youngest child, however, was in ongoing Section 240 removal proceedings before the Immigration Court. On August 17, 2017 in the wee hours of the morning ICE unexpectedly took the mother and her daughters from STFRC and removed them from the United States. The mother's youngest child was deemed "unaccompanied" by ICE and subsequently transferred to the care and custody of the Department of Health and Human Services, Office of Refugee Resettlement. The son lost communication with his mother and waited in government custody alone for six months attempting to reunify with his family.

6.      In my prior case, ICE proceeded in removing the family without providing written or oral notice of the time and date of removal to the family or counsel, and without giving the family an opportunity to make plans in advance of their separation. I have been unable to communicate with the mother or her daughters since they were removed from the United States. Unfortunately, even though the Board of Immigration Appeals subsequently reopened the mother and daughters immigration court proceedings and rescinded their orders of removal, I have not spoken with them since their removal and do not know if they are dead or alive.

7.      C.O.M. and P.M.B. have suffered greatly in detention. After C.O.M. began experiencing suicidal ideation due to her prolonged detention and past trauma, and made an

attempt to end her life while detained at STFRC, I filed a motion for custody redetermination on her behalf, asking the Immigration Judge to release C.O.M. from detention pursuant to the *Flores* Settlement Agreement and Section 236 of the INA. Because C.O.M. is a child and she has no appropriate alternate caregiver or guardian other than her mother P.M.B., I asked the court to order C.O.M. released to the care and custody of her mother, as a condition of her release, pursuant to 8 C.F.R. 1236.3. During a brief custody redetermination hearing that occurred on November 28, 2018, the Immigration Judge and ICE Office of Chief Counsel asserted that C.O.M. could not be released to her mother because of her mother's final order of removal. Many members from the community were present at the hearing in support of C.O.M.'s request for release, even though they had no pre-existing relationship with C.O.M. During the hearing the Immigration Judge made the unusual suggestion that I arrange for one of these community members – who are strangers to C.O.M. – to shelter her so that she could be separated from her mother and leave detention. The custody redetermination hearing was continued until December 5, 2018 and then cancelled due to an executive order that shut down the federal government in honor of former President George H.W. Bush. C.O.M.'s custody redetermination hearing has not since been rescheduled.

8.      P.M.B. has been C.O.M.'s only caretaker throughout the entirety of her life. They have never been separated from one another. P.M.B. is needed to help C.O.M. pursue C.O.M.'s pending asylum claim, not only because P.M.B. has the judgment of an adult and C.O.M. does not, but also because the facts of C.O.M.'s asylum claim involve P.M.B., who can give valuable testimony and advice to C.O.M.

9.      Based on the foregoing, I believe that C.O.M. faces immediate separation from her mother, and that P.M.B. faces immediate deportation from the United States.

10.     Unless there is a stay of removal in place, I believe P.M.B. will be deported any day. If this occurs C.O.M. will be forced to remain in government custody alone and to present her claim for asylum without the assistance of her mother.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 23rd day of December, 2018 in San Antonio, Texas.

Shalyn Fluharty
Managing Attorney
Dilley Pro Bono Project
1111 N. Main Ave.
San Antonio, Texas
(956) 982-5570
shay@caraprobono.org

I, P    M    E    , declare and state pursuant to 28 U.S.C. § 1746:

1.      My name is P.M.B. I am the biological mother of C.O.M., who is fifteen-years-old. At the time I signed this paper, I am detained with my daughter C.O.M. at the South Texas Family Residential Center in Dilley, Texas, where we have been since the end of June, 2018.

2.      I entered the United States for the first and only time in April of 2016 with my daughter to seek asylum in the United States. We crossed a river along the Mexican-United States border looking for immigration officers who could help us. We were apprehended by Immigration Officers the same day.

3.      I have been C.O.M's sole caregiver throughout the entirety of her life. We have never been separated.

4.      I have no criminal history and have never been deemed to be an unfit parent.

5.      I fear that I will soon be deported from the United States and separated from my daughter. I was ordered deported after my prior attorney requested voluntary departure on my behalf, and did so without my informed consent. An Immigration Judge found that my consent was informed.  I know I will be killed if I am returned to Honduras. My daughter will be killed too if she returns with me

6.      I have been told by Jessymyn Murphy, a Deportation Officer, that I will soon be taken from STFRC. On Monday December 17, 2018 Officer Murphy informed me that I would receive a decision on my case on December 21, 2018 from the Immigration Court. Officer Murphy stated that after a decision was made in my case, my release from STFRC would occur quickly. There are only two ways out of STFRC: being deported, or being released to the community. I understood Officer Murphy to be saying that if the Immigration Judge reopened

my case, I would quickly be released, and if she denied my request to reopen my case, I would quickly be deported.

7.      I told my lawyer, Shalyn Fluharty, what Officer Murphy told me. She was confused because I was not scheduled for court on December 21, 2018 and she did not know how ICE would know the Judge would issue a decision on December 21, 2018, as a decision had not yet been made in my case and no one from the court had communicated to Ms. Fluharty that a decision would be issued on December 21, 2018.

8.      On Tuesday, December 18, 2018 Officer Murphy came to my room at the jail. He wished my daughter a happy fifteenth birthday and told us both that as soon as a decision was made in our case, we would quickly be released from STFRC.  He knows how much my daughter has suffered during her extended detention at STFRC, because we have told him and he has seen it.

9.      On Thursday, December 20, 2018 Officer Murphy came to my room at the jail and told me that even though a decision would be made by the court on December 21, 2018 I would not need to go to court. He then told me as soon as the Judge made a decision on my case, I would quickly leave STFRC. He stated that there would not be much delay between the decision from the court, and my exit from STFRC.

10.     On December 21, 2018 my lawyer informed me that the Immigration Judge issued a decision denying my motion to reopen. For this reason, based upon everything Officer Murphy has told me, I believe I will be ripped away from my daughter and deported to my death any moment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 23rd day of December, 2018 in Dilley, Texas.

Ms. P.M.B.

## CERTIFICATE OF TRANSLATION

I, Spencer Bloom, am competent to translate from Spanish into English. I read and translated the foregoing declaration to P.M.B. who stated to me that it is true and correct. I also certify that the translation of the Declaration of Ms. P.M.B. is true and accurate to the best of my abilities.

Spencer Bloom
P.O. Box 18070
Dilley, Texas 78017
919-971-8904

Dated: 12/23/2018

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| M.G.U., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | No. 18cv1458-PLF |
| v. | § | |
| | § | Civil Action |
| U.S. DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**[PROPOSED] TEMPORARY RESTRAINING ORDER**

The Court has considered all authorities, evidence, and argument presented by all parties concerning Plaintiffs' application for temporary restraining order, ECF No. 59.  Counsel for Plaintiffs certifies that he notified Defendants' counsel of ECF No. 59 by telephone and email at the time of filing, and two days before, sought agreement to avoid the need for this proceeding.

Plaintiffs include P.M.B. and her minor child, C.O.M.  Defendants include the U.S Department of Homeland Security ("DHS") and its sub-agencies Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP").

The Court concludes that all four elements required for a temporary restraining order weigh in favor of entering immediate relief for Plaintiffs as follows:

(1)  Plaintiffs P.M.B. and C.O.M. are likely to succeed on the merits of their claim that Defendants' current family separation policy impermissibly places a substantial burden on their family integrity and is not narrowly tailored to serve a compelling government interest to the extent that it permits separation of families who arrive in

the United States together seeking asylum, and the child's asylum claim remains pending after the parent becomes subject to a final order of removal.

(2)  Plaintiffs suffer irreparable harm by the threat of separation because it causes them emotional trauma and impedes pursuit of asylum claims.

(3)  The balance of harms strongly favors Plaintiffs.

(4)  The public interest strongly weighs in favor of preserving family integrity absent a narrowly tailored means of accomplishing a compelling government objective.

WHEREFORE, the Court hereby directs Defendants to refrain from taking any action to separate P.M.B. from C.O.M. pending further order of this Court.

Plaintiffs shall post a bond of $ ____ as security pursuant to Rule 65(c).

This ORDER expires exactly 14 days after entry unless extended.  Plaintiffs shall file any application for preliminary injunction by January ____, 2019.  Defendants shall respond within _____ days.  Hearing on any application is set for _____ o'clock on _____, 2018 at courtroom _____ .

SO ORDERED at ____ ___.m. Eastern Standard Time on this _____ day of December, 2018 at Washington, D.C.


_____
Hon. Paul L. Friedman
United States District Judge